IN THE CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT,
IN AND FOR WALTON COUNTY, FLORIDA

STEVE ABBOTT, WILLIAM BELL,
ALEX KISH, and SAMUEL OSBORNE,

Plaintiffs,

vs.

Case No.:    07-CA-000889

OLSON & ASSOCIATES OF NW
FLORIDA, INC., INTRAWEST
SANDESTIN COMPANY, L.L.C.,
NORTHTIP DEVELOPMENT, LLC,
ADAMS HOMES OF NORTHWEST
FLORIDA, INC., DAVID O. CAMPBELL,
P.E., and CAMPBELL ENGINEERING, INC.

Defendants.

_____/

## SECOND AMENDED COMPLAINT

The Plaintiffs, STEVE ABBOTT, WILLIAM BELL, ALEX KISH, and SAMUEL

OSBORNE, sue the Defendants, and allege as follows:

1. This is an action to recover in excess of $15,000.00 in damages, excluding attorney's

   fees, pre-judgment interest, and/or taxable costs.

2. Plaintiff, STEVE ABBOTT (hereafter "ABBOTT"), is a resident of Walton County,

   Florida, and he is the owner of real property in and a resident of an area of the

   "Sandestin DRI," known as Driftwood Estates. Abbott purchased said real property

   from Defendant, INTRAWEST SANDESTIN COMPANY, L.L.C. (hereafter

   "INTRAWEST"), in January, 2002.

1

3. Plaintiff, WILLIAM BELL (hereafter "BELL"), is a resident of Walton County, Florida, and he is the owner of real property in and a resident of an area of the "Sandestin DRI," known as Driftwood Estates. BELL purchased said real property in March, 1999.

4. Plaintiff, ALEX KISH (herafter "KISH"), is a resident of Walton County, Florida, and he is the owner of real property in and a resident of an area of the "Sandestin DRI," known as Driftwood Estates. KISH purchased said property in June, 1999.

5. Plaintiff, SAMUEL OSBORNE (hereafter "OSBORNE"), is a resident of Walton County, Florida, and he is the owner of real property in and a resident of an area of the "Sandestin DRI," known as Driftwood Estates. OSBORNE purchased said property in May 2004.

6. Defendant, INTRAWEST SANDESTIN COMPANY, L.L.C., (hereafter "Intrawest") is a foreign profit corporation. Its principal place of business is in Walton County, Florida. Intrawest is the owner/developer of the Sandestin Resort in Walton County, Florida, that has been developed under the Development of Regional Impact Plan for the Sandestin Development (hereafter "Sandestin DRI"). Intrawest is the successor in interest to Bay Colony Property Company (hereafter, unless otherwise stated, the term "Intrawest" will include "Bay Colony Property Company").

7. Defendant, OLSON & ASSOCIATES OF NW FLORIDA, INC., (hereafter "OLSON") is a Florida for profit corporation. Its principal place of business is Okaloosa County, Florida. OLSON developed property in Driftwood Estates, and is a successor in interest to Intrawest in that portion of the Sandestin DRI known as Driftwood Estates.

2

8. Defendant, NORTHTIP DEVELOPMENT, LLC (hereafter "NORTHTIP"), is a Florida for profit corporation, and its principal place of business is located in Okaloosa County, Florida. NORTHTIP is a subsidiary of OLSON., and NORTHTIP carried out some of the development activities set forth in this complaint.

9. Defendant, CAMPBELL ENGINEERING, INC. (hereafter "CAMPBELL"), is a Florida Profit Corporation. Its principal place of business is Destin, Florida.

10. Defendant, DAVID O. CAMPBELL is a licensed professional engineer, and he is a resident of Bay County, Florida.

11. Defendant, ADAMS HOMES OF NORTHWEST FLORIDA, INC. (hereafter "ADAMS"), is a Florida Profit Corporation. Its principal place of business is Gulf Breeze, Florida.

12. On October 19, 1976, the Walton County Board of County Commissioners approved the Sandestin DRI. The Sandestin DRI is a public document that has the force and effect of law. It is incorporated by reference herein.

13. When applying for approval of the Sandestin DRI, the original developers described the development as an integrated community in which the residents would enjoy common access to various amenities, such as golf courses, restaurants, a marina, and shops.

14. In 1979, Bay Colony Property Company filed the Driftwood Estates Plat, which was acknowledged by the Clerk of Court for Walton County, Florida on July 24, 1979. Walton County officially accepted and approved the Driftwood Estates Plat, as filed in the public records.

15. The Driftwood Estates Plat was filed in the public records of Walton County, Florida, and is located at Book 5, Page 28. See Exhibit "A," to the original complaint.

16. Driftwood Estates is the northern most section of the Sandestin DRI. See Exhibit "B," to the original complaint.

17. In 1984 the developer of the Sandestin DRI applied for and obtained approval of the Masters Plan for the DRI. It became the benchmark for all future substantial deviations.

18. The developer has, throughout the existence of the DRI, represented to the state and county authorities that Sandestin is an integrated community.

19. The Defendant, INTRAWEST or its predecessors in interest, Bay Colony Property Company, Sandestin Bay Estates, and Sandestin Real Estate, have promoted and sold property in Sandestin, representing such property to be within and a part of an integrated community.

20. Driftwood Estates is a part of the Sandestin DRI. Property sold within Driftwood Estates was promoted and represented to be a part of the integrated community described in the Sandestin DRI and the 1984 Master Plan to the DRI.

21. In 1988, the Sandestin DRI developer, then Sandestin Bay Estates, petitioned Walton County to abandon the public right-of-way named in the Sandestin DRI and the Driftwood Estates Plat as Driftwood Drive.

22. On March 29, 1988, a meeting of the Walton County Commission was held wherein the developer of the Sandestin DRI asked Walton County to abandon Driftwood Drive as a public right-of-way through the Sandestin DRI to Highway 98.

4

23. Legally sufficient notice of the March 29, 1988 meeting of the Walton County Commission for the purpose of considering the abandonment of Driftwood Drive was not provided to the citizens whose property rights would be diminished thereby. Notwithstanding, some residents of Driftwood Estates attended said meeting and voiced their objection through legal counsel to the proposed abandonment.

24. Upon hearing the objection to the abandonment, consideration of the measure was tabled "until all concerned parties have reached an acceptable agreement." Attached as Exhibit "C," to the original complaint, is a true and correct copy of the minutes of the Walton County Commission meeting of March 29, 1988.

25. After the March 29, 1988, Walton County Commission meeting, the developer and a member of the Walton County Commission met in private, and on May 4, 1988, executed an agreement to purportedly abandon Driftwood Drive.

26. On May 10, 1988, with no notice to the public or to the residents of Driftwood Estates, the Board of County Commissioners met and approved the agreement to abandon Driftwood Drive that had been executed in private six days earlier. The abandonment of public roads must be done in strict compliance with Florida Statutes. The abandonment procedure utilized in an attempt to abandon Driftwood Drive violated both Florida Statutes and the Sandestin DRI. Attached as Exhibit "D," to the original complaint, is a true and correct copy of the minutes of the Walton County Commission meeting of May 10, 1988.

27. Driftwood Drive was and is the primary means of ingress and egress for the property located in Driftwood Estates. It was the only right-of-way within the Sandestin DRI

and designated in the Sandestin DRI as a means of ingress and egress for the residents of Driftwood Estates, within the Sandestin DRI.

28. The Driftwood Estates Plat has not been amended since its filing in 1979, thus there is no notation upon that plat indicating the putative abandonment of Driftwood Drive.

29. The Plaintiffs each own real property in Driftwood Estates. Their property rights include the use of Driftwood Drive for ingress and egress as depicted in the Driftwood Estates Plat and in the 1984 Master Plan to the Sandestin DRI, which was and is a part of the law in effect at the time their purchase contracts were executed.

30. In 1995, Sandestin Bay Estates applied for and obtained a bond to finance the improvement of roads in Driftwood Estates.

31. The 1995 bond application described Driftwood Estates as a part of the integrated community and it indicated that Driftwood Drive was the primary means of ingress and egress for residents in Driftwood Estates, and that said road was the residents of Driftwood Estates' common access to the amenities within the Sandestin DRI.

32. Walton County and the property owners of Driftwood Estates relied upon the Sandestin DRI and its developer's representations regarding their access through the integrated community in approving the road bond application, which is still being paid for by the property owners, including the Plaintiffs, in Driftwood Estates.

33. In the fall of 1997, the developer built a wall across Driftwood Drive, which unlawfully blocks the Plaintiffs and members of the public, generally, from using Driftwood Drive as a right-of-way through the Sandestin DRI and to Highway 98.

34. No permit was applied for or issued by Walton County to build the wall which now obstructs the Plaintiffs' right of ingress and egress via Driftwood Drive.

35. From 1998 until 2006, Walton County consistently expressed the position that Driftwood Drive was abandoned by plat, because that the abandonment of Driftwood Drive by Walton County appears on the Bay Villas Plat.

36. The existence of the Bay Villas Plat, and the putative abandonment of Driftwood Drive, has never been noted on the Driftwood Estates Plat as required by law, and Walton County has never followed the statutory requirements for abandoning said roadway, thus each of the plaintiffs were conveyed a property right in Driftwood Drive pursuant to their purchase under the Driftwood Estates Plat.

37. After the public's right of access through Driftwood Drive had been obstructed by the illegal wall, INTRAWEST, the developer of the Sandestin DRI, shifted density within the DRI from land that was located south of Driftwood Estates to the interior of Driftwood Estates. No notice of such plans was given to the public, as INTRAWEST intentionally chose to characterize the shift in density as a "non-substantial deviation" of the Sandestin DRI, and thus not subject to notice and public hearing.

38. As a part of INTRAWEST's plan to shift more density into Driftwood Estates, in or about 2004, INTRAWEST sold that part of Driftwood Estates, now designated as Phase II, to OLSON, knowing that OLSON intended to build homes in those interior portions of Driftwood Estates that had been designated as golf courses, holding ponds, and natural areas.

39. When INTRAWEST sold its interest in said real property within Driftwood Estates, INTRAWEST knew or reasonably should have known that no reasonable steps had been taken to implement a workable drainage system, and that the amenities that had been advertized in sales material, included in descriptions contained in the Sandestin

DRI, and noted on the Driftwood Estates Plat, had not built, and that it, or a successor would never build such amenities in Driftwood Estates. The land designated for the golf course in Driftwood Estates was, with no prior notice to the Plaintiffs, re-designated as land to be used for the construction of residential homes.

40. When INTRAWEST sold its interest in said real property within Driftwood Estates, it knew or reasonably should have known that the shifting of density would result in the elimination of most of the elements in the drainage plan it had commissioned Connelly & Wicker, Inc. to design, and had submitted to Walton County for approval, which was obtained. INTRAWEST never implemented that approved plan, and Walton County, notwithstanding its regulatory responsibility for doing so, never required INTRAWEST to build out the approved storm water drainage run off plan for Driftwood Estates.

41. INTRAWEST did not implement the storm water drainage plan that had been approved, and it caused additional density to be placed in Driftwood Estates without planning for and implementing a storm water drainage system that was adequate to handle the run off of the initially approved density, much less this additional density that has been developed there from 2004, forward. This caused damages to the adjacent property owners, including the Plaintiffs.

42. The shift in density was a part of the developer's plan to establish the neighborhood immediately south of Driftwood Estates, Burnt Pines, as an exclusive gated community within a gated community. The shift in density was carried out by the developer to increase the value of the Burnt Pines properties the developer was marketing.

43. In its efforts to increase the value of property in the Burnt Pines section of the DRI, the developer knew or reasonably should have known that building the wall, shifting density, abandoning drainage easements, failing to install an adequate storm water drainage run off system, increasing and redirecting storm water runoff to the other property owners in Driftwood Estates, eliminating amenities within the Driftwood Estates portion of the Sandestin DRI, and blocking access to amenities within the Sandestin DRI, would result is a significant diminution in the value of the Plaintiffs' real estate within Driftwood Estates.

44. Prior to the addition of density, certain interior portions of Driftwood Estates were designated as ponds, natural areas with nature trails, and a small golf course. These ponds and natural areas, including the golf course, were vital and necessary components of the storm water drainage plan for Driftwood Estates. Said plan was never fully implemented, and the additional development of density within Driftwood Estates further exacerbated the then existing storm water drainage system deficiencies.

45. The Sandestin DRI developer's sale in or about 2004 of the interior portion of Driftwood Estates to OLSON was a part of Intrawest's plan to shift density into Driftwood Estates so that the golf course planned for Driftwood Estates could instead be built within the Burnt Pines neighborhood.

46. The Sandestin DRI and the sales/promotional materials published by the developer described Driftwood Estates as a part of the integrated Sandestin Resort, with access to all the amenities, including golf courses, shops, marina, restaurants, and hotels. From 1995 until at least 2003, a promotional brochure, that was distributed by

9

Intrawest or its affiliated sales organization, and/or with the knowledge and approval of INTRAWEST, promised prospective buyers:

a. A private, bayfront club, complete with swimming pool, fishing pier, cookout area, picnic tables and a children's playground.

b. An invitation to join Sandestin clubs.

c. Single-access entry through beautifully designed and landscaped gatehouse entrance.

d. Large central nature preserve with boardwalks and leisure trails.

e. Convenient to schools, shopping and great dining.

f. Large, deep lots overlooking pristine Choctawhatchee Bay. Interior lots adjoining forest preserve, green belts and lagoons.

g. A private community club of excellent recreational amenities set on the bayside for all to enjoy.

See Exhibit "E," to the original complaint.

47. The brochure (see Exhibit "E" to the original complaint), designed to promote the sales of lots and homes within Driftwood Estates, primarily lists aspects of ownership within Driftwood Estates that were also described in the Sandestin DRI and the Driftwood Estates Plat.

48. When the Plaintiffs entered into their respective contracts to purchase the real property at issue herein, they relied upon the representations of the developer, including the developer's promise to, in the near future, build and make available the amenities described in the developer's sales materials, the Driftwood Estates Plat and the Sandestin DRI, and the developer intended for the Plaintiffs and every purchaser of real estate within Driftwood Estates to rely on said representations.

49. To date, there is no private bayfront club, complete with swimming pool, fishing pier, cookout area, picnic tables or children's playground, and there is no existing plan to

ever build these amenities. This benefit of "the Driftwood lifestyle" is given in two separate paragraphs in the brochure. To finance the non-existent waterfront recreational area, an assessment was taken from each purchaser, including the Plaintiffs, at the closing on each of the properties sold in Driftwood Estates.

50. While Driftwood is "[c]onvenient to schools, shopping and great dining," the only way to leave the neighborhood and reach such destinations is by Mack Bayou Road, a thirty foot right-of-way that, in 2005, after interior construction was underway, began to flood and become impassable during normal rain events. Shopping and restaurants are very close to the neighborhood, but the wall blocking Driftwood Drive prevents the touted convenient access. Residents must travel approximately five miles to reach restaurants that are a short distance from their homes, but separated from them by the wall blocking Driftwood Drive.

51. This is not a "beautifully designed and landscaped gatehouse entrance" to Driftwood Estates.

52. The "interior lots adjoining forest preserve, green belts and lagoons" now primarily adjoin dense developments.

53. The "large central nature preserves with board walks and leisure trails" have been reduced to lands that the developer either could not economically develop, or lands that it was precluded from developing by environmental protection regulations.

54. After access through Driftwood Drive was blocked in 1997, the Plaintiffs and the residents of Driftwood Estates, generally, were effectively segregated from the amenities of the Sandestin DRI. It is necessary for Driftwood Estates residents to

11

leave the Sandestin DRI, drive miles out of their way, and then re-enter the community, in order to enjoy the amenities of the supposed integrated community.

55. The Plaintiffs, and Driftwood Estates residents generally, had no notice or knowledge of the plan to shift density, and replace natural lands, golf course, and ponds with dense residential construction until OLSON began construction of homes in 2004.

56. It was not until late 2004, or 2005, after the construction of additional density within Driftwood Estates was underway, which resulted in pervious surfaces being replaced with impervious surfaces, and changes in natural elevations to raise the developer's lot elevations, thus redirecting the historical flow of storm water drainage run off, that the failure to implement an adequate drainage plan manifested itself, and caused the Plaintiffs' to sustain damages. For several years following the blocking off of Driftwood Drive, the Plaintiffs and other residents of Driftwood Estates were not affected by the flooding or access issues that rose to the level of safety concerns. However, once the shifting of residential density was actively underway, the increased runoff generated by increased residential construction became obvious, and the Plaintiffs' property was and is diminished thereby.

57. In preparation to build 244 residential homes in the interior of Driftwood Estates, the property was altered to prepare for such construction, including the filling of areas that had been approved as locations for retainage lakes and ponds.

58. In preparing to build 244 residential homes in the interior of Driftwood Estates, streets and utilities were constructed, the building up of lots and land, which changed the natural contour and redirected the historical water flow patterns.

12

59. In or about 2004, OLSON began construction of the infrastructure of the interior development of Driftwood Estates, which was designated as Phase II.

60. OLSON hired DAVID O. CAMPBELL and CAMPBELL ENGINEERING, INC., to prepare a storm water drainage run off plan that would satisfy the state and county requirements, and that would not adversely impact adjacent and downstream property owners, with regard to OLSON's planned development of the interior of Driftwood Estates.

61. The storm water drainage run off plan that DAVID O. CAMPBELL and CAMPBELL ENGINEERING, INC., designed for OLSON's development of the interior of Driftwood Estates, does not satisfy the requirements of the state and the county, and it has and continues to adversely impact adjacent and downstream property owners, including the Plaintiffs.

62. The shift of density, and the post-2004 development of the interior of Driftwood Estates caused a significant increase in the storm water run off which flows to the existing property owners in Driftwood Estates, and it redirected the flow of the increased storm water run off, and concentrated the flow of increased storm water run off to adjacent and downstream properties, including those of the Plaintiffs.

63. Neither OLSON nor INTRAWEST took any reasonable steps to compensate for the drainage of Driftwood Estates in light of the burden placed on the already inadequate drainage system, and they knew or should have known that their acts and omissions would cause the Plaintiffs to sustain damages.

64. In late 2004 or in 2005, for the first time, Driftwood Estates flooded due to the failure of the storm water drainage system's inability to handle normal rain events,

13

rendering, for the first time, the residents' sole means of ingress and egress impassable, during some normal rain events, and especially during more voluminous rain events.

65. INTRAWEST's and OLSON's actions and omissions with regard to the development of Driftwood Estates, have changed the hydrologic characteristics of the interior of Driftwood Estates, which has resulted in a decrease in the natural storage of storm water run off in the interior areas of Driftwood Estates, and increased the quantity, rate, and concentration of storm water run off to the adjacent and downstream properties, including the Plaintiffs' real estate.

66. On July 10, 2007, the Walton County Board of County Commissioners met to consider a "matter of public safety," the issues of flooding and ingress/egress in Driftwood Estates and to consider a moratorium on further building in the interior portions of the Driftwood Development. At that meeting, the Commissioners expressed their concern that as a matter of public safety, and that any further construction would only exacerbate the existing drainage problems which plague Driftwood Estates.

67. On July 24, 2007, the Walton County Commission met in DeFuniak Springs, and again concern was expressed for the safety and public welfare of the residents of Driftwood Estates, because their only means of ingress/egress is subject to flooding in normal rain events.

68. On August 14, 2007, the Walton County Commission met a third time to consider the moratorium on building in Driftwood Estates. Again the entire discussion was framed as a matter of public safety. However, when the moratorium was moved by one of the

14

commissioners, the measure died for lack of a second. The county commission action opened the way for the building of two hundred forty-four additional homes in the interior of Driftwood Estates, where eighty-nine had been advertized to be built. See true and correct copy of an excerpt from Minutes of Walton County Commission Meeting of August 14, 2007. See attached Exhibit "F," to the original complaint.

69. During the August 14, 2007 meeting of the Walton County Commissioners, the attorney for Defendant, OLSON, announced that the drainage issue had been studied by a certified engineer and that the engineer was present and available for questions. Said engineer was Defendant, DAVID CAMPBELL ("Mr. CAMPBELL"), the president of Defendant, Campbell Engineering, Inc ("CAMPBELL").

70. In 1995, the Army Corps of Engineers ("ACOE") granted a permit to Connelly & Wicker, Inc., engineers for Defendant, INTRAWEST, approving the drainage plan that had been designed by Connelly & Wicker, Inc. ("CW") and submitted to the ACOE on behalf of Walton County. Attached Exhibit "G," to the original complaint, is a true and accurate copy of the CW drainage plan.

71. The CW drainage plan consisted of a number of elements, including, but not limited to, lakes, littoral land, the planting of indigenous plants, and drainage easements that were carefully designed with silt fences at various specified locations. These elements were described in the plans that had been submitted to and approved by the Florida Department of Environmental Protection ("DEP"). The DEP permits expired on August 1, 1999. However, the CW drainage plan provides a comprehensive plan of the drainage that was approved, which if installed, would have meet the drainage needs and requirements that existed for the Driftwood Estates Development, prior to

15

the increase of density and further development that occurred in Driftwood Estates in 2004, and thereafter.

72. The plan approved by the DEP and the ACOE provided for monitoring and required that reports be submitted to the DEP. Upon information and belief, no such reports have ever been submitted.

73. Two of the primary drainage easements described in the CW plan were abandoned by the developer.

   ▪ One of those abandoned easements, located on the southwest corner of Driftwood Estates, consists of a steel reinforced, concrete pipe that is 28 years old. Two large, upscale homes have been built over that abandoned easement.

   ▪ The second easement, located on the northwest portion of Driftwood Estates, consisted of a ditch that is now on a private waterfront lot that has been sold to a private owner, which drained directly into Choctawhatchee Bay.

74. The CW Plan described 28.1 acres of lakes and 13.3% littoral land in the interior of Driftwood Estates.

75. The plan that was submitted to Walton County verbally by DAVID O. CAMPBELL/CAMPBELL on August 14, 2007, abandoned most of the primary elements of the CW Plan, or drastically reduced those elements, to such an extent that DAVID O. CAMPBELL/CAMPBELL and the Developer knew or reasonably should have known that the plan was inadequate to handle the drainage requirement of the original development plan, and grossly inadequate to deal with the greatly increased

16

density contemplated after the sale of those portions of Driftwood Estates to OLSON, and the additional development that occurred there in 2004, and thereafter.

76. The plan which was submitted to Walton County by Defendants, DAVID O. CAMPBELL, CAMPBELL and OLSON, seeks to utilize the abandoned easement in the southwest corner as a primary drainage for the 244 planned homes in Driftwood Trails (phase II, block c).

77. In contrast to the CW drainage plan, which had been designed to service less density, and thus less run off, the plan submitted by DAVID O. CAMPBELL, CAMPBELL, and OLSON significantly reduced the acreage of lakes and the percentage of littoral land. Where the CW plan specified that water absorbing plants were to be planted, including 450 trees per acre, the DAVID O. CAMPBELL/CAMPBELL plan contemplates the building of 244 homes that would increase the volume of drainage that must be handled by the existing system, which had never been built out by INTRAWEST, as submitted and approved. Thus, the plan submitted by DAVID O. CAMPBELL, CAMPBELL, and OLSON added development and increased and redirected the additional storm water run off, while further reducing the drainage capacity that had been approved under the CW Plan.

78. The current drainage plan is insufficient to handle the run off even in the current drought conditions. The plan presented by Defendants, DAVID O. CAMPBELL, CAMPBELL and OLSON, will not be sufficient for the current run off, and it will be overwhelmed by the vastly increased run off when an additional 244 homes are built in Phase II-C. These Defendants' drainage plan is unsuitable for wet years, and more than normal rain events.

17

79. In addition to flooding, the failure to design and implement a working drainage plan has impacted the general quality of life. The inclusion of 28.3 acres of lakes was critical for drainage, but also for pest control. The vastly decreased size and depth of the lakes has resulted in small, shallow ponds that are not conducive for the production of a living ecosystem. Fish do not thrive in these small, muck filled ponds. In the absence of fish, mosquitoes and dog flies have thrived. The residents of Driftwood cannot enjoy the well publicized "Driftwood Lifestyle" due to an infestation of mosquitoes and flies.

80. Defendant, OLSON sold certain portions of the interior property of the Driftwood Development to Defendant, ADAMS.

81. As a developer, ADAMS owes a duty to the other property owners in Driftwood Estates, including the Plaintiffs, such that ADAMS post-development storm water run off is not greater than the pre-development storm water run off, and that said additional water does not flow onto the other property owners' real estate, common areas and easements.

82. ADAMS and OLSON have built and sold homes in the interior of the Driftwood Development without regard for the design, construction and maintenance of an adequate drainage plan, such that significant additional storm water run off flows over the other property owners in Driftwood Estates' land, including the Plaintiffs.

83. Many of the homes built by ADAMS and OLSON in the interior of the Driftwood Estates, have been built in locations where retainage lakes are supposed to be, according to the CW drainage plan that was approved, but not built. The lots for these homes have been built up, to artificially raise their elevation, thus redirecting

the historical water flow. ADAMS and OLSON used impervious muck and clay as fill to elevate these lots, and the soil conditions are not suitable for percolation of water, or proper drainage, which reduces the natural drainage capacity of the area.

84. ADAMS and OLSON altered the natural contour of the land, and used improper fill to raise the elevation of their lots, so that the area available for home construction would be greatly expanded. These actions destroyed and/or impaired critical elements that had been approved, and were supposed to be built out, as set forth in the CW Plan.

85. OLSON, DAVID O. CAMPBELL, CAMPBELL and ADAMS have damaged the Plaintiffs by destroying critical parts of the approved drainage plan, replacing pervious surfaces with impervious ones, and constructing homes that have created a much larger volume of runoff, without implementing a storm water run off drainage system that contains the extra run off occasioned by their development. The Plaintiffs' homes, the streets adjacent to their homes, and the common areas they have access to, are now prone to flooding and the value of their homes has been damaged.

86. Prior to December of 2007, the OLSON and CAMPBELL had not requested a final inspection of the development order for the infrastructure of the Phase II development of the interior of Driftwood Estates.

87. As of December 10, 2007, OLSON had allowed its letter of credit to expire, thus there was no funding in place to provide for the funding of critical elements of an adequate drainage plan, even if one were presented for approval.

19

88. Until the development of the interior Driftwood Estates began in or about 2004, and effect of that additional manifested itself in 2005, the Plaintiffs did not suffer the damages complained of herein.

89. As a developer, INTRAWEST owes a duty to the other property owners in Driftwood Estates, including the Plaintiffs, such that INTRAWEST's post-development storm water run off is not greater than the pre-development storm water run off, and that said additional water does not flow onto the other property owners' real estate, common areas and easements.

90. As a developer/builder, OLSON owes a duty to the other property owners in Driftwood Estates, including the Plaintiffs, such that OLSON's post-development storm water run off is not greater than the pre-development storm water run off, and that said additional water does not flow onto the other property owners' real estate, common areas and easements.

91. As a developer/builder, INTRAWEST and OLSON have done construction work and development within Driftwood Estates without regard for the design, construction and maintenance of an adequate storm water run off drainage plan, such that significant additional storm water run off flows over and/or covers the other property owners in Driftwood Estates' land, including the Plaintiffs.

## COUNT I

## NEGLIGENCE OF INTRAWEST, NORTHTIP, AND OLSON

92. Plaintiffs reassert the allegations contained in numbered paragraphs 1 through 91, above, and incorporate them into this Count.

20

93. The Plaintiffs each purchased real property that is located in Driftwood Estates.

94. Defendants, INTRAWEST, NORTHTIP, and OLSON, as the developers of Driftwood Estates, owed a duty to the property owners within Driftwood Estates to avoid injury to the Plaintiffs.

95. Defendants, INSTRAWEST, NORTHTIP, and OLSON, breached their duty to the Plaintiffs by:

    a.  Violating the provisions of the Sandestin DRI in obstructing the means of ingress and egress of the Plaintiffs through the Sandestin DRI on Driftwood Drive;

    b.  Violating the provisions of the conveyance of the properties to the Plaintiffs in obstructing the means of ingress and egress of the Plaintiffs on Driftwood Drive pursuant to the Driftwood Estates Plat;

    c.  Violating the provisions of the Sandestin DRI and the drainage plans that had been submitted to and approved by Walton County, the Army Corps of Engineers, and the Florida Department of Environmental Protection, by failing to construct and maintain such drainage system;

    d.  Violating the density provisions of the Sandestin DRI and the promotional materials used to market Driftwood Properties, negligently increased the number of dwellings to be built within Driftwood Estates without regard for the issues of access and drainage;

    e.  Failing to construct a private, bayfront club, complete with swimming pool, fishing pier, cookout area, picnic tables and a children's playground, as

21

represented in the promotional materials for Driftwood Estates and designated in the Driftwood Estates Plat;

f. Failing to construct single-access entry through beautifully designed and landscaped gatehouse entrance; and

g. Building an inadequate infrastructure such that their post-development storm water run off significantly exceeds the pre-development storm water run off, and the concentration and flow of said additional run off has been redirected to adjacent and downstream property owners, thereby diminishing the value of the Plaintiffs' real property.

96. The negligent actions of the Defendants have injured the Plaintiffs in that said negligent acts have:

a. caused the roadways, common areas, and yards within Driftwood Estates to flood;

b. limited ingress and egress to the Plaintiff's properties to the use of a 30 foot right-of-way that is not within the Sandestin DRI and that becomes impassable during normal rain events, and harder rains and/or storm surges;

c. created small, shallow ponds that cannot sustain an aquatic environment, thus these ponds have become breeding grounds for mosquitoes and other insects,

d. created a publically acknowledged safety issue due to the combination of poor drainage and limited access;

e. significantly diminished the desirability of the Plaintiff's property as a part of a well designed and attractive neighborhood due to the failure to build the bayfront club facility and gatehouse facility, and reducing the amount of

property devoted to lakes, littoral land, parks, golf course, and natural habitats, they have; and

f. segregated Driftwood Estates from the amenities that were advertized as a benefit of living in that neighborhood and that were indicated in the Sandestin DRI as a part of the "integrated" community that was to be the Sandestin DRI by constructing a wall between Driftwood Estates and the rest of the Sandestin DRI.

97. Because of the negligent acts of Defendants, INTRAWEST, NORTHTIP, and OLSON, the Plaintiffs have suffered a greatly diminished lifestyle, a drastic diminution in the value of their property, and significant damage to the marketability of their property.

WHEREFORE, each Plaintiff demands the entry of a final judgment in his favor, against Defendants, INTRAWEST, NORTHTIP, and OLSON, in the amount of the damages he sustained, plus taxable costs and any other relief deemed appropriate by the Court and a trial by jury on all issues so triable.

## COUNT II

### NEGLIGENCE AS TO DAVID O. CAMPBELL and CAMPBELL

98. Plaintiffs reassert the allegations contained in numbered paragraphs 1 through 91, above, and incorporate them into this Count.

23

99. Defendants, DAVID O. CAMPBELL and CAMPBELL ENGINEERING, INC., were retained by OLSON to design a drainage plan for the interior portion of Driftwood Estates that OLSON developed.

100. Defendants, DAVID O. CAMPBELL and CAMPBELL ENGINEERING, INC., knew or should reasonably have known that the design of the drainage plan for the interior of Driftwood Estates had to work in relationship to the rest of Driftwood Estates, and would have a direct and significant impact upon property owned and resided upon by the Plaintiffs.

101. Defendants, DAVID O. CAMPBELL and CAMPBELL ENGINEERING, INC., owed the Plaintiffs a duty to design a drainage plan that would meet the requirements of the Sandestin DRI, would be in compliance with state, local, and national standards, and that would not diminish the value of the properties owned by the Plaintiffs and Driftwood Estates, generally.

102. Defendants, DAVID O. CAMPBELL and CAMPBELL ENGINEERING, INC., negligently designed a drainage plan for Driftwood Estates, and submitted such plan for approval to the Walton County Board of County Commissioners.

103. The Defendants, DAVID O. CAMPBELL and CAMPBELL ENGINEERING, INC., breached their duty to design functioning storm water drainage run off system for the interior of Driftwood Estates, and said breach is a proximate cause of the diminution of the value of the Plaintiffs' property and the destruction or significant impairment of the Plaintiffs' right to the quiet enjoyment of their property.

WHEREFORE, each Plaintiff demands the entry of a final judgment in his favor, against Defendants, DAVID O. CAMPBELL and CAMPBELL ENGINEERING, INC., in the

24

amount of the damages he sustained, plus taxable costs and any other relief deemed appropriate by the Court and a trial by jury on all issues so triable.

## COUNT III

## NEGLIGENCE AS TO ADAMS

104. Plaintiffs reassert the allegations contained in numbered paragraphs 1 through 91, above, and incorporate them into this Count.

105. ADAMS, as the successor in interest to INTRAWEST, owed a duty to build homes within Driftwood Estates in a manner consistent with the Sandestin DRI and other applicable state, federal, and local laws.

106. ADAMS, as the successor in interest to INTRAWEST, had a duty in the construction of homes within Driftwood Estates to conduct itself in a manner reasonably consistent with the rights of the Plaintiffs to the quiet enjoyment of their property.

107. ADAMS knew or reasonably should have known that the construction of an additional 244 homes, will result in:

a. An increase the volume of storm water run off from the interior of Driftwood Estates, which could not be managed by the existing drainage system;

b. that the drainage plan it built would be inadequate to manage the drainage needs of Driftwood Estates;

c. that the drainage plan would violate the requirements of the Sandestin DRI and applicable state, federal, and local laws;

25

d.  that the construction of 244 additional homes would significantly aggravate the existing public safety problems of Driftwood Estates due to prior drainage problems and ingress/egress limitations;

e.  that destruction of lakes, littoral lands, and other water absorbing features described in the Sandestin DRI, would over burden the existing or planned drainage system; and

f.  that the improper preparation of construction sites, and compacting lots with impermeable clay and muck, would result in additional drainage burdens upon the already inadequate drainage system or planned drainage system.

108. Though ADAMS knew or should have known that the construction of 244 homes would result in the problems alleged in paragraph 107, ADAMS initiated construction of those homes, altering the natural features of the land, altering the composition of the soil, ignoring the existing public safety problems of the Driftwood Estates neighborhood, and generally ignoring the Plaintiffs' right of quiet enjoyment of their property.

109. The failure of ADAMS to reasonably perform its duty to conduct its building activities in a manner consistent with the requirements of the Sandestin DRI, applicable state, federal, and local laws is a proximate cause of the diminution of the value of the Plaintiffs' property and the destruction or significant impairment of the Plaintiffs' right to the quiet enjoyment of their property.

WHEREFORE, each Plaintiff demands the entry of a final judgment in his favor, against Defendant, ADAMS, in the amount of the damages he sustained, plus taxable costs and any other relief deemed appropriate by the Court and a trial by jury on all issues so triable.

26

## COUNT IV

## NUISANCE AS TO INTRAWEST, NORTHTIP, OLSON, DAVID O. CAMPBELL, CAMPBELL, AND ADAMS

110.   Plaintiffs reassert the allegations contained in numbered paragraphs 1 through 91, above, and incorporate them into this Count.

111.   At all times material to this cause, Plaintiffs were in possession of real property within Driftwood Estates, a part of the Sandestin DRI.

112.   Each of the Plaintiffs maintained a home on their property within Driftwood Estates and said homes were the primary residences of the Plaintiffs.

113.   INTRAWEST, NORTHTIP, OLSON, DAVID O. CAMPBELL, CAMPBELL, and ADAMS, each owed a duty to the Plaintiffs, to make use of Defendants' property in a way that would not be a nuisance to owners and occupants of other property in the same community.

114.   INTRAWEST, NORTHTIP, OLSON, DAVID O. CAMPBELL, CAMPBELL, and ADAMS, each made use of their property in such a way that it annoys or disturbs the Plaintiffs' free use, possession or enjoyment of their property.

115.   INTRAWEST, NORTHTIP, OLSON, DAVID O. CAMPBELL, CAMPBELL, and ADAMS, each made use of their property in such a manner that it renders the Plaintiffs' ordinary use or occupation of their property physically uncomfortable.

116.   The actions of Defendants, INTRAWEST, NORTHTIP, OLSON, DAVID O. CAMPBELL, CAMPBELL, and ADAMS, have caused the impairment of the

comfort, health and safety of the Plaintiffs and anyone residing in the properties owned by the Plaintiffs in Driftwood Estates.

117.   The actions of said Defendants, have so diminished the quality of life in Driftwood Estates that the value of the property owned by the Plaintiffs has been significantly damaged.

**WHEREFORE**, each Plaintiff demands the entry of a final judgment in his favor, against Defendants, INTRAWEST, NORTHTIP, OLSON, DAVID O. CAMPBELL, CAMPBELL and ADAMS in the amount of the damages he sustained, plus taxable costs and any other relief deemed appropriate by the Court and a trial by jury on all issues so triable.

## COUNT V

## INTRAWEST'S BREACH OF CONTRACT AS TO ABBOTT

118.   Plaintiff, ABBOTT, reasserts the allegations contained in numbered paragraphs 1 through 91, above, and incorporate them into this Count.

119.   ABBOTT and Defendant, INTRAWEST, entered into a written contract for the sale and purchase of real property within the Driftwood Estates section of the Sandestin DRI.  Attached Exhibit "H," to this amended complaint, is a true and correct copy of these parties' January 16, 2002 contract.

120.   ABBOTT has performed all conditions precedent to be performed by him, or said conditions have otherwise occurred.

121.   Defendant, INTRAWEST has breached its contract with ABBOTT.

28

122.    As a result of the breach of contract by INTRAWEST, ABBOTT has sustained damages, and has suffered diminution in the value of his property, and has been denied the peaceful enjoyment, use and occupation of his home and property.

WHEREFORE, ABBOTT demands the entry of a final judgment in his favor, against INTRAWEST, in the amount of his damages, plus interest and taxable costs, and any other relief deemed appropriate by the Court, and a trial by jury on all issues so triable.

## COUNT VI

## INTRAWEST'S BREACH OF CONTRACT AS TO KISH

123.    Plaintiff, KISH, reasserts the allegations contained in numbered paragraphs 1 through 91, above, and incorporate them into this Count.

124.    KISH's predecessor(s) in interest, and Defendant, INTRAWEST, entered into a written contract for the sale and purchase of real property within the Driftwood Estates section of the Sandestin DRI. Attached Exhibit "I," to this amended complaint, is a true and correct copy KISH's April 5, 1999 contract to purchase his lot. INTRAWEST has in its possession, custody or control the sales/purchase contract between it and KISH's predecessor in interest.

125.    KISH has performed all conditions precedent to be performed by him, or said conditions have otherwise occurred.

126.    Defendant, INTRAWEST has breached its contract with KISH's predecessor's in interest.

29

127.    As a result of the breach of contract by INTRAWEST, KISH has sustained damages, and has suffered diminution in the value of his property, and has been denied the peaceful enjoyment, use and occupation of his home and property.

**WHEREFORE**, KISH demands the entry of a final judgment in his favor, against INTRAWEST, in the amount of his damages, plus interest and taxable costs, and any other relief deemed appropriate by the Court, and a trial by jury on all issues so triable.

## COUNT VII

## INTRAWEST'S BREACH OF CONTRACT AS TO OSBORNE

128.    Plaintiff, OSBORNE, reasserts the allegations contained in numbered paragraphs 1 through 91, above, and incorporate them into this Count.

129.    OSBORNE's predecessor(s) in interest, and Defendant, INTRAWEST, entered into a written contract for the sale and purchase of real property within the Driftwood Estates section of the Sandestin DRI. Attached Exhibit "J," to this amended complaint, is a true and correct copy OSBORNE's May 1, 2004 contract to purchase his home. INTRAWEST has in its possession, custody or control the sales/purchase contract between it and OSBORNE's predecessor in interest.

130.    OSBORNE has performed all conditions precedent to be performed by him, or said conditions have otherwise occurred.

131.    Defendant, INTRAWEST has breached its contract with OSBORNE's predecessor's in interest.

132. As a result of the breach of contract by INTRAWEST, OSBORNE has sustained damages, and has suffered diminution in the value of his property, and has been denied the peaceful enjoyment, use and occupation of his home and property.

**WHEREFORE**, OSBORNE demands the entry of a final judgment in his favor, against INTRAWEST, in the amount of his damages, plus interest and taxable costs, and any other relief deemed appropriate by the Court, and a trial by jury on all issues so triable.

## COUNT VIII

## INTRAWEST'S BREACH OF CONTRACT AS TO BELL

133. Plaintiff, BELL, reasserts the allegations contained in numbered paragraphs 1 through 91, above, and incorporate them into this Count.

134. BELL's predecessor(s) in interest, and Defendant, INTRAWEST, entered into a written contract for the sale and purchase of real property within the Driftwood Estates section of the Sandestin DRI. Attached Exhibit "K," to this amended complaint, is a true and correct copy of the deed which conveyed the subject land to BELL. A true and correct copy of BELL's purchase contract is being acquired and shall be supplemented upon receipt, or obtained through discovery and supplemented. INTRAWEST has in its possession, custody or control the sales/purchase contract between it and BELL's predecessor in interest.

135. BELL has performed all conditions precedent to be performed by him, or said conditions have otherwise occurred.

31

136.    Defendant, INTRAWEST has breached its contract with BELL's predecessor's in interest.

137.    As a result of the breach of contract by INTRAWEST, BELL has sustained damages, and has suffered diminution in the value of his property, and has been denied the peaceful enjoyment, use and occupation of his home and property.

**WHEREFORE,** BELL demands the entry of a final judgment in his favor, against INTRAWEST, in the amount of his damages, plus interest and taxable costs, and any other relief deemed appropriate by the Court, and a trial by jury on all issues so triable.

## COUNT IX

## FALSE INFORMATION NEGLIGENTLY SUPPLIED FOR THE GUIDANCE OF OTHERS AGAISNT INTRAWEST

138.    Plaintiffs reassert the allegations contained in numbered paragraphs 1 through 91, above, and incorporate them into this Count.

139.    INTRAWEST supplied false information to the Plaintiffs, Walton County, the Plaintiff's predecessors in interest, and to prospective purchasers and purchasers of real property within the Driftwood Estates area of the Sandestin DRI, including, but not limited to, the following misrepresentations:

a.INTRAWEST committed to Walton County that it would abide by and remain in compliance with the Sandestin DRI.

32

b.INTRAWEST told Walton County and the Plaintiffs, through official documents such as the Sandestin DRI, bond applications and promotional materials that Driftwood Estates was a part of the integrated Sandestin Resort community.

c.INTRAWEST and or its affiliated sales organization published, caused to be published, and/or distributed promotional literature to promised prospective buyers, including the Plaintiffs:

(a)A private, bayfront club, complete with swimming pool, fishing pier, cookout area, picnic tables and a children's playground.

(b)An invitation to join Sandestin Clubs.

(c)Single-access entry through beautifully designed and landscaped gatehouse entrance.

(d)Large central nature preserve with boardwalks and leisure trails.

(e)Convenient to schools, shopping and great dining.

(f)Large, deep lots overlooking pristine Choctawhatchee Bay. Interior lots adjoining forest preserve, green belts and lagoons.

(g)Private community club of excellent recreational amenities set on the bayside for all to enjoy. See Exhibit "E" to the original complaint.

140.    INTRAWEST supplied said false information in the course of its business, in transactions and potential transactions in which it had an economic interest.

141.    INTRAWEST was negligent in obtaining and communicating said false information.

33

142.    Each Plaintiff was a person for whose benefit and guidance INTRAWEST intended to supply the false information for use in persuading them to purchase property within the Driftwood Estates area of the Sandestin DRI.

143.    INTRAWEST intended the false information to influence each Plaintiff into buying the real property at issue.

144.    Each Plaintiff justifiably relied upon said false information to his detriment.

145.    Each Plaintiff's reliance upon said false information caused him to sustain damages in that they each purchased property in reliance upon said representations.

146.    The representations were false in that the elements described in paragraph 139 were not true; INTRAWEST did not comply with the Sandestin DRI; INTRAWEST permitted a wall to be built, isolating Driftwood Estates contrary to the representation that it is a part of the integrated Sandestin Resort; no bayfront club, gatehouse entrance or private community club of excellent recreational amenities were built; density was shifted and the large central nature preserve with boardwalks and leisure trails, along with the green belts and lagoons, were replaced by residential construction.

147.    INTRAWEST profited by others', including the Plaintiffs', reliance on the false information it supplied for their guidance in that INTRAWEST did not expend funds to construct a bayfront club, gatehouse entrance, or private community club; it chose to convert the central nature preserve with boardwalks and leisure trains, the green belts, and the lagoons to sites for private homes to obtain additional monetary gain from the Driftwood Estates neighborhood; and INTRAWEST chose to isolate Driftwood Estates and destroy the integration of that community with the Sandestin

34

Resort and raise the property values in other parts of the Sandestin DRI, thus realizing additional profits from the sale of those properties.

**WHEREFORE**, each Plaintiff demands the entry of a final judgment in his favor, against Defendant, INTRAWEST, in the amount of the damages he sustained, plus taxable costs and any other relief deemed appropriate by the Court and a trial by jury on all issues so triable.

## DEMAND FOR JURY TRIAL

The Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

J. LAYNE SMITH, ESQUIRE
FL Bar No. 0712930
STEPHEN M. MASTERSON, ESQ.
FL Bar No. 201014
SMITH, BROOKS & MASTERSON, P.L.
2629 Mitcham Drive
Tallahassee, FL 32308
Telephone No. 850 385-8000
Fax No. 850 201-8000
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify, that a copy of the foregoing has been served by regular United States Mail delivery on Bradley P. Herndon, Esq., 25 Walter Martin Road, Suite 201, Fort Walton Beach, FL 32549, Robert A. Emmanuel, Esq., 30 South Spring Street, Pensacola, Fl. 32591, Fred J. Lotterhos, Esq., and Jeremy J. Ches, Esq., 50 North Laura Street, Suite 3900, Jacksonville, FL 32202, and George R. Miller, Esq., 562 U.S. Highway 90, East, DeFuniak Springs, FL 32435, on this 27th day of October, 2008.

J. LAYNE SMITH, ESQUIRE

35