**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

CYNTHIA L. ABBOTT REVOCABLE TRUST,
JONILEA FOSTER BELL REVOCABLE
TRUST, ALEX R. KISH REVOCABLE TRUST,
DIANA J. KISH REVOCABLE TRUST, and
SAMUEL A. OSBORNE and ILLEANA E.
OSBORNE, as husband and wife,

      Plaintiffs,

vs.                                 CASE NO.: 3:14-CV-00646-MCR-EMT

OLSON & ASSOCIATES OF NW
FLORIDA, INC., INTRAWEST
SANDESTIN COMPANY, L.L.C.,
NORTHTIP DEVELOPMENT, LLC,
ADAMS HOMES OF NORTHWEST
FLORIDA, INC., DAVID O. CAMPBELL,
P.E., CAMPBELL ENGINEERING, INC.,
WALTON COUNTY, FLORIDA,
WALTON COUNTY BOARD OF COUNTY
COMMISSIONERS, and WALTON COUNTY
COMMISSIONER SARA COMANDER,

      Defendants.

_____/

### 8th AMENDED COMPLAINT

Plaintiffs, Alex R. Kish Revocable Trust, Diana J. Kish Revocable Trust, ("Kish") Jonilea Foster Bell Revocable Trust, ("Bell")  Cynthia L. Abbott Revocable Trust, ("Abbott") and Samuel A. Osborne ("Osborne")  ("Plaintiffs"), sue the Defendants and allege:

1

**ALLEGATIONS COMMON TO ALL COUNTS**

1.      This is an action to recover in excess of $15,000 in damages, excluding attorneys' fees, pre-judgment interest and costs. All referenced exhibits are incorporated herein and all such exhibits have been marked sequentially in depositions in this case, most of which have been previously filed in the court record and will be referenced as "Ex. ###". Because of the volume of the numbered Exhibits, and because the Defendants already possess all or most of such Exhibits and they are otherwise accessible electronically via the court reporter from whom Defendants have already obtained or can obtain these exhibits, Plaintiffs will not re-serve those Exhibits upon Defendants unless asked to do so. A printed copy and/or electronic copies of these exhibits can be provided to the Court or chambers. Further, Local Rule 7.2(A) states that the "removing party shall file true and legible copies of all pleadings, motions, and orders then on file in the state court" which the removing party has apparently not done. All defined terms have the meaning described and all reasonable inferences from those descriptions unless context of the term's use indicates otherwise.

2.      All Plaintiffs owned property, were in possession of, lived in as their primary residences, homesteads, domiciles, single family homes located on their property that is located in Walton County within the Development of Regional Impact Plan for the Sandestin Development ("Sandestin DRI") known as Driftwood Estates at Sandestin ("Driftwood") and in Driftwood I.   All Plaintiffs are (or were until sale during the pendency of this lawsuit) the owners or direct successors-in-interest and real parties in interest of their property without interruption of possession or homestead status at all

times that are material to this case. The specific parcels owned by each Plaintiff are identified in Exhibits 20, 21, 41, 42, 43, 44, 45, 47,48,51,52.

3. Plaintiff, Cynthia L. Abbott Revocable Trust ("Abbott"), and/or its trustees, Steven and Cindy Abbott, owned their property from before this lawsuit was filed until June 2013 when Abbott sold such property.

4. Plaintiff, Jonilea Foster Bell Revocable Trust ("Bell"), owned that property or its trustees, William Bell and Jonilea Foster Bell, owned their property from before this lawsuit was filed until June 2013 when Abbott sold such property and suffered damages.

5. Plaintiffs, Alex R. Kish Revocable Trust and Diana J. Kish Revocable Trust ("Kish"), own property in Driftwood I or their respective trustees Alex R. Kish and Diana J. Kish and owned their property from before this lawsuit was filed.

6. Plaintiff Samuel A. (Alan) Osborne owns property in Driftwood I.

7. All Plaintiffs have or had, at all times material to this action, interests in real property that are related to, arise from or are appurtenant to his property, either by law (common, statutory, local ordinance, covenants and restrictions, documents recorded in the public records or otherwise) that have been infringed, violated, harmed, encroached, denied, damaged, diminished, reduced, eliminated, impeded, impaired, extinguished, eliminated or effectively eliminated either permanently or temporally from all viable or meaningful uses for which those property interests were intended which has substantially reduced the value of Plaintiffs' property and those related property interests.

3

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 4 of 170

These property interests and rights include (as applicable to each Plaintiff), without limitation, fee simple, leasehold, homestead, easements, flowage easements, access, riparian, ingress/egress, due process, and third party beneficiary rights. This paragraph describes "property" as used in this document.

8. Conspirators knew Driftwood was promoted, represented to be a part, and is a part of the "integrated development plan" for the Sandestin DRI described in the 1984 Ordinance, and all subsequent changes to the Sandestin DRI that have been approved over the years by Walton County via Ordinances. Each Ordinance adopted a Master Plan, and thus has force and effect of law, that all property interests and rights material to this case arising from or related to the Sandestin DRI are appurtenant to Plaintiffs' ownership or ownership of their property in Driftwood Estates at Sandestin.

9. Driftwood is located on a peninsula in the Choctawhatchee Bay ("Bay") and it is divided into two major portions. The original portion is Driftwood Estates at Sandestin (Driftwood Phase I) which was platted in 1978 (Driftwood exterior or "Driftwood I") and is along the exterior of Driftwood; the lots in that phase all abut a road (approximately 4 miles long) that is around the permit of the Peninsula. That road was built in or around 1996-1997. Many of the homes along that road are Bay front. No substantial development or home construction occurred in Driftwood until about 1998.

10. Driftwood Phase I is generally the exterior lots of the Driftwood Estates neighborhood and is where Plaintiffs' property is located.

4

11.     Driftwood II is the second phase/portion of Driftwood and was platted from 2003 until 2006 in three sub-phases. See Ex 75. Since at least 2000 Driftwood II's actual lawful conditions are for approximately:

    (a)     Total Acres: 200

    (b)     Gross Open Space: 165.3 acres

        (i)     Conservation easement 37 acres

        (ii)    Other Open Space: 128.3

    (c)     Wetlands: 150 acres

    (d)     Platted lots: 0

    (e)     Acres designated for residential construction: 34.7

12.     Of that 165.3 acres of total Open Space in Driftwood II, Developers wrongfully and knowingly developed, designed and constructed 463 single family homes on approximately 128.3 of Open Space, most of which was upon wetlands. Of that 128.3 acres approximately 13 acres are for lakes which is Open Space.

13.     The state agency that has statutory oversight and enforcement authority for the Sandestin DRI was the Department of Community Affairs (DCA) until its name was changed in 2011 to the Department of Economic Opportunity (DEO), collectively both are ("DCA") herein.

14.     Intrawest Sandestin Company, LLC ("Intrawest"), is a foreign profit corporation. From July 1998 until March 2010, Intrawest was an owner/developer/declarant of the Sandestin Resort in Walton County, Florida, that has been developed pursuant to Florida law. The Sandestin DRI is a Development of Regional Impact pursuant to Florida law. Intrawest is the successor in interest of the

5

Sandestin DRI and hereafter, unless otherwise stated, the term "Intrawest" includes all of its predecessors in interest to the Sandestin DRI. Intrawest sold the Sandestin DRI to Sandestin Investments Inc. ("SDI") in March 2010. Regarding property located within Driftwood, in 2003, Intrawest conveyed its DRI status as declarant/developer/owner to Olson, Northip and Adams Homes. Olson and Northtip also conveyed such status and other property interests and obligations to Adams Homes for parcels in Driftwood I and II, from about 2002 through 2007.

15. Defendant Walton County ("County") is a political subdivision of the State of Florida. Each county in Florida is a subdivision of the state. *See* Art. VIII, §1, Fla. Const. As such, all powers of the County, the County Commission, and all county officials are derived from the State.

16. Sara Comander is and, since 2006, has been an elected Commissioner of Walton County.

17. Bill Imfeld is and, since November 2012, has been an elected Commissioner of Walton County.

18. Commissioners Imfeld and Comander acting under color of law as a Walton County Commissioner has subjected and caused Plaintiff Osborne to the deprivation of his rights, privileges and immunities secured by the United States Constitution and laws.

19. Defendants Olson and Associates of NW Florida Inc. ("Olson") and Northtip Development LLC ("Northtip") are Florida for profit corporations with their

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 7 of 170

principal places of business in Okaloosa County, Florida and they developed property as a successor-in interest/purchaser from Intrawest in that portion of the Sandestin DRI known as Driftwood Estates at Sandestin. Northtip is a subsidiary of Olson and will be referred to collectively as "Olson" unless stated differently. Olson and Northtip engaged in "development" as that term is defined by Chapter 380, Florida Statues, by carrying out building activity and by, but not limited to, the following actions:

(a)     making material changes in the use or appearance of the land in Driftwood;

(b)     changing the intensity of the use of land in Driftwood;

(c)     increasing the number of dwelling units on the acreage in Driftwood;

(d)     altering the shores and banks of the seacoast adjacent to Driftwood and the lakes in Driftwood.

20.     Defendant Campbell Engineering Inc. is a Florida profit corporation. Its principal place of business is Destin, Florida. Defendant, David O. Campbell, P.E. (collectively "Campbell") is a licensed professional engineer and was the civil engineer of record for the development and construction of a 463 single family lot neighborhood located on the 200 +/- acres in Driftwood II.

21.     Campbell and/or Mr. Campbell contracted with or were hired or employed by Olson, Northtip or Intrawest to perform civil design services for the development and construction of a 463 residential lot subdivision in Driftwood II. Campbell's services

7

included stormwater retention and management design, related permit procurement, observation, inspection and certification of the as-built conditions of that design to others including Walton County and other governmental agencies.

22. Defendant, Adams Homes of Northwest Florida, Inc. ("Adams Homes"), is a Florida profit corporation with it principal place of business is in Gulf Breeze, Florida.

23. The parties who are both "Developers" and "Conspirators" herein are Adams Homes, Intrawest, Olson, Northtip, and Campbell.

24. Other persons who are "Conspirators" herein are Walton County, Comander, Greg Graham, George Ralph Miller, Larry Jones, Scott Brannon, Renee Bradley, Greg Stewart, and Lynn Hoshihara. There maybe other persons who performed acts in furtherance of the conspiracy.

25. Developers engaged in "development" as that term is defined by Chapters 163 and 380, Florida Statues, by carrying out building activity in Driftwood I and II by, without limitation, making material changes in the land's use or appearance; changing the intensity of the use of land; increasing the number of dwelling units by over 300 single family homes thereby increasing that number by 100% or more in Driftwood; and altering the shores and banks of the seacoast and lakes.

26. Adams Homes cleared and removed dense mature trees, shrubs, foliage, from at least 111 and 217 residential lots in Driftwood I and II respectively and constructing single family homes upon them;

8

27. Adams Homes and Olson purchased from Intrawest all rights, interests, and responsibilities of law including the Sandestin DRI of the developer/declarant via Adams Homes purchase of 88 lots in Driftwood I and Olson's purchase of Driftwood II.

28. Adams Homes increased the total number of lots in Driftwood I from 88 to 111 lots by its submission and County approval of two plats recorded in the public records at Plat Book 16 pages 33 and 34. Adams Homes has identified itself as a "developer" in documents related to development in Driftwood and in conveyances of its property rights in Driftwood. Adams Homes held itself out to be and publically identified itself as an experienced and knowledgeable "master builder."

29. Adams Homes' improper construction and modifications of the Driftwood I stormwater system adjacent to those 111 lots created, contributed or exacerbated the function of that stormwater system resulting in insufficient drainage slope of that system resulting in standing water, flooded roads and yards, and other nuisances.

30. The Sandestin DRI is a matter of public record and law and it has been adopted by County Ordinances. At all times materials herein the Developers and Conspirators were obligated to adhere to the development and construction activities within Driftwood to the requirements of law which included the Sandestin DRI, Walton County Ordinances and Walton County Comprehensive Plan, Walton County Land Development Code Chapter 380, Florida Statutes, other Florida law, federal and common law (collectively "law").

31. Developers owed implied warranties of fitness and merchantability for services essential to the habitability of residences within the home development such as the roads for ingress and egress to Driftwood and private driveways to the homes, drainage systems and retention ponds and underground stormwater pipes necessary for the living accommodations in Driftwood.

32. The Developers' and Conspirators' actions have caused and contributed to, public and private nuisances and exacerbated the following negative and adverse impacts, consequences, injuries, damages to Plaintiffs and their property and which have damaged Plaintiffs.

33. The conditions described below are "nuisances" herein. The habitability, desirability, marketability, value, enjoyment of Plaintiffs' property in Driftwood is negatively impacted by stagnant standing water in the roadways, driveways, yards and by the flooding of ingress and egress and the erosion of soils, the flooding and overflow of retention ponds which has created child and adult safety hazards including the contraction and risk of infection of salmonella and other diseases, caused by mosquito and yellow fly infestations, increasing the risk of mosquito born West Nile virus infections, and other dangerous conditions such as a substantially increased risk of harm to hundreds of families in Driftwood by rising waters in storm events that prevent evacuation. Other nuisance and negative impacts from the interior development and construction include substantial cracking of roads, stormwater infrastructure and sidewalks because of improper construction upon unsuitable fill which also causes substantial cracking of stucco on many homes as well as cracked housing slabs. These conditions have greatly

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 11 of 178

diminished home values, including the values of Plaintiff's homes, and many of the homes in the neighborhood are not maintained or occupied and crime has increased. The improperly designed and/or constructed Driftwood I and Driftwood II stormwater system discharges tens of millions of gallons of untreated stormwater into the Choctawhatchee Bay causing the frequent proliferation of algae blooms and a thick dark slimy growth upon the seafloor adjacent and around the Driftwood peninsula. The "slime" often comes to the water surface, prevents enjoyable human use of the property because it emits a putrid, pungent stench and is unpleasant to touch or swim in.

34.     The nuisances negatively impact Plaintiffs' enjoyment of their property and the property's habitability, marketability, desirability, and value. The actions and misconduct of the Developers and Conspirators has caused the nuisances and damage to Plaintiffs as described herein.

35.     Defective workmanship, improper design, development or construction provided by Developers and/or their respective subcontractors or suppliers caused property damage to Plaintiffs' property. Further, these defects and deficiencies have been caused in whole or in part by the occurrence of repeated and continuous harmful conditions. The existence or cause of the defects and deficiencies are not readily recognizable by persons who lack special knowledge or training, or the defects and deficiencies are hidden by building components or finishes, and they are latent defects. The existence and cause of the defects and deficiencies are latent defects and deficiencies and have caused damage to property other than the defects and deficiencies themselves.

36. The Developers and Conspirators knew, had actual or constructive knowledge, by conscious avoidance, willful blindness, or by deliberate ignorance intentionally failed or did not endeavor to make reasonably sufficient inquires when they knew or they should have known of facts and circumstances that a reasonably prudent person in their position of spending or committing to spend millions of dollars would have inquired to know. They did not make such inquiries because they wished to remain ignorant to seek to establish the appearance of their ignorance. The Conspirators at various times learned and knew or gained knowledge of the violations, unlawful or improper conduct of the other Conspirators and did not thereafter publically acknowledge, disavow, disclose, reveal, report to appropriate persons such misconduct and instead continued to conceal such. Developers and Conspirators had actual or constructive knowledge of sufficient facts regarding their own misconduct and the misconduct of each other and knew. This paragraph describes and defines "knew", "knowledge" "knowingly" etc. as used in this document ("knew").

37. Developers and Conspirators knowingly colluded in their misconduct with knowledge of the misconduct of each other to engage, perform, enter into, perpetuate, misrepresent, conceal their collective misconduct and violations of the law related to or arising from their development in Driftwood, Plaintiffs' actions and exercise of Plaintiffs' First Amendment rights in opposition to their development and misconduct.

38. The Developers of such new residential real estate as Driftwood I and II, and the Conspirators knew the law or were in the best position to know the law and of their misconduct and to learn, discover, mitigate and prevent the nuisances, defects and

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 13 of 178

damages to Plaintiffs related to or arising from with their misconduct and development and that such misconduct would cause the nuisances and substantial damage to persons such as Plaintiffs of the kind and type alleged here. Such knowledge includes, but is not limited, to the following:

(a) that the land in Driftwood II was designated by law as Open Space and wetlands and not approved for residential construction except upon 34.7 acres and that their development activities were in violation of the law;

(b) that the development approvals had been knowingly procured in knowing violation of the law and without affording Plaintiffs and or others similarly situated notice or opportunity to be heard concerning such development approvals; and

(c) that the essential services for Driftwood II and in Driftwood I (from Adams Homes' misconduct and negligence in Driftwood I) of which they were responsible, developed or constructed were not developed, designed or constructed in accordance with the law or with sound practices which caused the nuisances and damages to Plaintiffs and others in Driftwood.

39. The information concerning the law, their knowing misconduct in violation of the law, and of misconduct of others in violation of the law was known, more readily known, knowable or discoverable by the Developers and Conspirators than the Plaintiffs.

40. Conspirators and Developers formed a combination for in furtherance of their conspiracy and their misconduct which includes imposing restraints upon

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/13/15 Page 14 of 178

constitutionally guaranteed freedoms including due process, denial of First Amendment rights of speech, petition government for redress of grievances, meaningful access to courts and government agencies. By their combination they sought to harass, deter, frustrate, repress and retaliate against  Plaintiffs from their exercise of their constitutional rights by massive concerted and purposeful activities of the group.

41.     All conditions precedent and defenses have been met, waived, satisfied or Defendants are estopped from asserting such conditions precedent or defenses. All Exhibits identified herein are incorporated herein.  Defendants are estopped, for example and not by limitation, but by the Conspirators' deliberate concealment of the existence of their conspiracy to deliberately violate the law, to thereafter unlawfully impede Plaintiffs' investigations, access to critical information and evidence, access to courts, and right to petition and seek redress from their government and speak in public forums concerning matters of public concern.

42.     Plaintiffs incorporate and adopt these "Allegations Common to All Counts" in each Count herein.

43.      Each Plaintiff demands entry of judgment for the following actual, consequential, special damages that  Developers' and Conspirators' actions have caused, contributed to, exacerbated the negative and adverse impacts, consequences, injuries, damages to Plaintiffs and their property as described herein and which have damaged Plaintiffs in the following ways:

(a)     Significant diminished value of their property of $1.5 million to $2 million per property.

(b)     Concomitant loss of use of such lost value for other opportunities such as to capture the higher values by sale, investment and investment income including prejudgment interest, refinance, improvements, and for the use and enjoyment for their families. This amount of damage is claimed as loss of prejudgment interest related to diminution in value of Plaintiffs' properties.

(c)     Actual damages for FDUTPA violations

(d)     Attorneys fees and litigation costs

(e)     Expenses related to document reproduction related to public records requests to government and to other persons in possession of relevant documents

(f)     Lost workplace leave and travel expenses for Osborne to investigate, petition his local and state government both in public and non-public meetings with government representatives

(g)     Expenses related to or arising from Plaintiffs' efforts to prevent, mitigate, or combat the damage, harm, losses, expenses, and the negative impacts to their properties that would not have been incurred but for Conspirators misconduct and own personal/individual/singular interest to deprive, further to deprive and reduce Plaintiffs of rights or the enforcement of their rights that Plaintiffs knew would damage Plaintiffs or persons similarly situated as Plaintiffs. The Defendants' actions included concealing and

15

Case 3:14-cv-00646-MCR-EMT   Document 172   Filed 08/18/15   Page 16 of 178

failing to disclose critical documents including but not limited to the documents described herein.

(h)     Expenses that the Conspirators caused Plaintiffs to unnecessarily incur to prepare information and analysis of issues for which the County requested but for which it already possessed but fraudulently failed to disclose such as attorneys and expert fees and costs related to analyzing  voluminous documents to prepare analysis that the County insisted upon of Sandestin DRI's noncompliance and of Plaintiffs' allegations when the County already knew and possessed much of that information (for example Bradley 2006/07 Report, Bradley 2009 Report, and Bradley 2010 Report) that the County failed to disclose to Plaintiffs.

44.     Plaintiffs demand entry of a declaratory judgment, injunction and judgment against Defendants (but not Walton County and Comander) to deposit with the court an amount to be administered by a receiver or to pay as damages into a trust or receivership,  within parameters directed by the Court the costs to, as much as practicable and feasible,  via *voluntary* purchases of property and/or by Walton County's lawful and proper exercise of its discretion to use its power of Eminent Domain to:

(a)     Reasonably restore the Open Space, wetlands and the planned conditions within Driftwood such that those areas serve as much of the function for which they were intended and designated by law that is practicable and feasible; and

(b)     To mitigate, reverse or improve the conditions that cause the nuisances in Driftwood and the diminution in water quality from improper and insufficiently treated stormwater discharge into the Bay and waterways.

45.     In addition, Plaintiffs seek entry of judgment against Comander for any or all of nominal, compensatory and punitive damages, a declaratory judgment that Comander unlawfully violated Osborne's constitutional rights by retaliating against Osborne because Osborne had previously exercised his constitutional rights, an injunction requiring Comander to annually attend constitutional law training for elected officials for as long as she holds an elected office.

46.     Plaintiffs seek entry of judgment against Walton County for nominal and compensatory damages, declaratory judgment that the County unlawfully violated Plaintiffs' or (anyone of them) federal or state constitutional rights; a declaratory judgment that the County wrongfully retaliated against Plaintiffs or anyone of them because one or more of them had exercised his constitutional rights and such retaliation was in violation of Osborne's constitutional rights; and an injunction that orders any person elected as a Walton County Commissioner to attend annually constitutional law training for elected officials.

47.     As described further below Plaintiffs Kish and Osborne seek an affirmative injunction against Walton County for Walton County to maintain the stormwater systems and related infrastructure in Driftwood such that it functions as required by law. As described further below Plaintiff Osborne seeks damages related to inverse condemnation against Walton County.   In addition to all other forms of relief

17

sought or described in this Complaint or that are otherwise fair, equitable, just, appropriate or within the authority of the Court the relief described below.

48. All of the Conspirators knew the facts, circumstances and law alleged herein.

49. Since the 1980s the interior 200 +/- acreage of Driftwood has been designated by law as "Open Space" which is recognized as a land use in Chapter 380, Florida Statutes. In 2000, Intrawest filed with Walton County and the DCA a Notice of Proposed Change (NOPC) pursuant to Chapter 380, Florida Statutes, which, after public hearings, Walton County approved via Ordinance 2000-18 that again designated by law that approximately 165 acres of Driftwood's interior's total acreage of approximately 200 acres was to be designated by law as Open Space and that only 34.7 acres of Driftwood's interior was designated by law for residential construction. Ordinance 2000-18 is a matter of public record.

50. In 2001 and 2002, Intrawest's Development Manager. (Ian McCook) though a serious of memos, emails, meetings, and discussions, repeatedly informed his superiors including the President, and General Counsel for Intrawest that Driftwood's interior acreage was predominantly Open Space where no residential development was authorized by law and that only 34.7 acres of Driftwood's interior was authorized by law to be developed for residential construction. He also informed them that in order for Intrawest to develop more than 34.7 acres in the interior of Driftwood, Intrawest was required by law to follow the procedural processes required by state and local law which included the NOPC process. In addition to the NOPC process that was required to change

18

the land use designation from Open Space to residential, Intrawest knew that the law required it to comply with the law which required public notices and public hearings in order for Intrawest to also obtain the required approvals from Walton County to obtain a development order to lawfully permit a residential development of any size greater than 20 single family units in Driftwood.

51.     At that same time in 2002, Intrawest also knew the following – that  it had reduced the Open Space acreage in the Sandestin DRI by far more than 20 acres and that pursuant to Section 380.06(19), Florida Statutes "A decrease in the area set aside for open space of 5 percent or 20 acres, whichever is less" was a substantial deviation and that "Any proposed change to a previously approved development which creates a reasonable likelihood of additional regional impact, or any type of regional impact created by the change not previously reviewed by the regional planning agency, shall constitute a substantial deviation and shall cause the proposed change to be subject to further development-of-regional-impact."

52.     As a practical matter such government review meant that multiple government, state, (and perhaps federal agencies such as the Army Corps of Engineers and Environmental Protection Agency (EPA)) would review the as-built status and compliance of the respective resources, environmental, economic and regional impacts, and infrastructure on Sandestin's DRI which had not been reviewed in over 40 years. Those state and regional agencies would include the DCA and Departments of Transportation, Florida Fish and Wildlife, Environmental Protection, the Water Management District and Regional Planning Council.

19

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/13/15 Page 20 of 178

53. Conspirators knew that the Sandestin DRI was likely not in compliance with many of legal requirements which would likely become known to the government during the review. Conspirators knew that such reviews created hundreds of millions of dollars of risks to them regarding not only the Driftwood development, but also for other development and revenue producing activities on Sandestin. Conspirators knew that government reviews of Sandestin's compliance would:

(a) Take many months if not years to conduct and prepare thereby preventing or impeding development upon Sandestin which would cause Conspirators to miss revenue from sales from the burgeoning real estate market in 2003. Conspirators knew that the homes that they would develop on a bayfront peninsula in Sandestin would be attractive to buyers.

(b) Discover violations or noncompliance such as the substantial unlawful Open Space reduction by over 100 acres and corresponding unlawful residential acreage increase of over 100 acres (even before Driftwood's interior was developed), insufficient stormwater discharge and traffic volume.

(c) Require Conspirators to incur millions of dollars in professional service fees for lawyers, engineers, surveyors, land-planners, and consultants for wetlands, archaeology to evaluate, negotiate, contest, design, procure permits, etc.

(d) Cost Conspirators millions of dollars in construction expenses to return the Sandestin DRI to compliance with the law which would disrupt and diminish revenue from resort activities.

20

(e)     Require Conspirators to incur millions of dollars of expenses to honor "their significant promises and commitments" to build the amenities in Driftwood and lose the revenue from the sale of the 200 acres in the interior of Driftwood.

(f)     Likely incur fines and penalties imposed by the government.

(g)     Perhaps bar or prevent any or all future significant development because Sandestin had already so exceeded its development entitlements that it could not be feasibly restored to a condition that would allow future development.

54.     Conspirators had significant financial motives to prevent those reviews and thus to conceal, conspire to conceal from certain government agencies, the public and persons such as Plaintiffs their actual development plans which, if known, would prevent their implementation of those plans and thus the loss of millions of dollars. One of the objectives of the conspiracy was to avoid these government reviews of the Sandestin DRI which was done by misconduct.

55.     McCook's superiors at Intrawest communicated to him in or about November 2002 to arrange for the sale of the Driftwood Interior and all of Intrawest's 88 exterior lots *without* following the legal process, and he complied with their directive by arranging sales to Olson and Adams Homes.

56.     In 2002, Intrawest contracted to sell all of the Driftwood interior acreage to Olson who, as known to Intrawest and Adams Homes, would construct and develop the road and stormwater infrastructure to service approximately 165 acres for approximately 463 single family home lots. At the time of the sale, the Conspirators

knew that in order to develop single family residential, they faced additional significant obstacles and problems such as:

(a)     Wetlands and stormwater quality permitting and function compliance from the ACOE and DEP; and

(b)     Stormwater management and "cleaning" treatment pursuant to Florida law including the Sandestin DRI standards which are also law.

57.     In December 2002, during Olson's "due diligence" period Olson and Intrawest were informed by its professional consultants that substantial wetlands compliance problems/issues existed concerning Driftwoods' interior and that there it appeared there was "no active binding [wetlands] jurisdictional determination for the project," and that the "review of these wetlands points in 1999 revealed an aggressive wetland delineation that in some instances would prove extremely difficult to defend in the presence of FDEP staff….we don't feel that it is secure enough to proceed with the purchase of the property until the line is bound by the State." BDI also warned that "If 78 acres of wetlands are filled as authorized in the ACOE permit, it appears that the project would be in violation of water quality standards with FDEP since permits have not been procured from the State." (Ex. 276.) (e.s.)

58.     On December 31, 2002, Intrawest signed a Purchase Agreement with Olson for $12.2 million to include the undeveloped 200+/− acreage in the interior of Driftwood identified by law as Open/Green Space and not authorized for residential construction. Developers knew that serious problems existed for development that each

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 23 of 176

intended to perform in Driftwood and identified them as conditions that must be satisfied in order to require Adams Homes and Olson to purchase the property. The parties identified these problems as conditions in the Purchase Agreement: as: (1) Traffic Concurrency Condition, (2) DRI Re-Allocation Condition and (3) Wetlands Delineation Condition. (Ex. 355)

59. Each of these conditions required Conspirators to perform certain acts and communicate with government in order to satisfy these conditions. Developers and Conspirators took actions including, but not limited to those described below, in furtherance of and for the purposes of the conspiracy ("conspiracy" throughout this document) as follows:

(a) Obtaining many substantive, material, (and some life-safety threatening) authorizations, permits, exceptions, waivers, variances, orders, etc. for the unlawful, improper, negligent, dysfunctional, and hazardous, development and construction in Driftwood Estates at Sandestin by purposeful misrepresentations, improper influence, collusion, conspiracy, deception, ethical violations, violations of constitutional, statutory, local and common law, ("misconduct") to government agencies such as the Army Corps of Engineers ("Corps"), DCA, Florida Department of Environment, and Walton County etc. ("government"), when Conspirators knew of the wrongfulness of their actions and when the Conspirators knew that their misconduct would, or was reasonably likely, to cause substantial and material damage and nuisances of the extent and type alleged herein to persons such as Plaintiffs who had property rights within Driftwood Estates at Sandestin.

(b)    Concealing, colluding and conspiring to conceal the wrongful misconduct and continue to conceal their misconduct to government in furtherance of the conspiracy.

60.    On January 24, 2003, Intrawest's Director of Development-Land (McCook) provided two (2) copies of Intrawest's DRI Land Use Survey and Summary Table to Olson indicating that the information was "Highly Confidential." and informed Olson that Intrawest's calculations for Open/Green Space yielded a "shortfall" even if those calculations included all purported Open/Green Space in the proposed Olson/Campbell development and that Intrawest was "making numerous assumptions at present to try to meet…the DRI land use requirements in order to satisfy the County and all other governmental jurisdictions." (Ex. 358.) Intrawest told Olson that it intended to make up the "shortfall of open/greenspace" by changing the methodology of accounting for Open Space by changing the categorization of certain roads and areas of subdivisions to Open/Green Space.

61.    On February 6, 2003, Intrawest (via McCook) submitted these two documents to the County: 1. "Notice of Proposed Density transfer of density within Driftwood", and 2. A "reconciled acreage report". Intrawest stated that "based on" those documents Olson's "proposed subdivision plan of 463 residential units is in compliance with the Sandestin DRI." (Ex. 136)

62.    Conspirators knew that McCook's representation that the submission of those two documents was not legally sufficient to actually render Olson's proposed 463 unit development "in compliance with the Sandestin DRI." Intrawest knew that only 34.7

24

acres Open Space in Driftwood II was authorized for residential construction and that Olson's plans attached to the submission showed that over 160 acres would be developed in Driftwood II.

63.     Conspirators knew that its "reconciled acreage report" was a misrepresentation and contained false and misleading information because it knew that the following misrepresentations were false:  "the net result of the reconciliation is a net increase in open space of 14.9 acres" and a "net decrease in residential acreage of 16.4 acres." Ex. 136. Intrawest knew that it had arrived at these amounts by unilaterally changing the methodology of how it reported Open Space etc. and reported it in a false and misleading way.

64.     Walton County has never approved Intrawest's 2003 "reconciled acreage report" and, in fact, the County has multiple times since at least 2004, determined that the "reconciled acreage report" is not valid and has never been approved by law, but failed to disclose those finding to Plaintiffs, DCA or the public for many years.

65.     On February 20, 2003, Walton County's "staff" found that Intrawest's February 6, 2003 "Notice of Proposed Density transfer of density within Driftwood", was "in accordance with the language in Ordinance 2000-18" but did not approve the "reconciled acreage report."

66.     The law including Ordinance 2000-18, however, as Conspirators knew, does not permit Intrawest to unilaterally change any land uses including a land use of 165 acres of open space to residential because the Ordinance only allows *density* unit

25

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 26 of 176

transfers "if the type of use to be transferred is available for development and is being transferred to an area which has been previously approved for that type of use within the DRI."

67. Conspirators contend that its Staff's approval of the density transfer to Driftwood II authorized the land use change of 165 acres of Open Space to residential.

68. On or about April 14, 2003, Intrawest sold approximately 88 lots to Adams Homes in Phase I of Driftwood for $5 million, and Intrawest sold the 200+/- acres in the interior of Driftwood to Olson for $12.2 million.

69. On April 25, 2003, Walton County apparently issued a "Minor" Development Order ostensibly authorizing the 463 lot development in Driftwood II.

70. As part of the Conspirators misrepresentations, on January 24, 2003 Intrawest's employee/engineer, Greg Graham, on behalf of Intrawest, signed, submitted or authorized the submission of a Joint Application ("Joint Application") Works in the Waters of Florida to the ACOE/DEP and Water Management District ("WMD") seeking to obtain authorization or a permit for construction and development on Driftwood's interior (See Ex. 145, WC 12336). Conspirators knew this Joint Application contained material misrepresentations and was false.

71. In that Joint Application, Intrawest, through Mr. Graham, told those government agencies that "The applicant, Intrawest Sandestin Company, LLC is preparing to develop a +/−200 acre parcel of land…known as Driftwood Estates." (Ex. 145, WC 12340) AND told the government agencies that "the applicant [Intrawest] is

26

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 27 of 178

proposing to develop the property as a single family residential community as previously permitted...." (See Ex. 145, WC 12341). Intrawest via Graham attached drawings to its January 2003 Joint Application that depict a configuration of the lots and lakes that is very different than the Olson/Campbell plans that were for plans submitted to the Corps in 1993 to obtain the expired permit to which Graham referred.

72. Prior to January 24, 2003, Intrawest had extensive discussions with Olson and Campbell and knew that they did not intend to "develop the property as a single family residential community *as previously permitted*" as Intrawest represented to those government agencies, ACOE, DEP and WMD.

73. Developers and Conspirators knew that Olson intended to develop a residential community that was very different than "previously permitted" in that the Driftwood development would include twice as many lots and far less open space and that such was not in accordance with the representations of the permit application and not authorized by law on Open Space. Intrawest's (and Graham's) Joint Application to the ACOE, DEP and WMD for the permit was knowing misconduct, purposely deceitful and misleading and sent in furtherance of the conspiracy

74. From 2004 to approximately 2007, Adams Homes purchased approximately 217 lots in Driftwood II and built single family homes upon them. Conspirators knew that the land upon which those homes was built was designated by law as Open Space and was not authorized for residential construction.

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 03/18/15 Page 28 of 178

75. In total Adams Homes developed 328 lots in Driftwood by modifying the terrain of those lots, brought in fill, changed, impeded, obstructed the flow of stormwater drainage across those lots, and changed, impeded and obstructed the flow of stormwater drainage in the swales in Driftwood I thereby causing nuisances such as water impoundment and stagnation to adjacent or nearby yards or lots and roadways.

76. Developers and Conspirators knew since at least 2003 (and perhaps earlier) that Intrawest had changed the methodology required by law to account for the Open Space, residential acreage, etc. in order to conceal the shortfalls from the public. Even though the County knew of that misconduct, concealment and numerous other violations regarding the Sandestin DRI, generally, and of those parties, development of Driftwood, specifically, the County concealed that information from Plaintiffs, others in their neighborhood and government.

77. At times from 2004 through 2006 and thereafter, Adams Homes publically and privately through its agents, and in furtherance of the conspiracy between them, advocated that it was a master builder and as such had investigated and confirmed that its construction and development activities within Driftwood complied with all aspects of the law when Adams Homes knew that those were misrepresentations.

## COUNT 1

### NEGLIGENCE OF NORTHTIP AND OLSON

78. Olson owed the following duties to Plaintiffs as persons with property interests in Driftwood to avoid damaging, Plaintiffs, and breached those duties as follows:

(a) To develop, design and build in accordance with the law regarding the Driftwood II stormwater design and function so that the post-development stormwater run-off is not greater than the pre-development stormwater run-off, so that the additional water does not flow onto or through Plaintiffs' property or impede or reduce stormwater from the exterior to follow its pre-development flow course causing it to impound, accumulate onto Plaintiffs' property common areas, easements and access. Olson breached this duty. Water from breach of this duty impedes Plaintiffs' property access, and creates and contributes to nuisances.

(b) Does not comply with the requirements of the Sandestin DRI such as stormwater drainage construction and design, Open Space, construction of residential lots, homes and appurtenant infrastructure in an area within Driftwood that is not designated by law for the construction.

(c) To not cause damage to roads that were paid for by property owners such as Plaintiffs and stormwater system in Driftwood I by its use of heavy dump trucks and earth moving equipment to haul, excavate tens of thousands of tons of fill in

Case 3:14-cv-00646-MCR-EMT   Document 172   Filed 08/13/15   Page 30 of 176

and out of Driftwood. Olson breached this duty by damaging the roads as described which contribute to the nuisances and the sustained standing water throughout Driftwood.

(d)     To develop, design and construct development in accordance with the law and in a way that did not damage Plaintiffs' property. Olson breached this duty because his stormwater system design for Driftwood II does not meet the design stormwater retention requirements of the Sandestin DRI or the as-built stormwater requirements of the law or the Sandestin DRI.

(e)     To facilitate and vouch for the lawfulness, propriety and Driftwood's compliance with the law to the government in public and private meetings. Olson, through his representatives, George Ralph Miller, Robert Lee

(f)     To perform pursuant to "commitments and promises" to provide the amenities and stormwater improvements ostensibly conveyed to it and/or Adams Homes. Olson provided neither the amenities nor stormwater improvements.

(g)     To not construct homes or other infrastructure contrary to law such that their function and non-compliance damages Plaintiffs.

79.     Olson and Northtip breached these duties by performing, facilitating, aiding, encouraging and conspiring to do those actions for the development, design or construction within Driftwood Estates that:

(a)     Was not designed and constructed in accordance with the Sandestin DRI, applicable Walton County ordinances and standard industry practices such that the post-development stormwater run-off is greater than the pre-development

30

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 03/18/15 Page 31 of 178

stormwater run-off, and that said additional water flows or causes water to impound on Plaintiffs' property, common areas, easements and other property rights.

(b)     Developing Driftwood's interior and exterior contrary to the requirements of the Sandestin DRI, applicable Walton County ordinances and other requirements of law.

(c)     Developing Driftwood such that post-development stormwater run-off for development within the Sandestin DRI is not greater than the pre-development stormwater run-off, and that said additional water does not flow or cause water to be impounded or directed onto Plaintiffs' and other property owners' real estate, common areas and easements.

(d)     Developing and negligently reviewing or failing to review the development, reviewed the development of Driftwood I and II without regard for the design, construction and maintenance of an adequate drainage plan or a stormwater drainage plan to comply with the Sandestin DRI, such that significant additional stormwater run-off flows over the other property owners in Driftwood Estates' land, including the Plaintiffs.

(e)     Developing in Driftwood with fill to artificially raise their elevation, thus redirecting the historical water flow towards Plaintiff's homes and exterior of Driftwood contributing to the increased flooding and standing water on the exterior of Driftwood.

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 32 of 176

(f)     Developing by replacing pervious surfaces with impervious ones, and constructing homes that have created a much larger volume of run-off, without implementing a stormwater run-off drainage system that contains the extra run-off occasioned by their development. The Plaintiffs' homes, the streets adjacent to their homes and the common areas they have access to are now prone to flooding and the value of their homes has been damaged.

(g)     Violating the provisions of the Sandestin DRI in obstructing the means of ingress and egress of the Plaintiffs through the Sandestin DRI on Driftwood Drive and by not allowing or providing such access via other means or locations.

(h)     Violating the provisions of the conveyance of the properties to the Plaintiffs in obstructing the means of ingress and egress of the Plaintiffs on Driftwood Drive pursuant to the Driftwood Estates Plat and/or the Access Agreement.

(i)     Negligently or intentionally increasing the number of dwellings to be built within Driftwood Estates without appropriate regard to the lawful requirements, including but not limited to the Sandestin DRI, for direct and contiguous pedestrian and vehicular access by Driftwood to the Sandestin DRI  and for stormwater retention and drainage.

(j)     Failing to construct amenities such as a private, bayfront club, complete with swimming pool, fishing pier, cookout area, picnic tables and a children's playground, as represented in the promotional materials for Driftwood Estates and designated in the Driftwood Estates Plat.

(k)     Failing to construct single-access entry through beautifully designed and landscaped gatehouse entrance.

(l)     Developing and building an inadequate civil infrastructure such that their post-development stormwater run-off significantly exceeds the pre-development stormwater run-off, and the concentration and flow of said additional run-off has been redirected to adjacent and downstream property owners, thereby diminishing the value of the Plaintiffs' real property.

(m)     Making false statements and misrepresentations in seeking to procure development authorizations for the development of Driftwood.

(n)     Wrongfully facilitating, vouching and procuring Development approvals for Driftwood's development to government agencies such as Walton County and other state and federal agencies by means of false, misleading information and concealing the facts material to those development authorizations.

(o)     After wrongfully facilitating, vouching and procuring Development approvals for Driftwood's development to government agencies, continuing to mislead or misrepresent information to those government agencies to prevent enforcement or stoppage of the development activities and as also described in paragraphs above.

(p)     Improperly altering the natural contour of the land and using improper fill to raise the elevation of their lots so that the area available for home construction would be greatly expanded, and filling wetlands not in accordance with

applicable permits. These actions destroyed or impaired critical vegetation elements that absorbed stormwater run-off and were otherwise important to the wetlands, Open Space, stormwater treatment and management, water quality, and property values in Driftwood.

80. Because Developers contributed to elevating the Project above Driftwood's exterior by filling the wetlands, stormwater now floods the exterior road and yards and blocks the historical stormwater flow into the interior wetlands exacerbating the flooding such that the sole narrow road from their neighborhood often floods to several feet preventing several hundred families from evacuating Driftwood's peninsula in storms.

81. The negligent actions of Olson breached duties causing injury and damage to Plaintiffs in that those negligent acts have:

(a) caused the roadways, common areas, and yards within Driftwood Estates to flood and created nuisances;

(b) limited ingress and egress to the Plaintiff's properties to the use of a 30 foot right-of-way that is not within the Sandestin DRI and that becomes impassable during normal rain events, and harder rains and/or storm surges and creates life safety hazards by severing ingress and egress;

(c) created small, shallow ponds that cannot sustain an aquatic environment, thus these ponds have become breeding grounds for mosquitoes and other insects;

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 35 of 178

(d)    created a publically acknowledged safety hazard due to the combination of poor drainage and limited access;

(e)    significantly diminished the desirability of the Plaintiff's property as a part of a well-designed and attractive neighborhood due to the failure to build the bayfront club facility and gatehouse facility, and reducing the amount of property devoted to lakes, littoral land, parks, golf course, and natural habitats, they have;

(f)    segregated Driftwood Estates from the amenities that were advertised as a benefit of living in that neighborhood and that were indicated in the Sandestin DRI as a part of the "integrated" community that was to be the Sandestin DRI by constructing a wall between Driftwood Estates and the rest of the Sandestin DRI; and

(g)    diminished the habitability of the neighborhood as described in herein.

82.    Because of the negligent acts of Northtip and Olson, the Plaintiffs have suffered a greatly diminished lifestyle, a drastic diminution in the value of their property, property damage and significant damage to the marketability of their property and the damages described above.

WHEREFORE, each Plaintiff demands the entry of a final judgment in his favor, against the Defendants, Northtip and Olson in the amount of the damages each has sustained and as described above, plus costs, interest and any other relief deemed appropriate by the Court and a trial by jury on all issues so triable.

## COUNT 2

## NEGLIGENCE AS TO CAMPBELL AND DAVID CAMPBELL

83.     Campbell and Mr. Campbell were retained or employed by Olson or Northtip to design and inspect the construction of a stormwater drainage plan for the interior portion of Driftwood Estates that Olson developed.

84.     Mr. Campbell was the licensed professional engineer who performed the design services for Olson or Northtip for the preparation of civil design drawings that included a stormwater retention system. Mr. Campbell is also a principal, owner and officer of Campbell Engineering Inc.

85.     Campbell and Mr. Campbell knew or should reasonably have known that the design and construction of the drainage plan for the interior of Driftwood Estates had to function in compliance with all applicable industry and legal requirements including, but not limited to, the Sandestin DRI, and that the failure of such design to comply with such requirements would have a direct and significant impact upon the property owned and resided upon by the Plaintiffs and its value.

86.     Campbell and Mr. Campbell certified to Walton County and other government agencies that the as-built conditions were in compliance with the design and all applicable legal requirements, including, but not limited to, the Sandestin DRI when, in fact, such as-built conditions were not in compliance with the design and all such requirements.

87.     Campbell and Mr. Campbell owed the Plaintiffs a duty to design a drainage plan that would meet the requirements of the Sandestin DRI, would be in compliance with

state, local, and national standards, and would not cause stormwater migration or impoundment that would diminish the value of the properties owned by the Plaintiffs and Driftwood Estates, generally, cause them property damage, or unreasonably impair their use and enjoyment of their property by creating nuisances of otherwise.

88. Campbell and Mr. Campbell breached their duties by not designing and ensuring construction of a stormwater system that complies with all applicable industry and legal requirements including, but not limited to, the Sandestin DRI, by certifying to Walton County and other government agencies that the design and construction of that stormwater system was in compliance with all applicable legal requirements when, in fact, such design was not in compliance with the design and all such requirements, by designing a stormwater drainage system that causes or allows stormwater migration or impoundment that damages Plaintiffs' property, impairs their property rights and use and enjoyment of their Property and thereby diminishes the value of the properties owned by the Plaintiffs within Driftwood, by failing to ensure construction of the improvements to Driftwood I and II to prevent unreasonable and harmful interference with the flow of surface waters in Driftwood so that such flow does not damage Plaintiffs' property, impair their property rights and the use and enjoyment of their property thereby diminish the value of the properties owned by the Plaintiffs within Driftwood.

89. Campbell and Mr. Campbell's breach of these duties is a proximate cause of Plaintiffs' damages as described above and the diminution of the value of the Plaintiffs' property, damage to their property and significant impairment of the Plaintiffs' right to the quiet enjoyment of their property within Driftwood.

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/13/15 Page 38 of 176

38

WHEREFORE, each Plaintiff demands the entry of a final judgment in his favor against Campbell and Mr. Campbell as stated above and in the amount of the damages stated herein  plus taxable costs and any other relief deemed appropriate by the Court and a trial by jury on all issues so triable.

Case 3:14-cv-00646-MCR-EMT   Document 172   Filed 08/18/15   Page 39 of 178

## COUNT 3

## NEGLIGENCE AS TO ADAMS HOMES

90.    Adams Homes, as a developer, successor in interest to Intrawest, master home builder and lot purchaser, and seller of over 300 homes in Driftwood, owed a duty to Plaintiffs to build homes within Driftwood Estates in a manner consistent with the Sandestin DRI and other applicable state, federal and local laws, to conduct itself in a manner reasonably consistent with the rights of the Plaintiffs to the quiet enjoyment of their property, to not alter its lots in such a way to cause harmful interference with the flow of surface waters or nuisances.

91.    Adams Homes also owes a duty to the other property owners in Driftwood, including the Plaintiffs, such that Adams Homes' post-development stormwater run-off is not greater than the pre-development stormwater run-off, and that such additional water does not flow onto the other property owners' real estate, common areas and easements.

92.    Adams Homes built and sold homes in the interior of the Driftwood without regard for the design, construction and maintenance of an adequate drainage plan, or a stormwater drainage plan that complies with the Sandestin DRI, such that significant additional stormwater run-off flows over the other property owners in Driftwood Estates' land, including the Plaintiffs and impairs Plaintiffs' property rights.

93.    Many of the homes built by Adams Homes in Driftwood II upon lots built up with fill to artificially raise their elevation, thus redirecting the historical water flow towards

Plaintiff's homes and exterior of Driftwood contributing to the increased flooding and standing water on the exterior of Driftwood. Moreover, Adams Homes used impervious muck and clay as fill to elevate these lots, and the soil conditions are not suitable for percolation of water, or proper drainage, which reduces the natural drainage capacity of the area.

94. Adams Homes also altered the natural contour of the land and used improper fill to raise the elevation of their lots so that the area available for home construction would be greatly expanded. These actions destroyed or impaired critical vegetation elements that absorbed stormwater run-off.

95. Adams Homes owed a duty to Plaintiffs as property owners within Driftwood Estates to avoid injury to the Plaintiffs and their property which included, but is not limited to, the following duties:

(a) To develop design and build in accordance with the law, including but not limited to the Sandestin DRI and applicable Walton County ordinances and common law, such that Intrawest's post-development stormwater run-off is not greater than the pre-development stormwater run-off, and that said additional water does not flow onto the other property owners' real estate, common areas and easements;

(b) To develop, design and build lots, homes or other infrastructure contrary to the requirements of the Sandestin DRI, applicable Walton County ordinances and other requirements of law;

(c)     To develop , design and build homes and infrastructure such that the post-development stormwater run-off for development within Driftwood is not greater than the pre-development stormwater run-off, and that said additional water does not flow or cause water to be impounded or directed onto Plaintiffs' and other property owners' real estate, common areas and easements;

96.     Adams Homes has breached these duties by performing or allowing by persons on its behalf the performance of development, design or construction,   within Driftwood Estates that:

(a)     does not comply with the requirements of the Sandestin DRI such as stormwater drainage construction and design, construction of residential lots, homes and appurtenant infrastructure in an area within Driftwood that is not designated by law for that development and construction;

(b)     was not designed and constructed in accordance with the Sandestin DRI, applicable Walton County ordinances and standard industry practices such that the post-development stormwater run-off is greater than the pre-development stormwater run-off, and that said additional water flows or causes water to impound on Plaintiffs' property, common areas, easements and other property rights;

(c)     developed, design or building lots, homes or other infrastructure contrary to the requirements of the Sandestin DRI, applicable Walton County ordinances and other requirements of law;

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 42 of 178

(d)     developing such that its post-development stormwater run-off for development is not greater than the pre-development stormwater run-off, and that said additional water does not flow or cause water to be impounded or directed onto Plaintiffs' and other property owners' real estate, common areas and easements;

(e)     developing, designing and constructing in Driftwood I and II without regard for the design, construction and maintenance of an adequate drainage plan or a stormwater drainage plan to complies with the Sandestin DRI or other requirements of law , such that significant additional stormwater run-off flows over and impairs the other property rights of owners in Driftwood including the Plaintiffs;

(f)     developing and constructing homes in Driftwood Estates upon lots built up with fill to artificially raise their elevation, thus redirecting the historical water flow towards Plaintiffs' homes and exterior of Driftwood contributing to the increased flooding and standing water on the exterior of Driftwood;

(g)     Replacing pervious surfaces with impervious ones, and constructing homes that have created a much larger volume of run-off, without implementing a stormwater run-off drainage system that contains the extra run-off occasioned by their development. The Plaintiffs' homes, the streets adjacent to their homes, and the common areas they have access to, are now prone to flooding and the value of their homes has been damaged;

(h)     violating the provisions of the Sandestin DRI in obstructing the means of ingress and egress of the Plaintiffs through the Sandestin DRI on Driftwood Drive and by not allowing or providing such access via other means or locations;

(i)     negligently increasing the number of dwellings to be built within Driftwood Estates without appropriate regard to the lawful requirements, including but not limited to the Sandestin DRI, for direct and contiguous pedestrian and vehicular access by Driftwood to the Sandestin DRI  and for stormwater retention and drainage;

(j)     building an inadequate civil infrastructure such that their post-development stormwater run-off significantly exceeds the pre-development stormwater run-off, and the concentration and flow of said additional run-off has been redirected to adjacent and downstream property owners, thereby diminishing the value of the Plaintiffs' real property.

(k)     Building over 200 homes in the interior of Driftwood upon land that Adams Homes knew or should have known was designated by law as Open Space and not authorized for residential construction

(l)     Failing to cease construction of homes in the interior of Driftwood upon land that Adams Homes knew or should have known was designated by law as Open Space and not authorized for residential construction no later than the spring of 2005 when Adams Homes, as a master builder, should have known that residential construction upon the Open Space in Driftwood's interior was unlawful and had not been lawfully authorized.

43

97.     Adams Homes breach its duties to Plaintiffs because Adams Homes knew or reasonably should have known that its construction of over 300 homes in Driftwood:

(a)     would cause increased volume of stormwater run-off from the interior of Driftwood Estates, which could not be managed by the existing drainage system;

(b)     that its construction of homes in the interior of Driftwood was contrary to the requirements of the Sandestin DRI and Walton County ordinances and was not an authorized use;

(c)     that the stormwater drainage design and as-constructed conditions would violate the requirements of the Sandestin DRI and applicable state, federal, and local laws;

(d)     significantly aggravate existing public safety problems of Driftwood Estates because of existing drainage limitations in Driftwood and its ingress/egress limitations;

(e)     that destruction of lakes, littoral lands, and other water absorbing vegetation and features would over-burden the existing or planned drainage systems; and

(f)     that the improper preparation of construction sites, the slopping of lots in a way to cause the harmful and unreasonable interference of surface flow waters onto other property, compacting lots with impermeable clay and muck, would result in additional drainage burdens upon the already inadequate drainage system or planned drainage system.

98.     Though Adams Homes knew, or should have known, that the construction of over 300 homes would result in the problems described herein, Adams Homes initiated

44

Case 3:14-cv-00646-MCR-EMT Document 1-72 Filed 08/18/15 Page 45 of 178

construction of those homes, altering the natural features of the land, altering the composition of the soil, ignoring the existing public safety problems of the Driftwood Estates neighborhood and generally ignoring the Plaintiffs' right of quiet enjoyment of their property.

99. Adams Homes breach of its duties is a proximate cause of the diminution of the value of the Plaintiffs' property, Plaintiff's property damage and the destruction or significant impairment of the Plaintiffs' right to the quiet enjoyment of their property.

100. Adams Homes has damaged the Plaintiffs by the above actions and by replacing pervious surfaces with impervious ones and constructing homes that have created a much larger volume of run-off, without implementing a stormwater run-off drainage system that contains the extra run-off occasioned by their development. The Plaintiffs' homes, the streets adjacent to their homes, and the common areas they have access to, are now prone to flooding and the value of their homes has been damaged by the unlawful construction of over 200 homes upon the Open Space and the adverse affects as described herein that Adams Homes created by such construction.

101. Because of the negligent acts of Adams Homes, the Plaintiffs have suffered a greatly diminished lifestyle, a drastic diminution in the value of their property, property damage and significant damage to the marketability of their property.

WHEREFORE, each Plaintiff demands the entry of a final judgment in his favor, against Adams Homes in the amount of the damages described above and that each Plaintiff

sustained, plus taxable costs and any other relief deemed appropriate by the Court and a trial by jury on all issues so triable.

## COUNT 4

### NUISANCE AND TRESPASS AS TO NORTHTIP, OLSON, CAMPBELL AND ADAMS HOMES

102.     Northtip, Olson and Adams Homes each owed a duty to Plaintiffs to not perform actions or to make use of their property in a way that would not create nuisances to persons and the property rights of such as Plaintiffs who owned property and possessed property rights in the same community and would not cause a trespass onto their property or impair the exercise of their property rights.

103.     Campbell and Mr. Campbell owed a duty to Plaintiffs to not design changes to these Defendants' property in a way that would not create a nuisance or trespass to  persons and the property rights of Plaintiffs who owned property and possessed property rights in the same community and would not cause a trespass onto their property or impair the exercise of their property rights

104.     Developers owed a duty to Plaintiffs because those Developers were persons whose designs, construction, development or other conduct changed, altered or restrained the flow of stormwater, surface and subsurface water  to  provide against the consequences that would will result from rainfall. They owed a duty to not allow their conduct to cause such waters that would naturally flow in one direction by drainage, ditches, dams, or otherwise, and divert them from their natural course and cast them upon the property of Plaintiffs another or to create nuisances that impair the Plaintiffs property rights.

105. Developers each owned real property which was adjacent to real property in which said Plaintiffs have property rights, including the Driftwood Estates' common property, and each Defendant's conduct has caused nuisances and trespasses that impair each Plaintiffs' free use and enjoyment of their property rights.

106. Northtip, Olson and Adams Homes each made use of their property in such a way that it annoys or disturbs said Plaintiffs' free use, possession or enjoyment of their property and causes a trespass of water onto Plaintiffs property, creates nuisances as described herein and renders Plaintiffs' ordinary use or occupation of their property physically uncomfortable.

107. The actions of Defendants Northtip, Olson, Adams Homes, Campbell and Mr. Campbell have created nuisances to Plaintiffs' property rights and the enjoyment of their property such as flooding, standing water for days and weeks in the yards and swales that causes boggy yards and prevents or impedes yard maintenance, mosquito infestations that carry West Nile virus and other potential serious diseases which restricts Plaintiffs use of the outdoors of their property rights, stormwater quality runoff that creates sludge/slim and algae blooms with a pungent stench in the Bay thereby impairing Plaintiffs' riparian rights of use in the Bay, life safety ingress and egress hazardous. These conditions impair the comfort, health and safety of Plaintiffs use of and their property rights and have so diminished the quality of life in Driftwood Estates that the value of the property owned by Plaintiffs has been significantly damaged and reduced.

108. WHEREFORE, Plaintiffs each demand the entry of a final judgment against Intrawest, Northtip, Olson, Campbell, Mr. Campbell and Adams Homes in the

amount of the damages described above and that each sustained, plus taxable costs and any other relief deemed appropriate by the Court and a trial by jury on all issues so triable and as stated herein.

## COUNT 5

### DECEPTIVE OR UNFAIR TRADE PRACTICES ACT VIOLATIONS BY ADAMS HOMES, CAMPBELL, OLSON AND NORTHTIP

109. This is an action for actual and statutory damages and declaratory relief pursuant to Florida's Deceptive and Unfair Trade Practices Act, Chapter 501, Florida Statutes ("FDUTPA"), against Olson, Northtip, Adams Homes and Campbell.

110. At all times material hereto Plaintiffs were "consumers" as defined by FDUTPA. At all times material hereto, Adams Homes, Olson or Northtip were engaged in "trade or commerce" by advertising, offering, selling property or other "things of value" in Driftwood defined by FDUTPA. Each Plaintiff is also "a person" bringing an action pursuant to FDUPTA "who has suffered a loss as a result of a violation of" FDUPTA and therefore seeks to "recover actual damages, plus attorney's fees and court costs."

111. The following acts and practices of Adams Homes, Olson or Northtip were unconscionable acts or practices or unfair or deceptive acts or practices committed by Adams Homes, Olson and/or Northtip in trade or commerce as defined by FDUTPA. Before and during the time Adams Homes, Olson, Northtip owned their interests in real property

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 49 of 178

within Driftwood Estates, Adams Homes, Olson or Northtip knew or reasonably should have known:

(a)     That 217 lots in Driftwood II upon which Adams Homes built single family homes were built on land designated by law as Open Space and was not authorized for residential construction.

(b)     That Adam Homes was using improper, unsuitable or inadequate fill materials and/or compaction methods, techniques or work that was insufficient or suitable given the wetlands, other types of hydric soils, the native subsurface conditions and high water table upon which Adams Homes constructed its homes would result in extensive foundation problems and exterior cladding cracking that, because of the mass, scale and quantity of homes that Adams Homes built would substantially damage home vales of other homes in the neighborhood such as Plaintiffs

(c)     That homes built by Adams Homes were incompatible with the requirements of law for home construction in Driftwood and that no lawful authorization had been obtained to all for Adams Homes construction of those homes, and that the construction of those homes to the mass and scale by Adams Homes would substantially devalue the property rights and values of persons such as Plaintiffs

(d)     That the Developers development and construction activities would damage the roads and infrastructure in Driftwood and they did not and would not repair it

(e)     Of the misconduct and misrepresentations described in the Common Allegations and in the Conspiracy Count and Count herein

(f)     that Olson intended to develop a residential community that was very different than "previously permitted" in that the Driftwood development would include twice as many lots and far less open space and that such was not in accordance with the representations of the permit application and not authorized by law on Open Space. Intrawest's (and Graham's) Joint Application to the ACOE, DEP and WMD for the permit was knowing misconduct, purposely deceitful and misleading and sent in furtherance of the conspiracy

(g)     that the amenities that had been advertised in sales material, included in descriptions contained in the Sandestin DRI, and noted on the Driftwood Estates Plat, had not built, and neither Adams Homes, Olson or Northtip, nor its successors would build such amenities in Driftwood Estates.

(h)     That the land that it developed in Driftwood II for 463 residential lots was designated for a golf course, Open Space, ponds, nature areas and nature trails in Driftwood II.

(i)     That Campbell's stormwater drainage design was not in compliance with the Sandestin DRI stormwater retention requirements;

(j)     Certain interior portions of Driftwood Estates were designated as ponds, natural areas with nature trails, Open Space and a golf course which were vital and necessary components in order for development of the interior of Driftwood to comply with the Sandestin DRI stormwater drainage requirements;

50

112.     Plaintiffs are persons within the meaning of "anyone aggrieved by a violation of" FDUTPA and seek a declaratory judgment that Adams Homes, Olson and Northtip's acts and practices alleged herein are deceptive and unfair trade practices pursuant to FDUTPA.

113.     WHEREFORE, Plaintiffs demand judgment against Adams Homes, Olson, Campbell and Northtip for all actual damages, including but not limited, damaged property, diminution in value, attorneys' fees and costs, and a declaration that the acts and practices alleged herein are deceptive and unfair trade practices pursuant to FDUTPA.

## COUNT 6

### CIVIL CONSPIRACY AND AIDING AND ABETTING
### AGAINST OLSON, NORTHTIP, CAMPBELL ENGINEERING,
### ADAMS HOMES, CAMPBELL

114.     Plaintiffs adopt the Common Allegations and the allegations in Count 10, the Civil Rights Claims against Walton County.

115.     This is an action for civil conspiracy against Olson, Northtip, Adams Homes, Campbell and Campbell Engineering.

116.     Conspirators entered an agreement to do unlawful acts and/or to do a lawful act by unlawful means and committed overt acts in pursuance of the conspiracy and the agreement.  Plaintiffs have been damaged as a result of the acts done in furtherance of the conspiracy.  Walton County is alleged to be a member of the conspiracy but is not being sued as a member of the Conspiracy.

51

117. The Conspirators also committed the independent tort of civil conspiracy because the Conspirators possessed a peculiar power of coercion and influence by virtue of their combination which power one of them standing in like relation to the Plaintiffs would not have had.

118. Here the actions of the Conspirators by their force of numbers acting in unison and the exceptional circumstances that was benefitted by the participation of the local government, Walton County, to provide approval of the Project where the Conspirators knew or should have known that they were deliberately violating the law in order to obtain the development approval and that such violations would harm persons who owned property nearby to the proposed development such as the Plaintiffs.

119. The Conspirators initial primary object was to achieve the necessary development approvals for the Driftwood II's development.

120. In furtherance of the conspiracy, the Conspirators employed a pattern of material and false misrepresentations and omissions to persons in Driftwood such as Plaintiffs and to multiple government agencies in furtherance of the conspiracy. Those misrepresentations were reasonably calculated to deceive persons of ordinary prudence and comprehension.

121. The Conspiracy was formed in or about December 2002. In or about that time Intrawest and Olson/Northtip knew that they were it was selling all of Driftwood's interior but that only 34.7 acres of that interior was authorized for residential construction.

122.    Adams Homes joined the conspiracy in or around January 2002.  Adams Homes initial contributions to the Conspiracy were the influence of its employee, Larry Jones who was also then the Chairman of the Walton County Board of County Commissioners to facilitate the approval of the proposed development outside of the lawful process.

123.    Adams Homes knew of, should have known of, aided, abetted and encouraged at least the following from about near of around April 2003:

(a)    The land in the interior of Driftwood was predominantly Open Space for which residential construction was not authorized

(b)    not lawful  and not upon which had it was contracted to build

(c)    that the lawful process that included notice and public hearings for the issuance of a development approval by Walton County was intentionally not followed in an effort to by the Conspirators to conceal from potential opposition such approval

124.     Intrawest could not sell to Olson/Northtip unless it procured some of those approvals.  Olson/Northtip would not purchase unless those approvals were secured. Adams Homes would not buy from Intrawest or Olson/Northtip unless those approvals were secured.

125.    Conspirators made representations that they knew to be false in order to secure some of those approvals and Adams Homes knew of, encouraged or aided and abetted the securing of some of those approvals from Walton County through the influence of its employee who was also the Chairman of the Board of County Commissioners at the relevant time in 2003.

126.     Representatives of Intrawest, Olson/Northtip and Adams Homes exerted improper influence with the Walton County officials and staff to secure from Walton County development approval for the Driftwood Project even though all Conspirators knew that they were deliberately ignoring, circumventing, avoiding and violating the law to do so.

127.     The initial objective of the collective effort of the Conspirators was to secure development approval for the Driftwood Project from Walton County and other governments. In order to accomplish the Conspirators objectives it was necessary for some or all of the Conspirators to not disclosing the true facts, make material misrepresentations, exert improper influence over the approval process from Walton County, and intentionally conceal their plans in order to avoid resistance knowingly not complying with the legal requirements of the public process required for local government approval of the Driftwood Project.

128.     All of the Conspirators knew that their actions concerning the development approval was reasonably likely to harm persons such as Plaintiffs who owned and lived in homes within the same neighborhood as the Driftwood Project.

129.     The Conspirators knowingly violated the law anyway because they assessed that the risks of being stopped or of liability exposure were low especially because the local government approval authority (Walton County) was complicit in the conspiracy.    The Conspirators also knew that by concealing their plans and approvals for the longest practical time period would further insulate them from negative consequences that may occur if opposition to their development of the Driftwood Project arose.

130. All Conspirators deliberately circumvented the lawful requirements because to comply with the law jeopardized whether the proposed project could ever comply with the lawful requirements and public notices and public hearings jeopardized its approval by public scrutiny and accountability of public officials. So the Conspirators knowingly bypassed many of the lawful requirements, with the unlawful and improper collusion of Walton County officials, in order to obtain the development approvals.

131. The Conspirators did this in part by concealing the true status of the wetlands and Open Space shortfall of the Sandestin DRI so as to avoid federal and state government scrutiny and review that might slow, prevent, or increase the costs of other development projects on Sandestin

132. In so doing, many of the Conspirators stood to realize substantial revenue of tens of millions of dollars from the development of the 463 lot housing development upon the Open Space and wetlands in the interior of Driftwood.

133. The conduct of the Conspirators was aided, abetted and encouraged by the participation of all of them as described below.

134. Intrawest was the owner of the Driftwood acreage. Intrawest knew that residential development upon the Open Space in Driftwood was unlawful but sold that acreage with knowledge that it would be developed for homes. Intrawest also knew that it was only able to sell the land because of Intrawest's false representations to governments in order to secure development entitlements.

55

135.    Intrawest's conduct in furtherance of the initial objectives of the conspiracy included:

(a)    Its submission of the false wetlands permit application on or about January 27, 2003 to the state and federal government by Intrawest's employee/engineer Greg Graham

(b)    its deliberate misrepresentations and omissions to Walton County concerning the Open Space reductions in Driftwood on February 6, 2003

(c)    its deliberate misrepresentations concerning the Open Space status of the land upon which it knew the Driftwood Project would be unlawfully built and when Intrawest also knew that it had not followed the lawful process to change that Open Space land use to lawfully allow residential construction where Intrawest also knew that they Olson/Northtip and Adams Homes would build homes and that without Intrawest's misrepresentations Intrawest could not sell the land to Olson/Northtip or Adams Homes because they would not be able to build upon it to scope and degree necessary for them to make the project profitable.

(d)    its deliberate and unlawful avoidance of the lawful approval process for a development such as the Driftwood Project for which the law required several aspects of notice to the public and of public meetings and that Board of County Commissioner approval was necessary which was aided and abetted by the Conspirators;

(e)    Intrawest's its deliberate and unlawful avoidance of complying with the stormwater retention standards for the Driftwood Project and its deliberate and

56

unlawfully false misrepresentations to Walton County on February 6, 2003 that the proposed Driftwood Project was in compliance with the law when Intrawest knew or should have known that it was not in compliance with the applicable stormwater retention standards

136.    Olson's and Northtip's conduct in furtherance of the conspiracy  included:

(a)      They aided, abetted and encouraged Intrawest's submission of the false wetlands permit application to the state and federal government by Intrawest's employee/engineer Greg Graham on or about January 24, 2003.

(b)      They aided, abetted and encouraged Intrawest's deliberate misrepresentations and omissions to Walton County concerning the Open Space reductions in Driftwood on February 6, 2003 which Olson and Northtip knew to be false'

(c)      They aided, abetted and encouraged Intrawest's deliberate misrepresentations concerning the Open Space status of the land upon which it knew the Driftwood II Project would be unlawfully built and when they knew, or should have known, that neither Intrawest nor they had followed the lawful process to change that Open Space land use to lawfully allow residential construction where they knew that they were going to build homes

(d)      its deliberate and unlawful avoidance of the lawful approval process for a development such as the Driftwood Project for which the law required several aspects of notice to the public and of public meetings and that Board of County Commissioner approval was necessary which was aided and abetted by the Conspirators

57

(e)      its deliberate and unlawful avoidance of complying with the stormwater retention standards for the Driftwood Project and its aiding and abetting and encouraging Intrawest's deliberate and unlawfully false misrepresentations to Walton County on February 6, 2003 that the proposed Driftwood Project was in compliance with the law when Olson and Northtip knew or should have known that it was not in compliance with the applicable stormwater retention standards

(f)      Olson and Northtip, in part through the actions of the former Walton County attorney, George Ralph Miller, exerted improper influence upon the Walton County staff and other officials in order to aid, abet and facilitate Walton County's approval of the Driftwood Project by Walton County staff members so that they on behalf of Walton County would aid and abet Olson and Northtip and the other Conspirator's objectives of avoiding public knowledge and scrutiny of the Driftwood Project. The avoidance of such scrutiny was accomplished by the collusion of the Conspirators to have some Walton County staff person "approve" the Driftwood Project because the Conspirators exerted unlawful and improper influence upon Walton County to avoid the lawful public process for such development approvals and by ignoring significant substantive legal requirements which otherwise would have been necessary for the approval of such a project.

137.  Adams Homes conduct in furtherance of the initial objectives of the conspiracy included:

(a)      Adams Homes aided, abetted and encouraged or sought to make itself intentionally ignorant of Intrawest's submission of the false wetlands permit application to

58

the state and federal government by Intrawest's employee/engineer Greg Graham to procure the wetlands authorizations necessary for the Driftwood Project

(b)     Adams Homes aided, abetted and encouraged or sought to make itself intentionally ignorant of Intrawest's deliberate misrepresentations and omissions to Walton County concerning the Open Space reductions in Driftwood on February 6, 2003 which Adams Homes knew to be false.

(c)     Adams Homes aided, abetted and encouraged, or sought to make itself intentionally ignorant, of Intrawest's deliberate misrepresentations concerning the Open Space status of the land upon which it knew the Driftwood II Project would be unlawfully built and when Adams Homes knew, or should have known, that no person had followed the lawful process to change that Open Space land use to lawfully allow residential construction where Adams Homes knew that it was going to build homes.  Adams Homes knew that it would be building homes on land not lawfully designated for residential construction and participated, aided, abetted and encouraged the other Conspirators to obtain ostensible "approvals" from Walton County by the false submission so that Adams Homes could build those homes and insulate itself from liability for its misconduct by virtue of the approval that it assisted to unlawfully procure.

(d)     Adams Homes aided, abetted and encouraged the other Conspirator's deliberate and unlawful avoidance of the lawful approval process for a development such as the Driftwood Project for which the law required several aspects of notice to the public and of public meetings and that Board of County Commissioner approval was necessary which was aided and abetted by the Conspirators.   Adams Homes aided, abetted and encouraged

59

the Conspirators to knowingly and deliberately violate the due process rights of persons such as Plaintiffs to notice and opportunity to be heard concerning the proposed development

(e) Adams Homes aided, abetted and encouraged the Conspirators deliberate a violation of persons such as Plaintiffs' due process rights because Adams Homes knew or should have known that if the longer duration of time that the Conspirators concealed the approval then the less likely it would be that when persons such as Plaintiffs learned of the development and tried to oppose such development, the less likely that such opposition would succeed.

(f) Adams Homes aided, abetted and encouraged the other Conspirators deliberate and unlawful avoidance of complying with the stormwater retention standards for the Driftwood Project and their deliberate and unlawfully false misrepresentations to Walton County on February 6, 2003 that the proposed Driftwood Project was in compliance with the law when Adams Homes knew or should have known that it was not in compliance with the applicable stormwater retention standards

(g) Adams Homes, exerted improper influence upon Walton County through and upon the Chairman of the Walton County Commissioners in 2003 who was also simultaneously an employee of Adams Homes to aid, abet and facilitate Walton County's approval of the Driftwood Project by Walton County staff members so that they on behalf of Walton County would avoid both the lawful process for such development approvals and ignoring significant substantive legal requirements which otherwise would have been necessary for the approval of such a project.

60

138.     Campbell's and Campbell Engineering's conduct in furtherance of the initial objectives of the Conspiracy included:

(a)     They aided, abetted and encouraged Intrawest's submission of the false wetlands permit application to the state and federal government by Intrawest's employee/engineer Greg Graham

(b)     They aided, abetted and encouraged Intrawest's deliberate misrepresentations and omissions to Walton County concerning the Open Space reductions in Driftwood on February 6, 2003 which Olson and Northtip knew to be false'

(c)     They aided, abetted and encouraged Intrawest's deliberate misrepresentations concerning the Open Space status of the land upon which it knew the Driftwood II Project would be unlawfully built and when they knew, or should have known, that neither Intrawest nor they had followed the lawful process to change that Open Space land use to lawfully allow residential construction where they knew that they were going to build homes

(d)     They deliberately and unlawfully avoided the lawful approval process for a development such as the Driftwood Project for which the law required several aspects of notice to the public and of public meetings and that Board of County Commissioner approval was necessary which was aided and abetted by the Conspirators

(e)     They deliberately and unlawfully avoidance of complying with the stormwater retention standards for the Driftwood Project and its aiding and abetting and encouraging Intrawest's deliberate and unlawfully false misrepresentations to Walton County

61

on February 6, 2003 that the proposed Driftwood Project was in compliance with the law when Olson and Northtip knew or should have known that it was not in compliance with the applicable stormwater retention standards

(f)     Olson and Northtip, in part through the actions of the former Walton County attorney, George Ralph Miller, exerted improper influence upon the Walton County staff  and other officials in order to aid, abet and facilitate Walton County's approval of the Driftwood Project by Walton County staff members so that they on behalf of Walton County would aid  and abet Olson and Northtip and the other Conspirator's objectives of avoiding public knowledge and scrutiny of the Driftwood Project.  The avoidance of such scrutiny was accomplished by the collusion of the Conspirators to have some Walton County staff person "approve" the Driftwood Project because the Conspirators exerted unlawful and improper influence upon Walton County to avoid  the lawful public process for such development approvals and by ignoring significant substantive legal requirements which otherwise would have been necessary for the approval of such a project.

139.    Walton County's initial objective of its involvement in the conspiracy was to facilitate the unlawful approval of the development in order to assist the Conspirators in their objective to make money.  Walton County accomplished this initial objective by the actions of some of its officials and representatives who deliberately and unlawfully manipulated discriminatorily favorable treatment of the other Conspirators by not requiring that the proposed development satisfy important requirements of the Land Development Code, the Walton County Comprehensive Plan, Chapter 380 Florida Statutes and the Sandestin DRI.

62

140. In so, doing Walton County unlawfully used its authority to deliberately disobey the law in favor of the Conspirators and to the harm of the Plaintiffs and to create circumstances that poses health and life safety risks persons such as Plaintiffs who live in Driftwood.

141. Walton County's conduct in furtherance of the initial objectives of the conspiracy included:

(a) Improperly facilitating the unlawful approval of the Driftwood Project in order to assist the Conspirators in their objective to make money. Walton County accomplished this initial objective by the actions of some of its officials and representatives who deliberately and unlawfully manipulated the discriminatorily favorable treatment of the other Conspirators by not requiring and that the proposed development satisfy the published requirements of the land development code, the Walton County Comprehensive plan, Chapter 380 Florida Statutes and the Sandestin DRI. In so, doing Walton County unlawfully used its authority to deliberately disobey the law in favor of the Conspirators and to the harm of the Plaintiffs.

(b) Walton County unlawfully and knowingly approved the development even though no notice of that proposed development was posted, mailed or advertised in the newspaper and Walton County unlawfully and deliberately did not require of the Conspirators any public meetings or hearings as required by the Walton County Land Development Code in order to aid and abet the Conspirators and approve the Project with the purpose of concealing its unlawful approval for as long as possible.

142. The Conspirators knew or should have known that their combined actions to avoid the Land Development Code's requirements to post, publish and mail notice of the proposed development and of the public meetings for its consideration by Walton County and to avoid the requirements of the Sandestin DRI, the Walton County Comprehensive Plan, and Chapter 380 were undertaken to avoid resistance from persons such as Plaintiffs who owned homes in the neighborhood adjacent to the proposed development and subject to the same requirements of law.

143. The Conspirators knew, should have known or made themselves intentionally ignorant before and after the sale that the proposed development was for 463 single family lots in the Open Space of the interior of Driftwood was not in compliance with the law in the following ways:

(a) The Conspirators conspired and acted in concert and collusion to avoid providing the legally required notices to those in the Driftwood neighborhood such as Plaintiffs, and to avoid any public hearings before the Walton County planning commission or the Walton County Board of County Commissioners because to do so would create greater risk that the sale and/or development could not proceed; That no notice and opportunity to object to the proposed development had ever been afforded to persons such as Plaintiffs who were entitled to such and that such was a violation of their fundamental constitutionally protected due process rights. They also knew that they had deliberately avoided providing such notice to adjacent or nearby landowners the notices and hearings required pursuant to law in order to avoid resistance because public scrutiny was likely to impede or prevent the project

(b)      That not one of them nor anyone else was going to provide any vehicular or pedestrian access from Driftwood to Sandestin;

(c)      The proposed development was impermissible and unlawful elimination of more than 20 acres of Open Space without following the appropriate process of approval for such and without ever obtaining such approval

(d)      The proposed development facially did not meet the requirements for the Coastal Center Zone for which the development order was issued.

(e)      That the wetlands dredge and fill permits from the state and federal had been procured by misrepresentations of Intrawest's engineer Greg Graham. That Intrawest procured the ACOE and DEP permits premised upon the Connelly and Wicker plans and that the Connelly and Wicker plans were not the plans for the development nor the plans actually used in the development of the interior;

(f)      Some or all of the Conspirators also knew that Intrawest's engineer, Greg Graham, had made false representations to the state and federal government to procure the wetlands resource permit for the project as described in paragraphs 148 through 159 above.

(g)      That no one had provided a traffic analysis that demonstrated that the proposed Driftwood II development and the entire Sandestin DRI development that included Driftwood II would comply the Plan or the Land Development Code.

(h)  That it did not meet or demonstrate that it satisfied applicable hurricane evacuation plan criteria as set forth in, for example, the Walton County Comprehensive Plan and/or the Walton County Land Development Code.

(i)  Some or all of the Conspirators knew before and after the sale that the construction of the 463 lots development in the Open Space of the interior of Driftwood would create a far greater risk of emergency evacuation to persons such as Plaintiffs because of the significant increase of homeowners and because they knew that only 1 narrow means of ingress and egress existed that was prone to flooding;

(j)  Some or all of the Conspirators knew before and after the sale that the construction of the 463 lots development in the Open Space of the interior of Driftwood would diminish the home values of adjacent and nearby property owners;

(k)  Some or all of the Conspirators knew before and after the sale that the construction of the 463 lots development in the Open Space of the interior of Driftwood was proceeding based upon permits issued by DEP and ACOE that had been issued based on design drawings that were not Olson/Campbell's design for the interior of Driftwood ;

(l)  The development order was not approved by the Walton County Board of County Commissioners as required by law and that the staff's "approval" of the development was unlawful and not authorized by any published criteria.

(m)  Their plan was to develop 463 single family home lots upon land designated as Open Space pursuant to the law, and that such a development would reduce the

overall quantity of the acreage of Open Space by at least 20 acres and/or that such residential construction upon that Open Space was unlawful;

(n)  The Conspirators knew in 2002 and thereafter that the majority of the approximate 200 acres in the interior of Driftwood where the proposed project would be located was designated by law as Open Space and that residential construction was not authorized upon that Open Space and that development improperly and unlawfully eliminated over 112 acres of Open Space;

(o)  The Conspirators knew in 2002 and thereafter, even before the development was approved, that the Open Space within the Sandestin DRI had been reduced by greater than 20 acres and that such constituted a substantial deviation requiring state agency review before approval, and they knew, or should have known, that pursuant to Florida law a reduction in Open Space, either individually or cumulatively of greater than 20 acres is a "substantial deviation" that requires further state agency review pursuant to Chapter 380, Florida Statutes;

(p)  That None of them would construct the amenities that Intrawest had committed to provide in the interior of Driftwood;

(q)  That Campbell had not designed the project to meet the stormwater retention requirements of the Sandestin DRI; and that the submitted stormwater run-off design did not comply with the stormwater retention requirements of the Sandestin DRI or other law; .

(r)     that Intrawest had exceeded its lawful authorization for construction upon residential acreage and that it had unlawfully decreased its Open Space below the lawful minimum required even before Olson and Adams Homes began development upon the land designated as Open Space in the interior of Driftwood

(s)     that Intrawest had unilaterally and without lawful authorization permission changed how it accounted for Open Space.

144.    The Conspirators also knowingly encouraged, aided and abetted Walton County to circumvent, violate, and ignore the requirements of the Land Development Code, the Sandestin DRI, Chapter 380, Florida Statutes, and the Walton County Comprehensive plan in order to facilitate and expedite approval of the proposed development and to conceal from the knowledge of persons such as Plaintiffs who would be most impacted by the proposed development of its approval by failing to follow the Land Development Code's requirements to post, mail, and advertise notice of public meetings for the Walton County staff, Walton County Planning Commission, and Walton County Board of County Commissioners to consider and vote upon the proposed development.

145.    The ultimate near term object of the Conspirators in the conspiracy was money. More specifically, Intrawest's near term object of the scheme was the millions of dollars of revenue from the sale of Driftwood to Olson/Northtip and Adams Homes. Correspondingly, Adams Homes and Olson/Northtip's object of the conspiracy was revenue from the sales of lots and homes in Driftwood.

146.    Another object of the conspiracy was the savings of money by Intrawest and Olson/Northip and Adams Homes from not having to incur expenses in fulfilling its

68

commitments and promises to those in Driftwood concerning the amenities and stormwater improvements.

147. Intrawest's longer term object of the conspiracy was also the money to be derived from the development and sales of its other properties in Sandestin from their increased value by avoiding the problems and expenses that would follow if Intrawest fulfilled its commitments to provide direct access from Driftwood to Sandestin. A related object of the conspiracy was also the increased revenue that Intrawest would derive from operational and tourist activities on Sandestin by its increased attractiveness and marketability without Driftwood and access from Driftwood.

**Actions After 2003 in Furtherance of the Conspiracy**

148. Walton County's objective in the conspiracy was to first to facilitate the approval of the other conspirators proposed construction and development by ignoring and failing to enforce the law and other requirements necessary for a development of the type proposed by the other conspirators for the development of the interior of Driftwood in 2003. Walton County's later objective in the conspiracy became to conceal from the Plaintiffs and the public its errors, omissions, and facilitation of its wrongful approval of the development originally and its continued authorization of the development.

149. After the April 2003 conveyance of Driftwood, Intrawest, in furtherance of its scheme and conspiracy with the other Defendants to unlawfully procure development authorization for Driftwood, to develop Driftwood and to conceal its related acreage and Open Space problems with the overall Sandestin DRI so as to avoid government scrutiny of Intrawest's other development activities, the Defendants engaged in the following actions to

69

conceal its conduct, misrepresentations, omissions and false applications and documents to the various government agencies, and or encouraged, aided and abetted others in these actions which were part of their scheme, conspiracy and the concealment of that scheme:

150. After the April 2003 conveyance of Driftwood, Intrawest, in furtherance of its scheme and conspiracy with the other Defendants to unlawfully procure development authorization for Driftwood, to develop Driftwood and to conceal its related acreage and Open Space problems with the overall Sandestin DRI so as to avoid government scrutiny of Intrawest's other development activities, the Defendants engaged in the following actions to conceal its conduct, misrepresentations, omissions and false applications and documents to the various government agencies, and or encouraged, aided and abetted others in these actions which were part of their scheme, conspiracy and the concealment of that scheme:

151. In 2004 and 2005, the Defendants perpetuated these violations by the following:

(a) Olson, Northtip and Adams Homes knowingly wrongful construction upon the Open Space pursuant to a design that Campbell and the other Defendants knew was not in compliance with the stormwater retention requirements of the law

(b) Pursuant to a requirement of law, in 2004 and 2005 and 2009 Intrawest submitted to Walton County Annual Reports that it knew were false, contained omissions and misrepresentations deliberately to conceal obscure, and mask, the true status of Open Space which it, and the other Defendants knew was not in compliance and to continue to conceal the breadth and scope of its development activities in Driftwood.

70

(c)      The Defendants knowingly concealed the unlawful Open Space reductions with the Sandestin DRI.   Intrawest,  in further of the interests of the Conspiracy, deliberately concealed the Open/Green Space "shortfall" by failing to report it  in the maps and the documents that it filed with the local government in 2004 and thereafter and by unilaterally changing the reporting format and its methodology in such a way that deliberately concealed the Open Space reduction.

152.   Intrawest and the Defendants conspired on reporting the accurate status of the Driftwood II and of the Open Space acreage reduction because to do risked Intrawest's ability to sell the interior of Driftwood because the other Defendants would not buy the property without those development approvals.   From 2005 until around November 2009, Intrawest failed to submit annual reports to Walton County as required by the Sandestin DRI County Ordinance and Chapter 380.

153.   Also, if Intrawest disclosed accurate status of its Open Space it not only jeopardized the viability of the Dirftwood II sale and development but also jeopardized any further development by Intrawest upon Sandestin thereby also hindering or impeding Intrawest's sales of other parcels.

154.   Additional delay in the sale of Driftwood was likely to result in more stringent limitations upon any development in the interior of Driftwood because a new wetlands determination was, as BDI had predicted, likely to include more acres of wetlands thereby reducing the viability of any sale of that acreage. (Ex. 276.)

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 72 of 176

155.   If Intrawest disclosed accurate status of its Open Space it not only jeopardized the viability of the Dirftwood II sale and development but also jeopardized any further development by Intrawest upon Sandestin thereby also hindering or impeding Intrawest's sales of other parcels.

156.   In the summer of 2005, when Plaintiffs and others who lived in their neighborhood publically and privately questioned Walton County Commissioners and Staff, Walton County formed an alliance with the Conspirators against Plaintiffs and their neighbors in order to continue to conceal their collective actions in their prior actions in furtherance of the Conspiracy:

(a)   Within only a few weeks of Plaintiffs' initial opposition voiced to Walton County, the alliance and conspiracy between Walton County and Adams Homes and Olson/Northip had resulted in "sweet heart" settlements in or around September 2005 by Walton County with co-conspirators Adams Homes and Olson for only $60,000 each. Walton County's settlements with these co-Conspirators included releases of Adams Homes and Olson for not just their past conduct in the Driftwood neighborhood, but also releases of Adams Homes and Olson for any future conduct in the neighborhood.

(b)   At the time of the release Walton County knew that Olson planned to continuing developing, constructing and building more roads and several hundred more homes sites in the interior of Driftwood.

(c)   Adams Homes exerted improper influence upon Walton County officials to procure the favorable settlement by utilizing another local developer to lobby

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 73 of 178

important officials and decision makers at Walton County for a settlement on overwhelmingly favorable terms for Adams Homes thereby Walton County officials shifted the enormous financial responsibility for the flooding in Driftwood away from the persons who caused the flooding to the Walton County taxpayers.

(d)    Also at the time of the approval of those settlements Walton County's engineer, Greg Graham, knew that in 2003 while he was an employee of Intrawest, that he had wrongfully applied for and obtained from the federal and state governments the wetlands permits for the development of the interior of Driftwood based on a design that was not what Graham, Intrawest, Olson and Campbell knew would not be built in the interior of Driftwood and Graham, Intrawest, Olson and Campbell knew that they would and were in fact building the project pursuant to Olson and Campbell's design for 463 lots.

157.    Intrawest's former employee, Greg Graham, in or about 2004 become the engineer at Walton County tasked with enforcement oversight of the Project.   During his tenure as Walton County's engineer and Intrawest's former employee, he failed to advise Walton County of the true facts that he knew, or should have known from his time as an employee at Intrawest, about the compliance and propriety of the Driftwood developments with, among other items, the unlawfulness of the residential construction upon the Open Space, the failure of the Driftwood II civil design to meet the Sandestin DRI stormwater retention requirement, and the improper construction premised upon a wetlands permit that he had falsely procured.

158.    Graham, as an employee of Walton County and in furtherance of the interests of the Defendants and their conspiracy and to continue to conceal his involvement in seeking

the wetlands permit by signing an application for that permit that he knew was false, continued to engage in conduct in furtherance of the concealing the conspiracy among the Defendants that caused or contributed to Walton County's actions or failures to act which were not in the interests of the taxpayers of Walton County but in the interests of the Defendant, as the county's engineer was responsible and exercised responsibility from about 2004 until the present to oversee, evaluate, inspect, determine and render professional advice to his superiors at Walton County as to whether Olson/Campbell's design was in compliance with the law.

(a)     Graham failed to disclose to his superiors his prior role as an employee of Intrawest and his actions in signing the wetlands permit applications on behalf of Intrawest (that Graham knew to be false representations to those government agencies). In order to conceal his role with Intrawest and his involvement in procuring the wetlands permits and in the sale of the interior of Driftwood from Intrawest to Olson, Graham continued to act in furtherance of the objectives of the Conspirators in concealing that the development of Driftwood's interior was not in compliance with the law.

(b)     On or about February 13, 2006, as the Walton County engineer, Greg Graham, signed the Plat for Driftwood Estates Phase IIC indicating that such plat "was approved by him' as submitted by Campbell and Campbell Engineering as the engineer of record for Olson/Northtip.  Graham knew at that time that the Driftwood Project was not in compliance with the law for the reasons described above.

74

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 03/13/15 Page 75 of 178

(c) Failed to advise Walton County of the gross insufficiency of the Olson and Adams settlements for $60,000 each when Walton County knew, or should have known, that the costs to remedy the stormwater problems exceeded several million dollars;

(d) Allowed Olson's letter of credit to expire which was Walton County's security that Driftwood II would be built in accordance with the plans that were approved even if not otherwise in compliance with the law. That letter of credit was Walton County's security that Driftwood II would be built in accordance with the plans that were approved even if not otherwise in compliance with the law further harming property owners in Driftwood such as Plaintiffs by reducing the possibility that resources would be available to correct the stormwater system and, in fact, the stormwater systems in Driftwood have not been substantially modified or corrected, in part, because of a lack of funding

(e) Graham, on behalf of Walton County but for the benefit of the Conspirators including his former employer Intrawest, approved or accepted the design submissions and as-built certifications of Campbell in or around 2009 when Graham knew, or should have known, that such as-built conditions were in fact not built in conformance with the design and that such as-built conditions did not satisfy the minimal criteria and that such certifications were for a development in which Graham and Intrawest had participated in the procurement of permits from state and federal agencies under false pretenses as described herein;

(f) Graham, in furtherance of the Conspiracy, advocated for the continued issuance of building permits and development authorizations for Olson, Northtip, Adams Homes for construction activities in Driftwood

(g)     In or about 2008, Olson, Campbell conspired with Greg Graham, to conceal the true status of the wetlands and stormwater permit procurements. For example, Olson/Northtip told Campbell and others about his agreements and conversations with Greg Graham concerning Driftwood's compliance issues:

> I also need to have the disclosure issues resolved with Greg [Graham] prior to the hearing. This is the disclosure I've mentioned several times that he [Graham] wants in the form of a covenant amended to the DCR requiring all lots be developed per the approved DO plans. Ex. 168

159.    Also in 2008, Olson, and Campbell, in furtherance of their scheme with Intrawest and others, deliberately worked with Greg Graham to conceal the problems with the permits obtained from the Army Corps of Engineers pursuant to Graham's application in 2003 for Intrawest.  Olson's representatives told the others via email that:

> And also disclosure of the Army Corps wetland permit with expiration date. I would much prefer that these not be topics for discussion at the hearing—primarily the ACE permit because someone may start digging into it.  Ex. 168

160.    In order to benefit the Defendants interests and in furtherance of the conspiracy Graham approved or accepting the design submissions and as-built certifications of Campbell in or around 2009 which both Graham and Campbell knew, or should have known, that such as-built conditions were in fact not built in conformance with the design and that such as-built conditions did not satisfy the minimal criteria and that such certifications were for a development in which Graham and Intrawest had participated in the

procurement of permits from state and federal agencies under false pretenses as described above;

161. Graham wrongfully manipulated and controlled and failed to disclose information to decisions makers at the County in furtherance of his personal interests and those interests of the Conspirators. For example, he continued to advocate for the propriety of the stormwater design of the Project and continued issuance of building permits and development authorizations in support of the Conspiracy's objectives and failed to advise Walton County or the Commissioners of his involvement with the Project as a former employee of Intrawest and that the Project was, in fact, not in compliance with the law.

162. In furtherance of the protecting the interests of the Defendants, some of the Defendants used their positions to grant special favor other Defendants. These actions included the following:

163. In 2005, Defendants exerted improper influence to cause Walton County to enter a settlement agreement with Olson/Northtip and Adams Homes for the stormwater drainage problems in Driftwood for the amount of $60,000 each when Walton County knew, or should have known, that the costs to remedy the stormwater problems exceeded several million dollars; this settlement amount was woefully insufficient and known to be such but was procured by the deliberate unlawful manipulation between County officials and the Defendants for the benefit of Olson and Adams Homes and to the deliberate detriment of the property owners in Driftwood such as Plaintiffs and other Walton County taxpayers and to conceal the wrongful approval of the neighborhood and grant releases from liability by the County of other members of the conspiracy

164.    In December 2005, Olson, via correspondence from his lawyer, threatened and sought to intimidate Plaintiff Osborne by sending a letter to Plaintiff Osborne's employer supervisor threatening a lawsuit against Osborne for Osborne's exercise of his First Amendment rights to petition his government by speaking in public meetings to the Walton County Commissioners about the flooding in Driftwood caused by Olson's development activities. The other Conspirators aided, abetted and encouraged Olson's correspondence.

165.    Conspirators conducted, aided, abetted or encouraged the following actions that sought to deprive Plaintiffs of their rights secured by the United States Constitution:

(a)    Condoning and encouraging, Olson/Northtip's  letter dated 14, 2005 sent to Plaintiff Osborne's employer (an official of the Department of Defense), and all Walton County Commissioners that threatened him with a lawsuit for his "presentation before public bodies, including the Board of County Commissioners of Walton County," (Ex. 167)

(b)    encouraging threats against the Osborne as described herein.  Also in furtherance of the conspiracy, Olson, Northtip or Adams Homes, through their representatives  threatened physical harm to Mr. Osborne and his family and in an effort to intimidate, threaten and cause Mr. Osborne to cease his efforts to understand and stop the continued development of Driftwood and to influence, delay or prevent Mr. Osborne from testifying in lawsuits that he and others had filed concerning Driftwood,  to retaliate against Mr. Osborne for his exercise of his First Amendment rights to address and petition the local, state and federal government in opposition to the Defendants' development and actions, and

78

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 79 of 178

to seek to prevent the exercise of such constitutional rights by Mr. Osborne or the other Plaintiffs in addressing the government concerning Defendants' development

(a)    Their other acts in furtherance of the scheme to threaten physical, financial and other  harm to Mr. Osborne and his family in an effort to intimidate  Osborne as a witnesses, and to influence whether he would testify and the content of such testimony in judicial proceedings, and in an effort to intimidate him  to cease or curtail their efforts in seeking for government agencies to take action and to cause a stoppage of development and construction activities in Driftwood, in an effort to silence Osborne and in an effort to improperly cause them to cease the exercise of their statutory or constitutional rights to petition and address government agencies and to otherwise impede, quash, silence, or influence their ability or willingness to communicate their views, opinions and information to those agencies with authority to cause a stoppage or modification of the development of Driftwood's interior upon the Open/Green Space and because the design, and construction means and methods used by the Defendants in the development and construction of both phase I and phase II of Driftwood were not in compliance with the law, all of the Defendants sent, aided and abetted encouraged, condoned, ratified the following acts of their agents or representatives to threaten the Osborne and his family on several occasions in trespassing onto the Osborne property in Driftwood after dark and before sunrise, causing property damage, slashing his tires, and leaving threatening and menacing articles near his front door.

166.    In 2005 into 2007, at various time Adams Homes through its agents, employees and lawyers, repeatedly told Walton County officials that it had checked the

propriety of its development activities in Driftwood and all were lawful and appropriate and that Walton County should continue to issue building permits to Adams Homes.

167. Adams Homes, in fact, knew such representations to be false as it had deliberately conspired with the other Conspirators to accomplish its construction activities on land that it knew, or should have known, was not authorized for residential construction and knew or should have known that its construction activities were causing flooding. Adams Homes also knew that other Conspirators exerted control and influence to conceal the untruthfulness of their representations via Graham as the County's engineer, via its employee who was a Commissioner, via Commissioner Brannon whose business partner owned lots in Driftwood, and via Olson/Northtip's lawyer, Miller, who had previously represented Walton County for over three decades.

168. Adams Homes' actions in 2005 and at other times in advocating that it was a master home builder who was operating in compliance with the law when, in fact, Adams Homes knew, or should have known, that its activities were not in compliance with the Sandestin DRI, that it was in fact improperly and unlawfully building several hundred homes on land designated by law as wetlands and Open/Green Space and that its modifications to lots and the drainage systems and aspects on its 88 lots in Driftwood I were not incompliance with the law, would not be effective at handling the stormwater in Driftwood I, would, and did, cause flooding of the roadway system in Driftwood I and thereby diminish the attractiveness and value of homes in that neighborhood.

169. In or about November 2006, Intrawest, in furtherance of the conspiracy met with and colluded with Walton County to seek to undermine and defeat Plaintiffs' interests

and concerns (Ex. 239) by improper means in order to seek to deprive Plaintiffs and Plaintiff Osborne of their statutory rights to access to public records and his statutory and constitutional rights to speak and to address the government including, but not limited to, the Walton County Board of County Commissioners.

170.   In or about 2007 and 2008, Intrawest, in furtherance of the conspiracy and in the interests of all Defendants, colluded with Walton County, Olson, Campbell and Adams Homes and to work against Plaintiffs and other homeowners in Driftwood concerning their right of direct access  and failed to reveal to Walton County and/or colluded with Walton County to prevent and frustrate enforcement of Plaintiffs rights and to conceal from Plaintiffs, the public the unlawful approval of the Project in Driftwood by:

(a)   Coming to an agreement regarding "compliance" with Walton County when both knew that the Sandestin DRI generally was not in compliance and the Driftwood Project specifically was not in compliance with the law and when Walton County knew that Intrawest had not filed any sufficient annual reports for at least 4 years, and,

(b)   to "silence [Plaintiff] Alan Osborne" by working with Walton County to deprive him of his constitutional and statutory rights to address his government and by continuing to conceal the Open Space shortfall and other misrepresentations in order to continue to make money on its development projects (Ex. 121.)

171.   Thus Conspirators entered an agreement for Walton County officials to deliberately use their positions of authority and the authority of the local government to manipulate the treatment of persons such as Plaintiffs by specifically targeting Plaintiffs and

others in Driftwood for discriminatory treatment for the unlawful purposes of concealing and protecting all of the Conspirators, to retaliate against Plaintiffs for their exercise of their First Amendment rights and in order to continue to seek to deprive Plaintiffs of the constitutional rights to access the courts and to petition the government.

172.    In furtherance of concealing the Conspiracy, Intrawest deliberately and wrongfully destroyed all or substantially all of its electronically stored information. Intrawest furthered the interests of the Conspirators by deliberately and unlawfully destroying all of its electronically stored information during the pendency of this lawsuit thereby depriving Plaintiffs of important information that would likely corroborate or provide direct proof of the Conspiracy, efforts to conceal the unlawful approval and efforts to improperly manipulate Walton County to oppose Plaintiffs and thereby protect the Conspirators.

173.    In furtherance of those actions, the Conspirators knowingly withheld relevant information from certain decision makers with Walton County, with the DCA,  and from Courts.

(a)    For example, County Engineer Greg Graham withheld important, relevant information from those persons as described above and County Attorney, Hoshihara, also withheld important, relevant information from those persons as described below.

(b)    Adams Homes knowingly withheld that it knew that its construction upon the acreage in Driftwoods interior was upon Open Space and not authorized by law.

174.    At that time in 2007, Walton County knew all of the following but, because of the influence of certain persons within Walton County improperly using their official positions to target Plaintiffs, conceal the Conspiracy and to protect the Conspirators, directed its efforts at fighting the Plaintiffs, causing the Plaintiffs to incur substantial resources engaging in serial litigation against the County and others in an effort to prove facts that Walton County knew to be true but deliberately suppressed to conceal the Conspiracy and protect its Co-Conspirators. In 2007, Walton County knew:

(a)    that Intrawest's 2004 Sandestin DRI Annual Report contained many errors and discrepancies, that it revealed a unlawful reduction of Open Space; and that Intrawest was in violation of Walton County ordinance 2002-18 because Intrawest had not filed with Walton County and annual report concerning the Sandestin DRI for 2005, 2006 or 2007.  Nevertheless, Walton County, as a Conspirator, knowingly took no action against Intrawest but instead—with knowledge of the unlawfulness of the development in the interior of Driftwood—formally forged an alliance against Plaintiffs and others in their neighborhood to protect the Conspirators' economic interests and Walton County's commissioners, officials and staff from liability exposure and negative publicity from the revelation of Walton County's initial unlawful approval and Walton County's failure to enforce the law against Intrawest

(b)    That Walton County, through Greg Graham, had allowed Olson and Northtip's letter of credit expire that was the only security for the correct completion of the Driftwood II Project and was done inn furtherance of the Conspiracy in order to continue to

grant discriminatorily favorable treatment to the County's Co-Conspirator. This conduct benefited Walton County's Co-Conspirator at the cost of the Walton County taxpayer.

(c)     That the state agency with oversight of DRI's, DCA, had via letter dated May 14, 2007 informed Walton County that the stormwater standard applicable to the Driftwood Project was the greater standard, but that Walton County, through the actions of Greg Graham and other officials, had deliberately ignored enforcing compliance with that greater standard in order to continue to further the interests of the County's Co-Conspirators. (Ex. 80). Greg Graham failed to take action on the letter because to do so risked exposing to the public and his bosses, Graham's involvement in submitting false applications concerning the Driftwood Project

**Bradley's 2009 Report**

175.   In March 2009, Walton County's DRI Coordinator, Renee Bradley, prepared a report ("Bradley 2009 Report") wherein she concluded that Intrawest and others had developed the interior of Driftwood without Walton County's lawful approval and that the Open Space within the Sandestin DRI had been reduced by more than 20 acres for several years and that development was nevertheless unlawfully continuing on Sandestin. Walton County, through Ms. Bradley and others, knew that such a reduction of Open Space required additional state agency review before any further development could be approved.

176.   Ms. Bradley gave her report to her the assistant administrator for Walton County and informed others senior in status and position within Walton County of her conclusions. Ms. Bradley was instructed to by those people not to tell anyone of her

Case 3:14-cv-00646-MCR-EMT   Document 172   Filed 08/18/15   Page 85 of 176

conclusions or the report.  Ms. Bradely was also told that she should not give the report to her immediate supervisor, Pat Blackshear, who was Walton County's Director of Planning. Ms. Bradley was instructed by her superiors to give her report to Walton County attorney Lynn Hoshihara.

(a)     Walton County suppressed Bradley's 2009 Report in furtherance of the Conspiracy and to protect its interests and the interests of the County's Co-Conspirators.

(b)     Walton County intentionally suppressed Bradley Report and its conclusions from the DCA to protect its interests and the interests of the County's Co-Conspirators.  In so doing, Walton County and its officials deliberately ignored and violated the law for the unlawful purpose of protecting their Co-Conspirators and to dis

(c)     also did not inform the state agency with oversight of the Sandestin DRI of the Ms. Bradely's report or its conclusions.

(d)     Walton County also deliberately concealed from DEO/DCA, the Plaintiffs, and the Special Magistrate, Carlos Alvarez, of Ms. Bradley's 2009 Report.

(e)     Walton County's lawyer, Lynn Hoshihara, met with and communicated with the DCA at various times concerning the Sandestin DRI and the allegations of Plaintiffs concerning the unlawful and improper development of Driftwood's interior, but Walton County's lawyer never informed the DCA and in fact actively concealed that report and the true condition of the lawful status of the Sandestin DRI from the DCA and all others.

Case 3:14-cv-00646-MCR-EMT   Document 1-72   Filed 08/18/15   Page 86 of 178

(f)     Walton County concealed the Bradely 2009 Report from Plaintiffs, DCA and all others in furtherance of the Conspiracy between the Conspirators and to protect the Conspirators from adverse consequences including substantial adverse financial consequences by the disclosure of information.

177.    In December 2009, in furtherance of the Conspiracy, Walton County's lawyer Lynn Hoshihara granted Intrawest's lawyers the ability to rewrite Walton County's submission to the DCA concerning issues in Driftwood.

(a)     Ms. Hoshihara emailed to Intrawest's lawyer, Suzanne Van Wyk, the draft of the County's proposed submission to the DCA, Plaintiffs and the Special Magistrate concerning the propriety of development in the interior of Driftwood for Intrawest's lawyer to edit before submission by Walton County.

(b)     Intrawest's lawyer edited Walton County's submission, returned it to Ms. Hoshihara who then submitted the document without modification to the DCA, Plaintiffs, and Special Magistrate as Walton County's official written position.

(c)     Walton County gave editorial license to Intrawest to draft the County's formal responses to DCA in furtherance of the Conspiracy and to aid and abet the Conspirators in protecting their financial interests from the development and sale of Driftwood's interior and to  master,

178.    From 2009 through 2012, Walton County attorney Lynn Hoshihara wrongfully continued to suppress the findings of Bradley's 2009 Report from the DCA, the public and the Plaintiffs  in order to protect the interests of the Conspirators.

179. From about 2006 to 2009, Walton County Commissioner, Scott Brannon, voted at various times at Board of County Commissioners meetings to continue to allow development in the interior of Driftwood. During that same time period, Commissioner Brannon's business partner, C. Wayne Jones, owned, through a closely held entity 77 lots within the interior of Driftwood. Walton County commissioner Scott Brannon voted to continue to allow development in the interior of Driftwood in furtherance of Walton County's involvement in the Conspiracy and for the additional purpose of protecting the financial investment interests of his business partner's ownership of the 77 lots.

180. In or about May 25, 2010, Commissioner Brannon, in furtherance of the Conspiracy, agreed with Sandestin representatives to facilitate development approvals and continued suppression of information on the Bradley 2009 Report the in exchange for assistance with his own dock project.

181. By letter dated April 2, 2010, the DCA informed Walton County through Chair Brannon that violations of the Sandestin Development have occurred and that Walton County was not enforcing the correct stormwater retention standard concerning Driftwood. (Exhibit 3).

182. The next month on May 11, 2010, another Walton County engineer (Bob Horner) asked Lynn Hoshihara and Gerry Demers for guidance in applying the more stringent DRI stormwater standard. (Ex 228.)

183. Horner never received an answer, was assigned different duties and quickly terminated Walton County through Demers within a month even though another engineer with less experience than Horner was retained. (Horner depo. Pp. 50-52)

184. Similarly, shortly after Ms. Bradley first published her report in or around March 2009 and was told not to inform her supervisor, the Director of Planning (Ms. Pat Blackshear), Ms. Blackshear's duties were also abruptly changed such that Ms. Blackshear longer had responsibility for evaluating the compliance of the Sandestin DRI and soon thereafter Ms. Blackshear was also terminated from employment with Walton County.

185. Walton County, in furtherance of the conspiracy to conceal Sandestin's noncompliance, its knowledge thereof and its other prior actions in support of the Conspiracy, terminated Mr. Horner and Ms. Blackshear because officials within Walton County knew that Mr. Horner and Ms. Blackshear were likely not to act in the interest of the Conspiracy and to continue to suppress Walton County's violations of the law.

186. In or about 2011 Commissioner Brannon exerted influence upon County Attorney Lynn Hoshihara to hire Brannon's personal legal counsel to be Walton County' special counsel concerning the Sandestin DRI. Commissioner Brannon caused this hiring in order to continue to concealing Walton County's involvement in the Conspiracy and to continue to suppress Ms. Bradley's 2009 Report and Walton County's knowledge that the Sandestin DRI was not in compliance with the law from Plaintiffs, the DCA and the public in order to protect the interests of the Conspirators. Otherwise, knowledge of the finding of Bradley's 2009 Report would likely result in the cessation of development in Driftwood and

in Sandestin causing financial harm to Brannon's business partner and his allies with financial interests in continued development in Sandestin.

187. During her tenure as Walton County attorney Ms. Hoshihara was offered gifts by private developers with interests in further developing on Sandestin.

188. Other County Commissioners sought to improperly use their influence to protect the interests of the Conspirators. In the spring of 2011, Commission Cecilia Jones arranged a meeting between County attorney Lynn Hoshihara and DCA Secretary Buzzett which occurred in May 2011. Plaintiffs nor anyone in Dirftwood was informed of this meeting because the meeting was intended by Walton County to further the interests of the Conspiracy by not revealing the Conspirators past violations of the law concerning the Sandestin DRI and the approval of the Driftwood Project and to continue to not enforce the law that Walton County knew was being violated concerning the Sandestin DRI in order to protect the interests of the Conspirators at the expense of Walton County taxpayers and of the Plaintiffs. These violations were known to Walton County officials including County Attorney Lynn Hoshihara by virtue of Bradley's 2009 Report.

189. At that meeting, Ms. Hoshihara, in furtherance of the interests of the Conspirators, failed to disclose to Secretary Buzzett or any other DCA representative the findings and conclusions of Ms. Bradley's 2009 report that had determined that set forth facts demonstrating that the Sandestin DRI was in noncompliance with the law and that the Driftwood Project had been unlawfully approved and was constructed on land designated as Open Space.

190.     Instead of revealing significant facts known for the prior two years, Ms. Hoshihara, in furtherance of the interests of the conspiracy, made pledges and commitments on behalf of Walton County concerning Driftwood which Ms. Hoshihara knew to be false. Ms. Hoshihara used her position to protect the interests of the conspirators and to manipulate and conceal information that she knew would harm the positions of the Plaintiffs in their claims against the Conspirators.  Ms. Hoshihara's conduct was purposefully discriminatory against Plaintiffs for the unlawful purpose of defeating their claims by deliberately concealing pertinent facts known to her and Walton County and to protect the interests of the Conspirators. (Exhibits 219, 200, 221).

191.     On June 9, 2011, Walton County Commissioner, Sara Comander, directed Walton County's Attorney, Lynn Hoshihara, via email to not announce or advertise that the "DCA will be in DFS [DeFuniak Springs] on July 5, or [Plaintiff] Allen Osborne will be there." (Ex. 132.) The County attorney complied. The DCA was holding a Growth Management Implementation Workshop. Commissioner Comander and Walton County's Attorney suppressed this information in order to continue suppress information known by Walton County as set forth in Bradley's 2009 Report and to seek to avoid state agency inquiry into the Sandestin DRI's compliance status.

192.     Comissioner Comander, using the force of her public office as a Walton County Commissioner, and Lynn Hoshihara, using the authority of her office as Walton County's attorney, specifically targeted government action at Plaintiff Osborne for unique discriminatory treatment in furtherance of the conspiracy and for the unlawful purpose of

frustrating Plaintiffs right to address their government and to continue to conceal Walton County's unlawful approval of the Project, Walton County's knowledge of Sandestin's noncompliance as shown by Ms. Bradely's 2009 Report.

193. Walton County Commissioner Cecilia Jones acted to manipulate the treatment of Plaintiffs and to target them for discriminatory treatment for the unlawful purpose of protect the interests of the Conspiracy. In 2012, Plaintiff Osborne informed and showed to Commissioner Cecilia Jones the Bradley 2009 Report, Commissioner Jones acknowledged that she was aware of corruption within County government but took no action on either Bradley's 2009 Report or the corruption but instead continued to use her official position to manipulate the discriminatory treatment of Plaintiffs and thereby protect the interest of the Conspirators.

194. In February 2012, Plaintiffs attended a meeting with Walton County and identified additional information in support of its position that the Sandestin DRI was not in compliance with the law and that the Driftwood interior development was unlawful and improperly developed.

(a) Ms. Hoshihara attended the meeting but Walton County did not disclose the existence or conclusions of Ms. Bradley's 2009 Report at that time or at anytime thereafter to the Plaintiffs. Instead, Ms. Hoshihara suppressed Bradley's 2009 Report and publically informed the Board of County Commissioners that the Sandestin DRI was not in noncompliance and that Walton County should not cease halt continued construction and development of homes in the interior of Driftwood. Ms. Hoshihara did this when she knew

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 92 of 178

the facts to be otherwise and did so to protect the interests of the Conspirators and herself from the adverse consequences that would likely result by the revelation that Walton County had continued to allow development in Driftwood and within the Sandestin DRI with knowledge that such development was unlawful.

(b)     Ms. Hoshihara's conduct was the use of her official position to knowingly suppress relevant information from Plaintiffs and the DCA in order to favorably manipulate Walton County's treatment of the Conspirators and in order to deliberately use her position for unlawful discriminatory treatment of Plaintiffs for the unlawful purpose of preventing them from having timely access to relevant, important information known to Walton County

195.    For harm that resulted to Plaintiffs, the Conspirators are liable if any of those involved in the conspiracy commited a tortious act in concert with the Conspirators.

196.    All Conspirators are liable for the harm that has resulted to Plaintiffs because all of them, pursuant to a common design with the others in the conspiracy, knew, or should have known, that that their acts or the acts of the other conspirators were unlawful or if, lawful, were done to accomplish an unlawful objective. Many of the acts themselves were unlawful and many of the objectives were unlawful such as the development and construction of homes upon land that the Conspirators knew was not designated for that residential construction and the Conspirators acts to conceal and use the force of the local government against Plaintiffs to defend and protect their unlawful activities and objectives.

197. The Conspirators also agreed or worked in combination to do unlawful acts or lawful acts by unlawful means as described herein. The Conspirators also committed the independent tort of civil conspiracy because the Conspirators possessed a peculiar power of coercion and influence which was significantly aided by their influence with and the cooperation of the local government, Walton County. By virtue of their combination which power one of them standing in like relation to the Plaintiffs would not have had, the Conspirators were able to conceal from the state, the public and the Plaintiffs relevant and important information that was essential to protect Plaintiff's interests and rights but was purposely thwarted by the Defendants.

198. Plaintiffs have been damaged by the conduct of the Conspirators in that the value of their property in Driftwood has been significantly reduced by the acts of the Conspirators to cause the unlawful and improper development of the interior of Driftwood and the acts of the Conspirators to cause such development to continue when the Conspirators knew or should have known that such development was unlawful.

199. In furtherance of and to conceal the conspiracy between them, all Defendants, at various times since 2002, aided, abetted, encouraged, endorsed, supported or made themselves willfully ignorant of the actions, omissions, misrepresentations, of the other members of the Conspiracy.

200. Each Conspirator is jointly and severally liable for the acts of the other Conspirators as well as for his or her own acts.

WHEREFORE, Plaintiffs demand judgment against each Conspirator, jointly and severally for actual, consequential and damages, costs of restoration, prejudgment interest, Court costs and any and all further relief as this Court deems just and proper.

## COUNT 7

## BREACH OF IMPLIED WARRANTIES OF HABITABILITY

201.    As developers of Driftwood I and II, Olson, Northtip, and Adams Homes and Intrawest, as the master developer for Sandestin DRI, gave  implied warranties of fitness and merchantability for services essential to the habitability of residences within the home development projects in Driftwood such as the roads for ingress and egress to the neighborhood and private driveways to the homes, drainage systems to divert flooding, retention ponds to correct water flow damage, and underground stormwater pipes necessary for the living accommodations and caused damage to the residential subdivision.

202.    The Defendants, as developers, builders and sellers of new residential real estate were in the best position to have knowledge of, discover and prevent defects in connection with the design, development and construction of the mass development of the 463 lot single family home residential real estate development.  The Defendants here also knew, or should have known, that the proposed 463 lot development was not in accordance with the law. Moreover, the information concerning the legal propriety of the development was more readily known, knowable or discoverable by the Defendants than the Plaintiffs.

94

203. As developers of Driftwood I and II, Olson, Northtip, and Adams Homes developer for Sandestin DRI, breached their implied warranties of fitness and merchantability for services essential to the habitability of residences within the home development projects in Driftwood as described in paragraphs 26 through 28 and 204 through 206.

204. The defendants named herein had duties to not allow the development activities in Driftwood II that were performed in an effort to satisfy their implied warranties of fitness and merchantability for services to persons living in Driftwood II, to not damage those persons such as Plaintiffs living in Driftwood I.

205. Olson, Northtip, and Adams Homes breached their implied warranties of fitness and merchantability for services essential to the habitability of residences within the home development projects in Driftwood by their activities described herein that created the nuisances which damage Plaintiff.

206. Olson, Northtip, and Adams Homes efforts to comply with their implied warranties of fitness and merchantability for services essential to the habitability of residences within Driftwood II has breached a duty to those persons such as Plaintiffs who live in Driftwood I by negatively impacting the habitability of Plaintiffs homes and neighborhood in Driftwood I.

207. The habitability of the homes in Driftwood I is also negatively impacted by breaches of the warranties of fitness and merchantability of the essential services to the

habitability of the Driftwood I neighborhood by the actions of Adams Homes and the other defendants as described herein.

208.   Those actions have rendered conditions in Driftwood I that negatively impact the habitability of Driftwood I and include issues such as stagnant standing water in the roadways, driveways, yards, and by the flooding or ingress and egress and the erosion of soils, the flooding and overflow of retention ponds has created child and adult safety hazards, caused mosquito infestation and other dangerous conditions such as a substantially increased risk of harm to humans in Driftwood by rising waters in storm events that prevent evacuation.

209.   These negative impacts to the habitability of the homes in Driftwood has also negatively impacted the desirability of homes in Driftwood and caused the value of Plaintiffs' homes to significantly diminish.

210.    The Defendants here also knew, or should have known, that these essential services for the 463 lot development were not developed, designed or constructed in accordance with the law or in accordance with sound practices.

WHEREFORE, Plaintiffs demand judgment against Olson, Northtip,  and Adams Homes for actual, consequential, costs of restoration,  resulting together prejudgment interest, Court costs and any and all further relief as this Court deems just and proper.

## COUNT 8

### ACTION FOR INJUNCTION AGAINST WALTON COUNTY

211. This is an action for injunction against Walton County by the Osborne and Kish Plaintiffs.

212. Plaintiffs have owned and possessed the Property as alleged herein.

213. Since at least 2005 Walton County has accepted the responsibility to maintain the roads, rights-of-way and the stormwater system in Driftwood I.

214. Since 2005 Walton County has failed to maintain those roads, rights-of-way and the stormwater system in Driftwood I.

215. Walton County owes a duty to the Plaintiffs to avoid injury to the Plaintiffs and Walton County has the responsibility to maintain the roadways and stormwater drainage system in Driftwood Estates in a way that it functions sufficiently so as not to cause frequent and repeated impairment of Plaintiffs' property rights in Driftwood.

216. Walton County has failed to maintain the drainage system, has diverted the natural flow of water which has caused water that would drain from the Property in its natural state, to remain on, impair or frustrate Plaintiffs' exercise of their property rights.

217. The County's failure to maintain the items described above has contributed to and exacerbated the nuisance conditions such as road and yard flooding, standing water in swales for days, weeks, and months, yellow-fly and mosquito infestations in the

neighborhood, increased risks of mosquito carried diseases, insufficiently treated stormwater discharging into the Bay and life safety risks such as frequent flood water impeded ingress and egress.

218.    At various times Walton County has made minor and small modifications or changes to the stormwater system in Plaintiffs neighborhood, which, at times have somewhat improved the function of the stormwater system for short periods of time.

219.    Walton County has also stated at various times to improve and maintain the stormwater system in Plaintiff's neighborhood, but none of Walton County's efforts to date has resulted in sustained improvement to the function of the stormwater system. Accordingly, the function of the stormwater system in Plaintiffs' neighborhood has fluctuated at times, but more recently the stormwater flooding onto Plaintiffs property and onto the roadways has become worse.

220.    Walton County has, also, through the fraudulent conduct described herein or through a gross abuse of discretion failed to maintain the stormwater system in Driftwood.

221.    Walton County has also palpably abused its authority with regard to how it has allowed and continued to allow the development activities within Driftwood that have caused or contributed to the stormwater problems and then failed to maintain those stormwater systems.  Moreover, Walton County, in its wrongful authorization of the Driftwood development and its sustained failure to maintain the stormwater drainage system has committed a public wrong or violated Plaintiffs substantive rights without giving an equal benefit in return.

98

222.     If Walton County is permitted to continue to not maintain the drainage system and is permitted to haphazardly replace culverts, widen or constrict ditches, move roadways, and divert the natural flow of water, then a prescriptive easement to use of the Property could ripen. As a result, Plaintiffs does not have an adequate remedy at law.

223.     Walton County has breached its duty to Plaintiffs by

(a)     failing to maintain the stormwater drainage system in Driftwood Estates;

(b)     violating the provisions of law concerning stormwater drainage requirements by failing to construct or maintain such a drainage system;

(c)     failing to maintain adequate stormwater infrastructure such that the post-development stormwater runoff significantly exceeds the pre-development stormwater runoff, and the concentration and flow of said additional runoff has been redirected to adjacent and downstream property owners such as Plaintiffs, thereby diminishing the value of the Plaintiffs' real property and impairing their rights of use.

(d)     The actions of Walton County have injured and continue to injure the Plaintiffs. With most rains, the stormwater system is not sufficiently maintained such that it:

(e)     Causes, contributes, and combines with the actions of the other Defendants to cause the roadways, common areas, and yards within Driftwood Estates to flood and other nuisances ;

(f)     limits ingress and egress to the Plaintiff's properties because of the stormwater accumulation on the roads in Driftwood such that Plaintiffs at times cannot safely access or leave their property by means of vehicle ingress or egress,

(g)     limits Plaintiffs use of a 30 foot right-of-way that becomes impassable or hazardous to pass during normal rain events, and harder rains and/or storm surges;

(h)     creates small, shallow ponds that cannot sustain an aquatic environment, thus these ponds have become breeding grounds for mosquitoes and other insects, creating unsanitary conditions and significantly reducing Plaintiffs ability to use or enjoy the exterior of their property

(i)     creates a publically acknowledged safety concern due to the combination of stormwater flooding of the sole, narrow means of ingress and egress from Driftwood and because of the health concerns caused by mosquitoes and other insects or stagnant water;

(j)     significantly diminishes the value and desirability of the Plaintiffs' property as a part of a well designed and attractive neighborhood

(k)     rendered and renders significant portions of Plaintiffs yards unusable and unsanitary

224.    Because of Walton County's actions or omissions, Plaintiffs have suffered a greatly diminished lifestyle, a drastic diminution in the value of their property, been unable to leave their neighborhood because the sole means of ingress and egress was flooded with

stormwater, and significant damage to the marketability of their property which will continue if Walton County continues to not perform its duties to adequately maintain the stormwater system in Driftwood.

225. The flooding caused by Walton County's failures to adequately maintain the stormwater system in Driftwood has and will inevitably result in substantial portions of the Property being too wet for residential use thereby continuing to diminish the value of Plaintiffs property.

226. The actions of Walton County will cause irreparable injury to Plaintiffs because the property will continue to flood and continue to significantly diminish the value of the Property as a result of Walton County's potential prescriptive use.

WHEREFORE, Plaintiffs demand judgment granting an injunction against Walton County requiring Walton County to adequately maintain or manage the stormwater drainage systems in Driftwood. Plaintiffs are not seeking an injunction that requires Walton County to maintain the stormwater system in a particular way but just that the maintenance be performed by whatever means and methods Walton County chooses to maintain the system to meet the applicable criteria. Such adequate maintenance may include the following:

Maintenance of the system such that stormwater from that system does not, as it has done, characteristically destroy, damage or encroach upon Plaintiffs property and so that the system adequately drains within a reasonable time and is not characteristically stagnant for days, weeks and months thereby fostering the pervasive

101

incubation, proliferation and habitation of mosquitoes other pests that adversely impact Plaintiffs ability to use and enjoy their property,

Maintenance of the system so as to not characteristically flood Plaintiffs rights of ingress and egress to their Property rendering such ingress and egress impassable or hazardous, and maintenance and periodic monitoring of the waters passing through the stormwater system to reasonably assure that such waters meet applicable stormwater retention standards and water quality standards before discharging such stormwater into the Choctawahatchee; and provide drainage for Plaintiff's property and property rights in accordance with the Sandestin DRI and all other applicable legal requirements. Plaintiffs further demand all other relief as may be just and appropriate and taxable costs.

## COUNT 9

### INVERSE CONDEMNATION BY OSBORNE

227. This is an action for inverse condemnation filed against Walton County by only the Osborne, in part, pursuant to Section 73, Florida Statutes, Article X, Section 6 of the Florida Constitution and the Fifth Amendment to the Constitution of the United States of America. Osborne at all times material has been in possession of the Property described herein.

228. Walton County failed to provide proper drainage, failed to maintain the drainage system, diverted the natural and managed flow of water or restricted certain portions

and aspects of the drainage system thereby diverting or impounding water onto Plaintiffs' property and water is caused to be retained on the Property for a longer duration and at a greater depth.

229. Walton County exercised dominion and control over and appropriated all portions of the Osborne Property that are subject to the flooding caused by Walton County.

230. Walton County's actions in seeking to maintain or modify the stormwater system in Driftwood by paving of the roadways, replacement of the culverts, maintenance of the roadways and swales, excavation of the swales and diversion of water from the existing flow pattern were each an action taken for a public purpose and each contributed to the flooding of Osborne's property.

231. The flooding caused by Walton County has and will inevitably result in substantial portions of the Osborne's property being too wet for residential use.

232. The County's activities rendered Plaintiffs property useless for many residential purposes at many times such as use and enjoyment of their yards because the yards are too wet and/or the mosquitoes are so rampant. The County's actions have caused and will cause great amounts of water from rainstorms to flow on Plaintiffs property.

233. At various times Walton County has made modifications or changes to the stormwater system in Plaintiffs neighborhood, which, at times have improved the function of the stormwater system and the degree of intrusion of stormwater onto Plaintiffs' property.

234. Walton County has also made commitments at various times to improve and maintain the stormwater system in Plaintiff's neighborhood. Some of those changes have

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 104 of 173

resulted in what turned out to be intermittent improvement, but none of Walton County's efforts to date has resulted in sustained improvement to the function of the stormwater system. Accordingly, the function of the stormwater system in Plaintiffs' neighborhood has fluctuated at times, but more recently the stormwater flooding onto Plaintiffs property and onto the roadways has become worse.

235. The actions of Walton County have injured and continue to injure Osborne with most rains, including rains in 2014, in that Walton County's actions to the stormwater management system:

(a) Causes, contributes, and combines with the actions of the other Defendants to cause the roadways, common areas, and Plaintiffs yard within Driftwood Estates to flood;

(b) limits ingress and egress to the Plaintiffs' property because of the stormwater accumulation on the roads in Driftwood such that Plaintiffs at times cannot safely access or leave their property or neighborhood by means of automobile,

(c) and limits such ingress and egress to the use of a 30 foot right-of-way that is not within the Sandestin DRI and that becomes impassable or hazardous to pass during normal rain events, harder rains and/or storm surges;

(d) creates ponds that cannot sustain an aquatic environment, thus these ponds have become breeding grounds for mosquitoes and other insects, also creates standing water in the swales throughout the neighborhood that persists for days and weeks

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 105 of 173

(e) creates a publically acknowledged safety concern due to the combination of poor drainage and limited access and health concerns caused by mosquitoes and other insects or stagnant water;

(f) significantly diminished the value and desirability of the Plaintiffs' property as a part of a well designed and attractive neighborhood

236. Because of Walton County's actions Osborne have suffered a greatly diminished lifestyle, a drastic diminution in the value of their property, and significant damage to the marketability of their property. The flooding caused by Walton County's actions has and will inevitably result in substantial portions of the Property being too wet for residential use thereby continuing to diminish the value of Plaintiffs property.

237. As a result of Walton County's actions and inactions, the Property has been greatly, permanently and substantially damaged. The increased depth and duration of flooding caused by Walton County's actions has created an actual physical permanent invasion of the Property and rendered the Property unsuitable for residential use or other economically beneficial use.

238. Walton County is vested with the power of eminent domain.

239. Osborne has given Walton County notice of the damage caused by Walton County's failure to provide proper drainage, but, to date, Walton County has failed to take action to correct the flooding that continues to occur.

240.     Walton County has not paid Osborne any compensation for the taking the real property.  Osborne is entitled to full compensation for all property taken, as well as compensation for the severance damages to their property.

241.     Osborne and counsel are entitled to receive a reasonable fee for the counsel's services. Pursuant to Article X, Section 6 of the Constitution of the State of Florida and Chapter 73, Florida Statutes, Walton County is liable for this fee together with reasonable expert fees and costs.

242.     Osborne demands a trial by a twelve person jury and that the jury be permitted to view the property taken.

WHEREFORE, Osborne demands judgment declaring that all property flooded by the actions of Walton County has been taken by Walton County, and judgment awarding Osborne full compensation to include the value of the property taken, all damages to the remaining property. Osborne further demand attorneys' fees, costs, expert fees and all such other appropriate relief.

## COUNT 10

## WALTON COUNTY'S CIVIL RIGHTS VIOLATIONS

243.     The Common Allegations and the allegations in the Civil Conspiracy Count (Count 6) are adopted.

244.      This is an action pursuant against Walton County for damages brought pursuant to 42 U.S.C. Sections 1983 and 1988. The Walton County Board of County Commissioners ("County") have policymaking authority for Walton County.

106

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 107 of 173

245.     County, acting under color of ordinances, regulations, customs and usages has subjected Plaintiffs and caused them, as described below, to be subjected to the deprivation of their rights, privileges and immunities secured by the United States Constitution and laws as described below. As described below, Walton County has, by its actions, implemented, approved, endorsed the following policies, customs and usages which have caused Plaintiff to be subjected to the deprivation of their rights, privilege and immunities secured by the United States Constitution. Walton County has also enacted ordinances and approved orders and policies which deprive Plaintiffs of their constitutional rights.

246.     The federal constitution provides that no person shall be deprived of life, liberty or the property without due process of law. Plaintiffs, among other violations, have been deprived of their property rights without due process of law by Walton County's action.

247.     As described in the Common Allegations, Conspirators knew that its "reconciled acreage report" submitted to the County in February 2003 false and a misrepresentation to County because, among other misrepresentations, it was intended to change a land use of 165 acres of Open Space to residential in Driftwood II.

248.     Walton County has never approved Intrawest's 2003 "reconciled acreage report" and, in fact, the County has multiple times since at least 2004, determined that the "reconciled acreage report" is not valid and has never been approved by law, but failed to disclose those finding to Plaintiffs, DCA or public for many years.

249. On February 20, 2003, Walton County's "staff" found that Intrawest's February 6, 2003 "Notice of Proposed Density transfer of density within Driftwood", was "in accordance with the language in Ordinance 2000-18" but did not approve the "reconciled acreage report."

250. The law including Ordinance 2000-18, however, as Conspirators knew, does not permit Intrawest to unilaterally change any land uses including a land use of 165 acres of open space to residential because the Ordinance only allows like-kind *density* unit transfers "if the type of use to be transferred is available for development and is being transferred to an area which *has been previously approved for that type of use* within the DRI."

251. On or about April 14, 2003, Intrawest sold approximately 88 lots to Adams Homes in Phase I of Driftwood for $5 million, and Intrawest sold the 200+/- acres in the interior of Driftwood to Olson for $12.2 million.

252. Plaintiffs' were afforded no notice or opportunity to be heard concerning Walton County's staff's February 20, 2003 finding that Intrawest's February 6, 2003 "Notice of Proposed Density transfer of density within Driftwood". The Conspirators contend that the density transfer changed 165 acres of an Open Space land use to residential land use.

253. On April 25, 2003, Walton County apparently issued a "Minor" Development Order ostensibly authorizing the development of that 463 lot on the Open Space in Driftwood without providing any published, posted or mailed notice to Plaintiffs or anyone as required by and in violation of state and local law.

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 109 of 173

254. Conspirators nor anyone else has ever published or posted any notice of that proposed land use change, or notice of any public hearings concerning the submission of Intrawest's February 6, 2003 Density Transfer, nor for the County's consideration of that density transfer, nor for the County's "approval" of that density transfer. No public hearings by Walton County or otherwise have ever occurred to consider this density transfer and its purported land use change from 165 acres of Open Space to a residential land use.

255. Conspirators nor anyone else has ever published or posted any notice of that proposed land use change, or notice of any public hearings to consider Olson's development submission to Walton County on or about January 24, 2003 that sought authorization to develop a 463 single family lots upon the Open Space acreage in Driftwood II. Conspirators nor anyone else has ever published or posted any notice of that proposed land use change, or notice of any public hearings to consider the County's approval of any development authorizations regarding the development of that 463 lot on the Open Space in Driftwood, and that development order was apparently approved without any posted, published or mailed notice in contravention of state and local law and no such public hearings ever occurred to consider or approve the development of Driftwood II.

256. Plaintiffs are persons who were entitled to receive mailed notice and live in Driftwood for which it is likely they would have become aware of the County's consideration of the proposed density transfer and of Olson's development submission for a development order which purportedly change the land use from Open Space to residential for the acreage in Driftwood II and/or authorize the development of 463 lots.

257.    Plaintiffs were entitled to rely on the public records and documents concerning authorized land uses in Driftwood. Those public records and documents have  since at least 2000 continuously identified that Driftwood's interior acreage is designated by law as Open Space except for 34.7 acres. These lawful designations in fact and in the public records did not change after 2003 and have never changed since 2000.

258.    Developer and Conspirators contend that no notice of any type, posted, published, mailed or otherwise was required to be provided to any person, including Plaintiffs, for either the change in the use of the 165 acres from Open Space to residential in Driftwood II or for any government approval for the development of the 463 lot neighborhood in Driftwood II.

259.    The County contends that it approved the "minor" development order pursuant to an unwritten policy/practice by which it processed all requests to develop within the Sandestin DRI as "minor" developments irrespective of its size, density, intensity, community impact etc. or any of its Comprehensive Plan or Land Development Code criteria that would apply to any other development application for any other project within Walton County, but not within the boundaries of the Sandestin DRI. (No-Notice Policy).

260.    Walton County contends that its No-Notice Policy applies to all proposed development within the Sandestin DRI, regardless of the planned size, acreage, land use change or density or any other characteristic of any proposed development that such proposed developments were not required to be publically noticed in any way and that no public hearing would be afforded to any person whose property might be impacted by the proposed development or the requirements of Florida law. This Walton County policy which,

110

according to Walton County, existed before and was the means by which the County purportedly "approved" the land use change and the development of Driftwood II  As such, Plaintiffs were afforded no notice or opportunity to be heard by the government before that development was "approved."

261.    Walton County and its Board knew that it had an unwritten policy that it had endorsed, adopted, approved by its long-term use that deliberately did not provide any notice or any opportunity to persons such as Plaintiffs' before the County granted authorization to develop projects such as Driftwood's interior, "No Notice Policy."

262.    Plaintiffs have constitutionally guaranteed property right in the protection of their own property against unlawful or incompatible uses of nearby property, and of changes to the previously lawfully authorized uses and development of such property which materially devalues and materially impacts their property rights. As such Plaintiffs were entitled to notice and meaningful opportunity to be heard before the purported land use change of 165 acres of Open Space to residential and before the any approvals were issued for the development of that Open Space in Driftwood II.

263.   Plaintiffs never received such notice or opportunity to be heard.

264.   Plaintiffs' also have property rights in the protection of their own property from devaluation of their property caused by the development "approval" and/or the land use changes under the circumstances. Their property and the developed property are located with the Sandestin DRI, all of which is approved by local ordinance which applies to all property within the Sandestin DRI. The Sandestin DRI is also regulated state law and for which the

Case 3:14-cv-00646-MCR-EMT  Document 172  Filed 08/18/15  Page 112 of 173

law requires a specific process in order to make the types of changes that were unlawfully made in Driftwood's interior without following any portion of that mandatory process.

265. The proposed development of Driftwood's interior sought to (and does) violate state and local law in that it eliminate over 100 acres of Open Space and such elimination under the circumstances rendered the Sandestin DRI substantially below its lawfully required acreage of Open Space. Concomitantly the development of Driftwood's interior also violated the law by increasing the quantity of residential acreage within the Sandestin DRI to exceed the law.

266. Neither the nature nor magnitude of the development and its adverse impacts are *de minims*. Plaintiffs' have lost more than $1 million each in home value. Moreover, the scale of the development is also not small as described below.

267. The Plaintiffs' property and due process rights are also established and required by the size, scope, mass, density, nature of the development that is entirely within Plaintiffs' neighborhood. Every part (nearly every portion) of the boundary of the interior development abuts the boundary of the exterior development. The development "approval" changed the 200 acres of mature forested undeveloped wetlands and Open Space into a 463 lots of single family homes which required approximately 4 to 12 vertical feet of fill over 150 acres of wetlands. The development is the largest in acreage within the Sandestin DRI, and the largest, non-high rise residential density development in Sandestin DRI. The interior development's acreage is over 10% of Sandestin DRI's total acreage.

268. Florida's statutory law and the County's local law require strict compliance that nearby property owners such Plaintiffs be provided notice of public hearings and that public hearings occur concerning the types of land use changes and development authorizations that were/are necessary for the development of Driftwood's interior.

269. The County violated Plaintiffs' due process rights because the County did provide to Plaintiffs' notice and opportunity to respond before changing the land use from Open Space to residential and also by approving the development by the application of a unwritten No-Notice "policy" that is and was arbitrarily applied by the County.

270. The Board ratified, endorsed, affirmed, and perpetuated that No-Notice Policy after it was again brought to the attention of the Board that such a policy was the means by which the development had been "approved" and the County took no action either to provide to the Plaintiffs' legally sufficient due process before any further development continued or to mitigate or prevent the adverse impacts and damages caused to Plaintiffs' by the County's No-Notice Policy.

271. The Board took no action to seek to change that policy after becoming informed again that such a policy had been implemented by the Board for years prior to the approval of Driftwood's interior. The Board took no meaningful action to ameliorate or mitigate the damage caused to the Plaintiffs by that policy despite multiple opportunities to do so and when such could have been done any number of actions within the authority of the Board by, among other actions, requiring that the Developers to remedy their violations, and negligent design and as-built development that causes nuisance conditions and that has substantially devalued Plaintiffs property and otherwise damaged them as described herein.

113

272.   The Board's knowing inaction and indifference of the original constitutional violations, its inaction or indifference to change those policies and/or to seek to address the adverse impacts to Plaintiffs' caused by their policy was itself a policy, practice or custom directed at Plaintiffs and those in their neighborhood. That policy of inaction and indifference to constitutional violations caused, perpetuated and increased Plaintiffs' damages.

273.   Plaintiffs have been damaged by the County's violation of their due process rights and seek damages as stated herein

**FIRST AMENDMENT VIOLATIONS – RIGHT TO ACCESS COURTS**

274.   If the Developers and County had followed the lawful procedural process that required multiple public notices and multiple public hearings as well as requiring that the person seeking the development authorization to comply with the procedural and substantive requirements for such a development, then the Driftwood development would not have been approved or it was more than reasonably likely that it would not have been approved to nearly the mass and scale of its present size. This is because, in part, in order for Driftwood to have been lawfully approved the Open Space reductions within the entire Sandestin DRI would have had to be revealed thereby causing a substantial deviation resulting in statewide agency review.

275.   Moreover, because Plaintiffs were given no notice or opportunity to be heard, they were also effectively denied their right to access the courts.

276.   Had the land use change or development approval of Driftwood II afforded Plaintiffs notice and opportunity to be heard, they could have filed a legal challenge to the

114

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 115 of 173

development because its inconsistency and substantive non-compliance with the law including accessed non-compliance with the Comp. Plan pursuant to Chapter 163 and/or, depending on the terms and circumstance of the approved development, other Florida law. The development as "approved" now violates many material, substantive components of the law that are grounds to overturn that approval. Such issues include traffic volume, hurricane and emergency evacuation, land uses, non-compliance with the "Coastal Center" zone in which Driftwood exists, stormwater design, incompatibility of land uses.

277.  Plaintiffs have First Amendment right to petition the government for a redress of grievances includes a right of access to the courts.

278.  Developers and Conspirators conspired to avoid the public hearing process and in order to deny Plaitnffs' due process rights and in order to deny or unlawfully frustrate their access to courts to challenge the land use change or the development approval.

**UNCONSTITUTITONAL RETALIATION, CONSPIRACY TO RETALIATE**

279. The First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right. The federal constitution prevents governments such as County from retaliating against persons such as Plaintiffs because they have exercised a constitutionally protected right.

280. The Developers and Conspirators unlawfully burdened Plaintiffs' First Amendment rights as described below. The Board committed multiple acts of retaliation against Plaintiffs because Plaintiffs exercised their First Amendment rights to speak at public meetings, to petition their government for redress of their grievances and because they exercised their right to access the courts.

281. Plaintiffs have exercised the protected First Amendment rights in seeking redress of their concerns related to Driftwood:

      (a)    Speaking at public Board meetings

      (b)    Osborne sought to be elected in 2008 as a County Commissioner

      (c)    Expressing opinions by speech and writing about County Commissioners conduct and actions related to their election for that office and while in office

      (d)    Seeking redress by speech, writing, and meeting to government agencies such as the DCA who have direct oversight and enforcement authority against

the County and Developer concerning their conduct related to Driftwood and the Sandestin DRI

(e) Accessing the courts by filing at least three lawsuits against Walton County and this lawsuit against Developers

282. Since May 2005, Plaintiffs Osborne and Alex Kish of Plaintiff Kish have spoken to the Board many times at Walton County public meetings regarding matters of public concern. To a lesser frequency, other Plaintiffs such a Steve Abbott, Cindy Abbott and Diana Kish have also spoken.

283. From May 2005 into 2011, Comander investigated determined that Osborne had spoken to the over 50 times, both personally and as a President of the Greater Driftwood Homeowner's Association which is comprised of property owners from Driftwood I.

284. At all times materials all such speakers have all:

285. been Walton County and Driftwood I residents, homeowners, taxpayers

286. have addressed the Board of County Commissioners at public meetings, in an appropriate manner, at the designated place (podium) and times during the meetings (either by agenda or under the specified "public comments" portions of the meetings.).

287. The subject matters of their speech have all been matters of public concern. The issues concerned Driftwood included its problems such as flooding, mosquito infestations, life safety concerns from inadequate access and flooding, water quality problems, algae blooms in the bay etc., the causes of these problems, evidentiary support that the problems in fact exist and of their causes and impacts, financial consequences to the

County of the problems, substantial adverse impacts to the homeowners in Driftwood because of these problems, undisclosed conflicts of interests by County Commissioners and staff members with decision making authority and upon whom the Board has sought advice concerning the Driftwood.

288. All of these issues are of public concern, and because most relate to the County's liabilities and potential expenditures of tax dollars rendering issues of concern to the entire County. In most instances, many people from Driftwood I attended Board meetings for support, concurrence and to allow Osborne and Kish speak of their collective concerns as well as those that were personal to him.

289. The County continually retaliated against Plaintiffs because they have exercised their speech by the following actions:

(a) At a May 2005 public meeting between where Mr. Osborne and Mr. Kish began to address the Board for the first time concerning the flooding problems that were beginning near the first phase of the development, Board Chairman, Larry Jones, ordered the deputy sheriff to seize and remove Mr. Osborne for the content of his speech and because Mr. Osborne had publically disclosed that Mr. Jones was an employee of Adams Homes but that Mr. Jones had not revealed that.

(b) Mr. Jones, as Board Chairman had also signed the first two plats for the interior development and knew of the emerging flooding problems caused by Adams Homes even before that May 2005 Board meeting. Mr. Jones did not recuse himself from participating in public meeting discussions concerning Driftwood until after

Mr. Osborne revealed Mr. Jones employment with Adams Homes. By the authority and influence of his position, Mr. Jones acted to protect Conspirators interests.

290. In the summer of 2005, when Plaintiffs and others who lived in their neighborhood publically and privately questioned the Board and Staff, Walton County formed an alliance with the Conspirators against Plaintiffs and their neighbors in order to continue to conceal their collective actions in their prior actions in furtherance of the Conspiracy.

291. Throughout the summer Plaintiffs and Osborne continued to address the Board at public meetings. In retaliation and in response to Plaintiffs' and Osborne's exercise of his First Amendment rights seeking that the County address and remedy the flooding and burgeoning problems in Driftwood, the County renewed its alliances and conspiracy to take actions both in retaliation against Plaintiffs and to conceal its due process violations in 2003.

292. By August 2005, the alliance and conspiracy between Walton County and Adams Homes and Olson/Northip had resulted in "sweet heart" settlements in or around September 2005 by Walton County with co-conspirators Adams Homes and Olson for only $60,000 each. Walton County's settlements with these co-Conspirators included releases of Adams Homes and Olson for not just their past conduct in the Driftwood neighborhood, but also releases of Adams Homes and Olson for any *future* conduct in the neighborhood when the County knew that Developers would perform substantial more development in Driftwood.

293. Walton County knew that a remedial fix of the stormwater system in Driftwood would cost several million dollars and that $120,000 was completely insufficient for that purpose. Walton County did not collect the settlement funds from Adams Homes or Olson.

294. Adams Homes exerted improper influence upon Walton County officials and/or Walton County conspired to gain an irrationally favorable settlement by utilizing another local developer to lobby important officials and decision makers at Walton County for a settlement on overwhelmingly favorable terms for Adams Homes. Thus Walton County shifted the enormous financial responsibility for the flooding in Driftwood away from the persons who caused the flooding to the Walton County taxpayers and effectively requiring Plaintiffs to live "in" the consequences of the problems caused by the Conspirators.

295. Throughout 2005, Osborne and Plaintiffs continued to address the Board and staff in seeking redress. The County retaliated by aiding, abetting, condoning and encouraging, Olson letter dated December 14, 2005 sent to Plaintiff Osborne's employer (an official of the Department of Defense), and the Board that threatened Osborne with a lawsuit because he had exercised his first amendment rights to advocate against Olson's continued development until the flooding problem was addressed, i.e. for his "presentation before public bodies, including the Board of County Commissioners of Walton County," (Ex. 167)

296. Aiding, abetting, encouraging threats against the Osborne Plaintiffs as described herein. Also in furtherance of the conspiracy, Olson, Northtip or Adams Homes, through their representatives threatened physical and financial harm to Mr. Osborne and his family and in an effort to intimidate, threaten and cause Mr. Osborne to cease his efforts to

120

understand and stop the continued development of Driftwood and to influence, delay or prevent Mr. Osborne from testifying in lawsuits that he and others had filed concerning Driftwood. To retaliate against Mr. Osborne for his exercise of his First Amendment rights to address and petition the local, state and federal government in opposition to the Defendants' development and actions, and to seek to prevent the exercise of such constitutional rights by Mr. Osborne or the other Plaintiffs in addressing the government concerning Defendants' development. Their other acts in furtherance of the scheme to threaten physical, financial and other harm to Mr. Osborne and his family in an effort to intimidate Mr. Osborne influence whether they would testify and the content of such testimony in judicial proceedings, and in an effort to intimidate them as homeowners to cease or curtail their efforts in seeking for government agencies to take action and to cause a stoppage of development and construction activities in Driftwood, in an effort to silence Mr. Osborne and in an effort to improperly cause him to cease the exercise of their statutory or constitutional rights to petition and address government agencies such as the Walton County Board of County Commissioners, the Department of Community Affairs, and the Army Corps of Engineers. All of the Defendants sent, aided and abetted encouraged, condoned, ratified the following acts of their agents or representatives to threaten the Osborne family. These threats included aiding and abetting condoning or ratifying its agents or representatives actions on several occasions in trespassing onto the Osborne property in Driftwood during nighttime darkness to cause property damage and leave other threatening emblems.

297. In and throughout 2006 and 2007, Osborne began to communicate his concerns to the DCA and continued to address the Board at public meetings concerning Driftwood.

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 122 of 173

298. In 2006 Plaintiff Osborne and the Greater Driftwood Estates Homeowners' Association filed suit against Walton County seeking a mandamus to compel the County to conduct a public hearing in order to abandon a portion of the road that, if it had not been unlawfully blocked, would provide direct access to Sandestin for Plaintiffs. *Greater Driftwood Estates Homeowners' Association* et. al. v. Walton County 06 AP 000002 (2006).

299. In April 2007, Plaintiffs Steve Abbott, William Bell, Alex Kish, and Alan Osborne (along with two other residents of Driftwood I) filed a lawsuit against Walton County and the Sandestin Owners Association, Inc. that concerned whether the County had properly abandoned a small portion of road in Driftwood. *Abbott et. al. v. Walton County Board of County Commissioners*, Case No. 07CA000290.

300. Because of Plaintiffs' exercise of their rights to address the DCA, on May 14, 2007 the DCA wrote a stern letter to the County regarding Driftwood's problems with access, stormwater treatment, retention, discharge into the Bay, and flooding.

301. On August 14, 2007, Osborne spoke at a Board meeting seeking for the County to correct the stormwater drainage function in Driftwood, and in opposition to the County's preliminary plan to make ditch improvements which would insufficient. That "proposed drainage plan would be the first the county had given."

302. In August 2007, Plaintiffs' lawyers exercised their free speech rights by the publication of an editorial in the *Walton Sun* that was critical of the Board's actions concerning Driftwood's flooding problems.

303. The County, in retaliation against Plaintiffs' and in an effort to quash and silence their future speech and in an effort to continue to conceal the County's due process violations, unbeknownst to Plaintiffs the County formed alliances with all persons' whose interests may have been affected by the issues in that lawsuit. Those persons included the Sandestin Owner's Association Inc. (SOA), Developers and Conspirators.

304. In October 2007, Plaintiffs filed this lawsuit and by the fall of 2008 were publically encouraging the County to intervene or separately sue Developers to hold those Developers accountable for their catastrophic development mess in Driftwood and not burden the County's taxpayers, or Plaintiffs and their neighbors, with the expenses to remedy the problems.

305. Also in October 2007, the DCA again wrote another stern letter to the County asking the "County to respond by identifying how the current operations [in Driftwood] are consistent with the DRI and FDEP permits and identify the plan to correct certain deficiencies."

306. In summer 2008, Osborne ran for County Commissioner and finished second to Cecilia Jones. Osborne had campaigned strongly against Ms. Jones and they had both attended public forums and debates where each was critical of the other's policies. The other Plaintiffs publically supported Osborne's campaign.

307. In 2008, when the Plaintiffs encouraged the County to sue the Developers to make Developers pay for the flooding mess, the County Attorney, Mike Burke, told Plaintiffs

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 124 of 173

Osborne and Alex Kish, that the County would not sue them because it would be easier to fight a few homeowners than the "800-pound gorillas", i.e. Developers.

308. But unbeknownst to Plaintiffs, the County was not simply refraining from suing the Developers, but it was actually affirmatively conspiring with Conspirators in retaliation and in order to conceal the misconduct and County's due process violations. The County continued to secretly collude with the other Conspirators in an effort to quash Osborne's public speech. During this time period, the County was corroborating with the Conspirators to not publically disclose the 2008 Bradley Report which identified Sandestin's DRI violations.

309. Instead of suing the Developers, Conspirators and County intensified their conspiracy actions which included retaliation against Plaintiffs because of the exercise of their speech rights in opposition to the Conspirators' conduct by affirmatively agreeing to "silence Alan Osborne." Ex. 121.

310. On October 7, 2008, the County sent Intrawest an extensive report (Bradley's 2008 Report) that found many discrepancies and errors in Intrawest's 2007 Annual Report which included multiple Open Space reductions and unapproved land use changes such as the one in Driftwood, asked Intrawest, in part, to:

> define green [open] space in Driftwood. Please provide green space and green space Driftwood on master plan map. This area should encompass…a total of 160.8 acres.
>
> Explain how open space decreased…[by 31.8 acres]… since 2002.
>
> Explain how lakes… decreased…[by 49 acres]…since 2002. How did this affect the overall master plan for drainage?  Was FDEP or CORP notified or applied to, to fill these lakes? If so, please provide a copy of permits or exemption letter."
>
> Explain green belt reduction by 79.6 acres.

Explain nature preserve reduction by 106.2 acres.

311. In February 2009, Osborne spoke at a Board meeting concerning Driftwood and the Sandestin DRI's noncompliance. In specific response to Osborne's request and comments at that public meeting the County's DRI Coordinator, Renee Bradley, in March 2009, prepared a lengthy report that concluded that the Sandestin DRI was out of compliance and that the Driftwood II had never been lawfully approved for development. (Bradley 2009 Report). That report stated, in part:

> **The 2003 reconcilation made many changes that were not through the DRI process, nor were these changes approved by West Florida Regional Planning Council, Department of Community Affairs or Walton County.**
>
> **Staff has found many discrepancies in open space numbers throughout the years of the Sandestin Development, Many issues have arisen from the 2003 acreage reconciliation which were never reviewed or approved through the state or approved through Walton County…There were several changes to the DRI which would have required an NOPC in the 2003 documents….**
>
> **No change in open space occurred to the Driftwood area during the 2002 NOPC.** (Bold and underline in original.)

312. Ms. Bradley was instructed by the assistant County Administrator, Shirl Williams, to not inform the Planning Department Director (Ms. Bradley's more immediate superior), but to give the 2009 Bradley Report to the County Attorney, Lynn Hoshihara.

313. In furtherance of the conspiracy neither Ms. Bradley, nor Ms. Hoshihara, nor Ms. Williams disclosed that report or its findings to Plaintiffs or the DCA. Instead, they repeatedly communicated to the Plaintiffs and the DCA conclusions that were completely contrary to the findings in those two reports.

314.    Ms. Bradley wrote a letter that was sent to the DCA on June 18, 2009, that stated that "Driftwood Estates is in compliance with the Sandestin DRI."  This was a false representation.

315.    The Developers and Conspirators knew that the 2008 and 2009 Bradley Report would be extremely important evidence in Plaintiffs' lawsuits, including this lawsuit, and to the DCA, and other government, to others in Sandestin, to Plaintiffs' neighbors and many others in the community given that Sandestin DRI is the largest DRI in northwest Florida.

316.     The Conspirators suppressed those reports in retaliation against Plaintiffs and in furtherance of the conspiracy which adversely affected Plaintiffs' future speech rights because such suppression denied the Plaintiffs of critically important evidence those Plaintiffs could have used in their lawsuits, including this lawsuit, in their petition to the DCA and other government, in their future speech to the Board, and in 2009 Special Magistrate proceedings.

317.    Within 6 months of the Conspirators explicit "silence Alan Osborne" strategy, the County (via Commissioner Comander) in fact silenced Mr. Osborne by refusing to allow him to address the Board of County Commissioners at an April 28, 2009 Board meeting. Ex. 445.

318.    Comander's stated reason was because she did not like the *content* of Mr. Osborne's speech at the previous public meeting that had—accurately—revealed to the Brannon conflict of interest.   At that prior meeting Mr. Osborne revealed that Commissioner Brannon's business partner had invested $7 million in 77 lots in Driftwood, and that Brannon

had not disclosed that and had voted for the previous three years to continue to allow the development of Driftwood.

319.   Osborne's disclosure of Brannon's longstanding undisclosed conflict of interest at a public meeting was an issue of public concern when Brannon had been, as described by the newspaper, "the most vocal opponent" of Driftwood's longstanding exercise of their speech rights efforts to seek redress at Board meetings, with the DCA, in court, and in political election campaign expressions of political speech.

320.   Osborne's public identification of Brannon's ethical conflict was a matter of public concern because the County had long since recognized that it would cost millions of taxpayer dollars to correct the stormwater and road problems in Driftwood and that to allow more residents to move into Driftwood would exacerbate a life-safety issue that the County recognized.

321.   Plaintiffs and others in their neighborhood had a letter to the editor published in the local newspaper in or around April 2009 concerning Brannon's ethical conflict.

322.   Plaintiffs also met with Brannon in April 2009 and he admitted that he had known that his business partner owned the lots in Driftwood for the past years when Brannon voted on the Driftwood issues where his votes inured to the benefit of his partner.

323.   Comander's motivation to stifle Osborne's speech was also to prevent the public discussion or Plaintiffs' public efforts that could pressure the County to have to reveal Bradley's 200 and 2009 Reports or other information that would damage Conspirators.

324. At that April 2009 meeting, the County referred "all issues" concerning Driftwood to the magistrate, and because of the breadth of such referral, thereafter prohibited Plaintiffs from speaking at Board meetings until after a special magistrate ruling.

325. The magistrate convened an evidentiary hearing on August 24-25, 2009. The DCA attended the hearing as a party and advocated positions largely identical to Driftwood's positions. The magistrate's order required the County to disclose all documents related to Driftwood.

326. In 2008 the County had provided the 2008 Bradley Report to Intrawest, but neither the County nor Intrawest produced it to Plaintiffs.

327. On August 11, 2009 just before that hearing, Bradley again gave her Bradley 2009 Report to Hoshihara who failed to disclose it. The County did not disclose the 2008 or 2009 Bradley Reports to the Plaintiffs', magistrate or the DCA or public before, during or after that hearing.

328. The County's failure to disclose those crucial reports was in retaliation against Plaintiffs' many prior exercises of their speech rights that concerned the subject matter of those reports. The County's failure to disclose those reports was also in furtherance of the conspiracy that was to cover-up the 2003 due process violations, denial of access to courts, to conceal the undisclosed conspiracy to retaliate against Plaintiffs including the Conspirators' actions to "silence" Plaintiffs' and those associated with them.

329. Both before and after the August 2009 magistrate hearing, unbeknownst to Plaintiffs or the DCA, the County communicated with other Conspirators such as Intrawest

128

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 03/18/15 Page 129 of 173

and the SOA who provided resources, information and professional services to support the County. Throughout the hearing process, the County advocated the positions and for the interests of Intrawest and the SOA and in opposition to the Plaintiffs' positions and interests.

330. Before and after August 2009, the same lawyers with the same firm, Bryant Miller & Olive, simultaneously represented Intrawest concerning its Sandestin DRI compliance also represented Walton County concerning land use matters including the terms and application of the County's Comprehensive Plan. Aspects of the application of that Comp. Plan were in dispute between Intrawest and Walton County at that time.

331. The County's advocacy of Intrawest and the SOA's positions could not be rationally explained to be in the interests of Walton County's taxpayers because the County's success on these arguments would result in the County incurring substantially larger liabilities, risks, and expenses while relieving the Conspirators of obligations for those items. The County's advocacy of such was in furtherance of the conspiracy and to retaliate against Plaintffs.

332. By December 2009, the special magistrate had issued his report which had many conclusions that were favorable to Driftwood which, at a public hearing in March 2010, the Board pledged to implement.

333. On January 15, 2010, unbeknownst to Plaintiffs, the County submitted a grant application for nearly $1 million for state and federal funds for repairs to the 0.3 mile area within the single point of ingress/egress into Driftwood. That application stated:

> This road is the only access for approximately 1000 citizens…[it] suffers repetitive flooding and is often impassable following localized bay surge and usually following

a rain related disaster event.[It] is functionally inadequate especially during periods of inclement weather…[it] often will become a public endangerment and is closed for days [which] severs the residents access to emergency services.

[The road] currently serves several hundred homes, has a daily traffic count of 2,000 vehicles per day. At build out there will be over 700 homes…and I anticipate the average daily traffic count will double.

It is imperative that Walton County ardently pursue all avenues of improvement to help protect the health, safety and welfare of the [Driftwood] community.

The road has been flooded many times over the years…when the road is flooded no access is afforded to the community. [We] hope to secure funding that will preemptively avert a future tragedy...to bring a much needed improvement to an area with extensive vulnerabilities.

334. The County failed to provide sufficient information for the application so it was not awarded the grant. The County did not disclose this application to the Plaintiffs until February 2015 despite multiple discovery and public records requests that would have called for its disclosure.

335. Notwithstanding the County's grant application, the County has since 2003 always publically maintained that the ingress/egress into Driftwood does not flood and that there is no life-safety reason (or any other reason) to stop the Developers from continued development. The Conspirators knew these positions to be false and maintained them in furtherance of the conspiracy, to allow the Conspirators' continued development, to conceal from Plaintiffs' and potential purchasers in Driftwood the substantial life-safety risks which would harm Conspirators interests.

336. On January 28, 2010, the County sent Intrawest a report regarding the County's analysis of Intrawest's 2009 Annual Report. The County (Ms. Bradley) found, in material part:

At the submittal of the 2004 annual report it was evident that corrections were needed to correct the DRI Development Order for Sandestin.

Intrawest's 2006/2007 report was "insufficient."

There was a "substantial decrease in open space and increase in residential. The decrease in open space is considered a substantial deviation. The change in other land use areas is presumed to be a substantial deviation per" Section 380.06(19).

337. In a letter dated March 8, 2010 the County (Bradley) told Intrawest that:

> the 2003 acreage reconciliation submitted by Ian McCook of Intrawest…assumed changes that were required to go through the NOPC process….Since 2004, staff has been requesting that Sandestin clarify their land uses and acreages through the NOPC process using the 2002…allocation table as a benchmark.

338. In or around March 2010, Ms. Bradley told the representatives of Sandestin Investments LLC of the substantial deviations that existed concerning the Sandestin DRI just before SDI purchased the Sandestin DRI from Intrawest.

339. In April 2, 2010, the DCA sent a sternly worded letter to the Board informing the Board that the DCA concurred with the magistrate's conclusions including that the Sandestin DRI required a more stringent stormwater retention standard than the County believed and:

that the "evidence…makes clear that violations of the [DRI] standard are occurring" and that if the "violations continue to occur without corrective action... the [DCA may] is a Notice of Violation to the County."

340. The DCA also requested that County send documents as to "what corrective action has been taken to date…as well as a schedule for corrective actions to be taken in the future" [which] should include an independent engineering study to document the extent of

131

Case 3:14-cv-00646-MCR-EMT   Document 172   Filed 08/18/15   Page 132 of 173

the drainage problem and what steps must be taken to bring the drainage system into compliance."

341. The County has never taken any meaningful action to comply with the magistrate's report or the DCA's directives.

342. The DCA staff and secretary had changed by the 2011. The new DCA Secretary was Billy Buzzett, a Walton County native and friend of Comander's and other Walton County Commissioners. By May 12, 2011, the County Attorney, Hoshihara, and County Administrator, Gerry Demers, had met with Secretary Buzzett, and, unbeknownst to Driftwood, had brokered a deal to get the DCA off the County's back, that was set forth in a letter.

343. At that meeting the County Hoshihara and Demers told the DCA that "the County has pledged funds for improving the exterior drainage system of Driftwood Estates, several improvements have been made and road elevation improvements that will also alleviate flooding are in the works." Ex. 219

344. The County knew that these representations were false. In furtherance of the conspiracy, and in retaliation against Plaintiffs' for exercising their speech rights, the County concealed from Plaintiffs, the DCA and the public, that the substantial deviations such as reduced open space, unapproved land use changes and unapproved residential acreage increases existed within the Sandestin DRI because of the misconduct of the Developers and Conspirators and that the County had known about that misconduct and those substantial

deviations since at least 2004 and had concealed them from Plaintiffs, the DCA and the public.

345.    On June 9, 2011, Walton County Commissioner, Sara Comander, directed Walton County's Attorney, Lynn Hoshihara, via email to conceal information from Plaintiffs and Osborne to not announce or advertise that the "DCA will be in DFS [DeFuniak Springs] on July 5, or [Plaintiff] Allen Osborne will be there." (Ex. 132.)

346.    "Lynn, We don't need to announce that the DCA will be in DFS on July 5th pr Allen Osborne will be there!"

347.    The County attorney complied.

348. Commissioner Comander and Walton County's Attorney suppressed this information in retaliation against Plaintiffs and Osborne because they have previously exercised of their First Amendment Rights many times by:

(a)    Speaking at public meetings many times each year since 2005 concerning the Developers' misconduct (as it became known), the Conspirators misconduct and other actions, the County's decisions and inaction to address Driftwood's nuisances, ethical conflicts of Commissioner Brannon, Commission Larry Jones' decisions and actions while an Adams Homes employee, County Engineer Greg Graham prior employment with Intrawest, County and Olson's Attorney George Ralph Miller.

(b)    Numerous communications in petitioning the DCA and other governments for redress and to hold the County accountable to the County's legal obligations regarding the development of Driftwood, the County's commitments to the

133

DCA and Plaintiffs to take corrective action particularly after the magistrate proceeding. Comander knew that Osborne's communications to the DCA had prompted the DCA to send several stern letters to the County since 2007.

(c) Communicating with the news media, providing the news media information and expressing his opinions in the newspaper that were critical of the Board and Brannon

(d) Accessing the Courts by suing Walton County in 2006 and 2007 concerning issues related to Driftwood and Osborne's prior communications with the DCA

(e) Running as a candidate for County Commission in 2008 and vigorously campaigning against certain candidates such as Comander. Comander knew that Osborne lived in the district that she represented, that Osborne had finished second in the 2008 election and that many people in the community wanted him to run against Comander in the next election.

349. The DCA Workshop was held at the Board of County Commissioners meeting room which is a public forum.

350. Any person, including Osborne, could attend that Workshop. Comander believed that Osborne could attend because a primary purpose of her email was to prevent his attendance.

351. Comander knew that Osborne frequently monitored the Counties notices of meetings—which in fact he did. Comander knew that if the County published a notice of the

134

Workshop, that Osborne would to attend that Workshop—which in fact he would have attended.

352. Comander knew that Osborne was or had been the President of his homeowner's association and had frequently spoken for himself and for the many other homeowner's in Driftwood. Comander knew that if Osborne learned of the workshop that other homeowners from Driftwood would attend the workshop, and that they also had a history of speaking at public meetings because she had heard Plaintiffs and others speak many times to the Board.

353. Comander's stated purpose of her directive was to prevent Osborne's knowledge of the Workshop "don't announce…or Allen Osborne will be there."

354. Comander knew that if Osborne attended the Workshop that he would speak at the Workshop. Otherwise Comander would have had no reason to seek to prevent Osborne's silent attendance at the Workshop.

355. Comander believed that Osborne could speak at the Workshop. Otherwise Comander would have had no reason to seek to prevent Osborne's silent attendance at the Workshop.

356. The DCA meeting was a "Growth Management Workshop" where questions and comments from the public were allowed.

357. Osborne had constitutional rights to attend that Workshop to hear, listen, obtain information, to petition, speak, and seek redress from and by the state agency with oversight

135

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 136 of 173

and enforcement authority concerning the Sandestin DRI and Driftwood's unlawful development.

358. Osborne and Plaintiffs had substantial interest in addressing the state agency's senior officials at a workshop held conveniently in his home County, in a public forum, where County officials and other key land planning decisions makers would attend. That was a unique opportunity to have multiple persons in authority in the room at the same time. Osborne and Plaintiffs would have been keenly interested in discussing with those senior officials, either during, before or after the Workshop, the non-compliance issues regarding the Sandestin DRI, the unlawful development of Driftwood, the unlawful land use changes and elimination of substantial acreage of Open Space and the County's failure to honor its commitments to the DCA or Plaintiffs, and the County's inaction since the DCA's April 2010 letters.

359. Osborne and Plaintiffs had lost millions of dollars in home value because of these unlawful actions, the Conspirators' conspiracy and retaliation against them and had spent substantial sums of money and time since 2005 to seek redress including paying for one-half of the magistrate process that Comander had demanded in 2009.

360. The context of Comander's June 9, 2011 directive to the County Attorney also included the following:

(a)    Her directive was just 3 weeks after the same County Attorney's misrepresentations to the DCA and the County's procurement of the May 17, 2011 letter which stated those misrepresentations as described above.

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 137 of 173

    (b)    Those false representations by the County's Attorney to the DCA had been to the DCA Secretary Buzzett and that he would be the primary speaker at the Workshop.

    (c)    The County had concealed its May 2011 meeting and false representations to the DCA; if Osborne or Plaintiffs learned of those false representations he could reveal those to the DCA, as well as all of the other attendees which would be embarrassing for Comander, and the County, and it might weaken Comander's or the other Commissioners' re-election chances.

361.    Further, the revelations of the County's misrepresentations could cause the DCA or the West Florida Regional Planning Council to investigate further which was contrary to the interests of the Conspirators which the County was protecting.

362.    A fundamental component of the unlawful development of Driftwood and Sandestin's concomitant non-compliance, both of which were known to the County, was to prevent other governments from reviewing its compliance. This is why, for example, the County had suppressed its conclusions in Bradley's 2007, 2009 or 2010 Reports.

363.    The directive came after Osborne and Plaintiffs had steadfastly sought redress by the repeated exercise of the their First Amendment rights since 2005.

364.    Commissioner Comander, using the force of her public office as a Walton County Commissioner, and Lynn Hoshihara, using the authority of her office as Walton County's attorney, specifically targeted government action at Plaintiff Alan Osborne in deliberation retaliation for his exercise of his free speech rights in previously addressing his

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 138 of 173

local government and his state government and in a deliberate attempt to prevent Plaintiff Alan Osborne and other Plaintiffs from exercising those First Amendment Rights at that particular meeting and in the future.

365. Comander's directive was intended to both retaliate against Osborne for his many prior exercises of his constitutional rights and to also prevent his exercise of another of his First Amendment Rights—the right to petition his government.

366. Commissioner Comander's retaliatory directive caused actual injury to Osborne and Plaintiffs because that directive prevented them from exercising their first amendment right to petition and seek redress from his government, i.e. DCA.

367. Commissioner Comander's retaliatory directive adversely affected speech rights generally and Osborne's speech rights specifically. Commissioner Comander's retaliatory conduct, i.e. her directive to the County Attorney, adversely affected protected speech and would chill or deter person of ordinary firmness from exercising his First Amendment rights.

368. A person of ordinary firmness in the context of the extended history and facts and circumstances of Osborne in this case would be deterred or chilled from the future exercise of his First Amendment rights. That context includes that the Chairwoman of the Board of County Commissioners use of force of her office to direct the County Attorney's actions specifically to target and prevent that person (and only that person)—whom the Chairwoman identifies by full name—from attending a Workshop, open to the public, hosted by the state agency with oversight and enforcement authority related to an issue that had cost

that person hundreds of thousands of dollars, would be deterred or chilled from exercising his First Amendment rights in the future. For example, such a person would be deterred from seeking redress from an elected official with authority to provide that redress, but who has specifically targeted government action to prevent that person's knowledge of important information and attendance at an important meeting.

369. Comander's actions were intended to cause and did cause unique unlawful discriminatory treatment in furtherance of the conspiracy described herein and for the unlawful purpose of retaliating, preventing and frustrating Mr. Osborne's right to address the state and local government and to continue to conceal Walton County's unlawful approval of the Driftwood interior Project and Walton County's knowledge of Sandestin's noncompliance. Comander's actions accomplished these purposes and caused injury to Osborne.

370. Commissioner Comander's conduct to prevent and retaliate against Mr. Osborne for his prior exercise of his First Amendment rights to address his local and state government violated his clearly established First Amendment rights and was done intentionally and with malice.

371. In January 17, 2012, Osborne and others from Driftwood met all day with the following County representative: County Attorneys Greg Stewart and Lynn Hoshihara, the County Administrator, Greg Kisela, and the Planning Director, Wayne Dyess. At that meeting Plaintiffs' explained the facts and reasons why the Plaintiffs believed that the Sandestin DRI status violated the law.

372.   None of those representatives revealed the existence of any of the three Bradley Reports or other County documents wherein the County had concluded that the Sandestin DRI had serious violations, unlawful reductions of open space, increases in residential acreage and unapproved land use changes.

373.   On February 14, 2012, Greg Stewart at a Board meeting stated to the Board that the Sandestin DRI was in compliance with the law. Hoshihara was present at the meeting. Stewart and Hoshihara knew this statement to be false; they knew of the contents of Bradley's Reports and other related County conclusions.

374.   On March 22, 2012, Walton County issued a Stop Work Order concerning construction on a 13-acre parcel within the Sandestin DRI that was very close to Driftwood because, in part, the "following conditions demonstrate that the development is not in substantial compliance with the development order. The amount of open space is below the requirement established in the [Sandestin] DRI development order" by 198.03 acres.

375.   The County thereby, within a month, enforced the law against another person's development in Sandestin on the very basis that that the County simultaneously denied to Plaintiffs even existed and concealed that information from Plaintiffs.

376.   In February 2012, some of the Plaintiffs hererin, and others in Driftwood, filed a lawsuit against Walton County seeking a writ of Quo Warranto against Walton County to show cause why Driftwood's allegations of Sandestin's DRI was not in compliance.  *Greater Driftwood Homeowner's Association Inc, Osborne et. al. v. Walton County,* 12CA174 (2012).

377.   In the spring 2012, Bill Imfeld was running for Walton County Commissioner. Mr. Imfeld had recently retired from employment with Walton County where he had held the position of Finance Director for many years. Imfeld called Osborne to arrange a meeting with Osborne. They met at the Waffle House in Defuniak Springs where Mr. Imfeld asked for Osborne's support for Imfeld's election. Imfeld knew that a significant number of voters in south Walton County value Osborne's opinion on such elections.

378.   Osborne asked Imfeld "What are you going to do about the corruption in the County government?" Imfeld, replied, "If you think that it is bad now, you should have seen it when I came here." Osborne then said, "If you cannot commit to me to do anything about the corruption then I cannot support you."  Imfeld did not reply and just stared at Osborne.

379.   In the summer of 2012, Osborne exercised his constitutional rights by writing, printing and delivering to homes of south Walton County voters election flyers that stated misconduct and others reasons to not vote for certain candidates such as Imfeld.

380.   Imfeld was elected Commissioner in 2012 and took office in November 2012.

381.   In August 2012, the County Attorney specifically invited Plaintiffs, their lawyer and expert, Charlie Gauthier, to attend a meeting with the County and all other "stake holders" concerning the Sandestin DRI's compliance. When our clients arrived at the meeting, the County forbid entry into the meeting (even to sit silently and watch) and required those clients to vacate the premises.  The County abruptly hung up the phone on the Plaintiffs' expert and counsel.

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 142 of 173

382. In December 2012, Plaintiffs had obtained written permission from the Board Chairman, County Administrator and County Attorney for Plaintiffs lawyer to address the newly constituted Board in speech and with a PowerPoint presentation at the December 11, 2012 Board meeting. Plaintiffs expressly sought the County's confirmation in writing because, as Plaintiffs' informed the County, the Plaintiffs' did not want to incur the significant costs of attorney preparation and travel with no assurance that the lawyer would be allowed to speak.

383. At the December 11, 2012 Board meeting, as the Plaintiffs' lawyer approached the podium to begin to speak at the designated time on the County's published agenda, Commissioner Imfeld made a motion to prevent Plaintiffs or their lawyer from exercising their constitutional rights to address their elected officials because the Plaintiffs had exercised their constitutional right of accessing the courts when they sued the County earlier in 2012.

384. Commissioner Imfeld and the Board's "Gag Policy" was in furtherance of the Conspirators conspiracy of concealment of misconduct as previously described and of the conspiracy of retaliation against Plaintiffs for the exercise of their constitutional rights. The County's actions, for example, in inviting and agreeing to allow Plaintiffs to attend meetings and speak, but then to deny their access and speech at the moment Plaintiffs seek to exercise it, is in bad-faith, with malice, intended to frustrate, harass cause substantial unnecessary expense, and otherwise retaliate against Plaintiffs.

385. In order to silence Plaintiffs and Osborne and because of their continued exercise of their First Amendment rights to access the courts, speak at public meetings, seek

redress from the DCA, the County retaliated and conspired to retaliate against Plaintiffs in order to continue to conceal the ir misconduct.

386.   In or around 2013 former Commissioner, then County Administrator   Larry Jones told Osborne that the reason the County did not take any action concerning Driftwood's complaints is that they figured Plaintiffs would simply "go away" if the County just ignored them long enough.

387.   Through a series of meetings from 2012 into 2014, the County Administrator, Larry Jones, and County Attorney, Mark Davis, committed to seek solutions to the flooding and other problems in Driftwood including potential funding from the Deepwater Horizon/Restore Act "BP Settlement."  They said that Plaintiffs and others in Driftwood had to "stop the lawsuits" and Plaintiffs' abated the lawsuits in reliance on their representations and dismissed an appeal of the Quo Warranto action.

388.   Despite repeated requests after those meetings, the County has never produced any documents or identified any information that any person at the County has ever taken any meaningful action to seek to prepare plans or to seek funding for improvements in Driftwood.

389.   In the spring 2014, County Administrator Larry Jones told Osborne. "Alan, they know you are right [about Driftwood and Sandestin]. They just don't know what to do about it." Jones was referring to the Board.

390.   On July 24, 2014 Walton County entered an order entitled "Determination of Non-Compliance Of Sandestin Investment, LLC With Development Order" wherein Walton County determined, among other conclusions:

391.   "that the Developer through its activities and those of its predecessors of the Sandestin Development of Regional Impact, is not in substantial compliance with its Development Order."

392.   That those "modification to the land use categories and uses which have been incorporated into the various Annual Reports are unauthorized and therefore rejected by the Board."

393.   That because Walton County "determined that the Developer in its activities with regard to the DRI is not in substantial compliance, and pursuant to the requirements of section 380.06 (17), Florida Statues, no further permits, approvals or extension of services shall be provided to the Developer, or its assigns, heirs, or successors until the DRI is brought into compliance"

394.   The County's determinations in that non-compliance order were determinations that the County had made since no later than 2007, had publically denied, had suppressed from Plaintiffs, the DCA and the public in furtherance of the conspiracy.

395.   Commissioner Cindy Meadows said to a group of citizens including Osborne that "Driftwood Estates and its problems were created by a bunch of half-truths by developers and people within the county," and that the county leadership wants to "cover this up, because its ugly." In or about June 2015, at a community meeting in Seaside that

144

concerned incorporating south Walton as its own city, Commissioner Meadows told the entire group, "if you want more say so in your community incorporation may be the way to go, the county leadership will never listen to you, just as Alan Osborne, the county's been screwing him for years." She pointed towards Osborne as she spoke.

396.   The County's, Imfeld, the Board's, Conspirators actions wherein retaliation of Plaintiff's multiple acts of exercising their First Amendment rights and were intended and did injure Plaintiffs.

397.   Those actions and in furtherance of a conspiracy to retaliate, including those that,  that were between a citizen's local government with enforcement authority (County),  a billion dollar international developer (Intrawest), one of the largest regional home builders (Adams Homes) and a prominent local developer who was then developing tens of millions of dollars worth of property in northwest Florida, for the purpose of concealing the due process and other violations of the law related to Driftwood, and to conceal the conspiracy itself would have an adverse affect on a person of ordinary firmness such that such a person might be chilled or less inclined to exercise his First Amendment rights in the future.

398.   Similarly, the following retaliatory actions which occurred to Osborne would adversely affect speech of a person of ordinary firmness, like Plaintiffs' and Osborne, such that such a person (or others who learn of such retaliation) might be chilled or materially less inclined to continue to exercise his First Amendment rights:

145

399. Threatening gestures, trespass and property damage at that person's home such trespasses after dark, yard and mail box damages, a severed baby doll head and a flounder gig left near his front door and slashed tires on his vehicle.

400. An agreement between that citizen's local government and a billion-dollar international development company (Intrawest) to silence that citizen especially when that agreement is set forth in an email to the President of Sandestin (Mike Stange) whose residence is located immediately adjacent to the location where Plaintiffs' direct access rights to Sandestin are closed off.

401. Such acts of retaliation included Walton County's persistent failure to disclose public records to Osborne pursuant to his public records requests and as required by Florida law. The County retaliated against Osborne and Plaintiffs by frustrating his efforts to discover the true facts concerning the due process and other violations of the law concerning Driftwood. Some of that important information included County's failure to disclose to the Plaintiffs or the public the following types of information:

402. The 2007, 2009 and 2010 Bradley Reports.

403. The January 2010 grant application.

404. The timely revelations of the conflicts of interests described below.

405. The following actions were both in support of the conspiracy and are evidence of that conspiracy:

146

406. The County knowingly did not seek to seek indemnification for over $300,000 fees and costs from Intrawest that the County incurred related to the 2006 lawsuit for which the County was entitled to recover.

407. In 2009, The County did seek to recover over $48,000 owed to it by Intrawest from sale proceeds of land within the DRI for which Intrawest had committed to build an elementary school.

408. The County only collected $3,150 from Intrawest during its ownership of Sandestin from 1998 until March 2010 even though Intrawest conducted tens of millions of dollars of development upon Sandestin.

409. The County did not collect or allowed Developers letters of credit to expire.

410. Intrawest destroyed all of its emails in 2010 during the pendency of this case and Olson destroyed his documents concerning Driftwood during the pendency of this case. Intrawest made false representations to the Plaintiffs and the Court that such emails did not exist when Intrawest knew that their non-existence was because of its intentional destruction of those emails.

411. The County knowingly allowed and did not disclose the following ethical conflicts and conflicts of interest:

412. The Bryant Miller & Olive law firm (BMO) to simultaneously represent Intrawest adversely to the County concerning the Sandestin DRI's compliance while BMO also continued to represent Walton County concerning land use matters.

413. The County's retention of Olson's lawyer George Ralph Miller while Miller represented Olson and thereafter for legal advice concerning Driftwoods' compliance with the law to evaluate the DCA's recommendations regarding Driftwood.

414. Commission Larry Jones employment with Adams Homes when Jones signed the first two plats of Driftwood II which were the lots that Adams Homes purchased and

415. Allowing Intrawest's' and the Sandestin Owners' Associations' lawyers to edit and "ghost write" the County's submissions to the Court and DCA advocating positions that in and lawyers

416. County Engineer's conflict of interest as the engineer who submitted false applications to the Corps and DEP in order to procure certain permits who was by 2005 the County Engineer charged with determining whether the Driftwood development complied with the law

417. Commissioner Brannon's conflict of interest because of his prior and present business relationships with a developer who, in March 2006, had purchased 77 lots in Driftwood II from Olson for $7 million win investor (C. Wayne Jones) within a week of Brannon's approval as the Board Chairman of the Driftwood II plat where those 77 lots are located. Commissioner Brannon's 22 votes to allow development concerning Driftwood where his business partner had invested over $7 million in Driftwood

418. Further evidence of the conspiracy and retaliation include the County's opposition to Plaintiffs' positions concerning issues for which the County, as the local government charged with enforcing the law, should have remained neutral. Not only did the

County unnecessarily and irrationally oppose Plaintiffs on these issues, but the County conspired with the other Conspirators and the SOA to affirmatively advocate or assist for their interests as follows:

419. Advocating the Conspirators' position concerning the stormwater retention standard that applies to development within the Sandestin DRI to the extent that the County has ignored the DCA and the magistrate's determinations that are contrary to the County's and the Conspirators. If the more stringent standard applies, as DCA and the magistrate determined, then achieving that standard will substantially increase the costs of future development in Sandestin.

420. Advocating the Conspirators' and SOA's position and interests concerning Plaintiffs' direct vehicular and pedestrian access rights to Sandestin.

421. Misrepresenting to and concealing from the DCA and Plaintiffs since at least 2006 that the Sandestin DRI was in compliance with the law when the County's own reports from 2006, 2009, and 2010 had determined that the Sandestin DRI was non-compliant when the County knew that such non-compliance was causing substantial harm to Plaintiffs by allowing for the continued development of Driftwood II.

422. County engineer Graham in 2008 devoting tens of hours of his time while at work as a County employee to prepare a stormwater computer modeling analysis of Driftwood to evaluate its performance and compliance when such information would ordinarily be required to be furnished by the engineer of record

149

423.     The following conduct by the County is so irrational and contrary to the patent interests of the County and its taxpayers that this conduct is evidence of the County's retaliation and conspiracy to retaliate and conceal its constitutional law violations:

(a)     County concealment and indifference to life safety risks of severed access and nuisances mosquitoes, flooding stagnate water, stormwater  when such concealment furthered the economic interests of  the Developers and political supporters of Walton County.

(b)     County failure to implement magistrate recommendations notwithstanding public commitments to Plaintiffs and the DCA to do so.

(c)     County's expenditures of hundreds of thousands of dollars to fight against Plaintiffs when the County knew that its own reports, which it suppressed, established critical  aspects of Plaintiffs claims including the Developers and Conspirators violations of the law.

(d)     County's expenditure of hundreds of thousands of dollars to advance the legal interests of the Developers and Conspirators against Plaintiffs and others in their neighborhood when the County's own reports showed that it had determined that the Developers had in fact violated the law.

(e)     Obtain the information and documents necessary so that Plaintiffs' could effectively petition state and federal agencies to demonstrate the various violations associated or caused by the development of Driftwood's interior.   Multiple times Plaintiffs sent public records upon Walton County for such information that was not

150

Case 3:14-cv-00646-MCR-EMT   Document 172   Filed 08/18/15   Page 151 of 173

disclosed until years later. Pursuant to Florida law a government should respond to a public records request within

424.   For example, the County failed to disclose to Plaintiffs three reports created in 2006, 2009 and 2010 by the County's DRI Coordinator, Renee Bradley, that identified the unlawful development of Driftwood while the County has always concealed those reports and instead publically maintained a position contrary to the findings of those reports.

425.   The facts, circumstances, and context described herein demonstrate a causal connection or relationship to between Plaintiffs' protected speech and the County's actions of retaliation.

426.   The Board adopted the policy of alliance, collusion, conspiracy and concealment with the Conspirators and acted with sustained indifference to Plaintffs' constitutional rights. The purpose of the policy was to collude to conceal, frustrate Plaintiffs' efforts to protect their property values by the exercise of their constitutional rights to access the courts, to petition and communicate with federal, state, and local governments, in seeking to be afforded due process rights and to deter the Plaintiffs by retaliating against them because they exercised and continued to exercised their constitutional rights.

### Substantive Due Process Violations

427.   Plaintiffs sue Walton County because the County intentionally and deliberately caused a deprivation of liberty and a property interests of Plaintiffs via actions that involve corruption and deliberate violations and interference with constitutionally protected activities that were intended to harm Plaintiffs.

Case 3:14-cv-00046-MCR-EMT Document 172 Filed 08/18/15 Page 152 of 173

428. Plaintiffs have a substantive due process right that its local government is not collude and conspire with such as the Conspirators here to violate fundamental due process and First Amendment rights of its citizens. Plaintiffs also have a due process right to be free from harassment and retaliation in their efforts to oppose the development of land in their neighborhood that is not lawfully authorized for that use.

429. Plaintiffs have a substantive due process right that their local government, Walton County, not suppress, conceal and conspire with others to prevent and frustrate Plaintiffs access to critical evidence that is a public record, from exercising their First Amendment rights to access the courts and seek redress from their government with such information.

430. Conspirators and Developers formed a combination for in furtherance of their conspiracy and their misconduct which includes imposing restraints upon constitutionally guaranteed freedoms including due process, denial of First Amendment rights of speech, petition government for redress of grievances, meaningful access to courts and government agencies. By their combination they sought to harass, deter, frustrate, repress and retaliate against Plaintiffs from their exercise of their constitutional rights by massive concerted and purposeful activities of the group.

431. Walton County, with the other Defendants, conspired and colluded to deliberately violate Plaintiffs fundamental due process rights by working with the Defendants to approve the Driftwood development and to intentionally not afford any notice or opportunity to be heard concerning that proposed development. Thereafter, Walton County and the other Defendants conspired and colluded to in efforts to mount a campaign of

harassment, threats and intimidation of Plaintiffs that was designed to have them abandon their First Amendment Rights, their efforts to secure their due process rights to protect their property rights. Walton County's sustained arbitrary, irrational conduct also and    insist upon their Due Process rights concerning the development and to continue the deprivation of Plaintiffs' due process rights.

432.    Walton County actions deliberately against Plaintiffs and unlawfully and via unconstitutional means to favor and work in combination with the Conspirators that was intended to cause harm to Plaintiffs and to unlawfully protect and benefit the Developers and Conspirators in their unlawful conduct which included multiple constitutional law violations is conscience shocking.

433.    The context of its egregiousness is that such patently unconstitutional, retaliatory and conspiratorial conduct is sustained and perpetuated over multiple years by multiple Commissioners and other senior officials within Walton County with knowledge of the enormous financial consequences to Plaintiffs, the life safety risks associated with the County's conduct, its physically threatening nature at times.

434.    Other conditions of egregiousness are the County's indifference and inaction with the knowledge that Plaintiffs did nothing to create the circumstances of their losses and that the County had initially conspired with the Developers to cause those losses.

435.    Further, the County has known that it has unnecessarily caused Plaintiffs' to incur hundreds of thousands of dollars of expenses to seek redress with its government, to

discover and develop the information that the County was suppressing because the County was insisting that Plaintiffs provide such information before it would consider redress,

436. The County's actions, for example, in inviting and agreeing to allow Plaintiffs to attend meetings and speak, but then to deny their access and speech at the moment Plaintiffs seek to exercise it, is in bad-faith, with malice, intended to frustrate, harass cause substantial unnecessary expense, and otherwise retaliate against Plaintiffs. The County has never explained these actions or denied that these were the purposes of their actions.

437. The County's strategy of attrition that was to seek to conceal the conspiracy included deliberately frustrating Plaintiffs ability to seek redress judicially or with government agencies by deliberately and maliciously causing Plaintiffs to either abandon their rights or incur hundreds of thousands of dollars of expense in order to develop evidence and information already known to the County but for which the County suppressed and denied its existence or its conclusions such as Bradley's Reports.

438. Walton County, in favor of the Conspirators, has treated Plaintiffs irrationally, arbitrarily and with malice and acted with improper motives, a sustained intent to harm Plaintiffs by behavior which, especially when viewed cumulatively shocks the conscience.

**Constitutional Violations as a Result of the County's GAG Policy:**

**Equal Protection, First Amendment Speech, First Amendment Petition, First Amendment Access to Courts, Unconstitutional Conditions Doctrine**

439. Walton County's GAG policy passed on December 11, 2012 is unconstitutionally vague. The County's application of the policy to the Plaintiffs it violates the Unconstitutional Conditions Doctrine.

440. The County passed the policy in furtherance of the Conspiracy described herein and to punish and retaliate against Plaintiffs for their prior exercises of their speech rights.

441. The County's application of its GAG policy violates Plaintiffs' rights to equal protection because by it the County has intentionally treated Plaintiffs differently from others similarly situated and that there is no rational basis for the difference in treatment.

442. Walton County has irrationally distinguished Plaintiffs from similarly situated classes of people in violation of the equal protection clause of the 14th Amendment.

443. The Equal Protection Clause is implicated in "class of one" claims "where the plaintiff alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.

444. As described above, at the December 11, 2012 Board meeting, as the Plaintiffs' lawyer approached the podium to begin to speak, as previously agreed to by the County, at the designated time on the County's published agenda, Commissioner Imfeld

155

Case 3:14-cv-00046-MCR-EMT Document 172 Filed 08/18/15 Page 156 of 173

made a motion to prevent Plaintiffs or their lawyer from exercising their constitutional rights to address their elected officials because the Plaintiffs had exercised their constitutional right of accessing the courts when they sued the County earlier in 2012. The Board then passed its GAG Policy.

445. The meeting minutes contain the only description of the GAG policy as "to refrain using the Board as a forum for discussion on pending litigation and limit that discussion to the court system."

446. The stated purpose of the policy was a subertfuge. The policy was created as Plaintiffs' lawyer approached the podium. The policy has not been applied or enforced equally nor apparently at any other time.

447. The County's real purposes of the GAG policy were in furtherance of the Conspirators conspiracy of concealment of misconduct as previously described and of the conspiracy of retaliation against Plaintiffs for the exercise of their constitutional rights.

448. Imfeld and the Board's purpose in the GAG policy was to retaliate against Osborne and Plaintiffs because Osborne had campaigned against Imfeld before the November 2012 election and because of Plaintiffs numerous prior exercise of their speech rights at public meetings and because a lawsuit (not this lawsuit) concerning Driftwood had been filed against Walton County.

449. In order to continue in the County's efforts to silence Plaintiffs and Osborne and because of their continued exercise of their First Amendment rights to access the courts, speak at public meetings, seek redress from the DCA, the County retaliated and conspired to

retaliate against Plaintiffs in order to continue to conceal their misconduct by creating the GAG Policy.

450.    The circumstances of the County's abrupt creation of the GAG Policy and its application of the GAG Policy to Plaintiffs places unconstitutional conditions on Plaintiffs rights. The GAG Policy punishes Plaintiffs for exercising their constitutional right to seek redress in the courts by prohibiting Plaintiffs from exercising their other constitutional rights of speech and petition for redress at public meetings.

451.    The Board created and passed its "Gag Policy" specifically to prevent Plaintiffs and their legal counsel from speaking because the Board did not like the content of the subject matter about which they were to speak. That content was the on-going, unaddressed and worsening nuisances, life-safety and violation conditions in Driftwood that the County had acknowledged since at least 2005 that it was responsible to address but had not done so, despite repeated public commitments to the Plaintiffs, other residents in Driftwood to do so, and to the DCA.

452.    Further, the GAG Policy has not been uniformly enforced, and has been selectively and exclusively enforced against Plaintiffs.

453.    Since December 11, 2012, then neither Plaintiffs nor their legal counsel have been permitted to address the Board at public meetings regarding the same substantive issues of whether Sandestin DRI is in compliance with the law for which Walton County allowed counsel for other persons to speak.

454.   After December 11, 2012, the County has allowed other persons who have filed lawsuits against the County to address the Board at a public meeting concerning the subject matter of that lawsuit.

455.   For example, in March 2014, Sandestin Investments, LLC, (SDI) who has been the owner/declarant of the Sandestin DRI since purchasing the Sandestin DRI from Intrawest in March 2010, filed suit against Walton County because Walton County would not allow SDI to proceed with its development of a mid-rise condominium on a 15 acre parcel within Sandestin called "Osprey Pointe", in part because of the non-compliance of the Sandestin DRI.

456.   Notwithstanding the lawsuit, the Board allowed SDI's lawyers, owner, experts to address the Board at multiple public meetings in March, April, May 2014 concerning the issues in dispute about Osprey Point and about Sandestin's non-compliance.

457.   Walton County has irrationally and arbitrarily treated Plaintiffs differently from similarly situated classes of people with regard to the application and enforcement of its GAG Policy.   Such disparate treatment not only violates Plaintiffs' equal protection rights, but is also evidence of the County's retaliatory intent.

458.   Plaintiffs are similarly situated in all material respects to those persons whom the Board allowed to speak at public meetings even though those persons had lawsuits pending against the County at the time that the Board allowed such persons to speak about issues related to that lawsuit. "to refrain using the Board as a forum for discussion on pending litigation and limit that discussion to the court system."

158

459.    Walton County's GAG policy is unconstitutionally vague and thus void. The GAG policy is apparently "to refrain using the Board as a forum for discussion on pending litigation and limit that discussion to the court system."

460.    The GAG policy concerns at three First Amendment rights (speech, petition and access to courts) and thus must have sufficiently definitive standards so as to not be arbitrarily applied.

461.    The Board's application of the County's GAG Policy cannot be meaningfully enforced except arbitrarily and irrationally because neither the Board nor the County's staff have any effective means to apply or enforce the GAG Policy. For example the GAG Policy does not identify whether it applies only if the speaker is a party or lawyer for a party to the pending litigation or whether it also applies to bar the speech of a non-party taxpayer or otherwise concerned person who is interested or who maybe affected by the pending litigation or its outcome.

462.    The GAG policy does not identify the scope of its application such as what subject matters of speech that the GAG policy actually bars such as whether:

(a)    barred subject matters are those that will or do address issues "at issue" in  pending litigation or

(b)    whether the barred speech is  any discussion of  the mere existence or status of pending litigation, or

(c)    whether the County must be a party to the litigation in order for the policy to apply or

(d)     that the County should be aware of or intervene in pending litigation to which it is not presently a party.

463.   The GAG policy does not identify and the County has no process that can rationally determine which potential speakers are or maybe associated with the pending litigation, the extent of such association such as party, non-party but person with potential or present legal interest, frugal taxpayer, potentially harmed non-party.

464.   The GAG Policy has no specificity to non-arbitrarily determine whether it applies to bar the speech of a resident of Driftwood who maybe unaware of the pending litigation by his neighbors, but is affected by the same conditions that are the subject matter of the lawsuit. Or even if the resident is aware of the pending litigation, but not aware of the issues at issue in the pending lawsuit, or if so aware, has no desire (or resources) to sue the County but is nevertheless impeded in her speech rights or rights to seek or obtain redress because of the pending litigation or until it is finally resolved.

465.   The GAG Policy is also unconstitutional because it bars the Plaintiffs from exercising their First Amendment rights to speak to their elected officials who have authority and responsibility to address the issues that are the subject matter of their speech because the Plaintiffs have exercised another constitutional right of accessing the Courts.

466.   Wherefore, Plaintiffs demand judgment against County pursuant to 42 USC Section 1983 and 1988 for all forms of relief available there under including nominal and/or compensatory damages, attorneys fees and costs, a declaratory judgment that the conduct described above has violated Plaintiffs' civil rights and an injunction against the County's

160

continuation of such conduct towards Plaintiffs and demand all other relief as may be just and appropriate.

<div align="center">

**Count 11 – Civil Rights Violations Against**
**<u>Walton County Commissioner Sara Comander</u>**

</div>

*Note: This Count is pled herein because it will be the subject matter of a forthcoming motion by Osborne pursuant to Federal Rule of Civil Procedure 54(b).*

467. This is an action by Alan Osborne against Walton County Commissioner Sara Comander individually for damages brought pursuant to 42 U.S.C. Sections 1983 and 1988. It incorporates the Common Allegations and the allegations of Count 6 and Count 10.

468. Sara Comander is an elected Commissioner of Walton County, Florida.

469. Commissioner Comander acting under color of law as a Walton County Commissioner has subjected and caused Plaintiff Alan Osborne to the deprivation of his rights, privileges and immunities secured by the United States Constitution and laws.

470. On June 9, 2011, Walton County Commissioner, Sara Comander, directed Walton County's Attorney, Lynn Hoshihara, via email to conceal information from Plaintiffs and Osborne. not announce or advertise that the "DCA will be in DFS [DeFuniak Springs] on July 5, or [Plaintiff] Allen Osborne will be there." (Ex. 132.)

471. "Lynn, We don't need to announce that the DCA will be in DFS on July 5th pr Allen Osborne will be there!" The County attorney complied.

472. The extensive context of Comander's directive is stated in Count 13.

<div align="center">

161

</div>

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 162 of 173

473. Commissioner Comander and Walton County's Attorney suppressed this information in retaliation against Plaintiffs and Osborne because they have previously exercised of their First Amendment Rights many times by:

474. Speaking at public meetings many times each year since 2005 concerning the Developers' misconduct (as it became known), the Conspirators misconduct and other actions, the County's decisions and inaction to address Driftwood's nuisances, ethical conflicts of Commissioner Brannon, Commission Larry Jones' decisions and actions while an Adams Homes employee, County Engineer Greg Graham prior employment with Intrawest, County and Olson's Attorney George Ralph Miller.

475. Numerous communications in petitioning the DCA and other governments for redress and to hold the County accountable to the County's legal obligations regarding the development of Driftwood, the County's commitments to the DCA and Plaintiffs to take corrective action particularly after the magistrate proceeding. Comander knew that Osborne's communications to the DCA had prompted the DCA to send several stern letters to the County since 2007.

476. Communicating with the news media, providing the news media information and expressing his opinions in the newspaper that were critical of the Board and Brannon

477. Accessing the Courts by suing Walton County in 2006 and 2007 concerning issues related to Driftwood and Osborne's prior communications with the DCA

478. Running as a candidate for County Commission in 2008 and campaigning. Comander knew that Osborne lived in the district that she represented, that Osborne had

Case 3:14-cv-00646-MCR-EMT Document 172 Filed 08/18/15 Page 163 of 175

finished second in the 2008 election and that many people in the community wanted him to run against Comander in the next election.

479. The DCA Workshop was held at the Board of County Commissioners meeting room which is a public forum.

480. Any person, including Osborne, could attend that Workshop. Comander believed that Osborne could attend because a primary purpose of her email was to prevent his attendance.

481. Comander knew that Osborne frequently monitored the Counties notices of meetings—which in fact he did. Comander knew that if the County published a notice of the Workshop, that Osborne would to attend that Workshop—which in fact he would have attended.

482. Comander knew that Osborne was or had been the President of his homeowner's association and had frequently spoken for himself and for the many other homeowner's in Driftwood. Comander knew that if Osborne learned of the workshop that other homeowners from Driftwood would attend the workshop, and that they also had a history of speaking at public meetings because she had heard Plaintiffs and others speak many times to the Board.

483. Comander's stated purpose of her directive was to prevent Osborne's knowledge of the Workshop "don't announce…or Allen Osborne will be there."

Case 3:14-cv-00046-MCR-EMT Document 172 Filed 08/18/15 Page 164 of 175

484. Comander knew that if Osborne attended the Workshop that he would speak at the Workshop. Otherwise Comander would have had no reason to seek to prevent Osborne's silent attendance at the Workshop.

485. Comander believed that Osborne could speak at the Workshop. Otherwise Comander would have had no reason to seek to prevent Osborne's silent attendance at the Workshop.

486. The purpose of the Workshop was a discussion for the DCA regarding to

487. Osborne had constitutional rights to attend that Workshop to hear, listen, to petition, speak, and seek redress from and by the state agency with oversight and enforcement authority concerning the Sandestin DRI and Driftwood's unlawful development.

488. Osborne and Plaintiffs had substantial interest in addressing the state agency's senior officials at a workshop held conveniently in his home County, in a public forum, where County officials and other key land planning decisions makers would attend. That was a unique opportunity to have multiple persons in authority in the room at the same time. Osborne and Plaintiffs would have been keenly interested in discussing with those senior officials, either during, before or after the Workshop, the non-compliance issues regarding the Sandestin DRI, the unlawful development of Driftwood, the unlawful land use changes and elimination of substantial acreage of Open Space and the County's failure to honor its commitments to the DCA or Plaintiffs, and the County's inaction since the DCA's April 2010 letters.

489. Osborne and Plaintiffs had lost millions of dollars in home value because of these unlawful actions, the Conspirators' conspiracy and retaliation against them and had spent substantial sums of money and time since 2005 to seek redress including paying for one-half of the magistrate process that Comander had demanded in 2009.

490. The context of Comander's June 9, 2011 directive to the County Attorney also included the following:

491. Her directive was just 3 weeks after the same County Attorney's misrepresentations to the DCA and the County's procurement of the May 17, 2011 letter which stated those misrepresentations as described above.

492. Those false representations by the County's Attorney to the DCA had been to the DCA Secretary Buzzett and that he would be the primary speaker at the Workshop.

493. The County had concealed its May 2011 meeting and false representations to the DCA; if Osborne or Plaintiffs learned of those false representations he could reveal those to the DCA, as well as all of the other attendees which would be embarrassing for Comander, and the County, and it might weaken Comander's or the other Commissioners' re-election chances.

494. Further, the revelations of the County's misrepresentations could cause the DCA or the West Florida Regional Planning Council to investigate further which was contrary to the interests of the Conspirators which the County was protecting.

495. A fundamental component of the unlawful development of Driftwood and Sandestin's concomitant non-compliance, both of which were known to the County, was to

prevent other governments from reviewing its compliance. This is why, for example, the County had not reported the findings in Bradley's 2007, 2009 or 2010 Reports.

496. The directive came after Osborne and Plaintiffs had steadfastly sought redress by the repeated exercise of the their First Amendment rights since 2005.

497. Commissioner Comander, using the force of her public office as a Walton County Commissioner, and Lynn Hoshihara, using the authority of her office as Walton County's attorney, specifically targeted government action at Plaintiff Alan Osborne in deliberation retaliation for his exercise of his free speech rights in previously addressing his local government and his state government and in a deliberate attempt to prevent Plaintiff Alan Osborne and other Plaintiffs from exercising those First Amendment Rights at that particular meeting and in the future.

498. Comander's directive was intended to both retaliate against Osborne for his many prior exercises of his constitutional rights and to also prevent his exercise of another of his First Amendment Rights—the right to petition his government.

499. Commissioner Comander's retaliatory directive caused actual injury to Osborne and Plaintiffs because that directive prevented them from exercising their first amendment right to petition and seek redress from his government, i.e. DCA.

500. Commissioner Comander's retaliatory directive adversely affected speech rights generally and Osborne's speech rights specifically. Commissioner Comander's retaliatory conduct, i.e. her directive to the County Attorney, adversely affected protected

speech and would chill or deter person of ordinary firmness from exercising his First Amendment rights.

501. A person of ordinary firmness in the context of the extended history and facts and circumstances of Osborne in this case would be deterred or chilled from the future exercise of his First Amendment rights. That context includes that the Chairwoman of the Board of County Commissioners prior silencing of that person in a public meeting to protect a personal friend of hers from public revelations of his misconduct. The context also includes use of force of her office to direct the County Attorney's actions specifically to target and prevent that person (and only that person)—whom the Chairwoman identifies by full name—from attending a Workshop, open to the public, hosted by the state agency with oversight and enforcement authority related to an issue that had cost that person hundreds of thousands of dollars, would be deterred or chilled from exercising his First Amendment rights in the future. For example, such a person would be deterred from seeking redress from an elected official with authority to provide that redress, but who has specifically targeted government action to prevent that person's knowledge of important information and attendance at an important meeting.

502. Comander's actions were intended to cause and did cause discriminatory treatment in furtherance of the conspiracy described herein and for the unlawful purpose of retaliating, preventing and frustrating Mr. Osborne's right to address the state and local government and to continue to conceal Walton County's unlawful approval of the Driftwood interior Project and Walton County's knowledge of Sandestin's noncompliance.

503. Commissioner Comander's conduct to prevent and retaliate against Mr. Osborne for his prior exercise of his First Amendment rights to address his local and state government violated his clearly established First Amendment rights and was done intentionally and with malice.

WHEREFORE, Plaintiffs demand judgment against Commissioner Comander individually pursuant to 42 USC Section 1983 and 1988 for all forms of relief available there under including nominal, compensatory and punitive damages, attorneys fees and costs, a declaratory judgment that the conduct has violated Plaintiffs' civil rights and an injunction against such conduct. Plaintiffs further demand all other relief as may be just and appropriate.

## DEMAND FOR JURY TRIAL AND VIEW

The Plaintiffs demand a view of the relevant properties by the jury and trial by jury on all issues so triable. Plaintiffs also demand judgment against Defendants as stated herein for all damages, actual, consequential, nominal, compensatory, special and for the costs of restoration of the Open Space and wetlands and for the costs of mitigation of the stormwater treatment and water quality, costs, attorneys fees, for prejudgment interest, court costs, injunction, declaratory and equitable relief and any and all further relief as this Court deems just and proper. Plaintiffs seeks monetary damages against Walton County only pursuant to the Osborne's inverse condemnation claim and pursuant to 42 U.S.C. §1983 and 1988.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically with the Clerk of Court by using the CM/ECF system on this 18<sup>th</sup> day of August, 2015, which will send a notice of electronic filing to all counsel and parties of record in this matter.

/s/ Shawn M. Heath
Shawn M. Heath, B.C.S • FBN 0255970
Nelson Mullins Riley & Scarborough LLP
3600 Maclay Boulevard South, Suite 202
Tallahassee, FL 32312-1267
(850) 907-2521
(850) 907-2501 *facsimile*
Shawn.Heath@nelsonmullins.com
Attorneys for Plaintiffs

169

**SERVICE LIST**

| **Attorneys for Walton County** | **Attorneys for Adams Homes of Northwest Florida, Inc.** |
|---|---|
| William G. Warner<br>Timothy M. Warner<br>Warner Law Firm, P.A.<br>P.O. Box 1820 (32402)<br>519 Grace Avenue<br>Panama City, Florida 32401<br>P: 850-784-7772<br>F: 850-784-7756<br>billwarner@warnerlaw.us<br>kendallhenley@warnerlaw.us<br>warnerlawpleadings@gmail.com | Robert A. Emmanuel<br>H. Wesley Reeder<br>Joseph A. Passeretti<br>Emmanuel, Shepperd & Condon Law Firm<br>30 South Spring Street<br>Pensacola, FL. 32502<br>P: 850-433-6581<br>F: 850-434-5856<br>rae@esclaw.com<br>hwr@esclaw.com<br>jal@esclaw.com<br>sew@esclaw.com<br>jap@esclaw.com<br>cfv@esclaw.com |
| **Attorneys for Walton County** | **Attorney for Walton County Commissioner Sara Comander** |
| Mark D. Davis<br>Sidney N. Noyes<br>Walton County Attorney<br>161 E. Sloss Avenue<br>DeFuniak Springs, Florida 32433<br>P: 850-892.8110<br>F: 850-892-8471<br>mdd@co.walton.fl.us<br>sincrissie@co.walton.fl.us | Linda H. Wade<br>Robert C. Palmer, III<br>Wade, Palmer & Shoemaker, P.A.<br>14 N. Palafox Street<br>Pensacola, Florida 32502<br>P: 850-429-0755<br>F: 850-429-0871<br>lwade@wpslawyers.com<br>kgrover@wpslawyers.com<br>jpaquette@wpslawyers.com<br>bpalmer@wpslawyers.com |
| **David Campbell and Campbell Engineering** | **Olson & Associates of NW Florida, Inc. and Northtip Development, LLC** |
| 8729 North Lagoon Drive<br>Panama City Beach, FL 32408<br>dcampbell214@comcast.net | 4300 Legendary Drive, Suite 234<br>Destin, FL 32541<br>P: 850-650-4353<br>F: 850-650-3881<br>rick@olsonlandpartners.com |

~#4839-1816-9127~

170



STATE OF FLORIDA

# DEPARTMENT OF COMMUNITY AFFAIRS

*"Dedicated to making Florida a better place to call home"*

CHARLIE CRIST
Governor

THOMAS G. PELHAM
Secretary

April 2, 2010

Honorable Scott Brannon
Chairman, Walton County Board of County Commissioners
415 Highway 20
Freeport, FL 32439

     Re:    Driftwood Estates

Dear Chairman Brannon:

     This letter concerns the recent developments regarding the Sandestin Development of Regional Impact Driftwood Estates Special Magistrate Proceeding, specifically as they relate to the abandonment of Driftwood Drive and the storm water drainage and flooding issues. It is the Department's understanding that Special Magistrate Carlos Alvarez presented his findings and recommendations to the Board of County Commissioners at the February 18, 2010 Board Meeting. While the Special Magistrate's findings and recommendations are not legally binding, all parties moved forward with the Special Magistrate Proceeding with the understanding that the parties would acknowledge the findings and work in good faith towards implementing the recommendations.

     Mr. Alvarez found that the abandonment of Driftwood Drive was legally valid, and recommended that the Sandestin DRI Master Plan (Map H) be amended to reflect the abandonment. This is to be done through a Notice of Proposed Change (NOPC). The Department agrees with this finding as well as the recommendation. Accordingly, the County should move forward with the NOPC process to properly depict points of access.

     A great deal of evidence was presented to Special Magistrate Alvarez regarding the stormwater drainage and flooding issues in Driftwood Estates. The controlling standard, as documented in the Sandestin Application for Development Approval (ADA), is *retention* of 6.7 inches of rainfall during a 3 year, 24 hour storm event. The ADA also prohibits untreated runoff from reaching any of the public waters surrounding Sandestin, including the Choctawhatchee Bay. The evidence presented at the Special Magistrate Hearing makes clear that violations of the ADA standard are occurring.

     The Department agrees with Special Magistrate Alvarez's findings that violations of the Development Order have occurred. Section 380.11, Florida Statutes, authorizes the Department

2555 SHUMARD OAK BOULEVARD  ∘  TALLAHASSEE, FL 32399-2100
850-488-8466 (p)  ∘  850-921-0781 (f)  ∘  Website: www.dca.state.fl.us

∘ COMMUNITY PLANNING 850-488-2356 (p) 850-488-3309 (f) ∘ FLORIDA COMMUNITIES TRUST 850-922-2207 (p) 850-921-1747 (f) ∘
∘ HOUSING AND COMMUNITY DEVELOPMENT 850-488-7956 (p) 850-922-5623 (f) ∘

Steve Abbott, et al
vs
Olson and Associates, et al
Exhibit 3

Abbott002317

Honorable Scott Brannon
Chairman, Walton County Board of County Commissioners
April 2, 2010
Page 2

to bring an action for injunctive relief in circuit court, or institute an administrative proceeding, if it has reason to believe a violation of a development order is occurring. The Department has been working diligently with the County and the Driftwood residents to find an amicable solution to solving the stormwater problems. However, if the identified violations continue to occur without corrective action taken, the Department may have no choice but to issue a Notice of Violation to the County.

A review of the minutes of the February 18, 2010 Board Meeting indicates that the Walton County Board of Commissioners expects to move forward with corrective action during the months of March and April. The Department requests that by April 30, 2010, the County send the Department an update documenting what corrective action has been taken to date regarding the Driftwood Drive abandonment and Driftwood stormwater issues, as well as a schedule for corrective actions to be taken in the future. The corrective actions should include an independent engineering study to document the extent of the drainage problem and what steps must be taken to bring the drainage system into compliance with the ADA standard. A plan must then be formulated to implement the independent engineer's recommendations.

Please contact the Regional Planning Administrator for Walton County, Susan Poplin, AICP, Regional Planning Administrator, at (850) 922-1821, or Matthew Davis, Assistant General Counsel, should you have any questions regarding this letter.

Sincerely yours,

Charles Gauthier, AICP
Director, Division of Community Planning

GG/mgd

cc:     Honorable Kenneth Pridgen
        Commissioner, Walton County Board of County Commissioners
        17400 State Highway 83 North
        DeFuniak Springs, FL 32433

        Honorable Cecilia Jones
        Commissioner, Walton County Board of County Commissioners
        70 Logan Lane
        Santa Rosa Beach, FL 32459

        Honorable Sara Comander
        Commissioner, Walton County Board of County Commissioners
        417 Highway 20
        Freeport, FL 32439

2

Abbott002318

Honorable Scott Brannon
Chairman, Walton County Board of County Commissioners
April 2, 2010
Page 3

Honorable Larry Jones
Commissioner, Walton County Board of County Commissioners
1483 County Highway 1087
DeFuniak Springs, FL 32433

Lynn Hoshihara
County Attorney, Walton County
161 East Sloss Avenue
Defuniak Springs, FL 32433-1343

Lyle Seigler
County Administrator, Walton County
76 North Sixth Street
DeFuniak Springs, FL 32433

Alan Osborne
253 Driftwood Point Road
Santa Rosa Beach, Florida 32459

3

Abbott002319

File No.: 6750

# 253 Driftwood Point Road



### Date of Valuation
March 01, 2005

### Samuel & Ileana Osborne

253 Driftwood Point Road
Lot 5 Blk C Driftwood Estates
Santa Rosa Beach, Florida 32459-3027

### Appraised BY: William V. Shaffer

Allied First Source Mortgage
253 Driftwood Point Road, Santa Rosa Beach, FL 32459

### Table of Contents

| | |
|---|---|
| Invoice | 1 |
| FIRREA/USPAP Addendum | 2 |
| USPAP Identification | 3 |
| URAR | 4 |
| Statement of Limiting Conditions | 10 |
| Building Sketch (Page - 1) | 12 |
| Building Sketch (Page - 2) | 13 |
| Location Map | 14 |
| Flood Map | 15 |
| Plat Map | 16 |
| Subject Photos | 17 |
| Subject Photos Interior | 18 |
| Subject Photos Interior | 19 |
| Photograph Addendum | 20 |
| Comparable Photos 1-3 | 21 |
| State Map | 22 |
| State Map | 23 |
| State Map | 24 |
| State Licenses | 25 |
| State Licenses | 26 |

Steve Abbott, et al
vs
Olson and Associates, et al
Exhibit 20

Abbott002782

Appraisal House, Inc (850) 244-0656

File No. 6750

# FIRREA / USPAP ADDENDUM

Borrower   Samuel & Ileana Osborne
Property Address   253 Driftwood Point Road
City   Santa Rosa Beach          County   Walton          State   Florida          Zip Code   32459-3027
Lender/Client   Allied First Source Mortgage

## Purpose

The purpose of this appraisal is to estimate the market value of the subject property.

## Scope

The Appraiser understands the use of the appraisal is for reference in loan origination.
The Social, Economic, Governmental, and Environmental factors affecting and influencing the value of the subject were researched and analyzed.
The comparable sales were inspected and photographed.
Sales personnel and market participants were interviewed.
Sales data was confirmed in the Public Records.
The income approach was not utilized, in this appraisal analysis as buyers and sellers of property do not base purchase and sale price decisions
on the income generating capacity or required rate of investment return.  We have elected not to employ the income approach in this analysis.

## Intended Use / Intended User

Allied First Source Mortgage, is the intended user of this appraisal. The use of this report is limited to the client and assigns only.

## History of Property

Current listing information   The subject was not found in MLS for sale and has not been listed for sale in the past 12 months.

Prior sale:   According to public records, the subject has had two previously qualified sales in the prior 38 months.  The sale took place on
04/16/2004 for $1,200,000.00, Book 2606 / Page 1603 and then on 05/09/2005 for $1,500,000.00, Book 2669 / Page 2062.

## Exposure Time / Marketing Time

Estimated exposure time is 101 days according to MLS.
Estimated marketing time is 88 days according to MLS.

## Personal (non-realty) Transfers

None.

## Additional Comments

Conditions of the Appraisal:      Neither all nor any part of the contents of this report shall be conveyed to any person or entity, other than the
appraiser's or firm's client, through advertising, solicitation materials, public relations, news, sales, or other media without the written consent and
approval of the approval of the authors, particularly as to valuation conclusions, the identity of the appraiser or firm with which the appraiser is
connected, or any reference to affiliation with any professional appraisal organization.  Further, the appraiser or firm assumes no obligation, liability,
or accountability to the third party.   If this report is placed in the hands of anyone but the client, client shall make such party aware of all the
assumptions and limiting conditions of the assignment.

Variations between the comparable sales and the subject property are mostly related to time sold, view, size, and location.

## Certification Supplement

1.  This appraisal assignment was not based on a requested minimum valuation, a specific valuation, or an approval of a loan.
2.  My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value
    estimate, the attainment of a stipulated result or the occurrence of a subsequent event.

Appraiser(s) William V. Shaffer
Effective date / Report date:                 March 01, 2006

Supervisory Appraiser(s) Ronald E. Wright
Effective date / Report date:

Abbott002783

File No. 6750

Borrower Samuel & Ileana Osborne     File No. 6750
Property Address 253 Driftwood Point Road
City Santa Rosa Beach     County Walton     State Florida     Zip Code 32459-3027
Lender Allied First Source Mortgage

## APPRAISAL AND REPORT IDENTIFICATION

This appraisal conforms to one of the following definitions:

☒ Complete Appraisal    (The act or process of estimating value, or an opinion of value, performed without invoking the Departure Rule.)

☐ Limited Appraisal    (The act or process of estimating value, or an opinion of value, performed under and resulting from invoking the Departure Rule.)

This report is one of the following types:

☐ Self Contained    (A written report prepared under Standards Rule 2-2(a) of a Complete or Limited Appraisal performed under STANDARD 1.)

☒ Summary    (A written report prepared under Standards Rule 2-2(b) of a Complete or Limited Appraisal performed under STANDARD 1.)

☐ Restricted    (A written report prepared under Standards Rule 2-2(c) of a Complete or Limited Appraisal performed under STANDARD 1, restricted to the stated intended use by the specified client or intended user.)

## Comments on Standards Rule 2-3

I certify that, to the best of my knowledge and belief:

The statements of fact contained in this report are true and correct.
The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions and conclusions.
I have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.
I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
My engagement in this assignment was not contingent upon developing or reporting predetermined results.
My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
My analyses, opinions and conclusions were developed and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.
I have made a personal inspection of the property that is the subject of this report.
No one provided significant real property appraisal assistance to the person signing this certification.

## Comments on Appraisal and Report Identification
Note any departures from Standards Rules 1-3 and 1-4, plus any USPAP-related issues requiring disclosure:
See FIRREA/USPAP Addendum for more information on the subject.

**APPRAISER:**

Signature:
Name: William V. Shaffer
Date Signed: March 01, 2005
State Certification #:
or State License #: RI 9688
State: Florida
Expiration Date of Certification or License: 11/30/2006

**SUPERVISORY APPRAISER (only if required):**

Signature:
Name: Ronald E. Wright
Date Signed: March 01, 2005
State Certification #: St.Cert.Gen. REA RZ2495
or State License #:
State: Florida
Expiration Date of Certification or License: 11/30/2006

☒ Did ☐ Did Not   Inspect Property

Abbott002784

Appraisal House, Inc. (850) 244-0656                   File No. 6750

# Uniform Residential Appraisal Report        File # 6750

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | | |
|---|---|---|
| Property Address 253 Driftwood Point Road | City Santa Rosa Beach | State Flork Zip Code 32459-3027 |
| Borrower Samuel & Ileana Osborne | Owner of Public Record Samuel & Ileana Osborne | County Walton |

Legal Description Lot 5 Blk C Driftwood Estates
Assessor's Parcel # 11-2S-21-42010-00C-0050 | Tax Year 2005 | R.E Taxes $ 8,500.89
Neighborhood Name Driftwood Estates | Map Reference M16 S05 | Census Tract 9506.00
Occupant ☒ Owner ☐ Tenant ☐ Vacant | Special Assessments $ 0.00 | ☐ PUD HOA $ ☐ per year ☐ per month
Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)
Assignment Type ☐ Purchase Transaction ☒ Refinance Transaction ☐ Other (describe)
Lender/Client Allied First Source Mortgage Address 253 Driftwood Point Road, Santa Rosa Beach, FL 32459
Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☒ Yes ☐ No
Report data source(s) used, offering price(s), and date(s). The subject has had two prior sales in the last 36 months, which took place on 04/16/2004 for
$1,200,000.00, Book 2608 / Page 1603 and then on 05/09/2005 for $1,500,000.00, Book 2669 / Page 2062.
I ☐ did ☒ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not
performed. Subject is not for sale.

Contract Price $ N/A Date of Contract N/A Is the property seller the owner of public record? ☒ Yes ☐ No Data Source(s) Public Records
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☒ No
If Yes, report the total dollar amount and describe the items to be paid Unknown

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☒ Increasing ☐ Stable ☐ Declining | | | PRICE | AGE | One-Unit | 60 % |
| Built-Up ☐ Over 75% ☒ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | $ (000) | (yrs) | 2-4 Unit | 1 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☒ Under 3 mths ☐ 3-6 mths ☐ Over 6 mths | | | 260 Low New | | Multi-Family | 0 % |
| Neighborhood Boundaries Neighborhood is bounded to the south by Highway 98, to the north, east, and | | | | 3,200 wt High 30 | | Commercial | 4 % |
| west by Choctawhatchee Bay | | | | 480 Pred. 10 | | Other | 55 % |

Neighborhood Description There are no adverse factors which should affect the subject's marketability. The subject's location is convenient to various
employment opportunities and recreational facilities. Employment stability in the area is good, due to in large part to Eglin Air Force Base and the
tourism in the southern countrys due to the beaches of the Gulf of Mexico.
Market Conditions (including support for the above conclusions) I have considered relevant competitive listings/contract offerings in performing this
appraisal, and any trend indicated by that data is supported by the listing/offering information included in this report. Market conditions are stable.
No financing concessions are prevalent. Property values have been increasing 12% to 35% over the past year.

Dimensions See Survey | Area 0.898 Acres | Shape Rectangle | View Bay From
Specific Zoning Classification NPA | Zoning Description Neighborhood Planning Area
Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)
Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements - Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Paved Asphalt | ☒ | ☐ |
| Gas | ☐ | | Sanitary Sewer | ☒ | | Alley None | ☐ | ☐ |

FEMA Special Flood Hazard Area ☒ Yes ☐ No FEMA Flood Zone AE FEMA Map # 12131C0537F FEMA Map Date 3/7/2000
Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No If Yes, describe
No apparent easements or encroachments were found upon inspection which would adversely affect the subject property. Only a survey can
determine if the subject is in a flood zone.

| General Description | Foundation | Exterior Description materials/condition | Interior materials/condition |
|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☒ Concrete Slab ☐ Crawl Space | Foundation Walls Concrete/Average | Floors Tile/Carpet, Wood/G |
| # of Stories Two | ☐ Full Basement ☐ Partial Basement | Exterior Walls Stucco/good | Walls SheetRock/Good |
| Type ☒ Det. ☐ Att. ☐ S-Det/End Unit | Basement Area None sq ft | Roof Surface Clay Tile/Good | Trim/Finish Wood/Paint/Good |
| ☒ Existing ☐ Proposed ☐ Under Const | Basement Finish % | Gutters & Downspouts None | Bath Floor Tile/Good |
| Design (Style) Beachhouse/Gd | ☐ Outside Entry/Exit ☐ Sump Pump | Window Type Insulated | Bath Wainscot Sheet Rock/Good |
| Year Built 1996 | Evidence of ☐ Infestation None | Storm Sash/Insulated | Car Storage ☐ None |
| Effective Age (Yrs) 5 | ☐ Dampness ☐ Settlement | Screens Screens | ☐ Driveway # of Cars |
| Attic ☐ None | Heating ☒ FWA ☐ HWBB ☐ Radiant | Amenities ☐ Woodstove(s) # | Driveway Surface Gravel, Concrete |
| ☒ Drop Stair ☐ Stairs | ☐ Other Fuel Electric | ☒ Fireplace(s) # 2 ☐ Fence | ☐ Garage # of Cars |
| ☐ Floor ☐ Scuttle | Cooling ☒ Central Air Conditioning | ☒ Patio/Deck Patio ☒ Porch 4 Covered | ☐ Carport # of Cars |
| ☐ Finished ☐ Heated | ☐ Individual ☐ Other | ☐ Pool ☒ Other 2 Balcony | ☐ Att ☐ Det ☐ Built-in |

Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☒ Microwave ☒ Washer/Dryer ☐ Other (describe)
Finished area above grade contains: 7 Rooms 4 Bedrooms 4 Bath(s) 3,701 Square Feet of Gross Living Area Above Grade
Additional features (special energy efficient items, etc.) Ceiling fans, top of the line appliances, two fireplaces, 4 covered porches, 2 balconies, workshop, 3
car garage, Built-in book cases, crown molding, upgrades through out the subject see pictures.
Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.) There were no physical, functional or external
inadequncies noted during my inspection. The quality of construction was very good and the condition was good.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No If Yes, describe
No physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property were noted during
inspection.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe
Many styles, ages, and conditions of homes are located in the subject market area. We found the subject to conform to the subjects
neighborhood.

Freddie Mac Form 70 March 2005 | Page 1 of 6 | Fannie Mae Form 1004 March 2005

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002785

File No. 6750

## Uniform Residential Appraisal Report    File # 6750

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| There are | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ | | | | | to $ | |
| There are | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ | | | | | to $ | |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 253 Driftwood Point Road | 400 Shore Drive | | 2987 Bay Vista Court | | 452 Admiral Court | |
| | Santa Rosa Beach, Florida 32459 | Santa Rosa Beach | | Santa Rosa Beach | | Santa Rosa Beach | |
| Proximity to Subject | | 3.38 miles | | 0.24 miles | | 5.21 miles | |
| Sale Price | $ N/A | $ 3,200,000 | | $ 2,100,000 | | $ 2,625,000 | |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 660.20 sq.ft. | | $ 649.35 sq.ft. | | $ 595.10 sq.ft. | |
| Data Source(s) | | Public Rec. Book2661Page0569 | | Public Rec. Book2692Page0304 | | Public Rec. Book2649Page0764 | |
| Verification Source(s) | | MLS #374229 (DOM 94) | | MLS #414069 (DOM 0) | | MLS # 385010 (DOM 112) | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | Cash | | Conventional | | Unknown | |
| Concessions | | Amount Unkwn | | Amount Unkwn | | Amount Unkwn | |
| Date of Sale/Time | | 03/24/2005 | | 09/29/2005 | | 08/31/2005 | |
| Location | Suburban/Avg | Suburban/Avg | | Suburban/Avg | | Suburban/Avg | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 0.898 Acres | 0.61 Acres | +145,000 | 0.50 Acres | +200,000 | 0.53 Acres | +185,000 |
| View | Bay Front/V.Gd | Bay Front/VGd | | LakeFront/Gd | +500,000 | Bay Front/VGd | |
| Design (Style) | Beachhouse/Gd | Beachhouse/Gd | | Beachhouse/Gd | | Beachhouse/Gd | |
| Quality of Construction | Stucco/Good | Stucco/Good | | Stucco/Good | | Stucco/Good | |
| Actual Age | A10 / E5 | New | -160,000 | A2 / E1 | -84,000 | A8 / E5 | 0 |
| Condition | Good | Good | | Good | | Good | |
| Above Grade | Total / Bdrms. / Baths | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | |
| Room Count | 7 / 4 / 4 | 7 / 3 / 4 | | 7 / 4 / 5 | -5,000 | 7 / 3 / 4 | |
| Gross Living Area | 3,701 sq.ft. | 4,847 sq.ft. | -157,600 | 3,234 sq.ft. | +64,200 | 4,411 sq.ft. | -97,600 |
| Basement & Finished | None | None | | None | | None | |
| Rooms Below Grade | Workshop | Dock,Boatslip | 0 | None | +15,000 | None | +15,000 |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Cent.Elec.Ht&A | Cent.Elec.Ht&A | | Cent.Elec.Ht&A | | Cent.Elec.Ht&A | |
| Energy Efficient Items | DoublePaneWn | DoublePaneWn | | DoublePaneWn | | DoublePaneWn | |
| Garage/Carport | 3CarGarage | 3CarGarage | | 2CarGarage | +6,000 | 3CarGarage | |
| Porch/Patio/Deck | 4 Cov.Porches | CoveredPorch | +10,000 | CoveredPorch | +10,000 | 2CoveredPorch | +7,500 |
| Decks,Porches,Fences, | 2 Balconies | ScreenPorch | | ScreenPorch | | ScreenPorch | |
| Fireplace,Storage Building | 2 Fireplaces | 2 Fireplaces | | One Fireplace | +2,000 | 2 Fireplaces | |
| Other | None | In-Ground Pool | -25,000 | None | | In-Ground Pool | -25,000 |
| Net Adjustment (Total) | | [ ] + [X] - | $ 187,600 | [X] + [ ] - | $ 708,200 | [X] + [ ] - | $ 84,900 |
| Adjusted Sale Price | | Net 5.9 % | | Net 33.7 % | | Net 3.2 % | |
| of Comparables | | Gross 15.6 % | $ 3,012,400 | Gross 42.2 % | $ 2,808,200 | Gross 12.6 % | $ 2,709,900 |

[ ] I did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain    We reviewed all information supplied on the
MLS sheets and public records. The GLA for the comparable sales used were taken from MLS sheets.

My research [X] did [ ] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)
My research [ ] did [X] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 04/16/2004 | None Within 36 Months | None Within 36 Months | None Within 36 Months |
| Price of Prior Sale/Transfer | $1,200,000.00 | | | |
| Data Source(s) | Bk2606 / Pg1603 | | | |
| Effective Date of Data Source(s) | | | | |

Analysis of prior sale or transfer history of the subject property and comparable sales    Any sale or transfer history or no sale history of the subject and/or
comparable properties has no impact on the value opinion in this appraisal report. Property values have been increasing in the subject market
area, see Florida Sales Pages.

Summary of Sales Comparison Approach    See Page 3 of the URAR
See FIRREA/USPAP Addendum for more information on the subject.

Indicated Value by Sales Comparison Approach $ 2,861,000
Indicated Value by: Sales Comparison Approach $ 2,861,000    Cost Approach (if developed) $ 2,710,314    Income Approach (if developed) $ not utilized
The sales comparison approach to value is the primary approach to value for properties of the subject's type and class. The sales comparison
approach was given the most weight in estimating the market value of the subject. All comparables used were the closest geographically,
qualitatively, conditionally, age-wise, and location-wise to the subject.
This appraisal is made [X] "as is", [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been
completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the
following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting
conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$ 2,861,000 , as of    March 01, 2005 , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 70 March 2005    Page 2 of 6    Fannie Mae Form 1004 March 2005

Form 1004 — TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002786

File No. 6750

## Uniform Residential Appraisal Report    File # 6750

**URAR: Sales Comparison Comments**

The comparable sales utilized were the most current sales with similar size, style, and features available from the public records. The sales comparison analysis had adjustments applied to the comparable sales which reflected the markets reaction to the differences in the properties, not the cost of the differences. The subject's market area has recently exploded with good quality homes similar to the subject. In search of comparable sales located on the bay that were similar to the subject was hard. In our search we found very few similar sales to the subject, therefore, the most similar sales were found and used. Few sales similar to quality, size, age, and location to the subject, therefore, we expanded the search for sales most similar to the subject out about five miles. Property values very due to time, size, view, location, and adjustments were made to reflect market differences. All sales were given equal weight. Land values have tripled over the past couple of years in the subject's market area and adjustments were made to reflect time the property sold and the size of property. See state map pages.

The subject's vacant land is high in demand along with many other vacant lots that are located near, or on the Gulf of Mexico in the subject's market area. With such high demand for vacant land, prices of vacant lots have tripled over the past year. With land values so high, it is not unusual to find land values worth 30-75% of total improved site in south Walton County. The area has a limited supply of land in the subject market area, due to it is a land locked between bay and gulf, State Parks, wet lands, and Eglin Air Force Base. With limited amount of buildable land in the area, with the same quality of homes as the subject, it was necessary to expand my search out for comparable sales more than one mile from the subject. Also, with limited amount of land and a high demand for properties, sellers are getting top dollar for homes, condo units, and vacant land, in the subject's market area. Then in some cases, buyers are bidding higher than listed price for some homes in the area.

In determining the replacement value for the subject, we used the marshall & swift valuation service and estimated the local cost to estimate reproduction cost of the subject property. The appraiser is noting that builders are charging between $150 - $350 a SF in the local area depending on what style and/or quality of home you build, therefore, $275.00 SF was used as an estimated in the cost approach from the information gathered on the subject. The value of land was determined by finding vacant land sales most similar to the subject size on the water in the surrounding market area. It is not uncommon for the cost approach to be higher or lower than the market value.

---

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)

| | | |
|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE ........ = $ | 1,500,000 |
| Source of cost data  See Below. | DWELLING  3,701 Sq.Ft @ $  275.00  = $ | 1,017,775 |
| Quality rating from cost service  V. Good   Effective date of cost data | None Sq.Ft. @ $  = $ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | Appls,C.Fans,2Firepic,2Bal,4CvPrch,Wrkshp  = $ | 147,550 |
| See Attached sketch area addendum for square footage calculation. | Garage/Carport  698 Sq.Ft. @ $  150.00  = $ | 104,700 |
| Data in the Cost Approach was abstracted from the Marshall and Swift | Total Estimate of Cost-New  = $ | 1,270,025 |
| Valuation Service. Where applicable and available, local construction | Less  Physical  Functional  External | |
| costs were also considered. | Depreciation  84,711  = $( | 84,711) |
| Remaining Economic Life: 70 years | Depreciated Cost of Improvements  = $ | 1,185,314 |
| Remaining Physical Life: 75 years | "As-is" Value of Site Improvements  = $ | 25,000 |
| Estimated Remaining Economic Life (HUD and VA only)  70 Years | INDICATED VALUE BY COST APPROACH  = $ | 2,710,314 |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| | | |
|---|---|---|
| Estimated Monthly Market Rent $  N/A  X Gross Rent Multipher  N/A  = $  not utilized | | Indicated Value by Income Approach |

Summary of Income Approach (including support for market rent and GRM)  The income approach was not utilized, in this appraisal analysis as buyers and sellers of property do not base purchase and sale price decisions on the income generating capacity or required rate of investment return.

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No    Unit type(s) ☐ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| | | |
|---|---|---|
| Total number of phases  Total number of units | Total number of units sold | |
| Total number of units rented  Total number of units for sale | Data source(s) | |

Was the project created by the conversion of existing building(s) into a PUD?  ☐ Yes  ☐ No  If Yes, date of conversion.

Does the project contain any multi-dwelling units?  ☐ Yes  ☐ No  Data Source

Are the units, common elements, and recreation facilities complete?  ☐ Yes  ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?  ☐ Yes  ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities

---

Freddie Mac Form 70 March 2005                Page 3 of 6                Fannie Mae Form 1004 March 2005

Form 1004 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002787

File No. 6750

# Uniform Residential Appraisal Report

File # 6750

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Abbott002788

[File No. 6750]

## Uniform Residential Appraisal Report    File # 6750

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Abbott002789

[File No. 6750]

## Uniform Residential Appraisal Report    File # 0750

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION: The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  William V. Shaffer | Name  Ronald E. Wright |
| Company Name  Appraisal House, Inc. | Company Name  Appraisal House, Inc. |
| Company Address  16 Ferry Road S.E. | Company Address  16 Ferry Road S.E. |
| Fort Walton Beach, FL 32548 | Fort Walton Beach, FL 32548 |
| Telephone Number | Telephone Number |
| Email Address  will7112005@yahoo.com | Email Address  rwright@ah.qccoxmail.com |
| Date of Signature and Report  March 01, 2005 | Date of Signature  March 01, 2005 |
| Effective Date of Appraisal  March 01, 2005 | State Certification #  St.Cert.Gen. REA RZ2495 |
| State Certification # | or State License # |
| or State License #  RI 9688 | State  Fl |
| or Other (describe)  _____ State # ___ | Expiration Date of Certification or License  11/30/2006 |
| State  Fl | |
| Expiration Date of Certification or License  11/30/2006 | SUBJECT PROPERTY |

| | |
|---|---|
| ADDRESS OF PROPERTY APPRAISED | ☐ Did not inspect subject property |
| 253 Driftwood Point Road | ☐ Did inspect exterior of subject property from street |
| Santa Rosa Beach, Florida 32459-3027 | Date of Inspection ____ |
| APPRAISED VALUE OF SUBJECT PROPERTY $  2,861,000 | ☒ Did inspect interior and exterior of subject property |
| LENDER/CLIENT | Date of Inspection  March 01, 2005 |
| Name  Natalie | |
| Company Name  Allied First Source Mortgage | COMPARABLE SALES |
| Company Address  253 Driftwood Point Road, Santa Rosa Beach, FL 32459 | ☐ Did not inspect exterior of comparable sales from street |
| Email Address  natalie@alliedfirstsource.com | ☒ Did inspect exterior of comparable sales from street |
| | Date of Inspection  March 01, 2005 |

Form 1004 — TOTAL for Windows appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002790



File No. 6750

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

Appraisal House, Inc. (850) 244-0656
Form ACR_DEFD — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002791

File No. 5750

**APPRAISER'S CERTIFICATION:** The appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:** 253 Driftwood Point Road, Santa Rosa Beach, Florida 32459-3027

| **APPRAISER:** | **SUPERVISORY APPRAISER (only if required):** |
|---|---|
| Signature: | Signature: |
| Name: William V. Shaffer | Name: Roland E. Wright |
| Date Signed: March 01, 2005 | Date Signed: March 01, 2005 |
| State Certification #: | State Certification #: St.Cert.Gen. REA RZ2496 |
| or State License #: RI 9688 | or State License #: |
| State: Florida | State: Florida |
| Expiration Date of Certification or License: 11/30/2006 | Expiration Date of Certification or License: 11/30/2006 |
| | ☒ Did  ☐ Did Not Inspect Property |

Freddie Mac Form 439 6-93                    Page 2 of 2                    Fannie Mae Form 1004B 6-93

Form ACR_DEFU — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002792



## Building Sketch (Page - 1)

File No. 6750

| | | | |
|---|---|---|---|
| Borrower/Client | Samuel & Ileana Osborne | | |
| Property Address | 253 Driftwood Point Road | | |
| City Santa Rosa Beach | County Walton | State Florida | Zip Code 32459-3027 |
| Lender Allied First Source Mortgage | | | |

[Building sketch diagram with rooms labeled: Living Room, Covered Porch #2, Breakfast Area, Kitchen, Covered Porch #3, Bathroom, Foyer, Bedroom, Covered Porch #1, Den, Utility Room, 1st Floor, Work Shop, Covered Porch #4, 3 Car Garage, with dimension measurements]

Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA1 | First Floor | 2023.5 | 2023.5 |
| P/P | Covered Porch #1 | 251.9 | |
| | Covered Porch #2 | 93.6 | |
| | Covered Porch #3 | 53.2 | |
| | Covered Porch #4 | 78.6 | 477.3 |
| GAR | Three Car Garage | 698.0 | 698.0 |
| OTH | Workshop | 213.5 | 213.5 |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| First Floor | | |
| 3.5 × 13.6 | | 47.5 |
| 3.0 × 7.5 | | 22.8 |
| 0.5 × 3.0 × 3.0 | | 4.6 |
| 0.5 × 3.0 × 3.0 | | 4.6 |
| 14.3 × 25.3 | | 361.8 |
| 1.5 × 9.3 | | 14.0 |
| 9.2 × 39.7 | | 365.1 |
| 19.0 × 41.5 | | 788.1 |
| 15.9 × 26.1 | | 414.5 |
| 0.5 × 0.0 × 0.0 | | 0.5 |

Net LIVABLE Area (Rounded) 2024

10 Items (Rounded) 2024

Abbott002793



File No. 6750

## Building Sketch (Page - 2)

| | | | |
|---|---|---|---|
| Borrower/Client Samuel & Ileana Osborne | | | |
| Property Address 253 Driftwood Point Road | | | |
| City Santa Rosa Beach | County Walton | State Florida | Zip Code 32459-3027 |
| Lender Allied First Source Mortgage | | | |

Comments

### AREA CALCULATIONS SUMMARY

| Code | Description | Net Size | Net Totals |
|---|---|---|---|
| GLA3 | Second Floor | 1677.0 | 1677.0 |
| P/P | Balcony #1 | Invalid | |
| | Balcony #2 | 22.0 | 22.0 |
| | Net LIVABLE Area | ( Rounded ) | 1677 |

### LIVING AREA BREAKDOWN

| | Breakdown | | Subtotals |
|---|---|---|---|
| Second Floor | | | |
| | 15.8 x 26.1 | | 412.4 |
| | 24.2 x 43.3 | | 999.5 |
| | 4.0 x 19.8 | | 79.2 |
| | 13.8 x 14.0 | | 182.8 |
| 0.5 x | 0.2 x 39.5 | | 4.0 |
| 5 Items | ( Rounded ) | | 1677 |

Abbott002794

File No. 5750

## Location Map

| | | | |
|---|---|---|---|
| Borrower/Client Samuel & Ileana Osborne | | | |
| Property Address 253 Driftwood Point Road | | | |
| City Santa Rosa Beach | County Walton | State Florida | Zip Code 32459-3027 |
| Lender Allied First Source Mortgage | | | |



Form MAP.LOC — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002795

[File No. 6750]

## Flood Map

| Borrower/Client | Samuel & Jeana Osborne | | | |
|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | |
| City Santa Rosa Beach | County Walton | State Florida | Zip Code 32459-3027 |
| Lender Allied First Source Mortgage | | | | |



**Prepared for:**
Appraisal House, Inc.

253 Driftwood Point Road
Santa Rosa Beach, Florida 32459-3020

**FLOODSCAPE**

Flood Hazards Map

**Map Number**
12131C0537F

**Effective Date**
March 7, 2000

For more information about flood zones and flood insurance, contact:

Powered by FloodSource
277-77-FLOOD
www.floodsource.com

© 1999-2002 FloodSource Corp. U.S. Patents Pending. All rights reserved. For more information, please e-mail info@floodsource.com

Form MAP.FLOOD — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002796

File No. 5750

## Subject Photos

| Borrower/Client | Samuel & Ileana Osborne | | | | |
|---|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | | |
| City | Santa Rosa Beach | County | Walton | State | Florida | Zip Code | 32459-3027 |
| Lender | Albed First Source Mortgage | | | | |



**Subject Front**
253 Driftwood Point Road



**Subject Rear**



**Subject Street**

Form PICPIX.TR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002797

File No. 6750

## Subject Interior Photo Page



| Borrower/Client | Samuel & Ileana Osborne | | | |
|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | |
| City | Santa Rosa Beach | County Walton | State Florida | Zip Code 32459-3027 |
| Lender | Allied First Source Mortgage | | | |



### Subject Interior

253 Driftwood Point Road

| | |
|---|---|
| Sales Price | N/A |
| Gross Living Area | 3,701 |
| Total Rooms | 7 |
| Total Bedrooms | 4 |
| Total Bathrooms | 4 |
| Location | Suburban/Avg |
| View | Bay Front/V.Gd |
| Site | 0.898 Acres |
| Quality | Stucco/Good |
| Age | A10 / E5 |



### Subject Interior



### Subject Interior

Abbott002798

File No. 5750

## Subject Interior Photo Page

| Borrower/Client | Samuel & Ileana Osborne | | | |
|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | |
| City | Santa Rosa Beach | County | Walton | State Florida | Zip Code 32459-3027 |
| Lender | Allied First Source Mortgage | | | |



**Subject Interior**

253 Driftwood Point Road
| | |
|---|---|
| Sales Price | N/A |
| Gross Living Area | 3,701 |
| Total Rooms | 7 |
| Total Bedrooms | 4 |
| Total Bathrooms | 4 |
| Location | Suburban/Avg |
| View | Bay Front/V.Gd |
| Site | 0.898 Acres |
| Quality | Stucco/Good |
| Age | A10 / E5 |



**Subject Interior**

**Subject Interior**

Form PICPIX.SI — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002799

## PHOTOGRAPH ADDENDUM

File No. 5750

| Borrower/Client | Samuel & Ileana Osborne | | | | |
|---|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | | |
| City | Santa Rosa Beach | County Walton | State Florida | Zip Code | 32459-3027 |
| Lender | Allied First Source Mortgage | | | | |



View of the Bay

Form GPICPIX — "TOTAL for Windows" appraisal software by a la mode, inc — 1-800-ALAMODE

Abbott002800

File No. 6750

## Comparable Photo Page

| Borrower/Client | Samuel & Ileana Osborne | | | | |
|---|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | | |
| City Santa Rosa Beach | | County Walton | | State Florida | Zip Code 32459-3027 |
| Lender Allied First Source Mortgage | | | | | |



**Comparable 1**
400 Shore Drive



**Comparable 2**
2987 Bay Villa Court



**Comparable 3**
452 Admiral Court

Form PICPIX.BR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002801



**State Map**

File No. 6750

| Borrower/Client | Samuel & Ileana Osborne | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | | | |
| City Santa Rosa Beach | | County Walton | | State Florida | | Zip Code 32459-3027 |
| Lender Allied First Source Mortgage | | | | | | |

# REAL ESTATE CONSUMER

THE LONG ISLAND DAY, MAY 29, 2005 • www.thesun.com PAGE 13D

# Florida home sales soar 25 percent in April

☛ See page 14D for national sales statistics

## Florida Sales Report – April 2005
### Single-Family, Existing Homes

Abbott002802

State Map

File No. 6750

| Borrower/Client | Samuel & Ileana Osborne | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | | | |
| City | Santa Rosa Beach | County | Walton | State | Florida | Zip Code 32459-3027 |
| Lender | Allied First Source Mortgage | | | | | |

Abbott002803

## Area home sales

**Okaloosa County**

| Sales | Nov. 2004 | Nov. 2003 | % change |
|---|---|---|---|
| Total single-family homes | 455 | 405 | 12.35 |
| Condominium/townhome | 168 | 128 | 31.25 |
| Manufactured homes | 23 | 9 | 155.66 |
| Residential lots | 213 | 139 | 53.24 |

| Dollar volume | | | |
|---|---|---|---|
| Total single-family homes | $102,255,612 | $77,503,733 | 31.94 |
| Condominium/townhome | 54,957,900 | 33,988,300 | 61.70 |
| Manufactured homes | 1,173,500 | 351,600 | 233.76 |
| Residential lots | 22,662,000 | 13,682,400 | 66.29 |

**Santa Rosa County**

| Sales | | | |
|---|---|---|---|
| Total single-family homes | 513 | 367 | 39.78 |
| Condominium/townhome | 18 | 46 | -60.87 |
| Manufactured homes | 46 | 26 | 76.92 |
| Residential lots | 366 | 370 | -1.08 |

| Dollar volume | | | |
|---|---|---|---|
| Total single-family homes | $92,228,489 | $56,694,123 | 62.68 |
| Condominium/townhome | 2,684,900 | 11,106,600 | -75.83 |
| Manufactured homes | 2,133,600 | 872,700 | 144.48 |
| Residential lots | 18,976,500 | 15,193,300 | 24.90 |

**Walton County**

| Sales | | | |
|---|---|---|---|
| Total single-family homes | 241 | 172 | 40.12 |
| Condominium/townhome | 110 | 169 | -34.91 |
| Manufactured homes | 57 | 14 | 307.14 |
| Residential lots | 434 | 438 | -.91 |

| Dollar volume | | | |
|---|---|---|---|
| Total single-family homes | $114,749,086 | $53,161,434 | 115.85 |
| Condominium/townhome | 61,536,300 | 55,015,700 | 10.65 |
| Manufactured homes | 7,275,500 | 691,800 | 951.68 |
| Residential lots | 105,034,900 | 67,943,000 | 54.59 |

Source: Metro Market Trends Inc.

(DN) ALKEN MARIES

# Sale of homes for 2004 ends on high a note

**By MORRIS FRASER**
Daily News Business Editor

Dollar sales of single-family homes in Walton County rose by almost 140 percent over the past year, according to figures compiled by Metro Market Trends of Pensacola.

Total sales of houses in the county in 2004 through November rose to $1.52 billion, compared to $634 million in the first 11 months of 2003.

Comparable Okaloosa sales in 2004 topped $1.24 billion, a 41 percent increase. Santa Rosa County saw a 36 percent increase, with sales above $951 million.

Comparing month-to-month figures, Walton County showed a 116 percent increase in November, with Santa Rosa gaining 63 percent and Okaloosa 32 percent.

Condominiums and townhomes gained 61 percent in sales volume in Okaloosa County. But similar markets in Okaloosa (-33 percent) and Santa Rosa (-75 percent) showed declines.

At the same time, Walton County showed an 11 percent gain in dollar sales for condominiums.

Manufactured housing sales also showed strong gains in all three counties. Walton County sales tripled in November from 2003 figures; sales in Okaloosa went up 155 percent, and Santa Rosa sales were up 76 percent.

Combining the three counties, dollar sales rose from $423.6 million in November 2003 to $745.3 million in November 2004, a 57 percent increase.

Metro Market Trends also reported that foreclosures were down across the board, with 40 fewer reported in Okaloosa County during 2004, and three fewer in both Walton and Santa Rosa counties.

Abbott002804

From MAP Suite — "TOTAL for Windows" appraisal software by a la mode, inc — 1-800-ALAMODE

State Map

File No. 6750

| Borrower/Client | Samuel & Ileana Osborne | | |
|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | |
| City | Santa Rosa Beach | County | Walton |
| Lender | Allied First Source Mortgage | State | Florida | Zip Code | 32459-3027 |

**State Licenses**

File No. 6250

| | |
|---|---|
| Borrower/Client | Samuel & Ileana Osborne |
| Property Address | 253 Driftwood Point Road |
| City | Santa Rosa Beach | County | Walton | State | Florida | Zip Code | 32459-3027 |
| Lender | Allied First Source Mortgage |

Licensing Portal - Search Results

Page 1 of 1



03:50:00 PM

Please see our                     for an explanation of the license status
shown in these search results.

| License Type | Name | Name Type | License Number/ Rank | Status/ Expires | |
|---|---|---|---|---|---|
| Registered Trainee Appraiser | | Primary | RI9689 Registered Appr | Current, Active 11/30/2006 | NICI |

Form MAP Survey — "TOTAL for Windows" appraisal software by a la mode, inc — 1-800-ALAMODE

Abbott002805

 

**State Licenses**

File No. 6750

| Borrower/Client | Samuel & Ileana Osborne | | | | |
|---|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | | |
| City Santa Rosa Beach | | County Walton | | State Florida | Zip Code 32459-3027 |
| Lender Allied First Source Mortgage | | | | | |

STATE OF FLORIDA      AC# 1713152
DEPARTMENT OF BUSINESS AND
PROFESSIONAL REGULATION

RZ2495          10/29/04 040214901

CERTIFIED GENERAL APPRAISER
WRIGHT, RON

IS CERTIFIED under the provisions of Ch.475 Fs.
Expiration date NOV 30, 2006

Abbott002806

File No.: 6750

## 253 Driftwood Point Road



### Date of Valuation
March 01, 2006

### Samuel & Ileana Osborne

253 Driftwood Point Road
Lot 5 Blk C Driftwood Estates
Santa Rosa Beach, Florida 32459-3027

### Appraised BY: William V. Shaffer

Allied First Source Mortgage
253 Driftwood Point Road, Santa Rosa Beach, FL 32459

### Table of Contents

Invoice ............................................................................. 1
FIRREA/USPAP Addendum ................................................. 2
USPAP Identification ......................................................... 3
URAR ............................................................................... 4
Statement of Limiting Conditions ....................................... 10
Building Sketch (Page - 1) .................................................. 12
Building Sketch (Page - 2) .................................................. 13
Location Map .................................................................... 14
Flood Map ........................................................................ 15
Plat Map .......................................................................... 16
Subject Photos ................................................................. 17
Subject Photos Interior ..................................................... 18
Subject Photos Interior ..................................................... 19
Photograph Addendum ...................................................... 20
Comparable Photos 1-3 ..................................................... 21
State Map ......................................................................... 22
State Map ......................................................................... 23
State Map ......................................................................... 24
State Licenses .................................................................. 25
State Licenses .................................................................. 26

Steve Abbott, et al
vs
Olson and Associates, et al
Exhibit 21

Abbott002363

Appraisal House, Inc. (850) 244-0656     File No. 6750

# FIRREA / USPAP ADDENDUM

Borrower   Samuel & Ileana Osborne
Property Address   253 Driftwood Point Road
City   Santa Rosa Beach     County   Walton     State   Florida     Zip Code   32459-3027
Lender/Client   Allied First Source Mortgage

**Purpose**
The purpose of this appraisal is to estimate the market value of the subject property.

**Scope**
The Appraiser understands the use of the appraisal is for reference in loan origination.
The Social, Economic, Governmental, and Environmental factors affecting and influencing the value of the subject were researched and analyzed.
The comparable sales were inspected and photographed.
Sales personnel and market participants were interviewed.
Sales data was confirmed in the Public Records.
The income approach was not utilized, in this appraisal analysis as buyers and sellers of property do not base purchase and sale price decisions
on the income generating capacity or required rate of investment return. We have elected not to employ the income approach in this analysis.

**Intended Use / Intended User**
Allied First Source Mortgage, is the intended user of this appraisal. The use of this report is limited to the client and assigns only.

**History of Property**
Current listing information: The subject was not found in MLS for sale and has not been listed for sale in the past 12 months.

Prior sale: According to public records, the subject has had two previously qualified sales in the prior 36 months. The sale took place on
04/16/2004 for $1,200,000.00, Book 2606 / Page 1603 and then on 05/09/2005 for $1,500,000.00, Book 2659 / Page 2062.

**Exposure Time / Marketing Time**
Estimated exposure time is 101 days according to MLS.
Estimated marketing time is 89 days according to MLS.

**Personal (non-realty) Transfers**
None.

**Additional Comments**
**Conditions of the Appraisal**     Neither all nor any part of the contents of this report shall be conveyed to any person or entity, other than the
appraiser's or firm's client, through advertising, solicitation materials, public relations, news, sales, or other media without the written consent and
approval of the approval of the authors, particularly as to valuation conclusions, the identity of the appraiser or firm with which the appraiser is
connected, or any reference to affiliation with any professional appraisal organization. Further, the appraiser or firm assumes no obligation, liability,
or accountability to the third party. If this report is placed in the hands of anyone but the client, client shall make such party aware of all the
assumptions and limiting conditions of the assignment.

Variations between the comparable sales and the subject property are mostly related to time sold, view, size, and location.

**Certification Supplement**
1. This appraisal assignment was not based on a requested minimum valuation, a specific valuation, or an approval of a loan.
2. My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value
    estimate, the attainment of a stipulated result or the occurrence of a subsequent event.

Appraiser(s) William V. Shaffer             Supervisory Appraiser(s) Ronald E. Wright
Effective date / Report date:     March 01, 2006        Effective date / Report date:

Form FUA — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002364

File No. 6750

| Borrower/Client | Samuel & Deana Osborne | | | File No. 6750 | |
| Property Address | 253 Driftwood Point Road | | | | |
| City | Santa Rosa Beach | County Walton | | State Florida | Zip Code 32459-3027 |
| Lender | Allied First Source Mortgage | | | | |

## APPRAISAL AND REPORT IDENTIFICATION

This appraisal conforms to **one** of the following definitions:

☒ Complete Appraisal  (The act or process of estimating value, or an opinion of value, performed without invoking the Departure Rule.)

☐ Limited Appraisal  (The act or process of estimating value, or an opinion of value, performed under and resulting from invoking the Departure Rule.)

This report is **one** of the following types:

☐ Self Contained  (A written report prepared under Standards Rule 2-2(a) of a Complete or Limited Appraisal performed under STANDARD 1.)

☒ Summary  (A written report prepared under Standards Rule 2-2(b) of a Complete or Limited Appraisal performed under STANDARD 1.)

☐ Restricted  (A written report prepared under Standards Rule 2-2(c) of a Complete or Limited Appraisal performed under STANDARD 1, restricted to the stated intended use by the specified client or intended user.)

### Comments on Standards Rule 2-3

I certify that, to the best of my knowledge and belief:

() The statements of fact contained in this report are true and correct.

() The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions and conclusions.

() I have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

() I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.

() My engagement in this assignment was not contingent upon developing or reporting predetermined results.

() My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

() My analyses, opinions and conclusions were developed and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

() I have made a personal inspection of the property that is the subject of this report.

() No one provided significant real property appraisal assistance to the person signing this certification.

### Comments on Appraisal and Report Identification

Note any departures from Standards Rules 1-3 and 1-4, plus any USPAP-related issues requiring disclosure:

See FIRREA/USPAP Addedum for more information on the subject.

**APPRAISER:**

Signature:

Name: William V. Shaffer

Date Signed: March 01, 2006

State Certification #:

or State License #: RI 9688

State: Florida

Expiration Date of Certification or License: 11/30/2006

**SUPERVISORY APPRAISER (only if required):**

Signature:

Name: Ronald E. Wright

Date Signed: March 01, 2006

State Certification #: St.Cert.Gen. REA RZ2495

or State License #:

State: Florida

Expiration Date of Certification or License: 11/30/2006

☒ Did  ☐ Did Not  Inspect Property

Appraisal House, Inc. (850) 244-0656
Form IDS — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002365

Appraisal House, Inc. (850) 244-0656

File No. 6750

## Uniform Residential Appraisal Report

File # 6750

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

| | |
|---|---|
| Property Address 253 Driftwood Point Road | City Santa Rosa Beach · State Flor · Zip Code 32459-3027 |
| Borrower Samuel & Ileana Osborne · Owner of Public Record Samuel & Ileana Osborne | County Walton |

Legal Description Lot 5 Blk C Driftwood Estates

Assessor's Parcel # 11-2S-21-42010-00C-0050 · Tax Year 2005 · R.E. Taxes $ 8,500.89

Neighborhood Name Driftwood Estates · Map Reference M16 S05 · Census Tract 9506.00

Occupant ☒ Owner ☐ Tenant ☐ Vacant · Special Assessments $ 0.00 · ☐ PUD · HOA $ ☐ per year ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☒ Refinance Transaction ☐ Other (describe)

Lender/Client Allied First Source Mortgage · Address 253 Driftwood Point Road, Santa Rosa Beach, FL 32459

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☒ Yes ☐ No

Report data source(s) used, offering price(s), and date(s). The subject has had two prior sales in the last 36 months, which took place on 04/16/2004 for $1,200,000.00, Book 2606 / Page 1603 and then on 05/09/2005 for $1,500,000.00, Book 2669 / Page 2062.

I ☐ did ☒ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. Subject is not for sale.

**CONTRACT**

Contract Price $ N/A · Date of Contract N/A · Is the property seller the owner of public record? ☒ Yes ☐ No Data Source(s) Public Records

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☒ No

If Yes, report the total dollar amount and describe the items to be paid. Unknown

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | One-Unit Housing Trends | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☒ Increasing ☐ Stable ☐ Declining | PRICE | AGE | One-Unit | 40 % |
| Built-Up ☐ Over 75% ☒ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | $ (000) | (yrs) | 2-4 Unit | 1 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☒ Under 3 mths ☐ 3-6 mths ☐ Over 6 mths | 260 Low | New | Multi-Family | 0 % |
| Neighborhood Boundaries Neighborhood is bounded to the south by Highway 98, to the north, east, and | | 3,200 High | 30 | Commercial | 4 % |
| west by Choctawhatchee Bay. | | 480 Pred. | 10 | Other | 55 % |

Neighborhood Description There are no adverse factors which should affect the subject's marketability. The subject's location is convenient to various employment opportunities and recreational facilities. Employment stability in the area is good, due to in large part to Eglin Air Force Base and the tourism in the southern countys due to the beaches of the Gulf of Mexico.

Market Conditions (including support for the above conclusions) I have considered relevant competitive listings/contract offerings in performing this appraisal, and any trend indicated by that data is supported by the listing/offering information included in this report. Market conditions are stable. No financing concessions are prevalent. Property values have been increasing 12% to 35% over the past year.

**SITE**

Dimensions See Survey · Area 0.898 Acres · Shape Rectangle · View Bay Front

Specific Zoning Classification NPA · Zoning Description Neighborhood Planning Area

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements - Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | ☐ | Water | ☒ | ☐ | Street Paved Asphalt | ☒ | ☐ |
| Gas | ☐ | ☐ | Sanitary Sewer | ☒ | ☐ | Alley None | ☐ | ☐ |

FEMA Special Flood Hazard Area ☒ Yes ☐ No · FEMA Flood Zone AF · FEMA Map # 12131C0537F · FEMA Map Date 3/7/2000

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No If Yes, describe

No apparent easements or encroachments were found upon inspection which would adversely affect the subject property. Only a survey can determine if the subject is in a flood zone.

**IMPROVEMENTS**

| General Description | Foundation | Exterior Description materials/condition | Interior materials/condition |
|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☒ Concrete Slab ☐ Crawl Space | Foundation Walls Concrete/Average | Floors Tile/Carpet, Wood/G |
| # of Stories Two | ☐ Full Basement ☐ Partial Basement | Exterior Walls Stucco/good | Walls SheetRock/Good |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | Basement Area None sq.ft. | Roof Surface Clay Tile/Good | Trim/Finish Wood/Paint/Good |
| ☒ Existing ☐ Proposed ☐ Under Const. | Basement Finish None % | Gutters & Downspouts None | Bath Floor Tile/Good |
| Design (Style) Beachhouse/Gd | ☐ Outside Entry/Exit ☐ Sump Pump | Window Type Insulated | Bath Wainscot Sheet Rock/Good |
| Year Built 1996 | Evidence of ☐ Infestation None | Storm Sash/Insulated Vinyl/Average | Car Storage ☐ None |
| Effective Age (Yrs) 5 | ☐ Dampness ☐ Settlement | Screens Screens | ☐ Driveway # of Cars |
| Attic ☐ None | Heating ☒ FWA ☐ HWBB ☐ Radiant | Amenities ☐ Woodstove(s) # | Driveway Surface Gravel, Concrete |
| ☒ Drop Stair ☐ Stairs | ☐ Other Fuel Electric | ☒ Fireplace(s) # 2 ☐ Fence | ☒ Garage # of Cars 3 |
| ☐ Floor ☐ Scuttle | Cooling ☒ Central Air Conditioning | ☒ Patio/Deck Patio ☒ Porch 4 Covered | ☐ Carport # of Cars |
| ☐ Finished ☐ Heated | ☐ Individual ☐ Other | ☐ Pool ☒ Other 2 Balcony | ☐ Att. ☒ Det. ☐ Built-In |

Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☒ Microwave ☒ Washer/Dryer ☐ Other (describe)

Finished area above grade contains: 7 Rooms · 4 Bedrooms · 4 Bath(s) · 3,701 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.). Ceiling fans, top of the line appliances, two fireplaces, 4 covered porches, 2 balconies, workshop, 3 car garage, Built-in book cases, crown molding, upgrades through out the subject see pictures.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). There were no physical, functional or external inadequacies noted during my inspection. The quality of construction was very good and the condition was good.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No If Yes, describe

No physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property were noted during inspection.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe

Many styles, ages, and conditions of homes are located in the subject market area. We found the subject to conform to the subjects neighborhood.

Freddie Mac Form 70 March 2005 · Page 1 of 6 · Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002366

File No. 6750

## Uniform Residential Appraisal Report   File # 6750

| | | | | |
|---|---|---|---|---|
| There are | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ | | to $ | |
| There are | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ | | to $ | |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 253 Driftwood Point Road | 400 Shore Drive | | 2987 Bay Villa Court | | 452 Admiral Court | |
| | Santa Rosa Beach, Florida 32459 | Santa Rosa Beach | | Santa Rosa Beach | | Santa Rosa Beach | |
| Proximity to Subject | | 3.38 miles | | 0.24 miles | | 5.21 miles | |
| Sale Price | $ N/A | | $ 3,200,000 | | $ 2,100,000 | | $ 2,625,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 660.20 sq.ft. | | $ 649.35 sq.ft. | | $ 595.10 sq.ft. | |
| Data Source(s) | | Public Rec. Book2661Page0569 | | Public Rec. Book2692Page0304 | | Public Rec. Book2649Page0764 | |
| Verification Source(s) | | MLS #374229 (DOM 94) | | MLS #414069 (DOM 0) | | MLS # 385010 (DOM 112) | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | Cash | | Conventional | | Unknown | |
| Concessions | | Amount Unkwn | | Amount Unkwn | | Amount Unkwn | |
| Date of Sale/Time | | 03/24/2005 | | 09/29/2005 | | 08/31/2005 | |
| Location | Suburban/Avg | Suburban/Avg | | Suburban/Avg | | Suburban/Avg | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 0.898 Acres | 0.61 Acres | +145,000 | 0.50 Acres | +200,000 | 0.53 Acres | +185,000 |
| View | Bay Front/V.Gd | Bay Front/VGd | | LakeFront/Gd | +500,000 | Bay Front/VGd | |
| Design (Style) | Beachhouse/Gd | Beachhouse/Gd | | Beachhouse/Gd | | Beachhouse/Gd | |
| Quality of Construction | Stucco/Good | Stucco/Good | | Stucco/Good | | Stucco/Good | |
| Actual Age | A10 / E5 | New | -160,000 | A2 / E1 | -84,000 | A8 / E5 | 0 |
| Condition | Good | Good | | Good | | Good | |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 7  4  4 | 7  3  4 | | 7  4  5 | -5,000 | 7  3  4 | |
| Gross Living Area | 3,701 sq.ft. | 4,847 sq.ft. | -157,600 | 3,234 sq.ft. | +64,200 | 4,411 sq.ft. | -97,600 |
| Basement & Finished | None | None | | None | | None | |
| Rooms Below Grade | Workshop | Dock,Boatslip | 0 | None | +15,000 | None | +15,000 |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Cent.Elec.Ht&A | Cent.Elec.Ht&A | | Cent.Elec.Ht&A | | Cent.Elec.Ht&A | |
| Energy Efficient Items | DoublePaneWn | DoublePaneWn | | DoublePaneWn | | DoublePaneWn | |
| Garage/Carport | 3 | 3CarGarage | | 2CarGarage | +6,000 | 3CarGarage | |
| Porch/Patio/Deck | 4 Cov.Porches | CoveredPorch | +10,000 | CoveredPorch | +10,000 | 2CoveredPorch | +7,500 |
| Decks,Porches,Fences, | 2 Balconies | ScreenPorch | | ScreenPorch | | ScreenPorch | |
| Fireplace,Storage Building | 2 Fireplaces | 2 Fireplaces | | One Fireplace | +2,000 | 2 Fireplaces | |
| Other | None | In-Ground Pool | -25,000 | None | | In-Ground Pool | -25,000 |
| Net Adjustment (Total) | | [ ]+ [X]- | $ 187,600 | [X]+ [ ]- | $ 708,200 | [X]+ [ ]- | $ 84,900 |
| Adjusted Sale Price | | Net 5.9 % | | Net 33.7 % | | Net 3.2 % | |
| of Comparables | | Gross 15.6 % | $ 3,012,400 | Gross 42.2 % | $ 2,808,200 | Gross 12.6 % | $ 2,709,900 |

[X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain   We reviewed all information supplied on the
MLS sheets and public records. The GLA for the comparable sales used were taken from MLS sheets.

My research [X] did [ ] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)   See Below - Public Records.
My research [ ] did [X] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)   See Below - Public Records.
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | See Below. | None Within 36 Months | None Within 36 Months | None Within 36 Months |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | Public Records | Public Records | Public Records | Public Records |
| Effective Date of Data Source(s) | 3/1/2006 | 3/1/2006 | 3/1/2006 | 3/1/2006 |

Analysis of prior sale or transfer history of the subject property and comparable sales   Any sale or transfer history or no sale history of the subject and/or
comparable properties has no impact on the value opinion in this appraisal report. Property values have been increasing in the subject market
area, see Florida Sales Pages...

Any sale or transfer history or no sale history of the subject and/or comparable properties has no impact on the value opinion in this appraisal
report. Property values have been increasing in the subject market area, see Florida Sales Pages...
Summary of Sales Comparison Approach   See Page 3 of the URAR
See FIRREA/USPAP Addedum for more information on the subject.

Indicated Value by Sales Comparison Approach $ 2,861,000

Indicated Value by: Sales Comparison Approach $ 2,861,000   Cost Approach (if developed) $ 2,710,314   Income Approach (if developed) $ not utilized

The sales comparison approach to value is the primary approach to value for properties of the subject's type and class. The sales comparison
approach was given the most weight in estimating the market value of the subject. All comparables used were the closest geographically,
qualitatively, conditionally, age-wise, and location-wise to the subject.

This appraisal is made [X] "as is", [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been
completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the
following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair.

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting
conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$ 2,861,000 , as of   March 01, 2006 , which is the date of inspection and the effective date of this appraisal.

Abbott002367

[File No. 6750]

## Uniform Residential Appraisal Report     File # 6750

- URAR: Sales Comparison Comments

The comparable sales utilized were the most current sales with similar size, style, and features available from the public records. The sales comparison analysis had adjustments applied to the comparable sales which reflected the markets reaction to the differences in the properties, not the cost of the differences. The subject's market area has recently exploded with good quality homes similar to the subject. In search of comparable sales located on the bay that were similar to the subject was hard. In our search we found very few similar sales to the subject, therefore, the most similar sales were found and used. Few sales similar to quality, size, age, and location to the subject, therefore, we expanded the search for sales most similar to the subject out about five miles. Property values very due to time, size, view, location, and adjustments were made to reflect market differences. All sales were given equal weight. Land values have tripled over the past couple of years in the subject's market area and adjustments were made to reflect time the property sold and the size of property, see state map pages...

The subject's vacant land is high in demand along with many other vacant lots that are located near, or on the Gulf of Mexico in the subject's market area. With such high demand for vacant land, prices of vacant lots have tripled over the past year. With land values so high, it is not unusual to find land values worth 30-75% of total improved site in south Walton County. The area has a limited supply of land in the subject market area, due to it is a land locked between bay and gulf, State Parks, wet lands, and Eglin Air Force Base. With limited amount of buildable land in the area, with the same quality of homes as the subject, it was necessary to expand my search out for comparable sales more than one mile from the subject. Also, with limited amount of land and a high demand for properties, sellers are getting top dollar for homes, condo units, and vacant land, in the subject's market area. Then in some cases, buyers are bidding higher than listed price for some homes in the area.

In determining the replacement value for the subject, we used the marshall & swift valuation service and estimated the local cost to estimate reproduction cost of the subject property. The appraiser is noting that builders are charging between $150 - $350 a SF in the local area depending on what style and/or quality of home you build, therefore, $275.00 SF was used as an estimated in the cost approach from the information gathered on the subject. The value of land was determined by finding vacant land sales most similar to the subject size on the water in the surrounding market area. It is not uncommon for the cost approach to be higher or lower than the market value.

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.
Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)

| ESTIMATED [ ] REPRODUCTION OR [X] REPLACEMENT COST NEW | OPINION OF SITE VALUE | | | =$ | 1,500,000 |
|---|---|---|---|---|---|
| Source of cost data   See Below. | DWELLING   3,701 Sq.ft. @ $   275.00 | | | =$ | 1,017,775 |
| Quality rating from cost service  V.Good   Effective date of cost data | None Sq.ft. @ $ | | | =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | Appts,C.Fans,2Fireplc,2Bal,4CvProh,Wrkshp | | | =$ | 147,550 |
| See Attached sketch area addendum for square footage calculation. | Garage/Carport   698 Sq.ft. @ $   150.00 | | | =$ | 104,700 |
| Data in the Cost Approach was abstracted from the Marshall and Swift | Total Estimate of Cost-New | | | =$ | 1,270,025 |
| Valuation Service. Where applicable and available, local construction | Less   Physical | Functional | External | | |
| costs were also considered. | Depreciation   84,711 | | | =$( | 84,711) |
| Remaining Economic Life: 70 years | Depreciated Cost of Improvements | | | =$ | 1,185,314 |
| Remaining Physical Life: 75 years | "As-is" Value of Site Improvements | | | =$ | 25,000 |
| Estimated Remaining Economic Life (HUD and VA only)   70 Years | INDICATED VALUE BY COST APPROACH | | | =$ | 2,710,314 |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $   N/A   X Gross Rent Multiplier   N/A   = $   not utilized   Indicated Value by Income Approach |
|---|

Summary of Income Approach (including support for market rent and GRM)   The income approach was not utilized, in this appraisal analysis as buyers and sellers of property do not base purchase and sale price decisions on the income generating capacity or required rate of investment return.

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?  [ ] Yes  [ ] No   Unit type(s)  [ ] Detached  [ ] Attached
Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.
Legal Name of Project
Total number of phases _____ Total number of units _____ Total number of units sold _____
Total number of units rented _____ Total number of units for sale _____ Data source(s) _____
Was the project created by the conversion of existing building(s) into a PUD?  [ ] Yes  [ ] No  If Yes, date of conversion.
Does the project contain any multi-dwelling units?  [ ] Yes  [ ] No  Data Source
Are the units, common elements, and recreation facilities complete?  [ ] Yes  [ ] No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?  [ ] Yes  [ ] No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Abbott002368

[File No. 6750]

## Uniform Residential Appraisal Report    File # 6750

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

---

Form 1004 -- "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002369

File No. 6750

## Uniform Residential Appraisal Report    File # 6750

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Freddie Mac Form 70 March 2005        Page 5 of 6        Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002370

File No. 6750

## Uniform Residential Appraisal Report    File # 6750

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name William V. Shaffer | Name Ronald E. Wright |
| Company Name Appraisal House, Inc. | Company Name Appraisal House, Inc. |
| Company Address 16 Ferry Road S.E. | Company Address 16 Ferry Road S.E. |
| Fort Walton Beach, FL 32548 | Fort Walton Beach, FL 32548 |
| Telephone Number | Telephone Number |
| Email Address will712005@yahoo.com | Email Address rwright@ah.gccoxmail.com |
| Date of Signature and Report March 01, 2006 | Date of Signature March 01, 2006 |
| Effective Date of Appraisal March 01, 2006 | State Certification # St.Cert.Gen. REA RZ2495 |
| State Certification # | or State License # |
| or State License # RI 9688 | State Fl |
| or Other (describe) State # | Expiration Date of Certification or License 11/30/2006 |
| State Fl | |
| Expiration Date of Certification or License 11/30/2006 | SUBJECT PROPERTY |

ADDRESS OF PROPERTY APPRAISED
253 Driftwood Point Road
Santa Rosa Beach, Florida 32459-3027
APPRAISED VALUE OF SUBJECT PROPERTY $ 2,861,000
LENDER/CLIENT
Name Natalie
Company Name Allied First Source Mortgage
Company Address 253 Driftwood Point Road, Santa Rosa Beach, F FL 32459
Email Address natalie@alliedfirstsource.com

SUBJECT PROPERTY

☐ Did not inspect subject property
☐ Did inspect exterior of subject property from street
   Date of Inspection
☒ Did inspect interior and exterior of subject property
   Date of Inspection March 01, 2006

COMPARABLE SALES

☐ Did not inspect exterior of comparable sales from street
☒ Did inspect exterior of comparable sales from street
   Date of Inspection March 01, 2006

Freddie Mac Form 70 March 2005      Page 6 of 6      Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002371

File No. 6750

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

Appraisal House, Inc. (850) 244-0656
Form ACR_DEFD — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002372

File No. 6750

**APPRAISER'S CERTIFICATION:** The appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:** 253 Driftwood Point Road, Santa Rosa Beach, Florida 32459-3027

| **APPRAISER:** | **SUPERVISORY APPRAISER (only if required):** |
|---|---|
| Signature: | Signature: |
| Name: William A. Shaffer | Name: Ronald E. Wright |
| Date Signed: March 01, 2006 | Date Signed: March 01, 2006 |
| State Certification #: | State Certification #: St.Cert.Gen. REA RZ2495 |
| or State License #: RI 9688 | or State License #: |
| State: Florida | State: Florida |
| Expiration Date of Certification or License: 11/30/2006 | Expiration Date of Certification or License: 11/30/2006 |
| | ☒ Did   ☐ Did Not Inspect Property |

Freddie Mac Form 439 6-93                     Page 2 of 2                     Fannie Mae Form 1004B 6-93

Form ACR_DEFD — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002373

File No. 6750

## Building Sketch (Page - 1)

| Borrower/Client | Samuel & Ileana Osborne | | | |
|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | |
| City | Santa Rosa Beach | County Walton | State Florida | Zip Code 32459-3027 |
| Lender | Allied First Source Mortgage | | | |




Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA1 | First Floor | 2023.5 | 2023.5 |
| P/P | Covered Porch #1 | 251.9 | |
| | Covered Porch #2 | 93.6 | |
| | Covered Porch #3 | 53.2 | |
| | Covered Porch #4 | 78.6 | 477.3 |
| GAR | Three Car Garage | 698.0 | 698.0 |
| OTH | Workshop | 213.5 | 213.5 |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| First Floor | | |
| 3.5 x 13.6 | | 47.5 |
| 3.0 x 7.5 | | 22.8 |
| 0.5 x 3.0 x 3.0 | | 4.6 |
| 0.5 x 3.0 x 3.0 | | 4.6 |
| 16.3 x 25.3 | | 361.8 |
| 1.5 x 9.3 | | 14.0 |
| 9.2 x 39.7 | | 365.1 |
| 19.0 x 41.5 | | 788.1 |
| 15.9 x 26.1 | | 414.5 |
| 0.5 x 0.0 x 0.0 | | 0.5 |

| Net LIVABLE Area | ( Rounded ) | 2024 |
|---|---|---|

| 10 Items | ( Rounded ) | 2024 |
|---|---|---|

Form SKT.BldSkI — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002374

File No. 6750

## Building Sketch (Page - 2)

| Borrower/Client | Samuel & Reana Osborne | | | |
|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | |
| City | Santa Rosa Beach | County Walton | State Florida | Zip Code 32459-3027 |
| Lender | Allied First Source Mortgage | | | |



Sketch by Area AP™

Comments.

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA2 | Second Floor | 1677.0 | 1677.0 |
| P/P | Balcony #1 | Invalid | |
| | Balcony #2 | 22.0 | 22.0 |
| Net LIVABLE Area | | ( Rounded ) | 1677 |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| Second Floor | | |
| 15.8 x 26.1 | | 412.4 |
| 24.2 x 41.3 | | 999.5 |
| 4.0 x 19.8 | | 79.2 |
| 13.0 x 14.0 | | 182.0 |
| 0.5 x 0.2 x 39.5 | | 4.0 |
| 5 Items | ( Rounded ) | 1677 |

Form SKT BldSkt — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002375

File No. 6750

## Location Map

| Borrower/Client | Samuel & Ileana Osborne | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | | | |
| City | Santa Rosa Beach | County | Walton | State | Florida | Zip Code 32459-3027 |
| Lender | Allied First Source Mortgage | | | | | |



Abbott002376

File No. 6750

## Flood Map

| Borrower/Client | Samuel & Ileana Osborne | | | | |
|---|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | | |
| City | Santa Rosa Beach | County Walton | | State Florida | Zip Code 32459-3027 |
| Lender | Allied First Source Mortgage | | | | |



InterFlood
www.interflood.com • 1-800-252-6633

**Prepared for:**
Appraisal House, Inc.

253 Driftwood Point Road
Santa Rosa Beach, Florida 32459-3020

Walton County
Unincorporated Areas
120317

ZONE AE

**FLOODSCAPE**

Flood Hazards Map

**Map Number**
12131C0537F

**Effective Date**
March 7, 2000

For more information about flood zones and flood insurance, contact:

Powered by FloodSource
877.77.FLOOD
www.floodsource.com

© 1999-2002 FloodSource Corp. U.S. Patents Pending. All rights reserved. For more information, please e-mail info@floodsource.com.

Abbott002377

File No. 6750

## Subject Photos

| Borrower/Client | Samuel & Ileana Osborne | | | | |
|---|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | | |
| City | Santa Rosa Beach | County | Walton | State Florida | Zip Code 32459-3027 |
| Lender | Allied First Source Mortgage | | | | |



**Subject Front**
253 Driftwood Point Road



**Subject Rear**



**Subject Street**

Form PICPIX.TR — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002379

File No. 6750

## Subject Interior Photo Page

| Borrower/Client | Samuel & Ileana Osborne | | | | |
|---|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | | |
| City | Santa Rosa Beach | County | Walton | State Florida | Zip Code 32459-3027 |
| Lender | Allied First Source Mortgage | | | | |



### Subject Interior
253 Driftwood Point Road

| | |
|---|---|
| Sales Price | N/A |
| Gross Living Area | 3,701 |
| Total Rooms | 7 |
| Total Bedrooms | 4 |
| Total Bathrooms | 4 |
| Location | Suburban/Avg |
| View | Bay Front/V.Gd |
| Site | 0.898 Acres |
| Quality | Stucco/Good |
| Age | A10 / E5 |



### Subject Interior



### Subject Interior

Form PICPIX.SI — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002380

File No. 6756

## Subject Interior Photo Page

| Borrower/Client | Samuel & Ileana Osborne | | | | |
|---|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | | |
| City | Santa Rosa Beach | County | Walton | State Florida | Zip Code 32459-3027 |
| Lender | Allied First Source Mortgage | | | | |



### Subject Interior
253 Driftwood Point Road
| | |
|---|---|
| Sales Price | N/A |
| Gross Living Area | 3,701 |
| Total Rooms | 7 |
| Total Bedrooms | 4 |
| Total Bathrooms | 4 |
| Location | Suburban/Avg |
| View | Bay Front/V.Gd |
| Site | 0.898 Acres |
| Quality | Stucco/Good |
| Age | A10 / ES |



**Subject Interior**

**Subject Interior**

Abbott002381

[File No. 6750]

## PHOTOGRAPH ADDENDUM

| Borrower/Client | Samuel & Ileana Osborne | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | | | |
| City | Santa Rosa Beach | County | Walton | State | Florida | Zip Code 32459-3027 |
| Lender | Allied First Source Mortgage | | | | | |



View of the Bay

Form GPICPIX — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002382

File No. 6750

## Comparable Photo Page

| Borrower/Client | Samuel & Ileana Osborne | | | |
|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | |
| City | Santa Rosa Beach | County  Walton | State  Florida   Zip Code  32459-3027 | |
| Lender | Allied First Source Mortgage | | | |



**Comparable 1**
400 Shore Drive



**Comparable 2**
2987 Bay Villa Court



**Comparable 3**
452 Admiral Court

Form PICPIX.BR — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002383

Case 3:14-cv-00646-MCR-EMT Document 173-3 Filed 08/19/15 Page 21 of 25

File No. 6750

## State Map

| | | | |
|---|---|---|---|
| Borrower/Client | Samuel & Ileana Osborne | | |
| Property Address | 253 Driftwood Point Road | | |
| City | Santa Rosa Beach | County Walton | State Florida Zip Code 32459-3027 |
| Lender | Allied First Source Mortgage | | |

# REAL ESTATE CONTINUED

# Florida home sales soar 29 percent in April

Low mortgage rates and a tight supply of homes pumped up sales of existing single-family homes in Florida 29 percent in April, for a total of 23,275 homes sold statewide compared to 18,094 homes a year ago, according to the Florida Association of Realtors.

Statewide, the median cost of a resale house in Florida rose 16 percent to $173,900; it was $149,300 in April 2003. In 1999, the statewide median sales price was $102,200, which translates to a dramatic 70.1 percent increase over the five-year period, according to FAR records.

Florida's median sales price compares favorably to the national median sales price for existing single-family homes, which was $174,100 in March 2004, up 7.4 percent from the previous March when the median price was $162,100. In California, the statewide median resales price was $428,280 in March; in Maryland, it was $210,582; in North Carolina, the average resales price was $182,587; in Illinois, the median price was $170,000; and in Virginia, it was $161,806.

Across the state, realtors cite continued low mortgage rates for encouraging people to become homeowners. In many markets, Realtors also report that the supply of existing homes for sale remains low, often resulting in multiple offers on proper-ties.

See page 14D for national sales statistics

"We currently have a feeding frenzy on second homes. Baby boomers can afford to buy second homes now, especially with the current mortgage rates."

Roland Guidry, ECAR president

The interest rate for a 30-year fixed-rate mortgage in April averaged 5.83 percent compared to 5.81 percent during the same month a year ago. FAR's sales figures reflect closings, which typically occur 30 to 90 days after sales contracts are written.

For the state's larger markets, the Jacksonville metropolitan statistical area reported strong home sales last month, with a total of 1,449 homes changing hands for a 25 percent gain over the 1,161 homes sold in April 2003. The market's median home price rose 15 percent to $154,700; a year ago, it was $134,300.

Andre Boutte, president of the Northeast Florida Association of Realtors, agrees that low rates are attracting buyers and fueling the area's strong resales activity.

"With rates down as low as they still are, more people can afford to purchase a home and that means people are ready to buy now," he says. "Jacksonville is growing — we have a lot of businesses coming to the area. And with the Super Bowl coming here next year, we probably have some investors looking to buy homes and rent them out for that event."

Other larger Florida metro areas posting double-digit increases in resales activity last month compared to a year ago include Tampa-Clearwater-St. Petersburg, where 4,308 homes sold for a 34 percent gain; and Orlando, where 3,454 homes changed hands for a 32 percent increase. The median sales price in those markets also rose over the same period: in Orlando, 13 percent to $164,200; and in Tampa-Clearwater-St. Petersburg, 12 percent to $148,800.

Of the state's smaller markets, the Fort Walton Beach area reported a 56 percent boost in home sales in April, with a total of 482 homes changing hands compared to 310 homes sold last year. The area's median sales price rose 32 percent to $185,100; a year ago, it was $140,000.

Roland Guidry, president of the Emerald Coast Association of Realtors and a broker with the Pat Guidry Agency, points to favorable mortgage rates and a busy second home market as two factors driving sales in the Fort Walton Beach/Destin area.

"We currently have a feeding frenzy on second homes," he says. "Baby boomers can afford to buy second homes now, especially with the current mortgage rates. Another advantage we have to offer is that the Gulf Coast is within driving distance of so many communities, including Houston, Atlanta and Birmingham, Ala., to name just a few."

Other smaller metro areas reporting strong gains in home sales last month include: Pensacola, where 613 homes sold for a 56 percent jump; and Fort Pierce-Port St. Lucie, where 642 homes sold for a 45 percent increase.

The median sales price in those markets also rose: in Fort Pierce-Port St. Lucie, 25 percent to $186,400; and in Pensacola, 13 percent to $126,200.

*This article was contributed to The Log by the Florida Association of Realtors.*

### Florida Sales Report - April 2004
### Single-Family, Existing Homes

| Statewide & Metropolitan Statistical Areas (MSAs) | Realtor Sales | | | Median Sales Price | | |
|---|---|---|---|---|---|---|
| | April 2004 | April 2003 | % Chg | April 2004 | April 2003 | % Chg |
| STATEWIDE | 23,275 | 18,094 | 29 | $173,900 | $149,300 | 16 |
| STATEWIDE YEAR-TO-DATE | 75,022 | 60,707 | 24 | $168,500 | $147,600 | 14 |
| Daytona Beach | 1,239 | 976 | 28 | $151,100 | $119,400 | 26 |
| Fort Lauderdale | 1,371 | 1,262 | 9 | $279,700 | $217,100 | 29 |
| Fort Myers-Cape Coral | 1,064 | 829 | 28 | $184,200 | $150,000 | 23 |
| Fort Pierce-Port St. Lucie | 642 | 446 | 45 | $186,400 | $145,000 | 25 |
| Fort Walton Beach | 482 | 310 | 55 | $185,100 | $140,000 | 32 |
| Gainesville | 291 | 251 | 16 | $150,700 | $146,300 | 9 |
| Jacksonville | 1,449 | 1,161 | 25 | $154,700 | $134,300 | 15 |
| Lakeland-Winter Haven | 524 | 496 | 6 | $104,800 | $91,200 | 15 |
| Melbourne-Titusville-Palm Bay | 600 | 501 | 20 | $156,000 | $128,900 | 21 |
| Miami | 1,262 | 1,058 | 19 | $242,000 | $215,000 | 12 |
| Naples | 529 | 432 | 22 | $390,100 | $313,400 | 25 |
| Ocala | 469 | 431 | 9 | $119,700 | $97,300 | 23 |
| Orlando | 3,454 | 2,613 | 32 | $164,200 | $145,400 | 13 |
| Panama City | 221 | 190 | 16 | $156,100 | $140,000 | 11 |
| Pensacola | 613 | 392 | 56 | $126,200 | $112,000 | 13 |
| Punta Gorda | 453 | 372 | 22 | $154,200 | $125,600 | 23 |
| Sarasota-Bradenton (1) | 1,299 | 762 | 70 | $235,700 | $182,700 | 29 |
| Tallahassee | 314 | 291 | 22 | $132,100 | $127,000 | 7 |
| Tampa-St. Petersburg-Clearwater (2) | 4,308 | 3,206 | 34 | $148,800 | $132,400 | 12 |
| West Palm Beach-Boca Raton | 1,567 | 1,232 | 28 | $281,700 | $221,900 | 27 |

(1) Data for Venice was not available.
(2) Data for Hernando County was not available.

Special to The Log

**ABOVE AVERAGE:** *Real estate sales in Fort Walton Beach and Panama City rose above the state average at 55 and 16 percent respectively.*

# LOTS

From B1

said.

Curran cited the decreasing availability of land as one reason for the increase.

"We had a lot last fall in Bluewater Bay, half acre, on the golf course," Curran said. "It was $85,000. Now it's upwards of $150,000.

"And there was land on Rocky Bayou that sold for $170,000. Last year it was under $100,000."

In addition to the land prices, of all types of residences in Okaloosa County increased dramatically over the past year, according to the report.

Yet higher prices haven't deterred sales activity, as virtually all categories of homes have shown increases of from 28 percent to 107 percent.

The average price of a new condominium in June was $507,436. A year ago the average price was $206,061.

The average price of a single family home in June was $210,080. Last year it was $172,051, an increase of 23 percent.

Even mobile and manufactured housing showed a gain of more than 107 percent. An average mobile home or modular home that went for $38,025 a year ago would have sold for $77,510 in June. But those figures don't necessarily reflect the span of structures available in that category, from singlewides that might bring $28,000 to triplewides that can cost nearly $90,000.

At the same time, sales volume increased 33 percent, from 867 transactions in June 2003 to 1148 this June, indicating buyers aren't being put off by the higher prices. Condominium sales gained from six a year ago to 44 this year.

□ Business Editor Morris Fraser can be reached at 863-1111, Ext. 439, or morrisf@nwfdailynews.com

## ■Okaloosa County residential real estate prices soar and sales market is not slowing.

**By MORRIS FRASER**
Daily News Business Editor

The average price of a residential lot in Okaloosa County one with no building on it, shot up to $258,174 in June, according to a report by Metro Market Trends. The average price in June 2003 was $70,033.

"That's what we're seeing," confirmed Sherry Carter of T Hister & Associates in Destin.

Roger Curran of Century 21 Wilson Minger Agency in Niceville, said, "Those figures probably reflect that fewer lower-priced lots are available."

He added that pricing of vacant lots could have inflated the average.

"If you find beachfront under $2 million, it's a bargain," said Tim Finler of Wilson Real Estate in Destin, "And that's for a lot 60 feet wide by maybe 180 feet."

Add a house costing $200 to $250 per square foot to build, and pretty soon you're talking serious money.

"The average house on the golf is about $3.7 million," Finler

Please see LOTS/B3

**Values continue to soar**

| Date | Average price of | | % Increase |
| --- | --- | --- | --- |
| | Residential lot | Single-family home | |
| June 2004 | $258,174 | $172,051 | 173.275 |
| June 2003 | $206,154 | $210,080 | 247 |

Source: Metro Market Trends — Daily News/KEN MAINES

Undeveloped residential lots in Okaloosa County, such as this one in Shalimar, are hard to come by. That's one reason the average price for undeveloped lots has more than tripled since June 2003.

Daily News/MARK KULAW

Form MAP Size — WinTOTAL appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott002385

Borrower/Client: Samuel & Reana Osborne
Property Address: 253 Driftwood Point Road
City: Santa Rosa Beach    County: Walton    State: Florida    Zip Code: 32459-3027
Lender: Allied First Source Mortgage

State Map

File No. 6730

Case 3:14-cv-00624-RV-EMT Document 173-5 Filed 05/06/16 Page 222 of 435

## Area home sales

**Okaloosa County**

| Sales | Nov. 2004 | Nov. 2003 | % change |
|---|---|---|---|
| Total single-family homes | 455 | 405 | 12.36 |
| Condominium/townhome | 168 | 128 | 31.25 |
| Manufactured homes | 23 | 9 | 155.56 |
| Residential lots | 213 | 139 | 53.24 |

| Dollar volume | | | |
|---|---|---|---|
| Total single-family homes | $102,255,612 | $77,503,733 | 31.94 |
| Condominium/townhome | 54,957,900 | 33,988,300 | 61.70 |
| Manufactured homes | 1,173,500 | 351,600 | 233.76 |
| Residential lots | 22,662,000 | 13,682,400 | 66.29 |

**Santa Rosa County**

| Sales | | | |
|---|---|---|---|
| Total single-family homes | 513 | 367 | 39.78 |
| Condominium/townhome | 18 | 46 | -60.87 |
| Manufactured homes | 46 | 26 | 76.92 |
| Residential lots | 366 | 370 | -1.08 |

| Dollar volume | | | |
|---|---|---|---|
| Total single-family homes | $92,228,489 | $56,694,123 | 62.68 |
| Condominium/townhome | 2,684,900 | 11,106,600 | -75.83 |
| Manufactured homes | 2,133,600 | 872,700 | 144.48 |
| Residential lots | 18,976,500 | 15,193,300 | 24.90 |

**Walton County**

| Sales | | | |
|---|---|---|---|
| Total single-family homes | 241 | 172 | 40.12 |
| Condominium/townhome | 110 | 169 | -34.91 |
| Manufactured homes | 57 | 14 | 307.14 |
| Residential lots | 434 | 438 | -.91 |

| Dollar volume | | | |
|---|---|---|---|
| Total single-family homes | $114,749,086 | $53,161,434 | 115.85 |
| Condominium/townhome | 61,536,300 | 55,615,700 | 10.65 |
| Manufactured homes | 7,275,500 | 691,800 | 951.68 |
| Residential lots | 105,034,900 | 67,943,000 | 54.59 |

Source: Metro Market Trends Inc.

Daily News/KEN MAINES

# Sale of homes for 2004 ends on high a note

**By MORRIS FRASER**
Daily News Business Editor

Dollar sales of single-family homes in Walton County rose by almost 140 percent over the past year, according to figures compiled by Metro Market Trends of Pensacola.

Total sales of houses in the county in 2004 through November rose to $1.52 billion, compared to $634 million in the first 11 months of 2003.

Comparable Okaloosa sales in 2004 topped $1.24 billion, a 41 percent increase. Santa Rosa County saw a 36 percent increase, with sales above $951 million.

Comparing month-to-month figures, Walton County showed a 116 percent increase in November, with Santa Rosa gaining 63 percent and Okaloosa 32 percent.

Condominiums and townhomes gained 61 percent in sales volume in Okaloosa County. But similar markets in Okaloosa (-35 percent) and Santa Rosa (-75 percent) showed declines.

At the same time, Walton County showed an 11 percent gain in dollar sales for condominiums.

Manufactured housing sales also showed strong gains in all three counties. Walton County sales tripled in November from 2003 figures; sales in Okaloosa went up 155 percent, and Santa Rosa sales were up 76 percent.

Combining the three counties, dollar sales rose from $423.6 million in November 2003 to $745.3 million in November 2004, a 57 percent increase.

Metro Market Trends also reported that foreclosures were down across the board, with 40 fewer reported in Okaloosa County during 2004, and three fewer in both Walton and Santa Rosa counties.

State Map

Borrower/Client Samuel & Ileana Osborne
Property Address 253 Driftwood Point Road
City Santa Rosa Beach
Lender Allied First Source Mortgage
County Walton
State Florida Zip Code 32459-3027
File No. 9730

Form MAP.Sta — WinTOTAL appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott092386

**State Licenses**

[File No. 6750]

| Borrower/Client | Samuel & Ileana Osborne | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | | | |
| City | Santa Rosa Beach | County | Walton | State | Florida | Zip Code 32459-3027 |
| Lender | Allied First Source Mortgage | | | | | |

Licensing Portal - Search Results

Page 1 of 1



03:50:00 PM

Search Results

Please see our glossary of icons for an explanation of the license status shown in these search results.

| License Type | Name | Name Type | License Number/ Rank | Status/ Expires | C |
|---|---|---|---|---|---|
| Registered Trainee Appraiser | Osborne, Mr. Sam | Primary | RI9688 Registered Appr | Current, Active 11/30/2006 | NICE |

Abbott002387

File No. 6750

## State Licenses

| Borrower/Client | Samuel & Ileana Osborne | | | |
|---|---|---|---|---|
| Property Address | 253 Driftwood Point Road | | | |
| City | Santa Rosa Beach | County Walton | State Florida | Zip Code 32459-3027 |
| Lender | Allied First Source Mortgage | | | |



Abbott002388

This instrument was prepared by:
Mark D. Davis
Attorney at Law
ANDREWS & DAVIS
Attorneys and Counselors at Law
The Professional Building
694 Baldwin Avenue, Suite 1
DeFuniak Springs, Fla. 32433

PARCEL ID NO.: R 11-2S-21-42010-00G-0170

FILED AND RECORDED
DATE 03/10/99 TIME 14:05

DAN BODIFORD          CLERK
CO:WALTON          ST:FL

DOC STAMPS     1,771.00
INTANG TAX         .00

RECORD VERIFIED
BY _____ DC

WARRANTY DEED

This INDENTURE, made this 8th day of March 1999, BETWEEN

**ROBERT P. MAXON, M.D., a single man**, whose address is P. O. Box 784, Shalimar, Florida 32579; **GENEVIEVE M. STARK** whose address is 5923 Lookout Mountain Drive, Austin, Texas, 78731; **EUGENIA M. LAMBERT** whose adre3954 Everest Drive, Montgomery, Alabama 36106; **JOSEPH S. LAMBERT** whose address is 3541 Harbour Drive, Mount Dora, Florida 32757; **ROBERT M. LAMBERT** whose address is 23 Bayview Drive, Shalimar, Florida 32579; **EUGENIA STARK** whose address is Apt 25-1904 Jefferson Park Avenue, Charlottsville, Va. 22903; **RANDOLPH STARK** whose address is 5923 Lookout Mountain Drive, Austin, Texas 78731; **CAROLINE STARK** whose address is 5923 Lookout Mountain Drive, Austin, Texas 78731; **AND ANDREW STARK** whose address is 5923 Lookout Mountain Drive, Austin, Texas, 78731, as their separate and non-homestead property,, GRANTORS,

AND

**WILLIAM E. BELL, JR., A MARRIED MAN,** whose address 122-2 Bishop-Tolbert Road, Santa Rosa Beach, Florida 32459 ,GRANTEE,

WITNESSETH that Grantors, for an in consideration of the sum of Ten and No/100 ------------------------($10.00), and other good and valuable considerations to the Grantors in hand paid by the GRANTEE, the receipt whereof is hereby acknowledged, have granted, bargained and sold to the GRANTEE, and GRANTEE'S heirs and assigns forever, the following described land, situate, lying and being in Walton County, Florida, to-wit:

**LOT 17, BLOCK G, OF DRIFTWOOD ESTATES A SUBDIVISION OF A PORTION OF SECTIONS 11,12,13, & 14, TOWNSHIP 2 SOUTH, RANGE 21 WEST, AS RECORDED IN PLAT BOOK 5 PAGE 28, OF THE PUBLIC RECORDS OF WALTON COUNTY, FLORIDA.**

and Grantors hereby fully warrant the title to the land, and will defend the same against the lawful claims of all persons whomsoever.

IN WITNESS WHEREOF, Grantors have hereunto set Grantors' seal the day and year first above written.

Signed in the presence of:

WITNESS (Print )
MICHAEL E. HOUGHLAND

WITNESS (Print: Robert P. Maxon, Jr.)

ROBERT P. MAXON, M. D.

FL    600876 B 1976 P  394
CO:WALTON          ST:FL

STATE OF FLORIDA
COUNTY OF WALTON

THE FOREGOING INSTRUMENT was acknowledged before me this 8th day of March, 1999, by ROBERT P. MAXON, M.D. ✓ who are personally known to me or who have produced_____ as identification.

Notary Public:
Commission Expires:

CHRISTINE C. GIPSON
My Comm Exp. 3/27/2002
No. CC 721287
✓ Personally Known  [ ] Other I.D.

Steve Abbott, et al
vs
Olson and Associates, et al
Exhibit 41

Abbott002750

Page 2
Parcel ID Number R 11-2S-21-42010-00G-0170

IN WITNESS WHEREOF, Grantors have hereunto set Grantors' seal the day and year first above written.

Signed in the presence of:

WITNESS ( Print: )
MICHAEL C. HOUGHLAND

ROBERT P. MAXON, M.D. as Attorney in Fact for: GENEVIEVE M. STARK; EUGENIA M. LAMBERT; JOSEPH S. LAMBERT; ROBERT M. LAMBERT; EUGENIA STARK; RANDOLPH STARK; CAROLINE STARK; AND ANDREWS STARK

WITNESS (Print: R. Leith maxty, Jr. )

STATE OF FLORIDA
COUNTY OF WALTON

THE FOREGOING INSTRUMENT was acknowledged before me this 8th day of March, 1999, by ROBERT P. MAXON, M.D., as Attorney in Fact for: GENEVIEVE M. STARK; EUGENIA M. LAMBERT; JOSEPH S. LAMBERT; ROBERT M. LAMBERT; EUGENIA STARK; RANDOLPH STARK; CAROLINE STARK; AND ANDREWS STARK ✓ who are personally known to me or who have produced_____ as identification.

Notary Public:
Commission Expires:

CHRISTINE C. GIPSON
My Comm Exp. 3/27/2002
No. CC 721287
✗ Personally Known  ☐ Other I.D.

FL  600876 B 1976 P  395
CO:WALTON            ST:FL

Abbott002751

PREPARED BY:

Name: First South Bank

Address: 1241 Airport Road  Suite C
Destin, FL  32541

Return to:  First South Bank
P.O. Box 550840
Jacksonville FL,32255-0840

DAN BODIFORD        CLERK
CO:WALTON          ST:FL

DOC STAMPS        875.00
INTANG TAX        500.00

FL    639711 B 2232 P    35
CO:WALTON          ST:FL

—————————————— [Space Above This Line For Recording Data] ——————————

# MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on  June  8, 2000
The mortgagor is  William E. Bell Jr. and Jonilea F. Bell, Trustee's of the Jonilea
Foster Bell Revocable Trust Agreement dated Dec. 8, 1999.
("Borrower"). This Security Instrument is given to

First South Bank
which is organized and existing under the laws of the United States of America    , and whose address is
P.O. Box 550930
Jacksonville, Florida 32255-0930
("Lender"). Borrower owes Lender the principal sum of

TWO HUNDRED FIFTY THOUSAND AND 00/100
Dollars (U.S.$    250,000.00    ). This debt is evidenced by Borrower's note dated the same date as this Security
Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on
April  1, 2031    . This Security Instrument secures to Lender: (a) the repayment of the debt evidenced
by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with
interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of
Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby
mortgage, grant and convey to Lender the following described property located in Walton
County, Florida:

LOT 17, BLOCK G, DRIFTWOOD ESTATES, A SUBDIVISION OF A PORTION OF
SECTIONS 11, 12, 13, AND 14, TOWNSHIP 2 SOUTH, RANGE 21 WEST, AS
RECORDED IN PLAT BOOK 5, PAGE 28, OF THE PUBLIC RECORDS OF WALTON
COUNTY, FLORIDA.

which has the address of  Lot 17, Driftwood Point Road          Santa Rosa Beach
[Street]                                    [City]

Florida          32459          ("Property Address");
[Zip Code]

FLORIDA -- Single Family -- Fannie Mae/Freddie Mac Uniform Instrument          Form 3010 9/90
1500408-2                                                        GREATLAND ■
ITEM 1615L1 (9607R)                          (Page 1 of 6 pages)          To Order Call: 1-800-530-9393  Fax 616-791-1131

RECORD VERIFIED
BY_____DC

Steve Abbott, et al
vs
Olson and Associates, et al
Exhibit 42

Abbott002521

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.   Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2.   Funds for Taxes and Insurance. Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 *et seq.* ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3.   Application of Payments. Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

4.   Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5.   Hazard or Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and

Abbott002522

for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6. **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

7. **Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

8. **Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

9. **Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**Form 3010 9/90**

GREATLAND ■
To Order Call: 1-800-530-9393    Fax 816-791-1131

ITEM 1615L3 (9607R)

*(Page 3 of 6 pages)*

Abbott002523

10. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

11. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

12. **Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13. **Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

14. **Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

15. **Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

16. **Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

17. **Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. **Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as

Form 3010 9/90

GREATLAND ■
To Order Call: 1-800-530-9393 Fax 816-791-1131

ITEM 1615L4 (9607R)

*(Page 4 of 6 pages)*

Abbott002524

applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

19. **Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

20. **Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in** full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

22. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

23. **Attorneys' Fees.** As used in this Security Instrument and the Note, "attorneys' fees" shall include any attorneys' fees awarded by an appellate court.

25. The Construction Loan Agreement executed by the parties of even date herewith is incorporated by this reference and a default in any of the terms set forth in said agreement shall constitute a default under this mortgage.

GREATLAND ■
To Order Call: 1-800-530-8393 Fax 616-791-1131

ITEM 1615L5 (9607R)

Abbott002525

**24. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ 1-4 Family Rider |
| ☐ Graduated Payment Rider | ☒ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ Balloon Rider | ☐ Rate Improvement Rider | ☐ Second Home Rider |
| ☒ Other(s) [specify] Trust Rider | | |

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 6 of this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

_____ (Seal)
William E. Bell Jr., Trustee          -Borrower

_____ (Seal)
Jonilea F. Bell, Trustee          -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

Signed, sealed and delivered in the presence of:

_____

_____

STATE OF FLORIDA
COUNTY OF Walton

The foregoing instrument was acknowledged before me this 8TH day of June 2000 by
William E. Bell Jr. and Jonilea F. Bell

who is personally known to me or who has produced

as identification.

_____
Notary Public

My Commission expires:

(Seal)

Susan J Davis
My Commission CC700691
Expires December 7, 2001

Form 3010 9/90
GREATLAND ■

Abbott002526

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this     **8TH**        day of **June**     **2000**    , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to
**First South Bank**

                                              (the "Lender")

of the same date and covering the Property described in the Security Instrument and located at:

**Lot 17, Driftwood Point Road, Santa Rosa Beach, Florida 32459**

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in

(the "Declaration"). The Property is a part of a planned unit development known as:

**DRIFTWOOD ESTATES**
                     [Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the Homeowners Association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

     PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

     A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

     B. Hazard Insurance. So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," then:

         (i)    Lender waives the provision in Uniform Covenant 2 for the monthly payment to Lender of the yearly premium installments for hazard insurance on the Property; and

         (ii)    Borrower's obligation under Uniform Covenant 5 to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

     Borrower shall give Lender prompt notice of any lapse in required hazard insurance coverage provided by the master or blanket policy.

     In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, with any excess paid to Borrower.

MULTISTATE PUD RIDER -- Single Family -- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      **Form 3150 9/90**

GREATLAND ■
ITEM 1622L1 (9612)              *(Page 1 of 2 pages)*          To Order Call: 1-800-530-9393   Fax 616-791-1131

Abbott002527

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Uniform Covenant 10.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to:

(i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain;

(ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender;

(iii) termination of professional management and assumption of self-management of the Owners Association; or

(iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 and 2 of this Planned Unit Development Rider.

_____(Seal)  
William E. Bell Jr.  -Borrower

_____(Seal)  
Jonilea F. Bell  -Borrower

_____(Seal)  
-Borrower

_____(Seal)  
-Borrower

_____(Seal)  
-Borrower

_____(Seal)  
-Borrower

*[Sign Original Only]*

Form 3150 9/90

GREATLAND ■  
To Order Call: 1-800-530-9393 ☐ 816-791-1131

ITEM 1622L2 (9612)          *(Page 2 of 2 pages)*

Abbott002528

# INTER VIVOS REVOCABLE TRUST RIDER

**DEFINITIONS USED IN THIS RIDER.**

(A)    "Revocable Trust."    Jonilea Foster Bell Revocable Trust Agreement Dated December 8, 1999 Trust created under trust instrument dated December 8, 1999 , for the benefit of Jonilea Foster Bell and William Bell, Jr.

(B)    "Revocable Trust Trustee(s)."    Jonilea Foster Bell and William Bell, Jr. trustee(s) of the Revocable Trust.

(C)    "Revocable Trust Settlor(s)."    Jonilea Foster Bell settlor(s) of the Revocable Trust signing below.

(D)    "Lender."    **First South Bank**

(E)    "Security Instrument." The Deed of Trust, Mortgage or Security Deed and any riders thereto of the same date as this Rider given to secure the Note to the Lender of the same date made by the Revocable Trust, the Revocable Trust Trustee(s) and the Revocable Trust Settlor(s) and any other natural persons signing such Note and covering the Property as defined below.

(F)    "Property." The property described in the Security Instrument and located at:

<div align="center">

Lot 17, Driftwood Point Road
Santa Rosa Beach, Florida 32459

[Property Address]

</div>

**THIS INTER VIVOS REVOCABLE TRUST RIDER** is made this  **8**  day of  **June**  , **2000** , and is incorporated into and shall be deemed to amend and supplement the Security Instrument.

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, the Revocable Trust Trustee(s), and the Revocable Settlor(s) and the Lender further covenant and agree as follows:

**A. INTER VIVOS REVOCABLE TRUST.**

**1. CERTIFICATION AND WARRANTIES OF REVOCABLE TRUST TRUSTEE(S).**

The Revocable Trust Trustee(s) certify to the Lender that the Revocable Trust is an inter vivos revocable trust for which the Revocable Trust Trustee(s) are holding full title to the Property as trustee(s).

INTER VIVOS REVOCABLE TRUST RIDER

Page 1 of 3

Abbott002529

The Revocable Trust Trustee(s) warrants to the Lender that (i) the Revocable Trust is validly created under the laws of the State of  Florida                              ; (ii) the trust instrument creating the Revocable Trust is in full force and effect and there are no amendments or other modifications to the trust instrument affecting the revocability of the Revocable Trust; (iii)  the Property is located in the State of Florida                                          ; (iv)  the Revocable Trust Trustee(s) have full power and authority as trustee(s) under the trust instrument creating the Revocable Trust and under applicable law to execute the Security Instrument, including this Rider;  (v)  the Revocable Trust Trustee(s) have executed the Security Instrument, including this Rider, on behalf of the Revocable Trust;  (vi)  The Revocable Trust Settlor(s) have executed the Security Instrument, including the Rider, acknowledging all of the terms and conditions contained therein and agreeing to be bound thereby;  (vii)  only the Revocable Trust Settlor(s) and the Revocable Trust Trustee(s) may hold any power of direction over the Revocable Trust;  (viii)  only the Revocable Trust Settlor(s) hold the power to direct the Trustee(s) in the management of the Property;  (ix) only the Revocable Trust Settlor(s) hold the power of revocation over the Revocable Trust;  and  (x)  the Revocable Trust Trustee(s) have not been notified of the existence or assertion of any lien, encumbrance or claim against any beneficial interest in, or transfer of all or any portion of any beneficial interest in or powers of direction over the Revocable Trust Trustee(s) or the Revocable Trust, as the case may be, or power of revocation over the Revocable Trust.

2.  NOTICE OF CHANGES TO REVOCABLE TRUST AND TRANSFER OF POWERS OVER REVOCABLE TRUST TRUSTEE(S) OR REVOCABLE TRUST OR BOTH; NOTICE OF CHANGE OF REVOCABLE TRUST TRUSTEE(S);  NOTICE OF CHANGE OF OCCUPANCY OF THE PROPERTY; NOTICE OF TRANSFER OF BENEFICIAL INTEREST IN REVOCABLE TRUST.

The Revocable Trust Trustee(s) shall provide timely notice to the Lender promptly upon notice or knowledge of any revocation of termination of the Revocable Trust, or of any change in the holders of the powers of direction over the Revocable Trust Trustee(s) or the Revocable Trust as the case may be, or of any change in the holder of the power of revocation over the Revocable Trust, or both, or of any change in the trustee(s) of the Revocable Trust (whether such change is temporary or permanent), or of any change in the occupancy of the Property, or of any sale, transfer, assignment or other disposition (whether by operation of law or otherwise) of any benefit of interest in the Revocable Trust.

B.  ADDITIONAL BORROWER(S).

The term "Borrower" when used in the Security Instrument shall refer to the Revocable Trust, the Revocable Trust Trustee(s) and the Revocable Trust Settlor(s), jointly and severally.  Each party signing this Rider below (whether by accepting and agreeing to the terms and covenants contained herein or by acknowledging all of the terms and covenants contained herein and agreeing to be bound thereby, or both) covenants and agrees that, whether or not such party is named as "Borrower" on the first page of the Security Instrument, each covenant and agreement and undertaking of the "Borrower" in the Security Instrument shall be such party's covenant and agreement and undertaking as "Borrower" and shall be enforceable by the Lender as if such party were named as "Borrower" in the Security Instrument.

C.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN THE REVOCABLE TRUST.

Uniform Covenant 17 of the Security Instrument is amended to read as follows:

Transfer of Beneficial Interest;  Transfer of the Property.

If, without the Lender's prior written consent, (i) all or any part of the Property or an interest in the Property is sold or transferred or (ii) there is a sale, transfer, assignment or other disposition of any beneficial

INTER VIVOS REVOCABLE TRUST RIDER

Page 2 of 3

Abbott002530

interest in the Revocable Trust, the Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by the Lender if exercise is prohibited by federal law as of the date of the Security Instrument.

If the Lender exercises this option, the Lender shall give the Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by the Security Instrument. If the Borrower fails to pay all sums secured prior to the expiration of this period, the Lender may invoke any and all remedies permitted by the Security Instrument without further notice or demand on the Borrower.

BY SIGNING BELOW, the Revocable Trust Trustee(s) accepts and agrees to the terms and covenants contained in this Inter Vivos Revocable Trust Rider.

Jonilea Foster Bell                    ,        William Bell, Jr.

Trustee of the Jonilea Foster Bell              Trustee of the Jonilea Foster Bell

Revocable Trust Agreement Dated                 REvocable Trust Agreement Dated
December 8, 1999                                December 8, 1999
Trust under trust instrument dated 12/8/1999    Trust under trust instrument dated 12/8/1999,
for the benefit of Jonilea Foster Bell          for the benefit of Jonilea Foster Bell
and William Bell, Jr.                           and William Bell, Jr.

_____               _____
                        Borrower                                        Borrower


BY SIGNING BELOW, the undersigned, settlor(s) of the   Jonilea Foster Bell Revocable Trust Agreement Dated December 8, 1999,

Trust under trust instrument dated   December 8, 1999          for the benefit of
Jonilea Foster Bell and William Bell, Jr.
acknowledges all of the terms and covenants contained in the Security Instrument and any rider(s) thereby, and agrees to be bound thereby.

_____
Jonilea Foster Bell              Trust Settlor

_____
                                 Trust Settlor

_____
                                 Trust Settlor

_____
                                 Trust Settlor

INTER VIVOS REVOCABLE TRUST RIDER

Page 3 of 3

Abbott002531



## AFFIDAVIT OF MORTGAGOR

STATE OF FLORIDA
COUNTY OF __Walton__

Before me this day personally appeared __William E. Bell Jr. and Jonilea F.__
__Bell__

who, being duly sworn, deposes and says:

1   The Affiant is purchasing or owns the following described real
    property ("property") and is mortgaging it to First South Bank, A
    Federal Savings Bank.
       LOT 17, BLOCK G, DRIFTWOOD ESTATES, A SUBDIVISION OF A PORTION
       OF SECTIONS 11, 12, 13, AND 14, TOWNSHIP 2 SOUTH, RANGE 21
       WEST, AS RECORDED IN PLAT BOOK 5, PAGE 28, OF THE PUBLIC
       RECORDS OF WALTON COUNTY, FLORIDA.

2   The Affiant has ordered no services, labor materials or supplies
    to be used, applied or furnished to the property for which
    payment has not been made.  The Affiant is aware of no unpaid
    accounts arising from any services, labor, materials or supplies
    which have been used, applied or furnished to said property.  The
    Affiant is aware of no lien which has been filed or may be filed
    against the property for services, labor, materials or supplies.

3   The Affiant is in sole possession of the property.

4   The Affiant has no unpaid judgment outstanding against him in any
    court and there are no suits pending against him in any court.

5   The Affiant has not authorized or permitted anyone in his behalf
    to execute any instrument or make any agreement affecting or
    likely to affect title to or be a lien upon the property.

6   Affidavit is given solely for the purpose of inducing First South
    Bank, A Federal Savings Bank to make a mortgage loan on the above
    described property.

William E. Bell Jr.

Jonilea F. Bell

STATE OF FLORIDA,                     County ss:

The foregoing instrument was acknowledged before me this _8TH_ day
of _June_ 20_00_ by _William E. Bell, Jr. & wife Jonilea F. Bell_
who is personally known to me or who has produced _____
as identification and who did _not_ take an oath.

Susan J Davis
My Commission CC700691
Expires December 7, 2001

Notary Public

A-MGO

Abbott002532

# SOUTHERN VALUES, INC.

### commercial & residential appraisals

725 E. 24<sup>th</sup> Plaza
Panama City, FL 32405
(850) 769-3535
fax (850) 769-3595
southernvalues@comcast.net

March 26, 2010

Bill Bell
690 Driftwood Rd.
Santa Rosa Beach, FL

RE:   Appraisal
      690 Driftwood Rd.

Dear Mr. Bell,

Your appraisal on the above referenced property is attached.   The final value
estimate  is  **$1,200,000**.     This  value  takes  into  account  the  locational
characteristics of Driftwood Estates as they currently exist.    In this report, I
utilized three sales (No. One, Two, and Three) that are from similar overall areas.
I also used three sales (No. Four, Five, and Six) from planned developments.
Sales No. Four and Five are from SanDestin   These sales show a **$1,000,000**
premium paid for this superior location.   Sale No. Six is from Kelly Plantation.
This sale shows a **$700,000** premium for this superior location.   The location
adjustments account for the fact that Driftwood Estates does not have uniform
development, does not have recreational facilities or direct access to such, does
not have a guarded gate, and suffers from inferior streets and drainage.

Thank you for this opportunity.  Call with any questions.

Respectfully,

Michael L. Carroll, MAI, SRA
St.Cert.Gen.REA #0000694

Steve Abbott, et al
vs
Olson and Associates, et al
Exhibit 43

### Southern Values, Inc

Abbott002824

Summary Appraisal Report

## Uniform Residential Appraisal Report
File # 2010424

The purpose of this summary appraisal report is to provide the client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

| Property Address | 690 Driftwood Dr | City | Santa Rosa Beach | State | FL | Zip Code | 32459-8009 |

Owner Bell | Intended User Bell | County Walton

Legal Description Lot 17, Block G, Driftwood Estates

| Assessor's Parcel # 11-2S-21-42010-00G-0170 | Tax Year 09 | R.E. Taxes $7,500 |

| Neighborhood Name Driftwood / N. Santa Rosa Beach | Map Reference Walton | Census Tract 9506 |

| Occupant [X] Owner | Tenant | Vacant | Special Assessments $N/A | PUD | HOA $57 | [ ] per year | [X] per month |

| Property Rights Appraised [X] Fee Simple | Leasehold | Other (describe) |

Intended Use: Litigation

Client Bell | Address 690 Driftwood Dr, Santa Rosa Beach, FL, 32459

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of the appraisal? [ ] Yes [X] No

Report data source(s) used, offering price(s), and date(s). Local MLS

**CONTRACT**

I [ ] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. N/A

Contract Price $ N/A | Date of Contract N/A | Is the property seller the owner of public record? [ ] Yes [ ] No | Data Source(s) N/A

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the client? [ ] Yes [ ] No

If Yes, report the total dollar amount and describe the items to be paid: N/A

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location | Urban [ ] Suburban [X] Rural [ ] | | Property Values | Increasing [ ] Stable [X] Declining [ ] | | PRICE $(000) | AGE (yrs) | One-Unit | 60.0 % |
| Built-Up | Over 75% [X] 25-75% [ ] Under 25% [ ] | | Demand/Supply | Shortage [ ] In Balance [X] Over Supply [ ] | | Low New | | 2-4 Unit | 5.0 % |
| Growth | Rapid [ ] Stable [X] Slow [ ] | | Marketing Time | Under 3 mths [ ] 3-6 mths [ ] Over 6 mths [X] | | 135 Low New | | Multi-Family | 5.0 % |
| | | | | | | 2,000 High 35 | | Commercial | 5.0 % |
| | | | | | | 650* Pred. 10-20 | | Other | 25.0 % |

Neighborhood Boundaries N. Santa Rosa Beach - Along the southern shore of Choctawhatchee Bay.

Neighborhood Description The area includes mixed property uses. Most bay-front parcels are improved with detached homes. See Driftwood Estates comments on page 3. * Predominant value is for bay-front properties. Some bay-front homes are valued in the $1,000,000 to $2,500,000 range.

Market Conditions (including support for the above conclusions) Market conditions are fair. Values have been declining at unprecedented rates since 2006. Properties listed at or near market value tend to sell in less than 12 months. Foreclosures and short sales make up a large part of the market and are driving down values.

**SITE**

| Dimensions 100Fx278LSx100Rx288RS | Area .65 AC | Shape Irregular | View Bay / Very Good |

Specific Zoning Classification DRI / Mixed Use | Zoning Description Detached homes

Zoning Compliance [X] Legal | Legal Nonconforming (Grandfathered Use) | No Zoning | Illegal (describe)

Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes | No If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [X] | | Street Asphalt | [X] | |
| Gas | | | Sanitary Sewer | [X] | | Alley N/A | | |

FEMA Special Flood Hazard Area [X] Yes [ ] No | FEMA Flood Zone AE | FEMA Map No. 120317 0537F | FEMA Map Date 2000-03-07

Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No. If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No If Yes, describe

A survey was not provided. The site dimensions, site area, and flood zone status should be verified with a current survey. The Subject has 100' of frontage along the shores of Choctawhatchee Bay. This offers a very good view amenity. Boat access is fair due to the very shallow water. This is typical for bay-front lots in the area.

**IMPROVEMENTS**

| General Description | | Foundation | | Exterior Description | materials/condition | Interior | materials/condition |
|---|---|---|---|---|---|---|---|
| Units [X] One | One with Accessory Unit | [X] Concrete Slab | Crawl Space | Foundation Walls Slab / Good | | Floors Wood, Tile/V.G. | |
| # of Stories Two | | Full Basement | Partial Basement | Exterior Walls Brick / Very Good | | Walls S.rock / V.Good | |
| Type [X] Det. | Att. S-Det/End Unit | Basement Area sq. ft. | | Roof Surface Shingle, Metal / V.Good | | Trim/Finish Good | |
| [X] Existing | Proposed Under Const. | Basement Finish % | | Gutters & Downspouts Metal / Good | | Bath Floor Tile/V.Good | |
| Design (Style) Custom | | Outside Entry/Exit | Sump Pump | Window Type Insulated / Very Good | | Bath Wainscot Tile/V.Good | |
| Year Built 2001 | | Evidence of Infestation | | Storm Sash/Insulated N/A | | Car Storage None | |
| Effective Age (Yrs) 5 | | Dampness | Settlement | Screens N/A | | [X] Driveway # of Cars | |
| Attic None | | Heating [X] FWA HWBB Radiant | | Amenities | | Driveway Surface Pavers/Conc. | |
| Drop Stair Stairs | | Other Fuel Electric | | [X] Fireplace(s) # Dbl. [X] Fence Custom | | [X] Garage # of Cars 2 | |
| Floor [X] Scuttle | | Cooling [X] Central Air Conditioning | | [X] Patio/Deck [X] Porch Screen | | Carport # of Cars | |
| Finished Heated | | Individual Other | | [X] Pool w/spa Other | | [X] Att Det Built-in | |

| Appliances [X] Refrigerator [X] Range/Oven [X] Dishwasher [X] Disposal [X] Microwave | Washer/Dryer | Other (describe) |

Finished area above grade contains: 9 Rooms | 4 Bedrooms | 3.5 Bath(s) | 3,571 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.) 9' - 10' ceilings, granite kitchen tops, sub-zero refrigerator, d.oven, wine cooler, screen porch, 1,100 s.f. dock with 2 motor lift, double pwc lift, seawall with rip rap, pool with spa, bbq.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.) The Subject is in overall very good condition. No repairs needed.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No If No, describe

RMPF Form 1004 May 2007 | Page 1 of 6

Southern Values

Abbott002825

Summary Appraisal Report

## Uniform Residential Appraisal Report

File # 2010424

| | | | | |
|---|---|---|---|---|
| There are N/A comparable properties currently offered for sale in the subject neighborhood ranging in price from $ N/A to $ N/A | | | | |
| There are N/A comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ N/A to $ N/A | | | | |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Address | 690 Driftwood Dr / Santa Rosa Beach | 674 Woodland Bayou Dr / Santa Rosa Beach | 4091 Indian Trail / Destin | 4053 Indian Trail / Destin |
| Proximity to Subject | | 3.87 miles SE | 9.41 miles W | 9.14 miles W |
| Sale Price | $ N/A | $ 615,000 | $ 750,000 | $ 1,500,000 |
| Sale Price/Gross Liv. Area | $ sq. ft. | $ 219.64 sq. ft. | $ 177.73 sq. ft. | $ 301.99 sq. ft. |
| Data Source(s) | | MLS #512995, inspection, | MLS #524174, inspection, | MLS #514950, inspection, |
| Verification Source(s) | | Agent | Agent | Agent |

| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment |
|---|---|---|---|---|---|---|---|
| Sale or Financing Concessions | | Cash = | | Cash = | | Cash = | |
| Date of Sale/Time | | 11/24/2009 | | 3/4/2010 | | 7/13/2009 | -120,000 |
| Location | Average | Average | | Average | | Average | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | .65 AC | 1.73 AC | | .91 AC | | 1.19 AC | |
| View | 100'Bay/V.Good | 88' Bay/V.Good | | 100' Bay/V.Good | | 100'Bay/V.Good | |
| Design (Style) | Very Good | Average-Good | +100,000 | Average | +150,000 | Very Good | |
| Quality of Construction | Very Good | Average-Good | +100,000 | Average | +200,000 | Very Good | |
| Actual Age | 9 years | 20 years | +22,000 | 15 years | +12,000 | 22 yrs./Renov. | |
| Condition | Very Good | Fair | +150,000 | Good | +50,000 | Very Good | |
| Above Grade | Total / Bdrms. / Baths | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | |
| Room Count | 9 / 4 / 3.5 | 7 / 3 / 2.5 | +9,000 | 7 / 4 / 3.5 | | 7 / 3 / 3.5 | |
| Gross Living Area | 3,571 sq. ft. | 2,800 sq. ft. | +77,100 | 4,220 sq. ft. | -64,900 | 4,967 sq. ft. | -139,600 |
| Basement & Finished Rooms Below Grade | N/A | N/A | | N/A | | N/A | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Items | Typical | Typical | | Typical | | Typical | |
| Garage/Carport | 2-Car Garage | 2-Car Garage | | 3-Car Garage | -10,000 | 2++ Garage | -10,000 |
| Porch/Patio/Deck | Pool w/ spa, Dock, Boat lift, F/P, Spklr., Tub, BBQ | Porch, Shutters, Pool, Spklr., Boat Dock/B.Hse. | +35,000 | Scr Porch, Spklr., 2+ FP, Storage, Dock, S.Wall | +115,000 | Porches, 2+ F/P, Pool, Spklr., Pond S.Wall, Boat H. | +15,000 |
| Net Adjustment (Total) | | X + | $ 493,100 | X + | $ 452,100 | + X - | $ -254,600 |
| Adjusted Sale Price of Comparables | | Net Adj. 80.18 % Gross Adj. 80.18 % $ 1,108,100 | | Net Adj. 60.28 % Gross Adj. 80.25 % $ 1,202,100 | | Net Adj. 16.97 % Gross Adj. 18.97 % $ 1,245,400 | |

[X] I [ ] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s) Public records

My research [ ] did [X] did not reveal any prior sales or transfers of the comparable sales for the prior year to the date of sale of the comparable sale.
Data Source(s) Public records

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | N/A | 1/05 @ $1,260,000 | N/A | N/A |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | Public Records | Public Records | Public Records | Public Records |
| Effective Date of Data Source(s) | Current | Current | Current | Current |

Analysis of prior sale or transfer history of the subject property and comparable sales The prior sale for Sale No. One illustrates recent value declines.

Summary of Sales Comparison Approach All six sales are reasonable indicators of value for the Subject. Sales No. One, Two, and Three are in comparable locations. Sales No. Four, Five, and Six are in guard-gated subdivisions with more uniform development, superior common elements, and substantial recreational amenities.

Indicated Value by Sales Comparison Approach $1,200,000

Indicated Value by: Sales Comparison Approach $1,200,000 Cost Approach (if developed) $N/A Income Approach (if developed) $N/A

This appraisal is made [X] "as is," [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 1,200,000 , as of 3/19/2010 , which is the effective date of this appraisal.

RMPF Form 1004 May 2007

Page 2 of 6

Southern Values

Abbott002826

Summary Appraisal Report

## Uniform Residential Appraisal Report     File # 2010424

Driftwood Estates is located at the north end of Mack Bayou Road, in a penninsula along Choctawhatchee Bay. The Subdivision features varied property uses. The more valuable homes are located along the shores of the bay. Interior homes very widely and include newer homes on very small lots in the center of the neighborhood. Driftwood Point Road features underground utilities, no curbs or sidewalks, and open ditches. On the date of inspection, many of the ditches had standing water.

**COST APPROACH TO VALUE**

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)

The Cost Approach is not applicable given the lack of recent land sales and age of the improvements.

| ESTIMATED | REPRODUCTION OR | REPLACEMENT COST NEW | OPINION OF SITE VALUE | | = $ |
|---|---|---|---|---|---|
| Source of cost data | | | Dwelling | Sq. Ft. @ $ | = $ |
| Quality rating from cost service | | Effective date of cost data | BSMT | Sq. Ft. @ $ | = $ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | | | |
| | | | Garage/Carport | Sq. Ft. @ $ | = $ |
| | | | Total Estimate of Cost-New | | = $ |
| | | | Less   Physical   Functional External | | |
| | | | Depreciation | | = $ ( ) |
| | | | Depreciated Cost of Improvements | | = $ |
| | | | 'As-is' Value of Site Improvements | | = $ |
| | | | | | = $ |
| Estimated Remaining Economic Life (HUD and VA only) | 60 | Years | Indicated Value By Cost Approach | | = $ |

**INCOME APPROACH TO VALUE**

Estimated Monthly Market Rent $ **N/A** X Gross Rent Multiplier = $ Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM)

**PROJECT INFORMATION FOR PUDs (if applicable)**

Is the developer/builder in control of the Homeowners' Association (HOA)?  Yes  No  Unit type(s)  Detached  Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal name of project

| Total number of phases | Total number of units | | Total number of units sold |
|---|---|---|---|
| Total number of units rented | Total number of units for sale | | Data Source(s) |

Was the project created by the conversion of existing building(s) into a PUD?  Yes  No  If Yes, date of conversion

Does the project contain any multi-dwelling units?  Yes  No  Data Source(s)

Are the units, common elements, and recreation facilities complete?  Yes  No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?  Yes  No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities

RMPF Form 1004 May 2007     Page 3 of 6

Southern Values

Abbott002827

Summary Appraisal Report

## Uniform Residential Appraisal Report

File # 2010424

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. The Appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

RMPF Form 1004 May 2007                                        Page 4 of 6

Southern Values

Abbott002828

Summary Appraisal Report

## Uniform Residential Appraisal Report
File # 2010424

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event.

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

Southern Values

Abbott002829

Summary Appraisal Report

## Uniform Residential Appraisal Report    File # 2010424

20. I identified the client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. I am aware that any disclosure or distribution of this appraisal report by me or the client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

22. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

**SUPERVISORY APPRAISER'S CERTIFICATION:**   The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name   Michael L. Carroll, MAI, SRA | Name |
| Company Name   Southern Values | Company Name |
| Company Address   725 E. 24th Plaza | Company Address |
| Panama City, FL 32405 | |
| Telephone Number   850-769-3535 | Telephone Number |
| Email Address | Email Address |
| Date of Signature and Report   March 26, 2010 | Date of Signature |
| Effective Date of Appraisal   3/19/2010 | State Certification # |
| State Certification #   St.Cert.Gen.REA #0000694 | or State License # |
| or State License # | State |
| or Other | Expiration Date of Certification or License |
| State   FL | |
| Expiration Date of Certification or License   11/30/2010 | SUBJECT PROPERTY |
| | ☐ Did not inspect subject property |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did inspect exterior of subject property from street |
| 690 Driftwood Dr | Date of Inspection |
| Santa Rosa Beach, FL 32459-8009 | ☐ Did inspect interior and exterior of subject property |
| APPRAISED VALUE OF SUBJECT PROPERTY $ 1,200,000 | Date of Inspection |
| CLIENT | |
| Name | COMPARABLE SALES |
| Company Name   Bell | |
| Company Address   690 Driftwood Dr | ☐ Did not inspect exterior of comparable sales from street |
| Santa Rosa Beach, FL 32459 | ☐ Did inspect exterior of comparable sales from street |
| Email Address | Date of Inspection |

RMPF Form 1004 May 2007                    Page 9 of 9

Southern Values

Abbott002830

File No. 2010424

## ADDITIONAL COMPARABLES

Intended User **Bell**

Property Address **690 Driftwood Dr**

City **Santa Rosa Beach**   County **Walton**   State **FL**   Zip Code **32459-8009**

Client **Bell**

| FEATURE | SUBJECT | COMPARABLE SALE NO. 4 | +(-)$ Adjustment | COMPARABLE SALE NO. 5 | +(-)$ Adjustment | COMPARABLE SALE NO. 6 | +(-)$ Adjustment |
|---|---|---|---|---|---|---|---|
| Address | 690 Driftwood Dr / Santa Rosa Beach | 3023 Club Dr / Sandestin | | 3038 The Oaks / Sandestin | | 4510 Olde Plantation Pl / Destin | |
| Proximity to Subject | | 1.50 miles S | | 1.30 miles S | | 7.25 miles W | |
| Sale Price | $ N/A | $ 2,750,000 | | $ 1,812,500 | | $ 2,150,000 | |
| Sale Price/Gross Liv. Area | $ sq. ft. | $ 474.14 sq. ft. | | $ 444.68 sq. ft. | | $ 452.06 sq. ft. | |
| Data Source(s) | | MLS #509634, inspection, | | MLS #508627, inspection, | | MLS #522465, inspection, | |
| Verification Source(s) | | Agent | | Agent | | Agent | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment |
| Sale or Financing Concessions | | Cash = | | Cash = | | Cash = | |
| Date of Sale/Time | | 12/4/2009 | | 11/18/2009 | | 9/2/2009 | |
| Location | Average | Excellent | -1,000,000 | Excellent | -1,000,000 | Very Good | -700,000 |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | .65 AC | 1.52 AC | | .3 AC | +100,000 | .91 AC | |
| View | 100'Bay/V.Good | 112' Bay/V.Good | -75,000 | 86' Bay / V.Good | +100,000 | 180' Bay/V.Good | -50,000 |
| Design (Style) | Very Good | Very Good | | Average-Good | +100,000 | Very Good | |
| Quality of Construction | Very Good | Very Good | | Good | +100,000 | Very Good | |
| Actual Age | 9 years | 12 years | +6,000 | 9 years | | 13 years | +4,000 |
| Condition | Very Good | Very Good | | Good | +50,000 | Very Good | |
| Above Grade Room Count | Total 9 / Bdrms. 4 / Baths 3.5 | Total 8 / Bdrms. 4 / Baths 6 | -9,000 | Total 8 / Bdrms. 4 / Baths 5.5 | -6,000 | Total 8 / Bdrms. 4 / Baths 5/2 | -6,000 |
| Gross Living Area | 3,571 sq. ft. | 5,800 sq. ft. | -222,900 | 4,076 sq. ft. | -50,500 | 4,756 sq. ft. | -118,500 |
| Basement & Finished Rooms Below Grade | N/A | N/A | | N/A | | N/A | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Items | Typical | Typical | | Typical | | Typical | |
| Garage/Carport | 2-Car Garage | 3+ Garage | -10,000 | 2-Car Garage | | 3+ Garage | -10,000 |
| Porch/Patio/Deck | Pool w/ spa, Dock, Boat lift, F/P, Spklr., Tub, BBQ | Pool, Scr.Pch., Summer kitchen, Fence, spa, V.G. Landscap. | -10,000 | Pool, Scr.Pch, F/P, Boathouse | +80,000 | Scr.Pool w/spa, Dock, Boat Lift, 2+ F/P, BBQ, V.G. Landscap. | -10,000 |
| Net Adjustment (Total) | | - [X] - | $ -1,320,900 | + [X] - | $ -526,500 | + [X] - | $ -890,500 |
| Adjusted Sale Price of Comparables | | Net Adj. 48.03 % / Gross Adj. 48.47 % | $ 1,429,100 | Net Adj. 29.05 % / Gross Adj. 87.53 % | $ 1,286,000 | Net Adj. 41.42 % / Gross Adj. 41.79 % | $ 1,259,500 |

| ITEM | SUBJECT | COMPARABLE SALE #4 | COMPARABLE SALE #5 | COMPARABLE SALE #6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | N/A | N/A | N/A | N/A |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | Public Records | Public Records | Public Records | Public Records |
| Effective Date of Data Source(s) | Current | Current | Current | Current |

Comment on Sales Comparison   Sales No. Four, Five, and Six are each located in guard gated communities with uniform development, well maintained streets and common areas, and recreational facilities such as golf courses and tennis facilities. For Sales No. Four and Five, these comparables are located in SanDestin which also includes a marina, commercial districts, and beach access. The location adjustment accounts for the overall impact of these amenities to the properties when compared to the lack of such amenities.

Southern Values

Abbott002831

File No. 2010424

## PHOTOGRAPH ADDENDUM

| Intended User | Bell | | | | |
|---|---|---|---|---|---|
| Property Address | 690 Driftwood Dr. | | | | |
| City | Santa Rosa Beach | County | Walton | State | FL | Zip Code | 32459-8009 |
| Client | Bell | | | | |



FRONT VIEW OF
SUBJECT PROPERTY

REAR VIEW OF
SUBJECT PROPERTY

STREET SCENE OF
SUBJECT PROPERTY

Southern Values

Abbott002832

File No    2010424

## PHOTOGRAPH ADDENDUM

| | | | |
|---|---|---|---|
| Intended User | Bell | | |
| Property Address | 690 Driftwood Dr | | |
| City Santa Rosa Beach | County Walton | State FL | Zip Code 32459-8009 |
| Client | Bell | | |



690 Driftwood Dr
Stairs/Entry

690 Driftwood Dr
Study

690 Driftwood Dr
Kitchen

Southern Values

Abbott002833

File No    2010424

## PHOTOGRAPH ADDENDUM

| Intended User | Bell | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 690 Driftwood Dr | | | | | | |
| City | Santa Rosa Beach | County | Walton | State | FL | Zip Code | 32459-8009 |
| Client | Bell | | | | | | |



690 Driftwood Dr
Pool/Bay View

690 Driftwood Dr
Dock / Boat Lift

690 Driftwood Dr
Shoreline / Sea Wall

Southern Values

Abbott002834



Abbott002835

File No. 2010424

## FLOOD MAP

| | | | | | | |
|---|---|---|---|---|---|---|
| Intended User | Bell | | | | | |
| Property Address | 690 Driftwood Dr | | | | | |
| City | Santa Rosa Beach | County | Walton | State | FL | Zip Code 32459-8009 |
| Client | Bell | | | | | |

Subject
98 DRIFTWOOD CT
SANTA ROSA BEACH, FL 32459-8009

N

## Flood Zones

- Areas inundated by 500-year flooding
- Areas outside of the 100- and 500-year flood plains
- Areas inundated by 100-year flooding
- Areas inundated by 100-year flooding with velocity hazard
- Floodway areas
- Floodway areas with velocity hazard
- Areas of undetermined but possible flood hazards
- Areas not mapped on any published FIRM

## Flood Zone Determination

Latitude: 30.421181654718
Longitude: -86.314817264408
Community Name:
UNINCORPORATED AREA
Community: 120317
SFHA (Flood Zone): In
Within 250 ft. of multiple flood zones: No
Zone: AE
Panel: 0537F          Panel Date: 2000-03-07
FIPS Code: 12131     Census Tract: 9506

This Report is for the sole benefit of the Customer that ordered and paid for the Report and is based on the property information provided by that Customer. That Customer's use of this Report is subject to the terms agreed to by that Customer when accessing this product. No third party is authorized to use or rely on this Report for any purpose. NEITHER FIRST AMERICAN FLOOD DATA SERVICES NOR THE SELLER OF THIS REPORT MAKES ANY REPRESENTATIONS OR WARRANTIES TO ANY PARTY CONCERNING THE CONTENT, ACCURACY OR COMPLETENESS OF THIS REPORT, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Neither FARES nor the seller of this Report shall have any liability to any third party for any use or misuse of this Report.

Southern Values

Abbott002836

File No. 2010424

## LOCATION MAP

| Intended User: | Bell | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 690 Driftwood Dr | | | | | | |
| City | Santa Rosa Beach | County | Walton | State | FL | Zip Code | 32459-8009 |
| Client | Bell | | | | | | |



Southern Values

Abbott002837

File No. 2010424

## PHOTOGRAPH ADDENDUM

Intended User: Bell
Property Address: 690 Driftwood Dr
City: Santa Rosa Beach  County: Walton  State: FL  Zip Code: 32459-8009
Client: Bell



### COMPARABLE #1

674 Woodland Bayou Dr
Santa Rosa Beach

| | |
|---|---|
| Price | $615,000 |
| Price/SF | 219.64 |
| Date | 11/24/2009 |
| Age | 20 years |
| Room Count | 7-3-2.5 |
| Living Area | 2,800 |
| Value Indication | $1,108,100 |



### COMPARABLE #2

4091 Indian Trail
Destin

| | |
|---|---|
| Price | $750,000 |
| Price/SF | 177.73 |
| Date | 3/4/2010 |
| Age | 15 years |
| Room Count | 7-4-3.5 |
| Living Area | 4,220 |
| Value Indication | $1,202,100 |



### COMPARABLE #3

4053 Indian Trail
Destin

| | |
|---|---|
| Price | $1,500,000 |
| Price/SF | 301.99 |
| Date | 7/13/2009 |
| Age | 22 yrs./Renov. |
| Room Count | 7-3-3.5 |
| Living Area | 4,967 |
| Value Indication | $1,245,400 |

Southern Values

Abbott002838

File No. 2010424

## PHOTOGRAPH ADDENDUM

Intended User: Bell
Property Address: 690 Driftwood Dr
City: Santa Rosa Beach   County: Walton   State: FL   Zip Code: 32459-8009
Client: Bell

### COMPARABLE #4

3023 Club Dr
Sandestin

| | |
|---|---|
| Price | $2,750,000 |
| Price/SF | 474.14 |
| Date | 12/4/2009 |
| Age | 12 years |
| Room Count | 8-4-6 |
| Living Area | 5,800 |
| Value Indication | $1,429,100 |

### COMPARABLE #5

3038 The Oaks
Sandestin

| | |
|---|---|
| Price | $1,812,500 |
| Price/SF | 444.68 |
| Date | 11/18/2009 |
| Age | 9 years |
| Room Count | 8-4-5.5 |
| Living Area | 4,076 |
| Value Indication | $1,286,000 |

### COMPARABLE #6

4510 Olde Plantation Pl
Destin

| | |
|---|---|
| Price | $2,150,000 |
| Price/SF | 452.06 |
| Date | 9/2/2009 |
| Age | 13 years |
| Room Count | 8-4-5/2 |
| Living Area | 4,756 |
| Value Indication | $1,259,500 |

Southern Values

Abbott002839

File No.    2010424

## DISCLOSURE ADDENDUM

| Intended User | Bell | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 690 Driftwood Dr | | | | | | |
| City | Santa Rosa Beach | County | Walton | State | FL | Zip Code | 32459-8009 |
| Client | Bell | | | | | | |

DEFINITION OF INSPECTION:

The term "Inspection", as used in this report, is not the same level of inspection that is required for a "Professional Home Inspection". The appraiser does not fully inspect the electrical system, plumbing system, mechanical systems, foundation system, floor structure, or subfloor. The appraiser is not an expert in construction materials and the purpose of the appraisal is to make an economic evaluation of the subject property. If the client needs a more detailed inspection of the property, a home inspection, by a Professional Home Inspector, is suggested.

DIGITAL SIGNATURES:

The signature(s) affixed to this report, and certification, were applied by the original appraiser(s) or supervisory appraiser and represent their acknowledgements of the facts, opinions and conclusions found in the report. Each appraiser(s) applied his or her signature electronically using a password encrypted method. Hence these signatures have more safeguards and carry the same validity as the individual's hand applied signature. If the report has a hand-applied signature, this comment does not apply.

| APPRAISER: | | SUPERVISORY APPRAISER (ONLY IF REQUIRED): | |
|---|---|---|---|
| Signature: | | Signature: | |
| Name: | Michael L. Carroll, MAI, SRA | Name: | |
| Date Signed: | March 26, 2010 | Date Signed: | |
| State Certification #: | St.Cert.Gen.REA #0000694 | State Certification #: | |
| or State License #: | | or State License #: | |
| State: | FL | State: | |
| Expiration Date of Certification or License: | 11/30/2010 | Expiration Date of Certification or License: | |

☐ Did    ☐ Did Not Inspect Property

Southern Values

Abbott002840

02/01/2005 17:38 FAX 205 238 2039     COMPASS BANK-CLC                    @001

File No.: 4750

## 690 Driftwood Point Road



### Date of Valuation
01/25/2005

### William & Jonilea Bell
690 Driftwood Point Road
Lot 17 Blk G Driftwood Estates
Santa Rosa Beach, Florida 32459-3020

### Appraised BY: William V. Shaffer
Compass Bank



200 S.

## Table of Contents

| | |
|---|---|
| Invoice | 1 |
| ARREA/USPAP Addendum | 2 |
| USPAP Identification | 3 |
| URAR | 4 |
| Additional Comparables 4-6 | 6 |
| Statement of Limiting Conditions | 7 |
| Building Sketch (Page - 1) | 9 |
| Building Sketch (Page - 2) | 10 |
| Location Map | 11 |
| Flood Map | 12 |
| Plat Map | 13 |
| Subject Photos | 14 |
| Subject Photos Interior | 15 |
| Subject Photos Interior | 16 |
| Subject Photos Interior | 17 |
| Photograph Addendum | 18 |
| Comparable Photos 1-3 | 19 |
| Comparable Photos 4-6 | 20 |
| State Map | 21 |
| State Map | 22 |
| State Map | 23 |
| General Text Addendum | 24 |

Steve Abbott, et al
vs
Olson and Associates, et al
Exhibit 44

Appraisal House, Inc. (850) 244-0656
Form TCN — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIT

Abbott000686

02/01/2005 17:38 FAX 205 236 2039          COMPASS BANK-CLC                                    002

Appraisal House, Inc. (850) 244-0658                    File No. 4750 Page #2

## FIRREA / USPAP ADDENDUM

Borrower  William & Jonilea Bell
Property Address  890 Driftwood Point Road
City  Santa Rosa Beach          County  Walton          State  Florida          Zip Code  32459-3020
Lender/Client  Compass Bank

### Purpose
The purpose of this appraisal is to estimate the market value of the subject property.

### Scope
The Appraiser understands the use of the appraisal is for reference in loan origination.
The Social, Economic, Governmental, and Environmental factors affecting and influencing the value of the subject were researched and analyzed.
The comparable sales were inspected and photographed.
Sales personnel and market participants were interviewed.
Sales data was confirmed in the Public Records.
The income approach was not utilized, in this appraisal analysis as buyers and sellers of property do not base purchase and sale price decisions
on the income generating capacity or required rate of investment return. We have elected not to employ the income approach in this analysis.

### Intended Use/Intended User
eAppraiseIT & Compass Bank, is the intended user of this appraisal. The use of this report is limited to the client and assigns only.

### History for Property
Current listing information:  The subject was not found in MLS for sale and has not been listed for sale in the past 12 months. All comparables were
found in MLS.

Prior sale:  No prior qualified 36 month sale history was available in public records.

### Exposure Time / Marketing Time
Estimated exposure time is 101 days according to MLS.
Estimated marketing time is 59 days according to MLS.

### Personal Property / Transfers
None.

### Additional Comments
Conditions of the Appraisal:      Neither all nor any part of the contents of this report shall be conveyed to any person or entity, other than the
appraiser's or firm's client, through advertising, solicitation materials, public relations, news, sales, or other media without the written consent and
approval of the approval of the authors, particularly as to valuation conclusions, the identity of the appraiser or firm with which the appraiser is
connected, or any reference to affiliation with any professional appraisal organization. Further, the appraiser or firm assumes no obligation,
liability, or accountability to the third party.   If this report is placed in the hands of anyone but the client, client shall make such party aware of all
the assumptions and limiting conditions of the assignment.

Variations between the comparable sales and the subject property are mostly related to time sold, view, size, and location.

### Certification Supplement
1. This appraisal assignment was not based on a requested minimum valuation, a specific valuation, or an approval of a loan.
2. My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value
   estimate, the attainment of a stipulated result or the occurrence of a subsequent event.

Appraiser(s): William V. Shaffer                                Supervisory Appraiser(s): Ronald E. Wright
Effective date / Report date:              01/25/2005            Effective date / Report date:

Form FUA — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIT

Abbott000687

02/01/2005 17:39 FAX 205 238 2039          COMPASS BANK-CLC                                      ☑003

File No. 4750 Page #3

| Borrower | William & Jonites Bell | | | File No. 4750 |
| Property Address | 690 Driftwood Point Road | | | |
| City Santa Rosa Beach | | County Walton | State Florida | Zip Code 32459-3020 |
| Lender Compass Bank | | | | |

## APPRAISAL AND REPORT IDENTIFICATION

This appraisal conforms to one of the following definitions:

☒ Complete Appraisal    (The act or process of estimating value, or an opinion of value, performed without invoking the Departure Rule.)

☐ Limited Appraisal     (The act or process of estimating value, or an opinion of value, performed under and resulting from invoking the Departure Rule.)

This report is one of the following types:

☐ Self Contained    (A written report prepared under Standards Rule 2-2(a) of a Complete or Limited Appraisal performed under STANDARD 1.)

☒ Summary          (A written report prepared under Standards Rule 2-2(b) of a Complete or Limited Appraisal performed under STANDARD 1.)

☐ Restricted       (A written report prepared under Standards Rule 2-2(c) of a Complete or Limited Appraisal performed under STANDARD 1, restricted to the stated intended use by the specified client or intended user.)

## Comments on Standards Rule 2-3

I certify that, to the best of my knowledge and belief:

The statements of fact contained in this report are true and correct.
The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions and conclusions.
I have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.
I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
My engagement in this assignment was not contingent upon developing or reporting predetermined results.
My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
My analyses, opinions and conclusions were developed and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.
I have made a personal inspection of the property that is the subject of this report.
No one provided significant real property appraisal assistance to the person signing this certification.

## Comments on Appraisal and Report Identification
Note any departures from Standards Rules 1-3 and 1-4, plus any USPAP-related issues requiring disclosure:
See FIRREA/USPAP Addedum for more information on the subject.

**APPRAISER:**

Signature _____
Name  William V. Sheffer
Date Signed  January 28, 2005
State Certification #: _____
or State License #:  RI 8688
State:  Florida
Expiration Date of Certification or License: 11/30/2004

**SUPERVISORY APPRAISER (only if required):**

Signature _____
Name  Ronald E. Wright
Date Signed:  January 28, 2005
State Certification #: RZ 2495
or State License #: _____
State:  Florida
Expiration Date of Certification or License: 11/30/2004

☒ Did  ☐ Did Not   Inspect Property

Appraisal House, Inc. (850) 244-0858
Form ID5 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIT

Abbott000688

02/01/2005 17:39 FAX 205 238 2039          COMPASS BANK-CLC                                                    Ø004

Appraisal House, Inc. (850) 244-0656

File No. 4750 | Page #4
2104537

**Summary Appraisal Report**            **UNIFORM RESIDENTIAL APPRAISAL REPORT**     File No. 4750

**Property Description**

| | |
|---|---|
| Property Address 890 Driftwood Point Road | City Santa Rosa Beach  State Florida  Zip Code 32459-3020 |
| Legal Description Lot 17 Blk G Driftwood Estates | County Walton |
| Assessor's Parcel No. 11-2S-21-42010-00G-0170 | Tax Year 2004  R.E. Taxes $ 8,904.80  Special Assessments $ 0.00 |
| Borrower William & Jonilee Bell | Current Owner William & Jonilee Bell  Occupant ☒ Owner  ☐ Tenant  ☐ Vacant |
| Property rights appraised ☒ Fee Simple  ☐ Leasehold | Project Type  ☐ PUD  ☐ Condominium (HUD/VA only)  HOA $ Unknown  /Mo. |
| Neighborhood or Project Name Driftwood Estates | Map Reference M16 S05  Census Tract 9506.00 |
| Sale Price $ N/A  Date of Sale N/A | Description and $ amount of loan charges/concessions to be paid by seller  Appraisal |
| Lender/Client Compass Bank | Address |
| Appraiser William V. Shaffer | Address 36 Miracle Strip Parkway SW, Suite 2, Fort Walton Beach, FL 32548 |

| | | | | Predominant occupancy | Single family housing PRICE $(000) / AGE (yrs) | Present land use % | Land use change |
|---|---|---|---|---|---|---|---|
| Location | ☐ Urban | ☒ Suburban | ☐ Rural | | | One family 40 | ☒ Not likely  ☐ Likely |
| Built up | ☐ Over 75% | ☒ 25-75% | ☐ Under 25% | | | 2-4 family 1 | ☐ In process |
| Growth rate | ☐ Rapid | ☒ Stable | ☐ Slow | ☒ Owner | 195 Low/New | Multi-family 0 | To: |
| Property values | ☒ Increasing | ☐ Stable | ☐ Declining | ☐ Tenant | 1,500wf High 30 | Commercial 4 | |
| Demand/supply | ☐ Shortage | ☒ In balance | ☐ Over supply | ☒ Vacant (0-5%) Predominant | | Vacant 55 | |
| Marketing time | ☒ Under 3 mos. | ☐ 3-6 mos. | ☐ Over 6 mos. | ☐ Vac.(over 5%) | 450 20 | | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics: Neighborhood is bounded to the south by Highway 98, to the north, east, and west by Choctawhatchee Bay.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): There are no adverse factors which should affect the subject's marketability. The subject's location is convenient to various employment opportunities and recreational facilities. Employment stability in the area is good, due to in large part to Eglin Air Force Base and the tourism in the southern counties due to the beaches of the Gulf of Mexico. There are many active duty and retired personnel in the general area. Property values increasing demonstrate good market demand for this area.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time -- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): I have considered relevant competitive listings/contract offerings in performing this appraisal, and any trend indicated by that data is supported by the listing/offering information included in this report. Market conditions are stable. No financing concessions are prevalent. Current market conditions include 1% loan origination fee with zero points. Conventional and VA loans are readily available at 5.80% to 6.90% interest for thirty years. The average marketing time is 89 days according to MLS. Sales price/listing price ratio for comparable homes in this area is 98% according to MLS. Property values have been increasing 12% to 35% over the past year.

Project Information for PUDs (if applicable) -- Is the developer/builder in control of the Home Owners' Association (HOA)?  ☐ Yes  ☐ No
Approximate total number of units in the subject project _____  Approximate total number of units for sale in the subject project _____
Describe common elements and recreational facilities:

| | | | |
|---|---|---|---|
| Dimensions 100 x 293 | | Topography | Level |
| Site area 29,300 SF | Corner Lot ☐ Yes ☒ No | Size | Typical |
| Specific zoning classification and description  Neighborhood Planning Area | | Shape | Rectangle |
| Zoning compliance ☒ Legal  ☐ Legal nonconforming (Grandfathered use)  ☐ Illegal  ☐ No zoning | | Drainage | Appears Adequate |
| Highest & best use as improved ☒ Present use  ☐ Other use (explain) | | View | Bay Front |
| | | Landscaping | Average |

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private | | |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Street | Paved Asphalt | ☒ | ☐ | Driveway Surface | Concrete |
| Gas | | | Curb/gutter | Gutter | ☒ | ☐ | Apparent easements | None Observed |
| Water | ☒ | | Sidewalk | None | ☐ | ☐ | FEMA Special Flood Hazard Area | ☒ Yes ☐ No |
| Sanitary sewer | ☒ | | Street lights | None | ☐ | ☐ | FEMA Zone AE | Map Date 3/7/2000 |
| Storm sewer | | | Alley | None | ☐ | ☐ | FEMA Map No. 12131C0537F | |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.): No apparent adverse easements or encroachments were found upon inspection which would adversely affect the subject property. Only a survey can determine if the subject is in a flood zone.

| GENERAL DESCRIPTION | | EXTERIOR DESCRIPTION | | FOUNDATION | | BASEMENT | | INSULATION | |
|---|---|---|---|---|---|---|---|---|---|
| No. of Units | One | Foundation | Concrete Slab | Slab | yes | Area Sq. Ft. None | | Roof | ☐ |
| No. of Stories | Two | Exterior Walls | Brick, Stucco | Crawl Space | None | % Finished | | Ceiling | ☐ |
| Type (Det./Att.) | Detached | Roof Surface | Slate Roof | Basement | None | Ceiling | | Walls | ☐ |
| Design (Style) | Contempora | Gutters & Dwnspts. | None | Sump Pump | None | Walls | | Floor | ☐ |
| Existing/Proposed | Existing | Window Type | Insulated | Dampness | None | Floor | | None | ☐ |
| Age (Yrs.) | 3 | Storm/Screens | Screens | Settlement | None | Outside Entry | | Unknown | ☒ |
| Effective Age (Yrs.) | 3 | Manufactured House | No | Infestation | None | | | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | None |
| Level 1 | 1 | 1 | 1 | 1 | 1 | | | | 0.5 | 1 | | 1,564 |
| Level 2 | | | | | | | | 4 | 3 | | 1 | 2,091 |
| Other | | | | | | | | | 0.5 | | | |

Finished area above grade contains: 9 Rooms;  4 Bedroom(s);  3F2H Bath(s);  3,655 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | yes | KITCHEN EQUIP. | | ATTIC | | AMENITIES | | CAR STORAGE: Yes | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Floors | Tile/Carpet/Wood/Gd | Type FWA | | Refrigerator | ☒ | None | ☐ | Fireplace(s) # Two | ☒ | None | ☐ |
| Walls | SheetRock/Good | Fuel Electric | | Range/Oven | ☒ | Stairs | ☐ | Patio Open | ☒ | Garage | # of cars |
| Trim/Finish | Wood/Paint/Good | Condition Average | | Disposal | ☒ | Drop Stair | ☐ | Deck | ☐ | Attached Two |
| Bath Floor | Tile/Good | COOLING yes | | Dishwasher | ☒ | Scuttle | ☒ | Porch Covered | ☒ | Detached | |
| Bath Wainscot | Sheet Rock/Good | Central Cen/Elec | | Fan/Hood | ☒ | Floor | ☐ | Fence | | Built-in | |
| Doors | 6 Panel / Good | Other 2 Units | | Microwave | ☒ | Heated | ☐ | Pool Heated In-Grd | | Carport | |
| | | Condition Average | | Washer/Dryer | ☒ | Finished | ☐ | Other | ☒ | Driveway Concrete |

Additional features (special energy efficient items, etc.): Ceiling fans, heated in-ground pool, dock, top of the line appliances, two fireplaces, boat lift, gated, upgrades through out the subject see pictures.

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction, remodeling/additions, etc.: There were no physical, functional or external inadequacies noted during my inspection. The quality of construction was very good and the condition was good.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property.: No adverse conditions were noted upon inspection.

Freddie Mac Form 70 6/93                          PAGE 1 OF 2                          Fannie Mae Form 1004 6/93
Form UA2 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIT

Abbott000689

02/01/2005 17:40 FAX 205 238 2039          COMPASS BANK-CLC                              ☑005

File No. 4750 Page #5
2104537

## UNIFORM RESIDENTIAL APPRAISAL REPORT

File No.  4750

**Valuation Section**

| | |
|---|---|
| ESTIMATED SITE VALUE ................................. = $ | 1,000,000 |
| ESTIMATED REPRODUCTION COST-NEW-OF IMPROVEMENTS: | |
| Dwelling   3,855 Sq. Ft. @ $  180.00  = $   657,900 | |
| Sq. Ft. @ $ = | |
| Appls,CeilingFans,In-GrndPool,CvPrch  =  47,550  Dck,boatSl | |
| Garage/Carport 848   Sq. Ft. @ $  50.00  =   32,400 | |
| Total Estimated Cost New................................ = $  737,850 | |
| Less   Physical   Functional   External | |
| Depreciation   22,136 | |
| = $  22,136 | |
| Depreciated Value of Improvements .......................... = $  715,714 | |
| "As-is" Value of Site Improvements .......................... = $  10,000 | |
| INDICATED VALUE BY COST APPROACH ........ Rounded ...... = $  1,726,000 | |

Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property):  See Attached sketch area addendum for square footage calculation. Data in the Cost Approach was abstracted from the Marshall and Swift Valuation Service. Where applicable and available, local construction costs were also considered.

Remaining Economic Life: 72 years
Remaining Physical Life: 75 years

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 690 Driftwood Point Road  Santa Rosa Beach | 263 Driftwood Point Road  Santa Rosa Beach | | 1537 Driftwood Point Road  Santa Rosa Beach | | 194 Mitchell Avenue  Santa Rosa Beach | |
| Proximity to Subject | | 0.43 miles | | 0.42 miles | | 9.32 miles | |
| Sales Price | N/A | 1,200,000 | | 1,325,000 | | 995,000 | |
| Price/Gross Living Area | | 318.73 | | 431.17 | | 554.63 | |
| Data and/or | Inspection | Public Rec. Book2606Page1603 | | Public Rec. Book N/A Page N/A | | Public Rec. Book N/A Page N/A | |
| Verification Source | Tax Assessor | MLS #352300 (DOM 120) | | MLS #384431 (DOM 23) | | MLS # 361658 (DOM 209) | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. |
| Sales or Financing Concessions | | Unknown  Amount Unknown | | Conventional  Amount Unknown | | Unknown  Amount Unknown | |
| Date of Sale/Time | | 04/16/2004 | | 08/31/2004 | | 01/18/2005 | |
| Location | Suburban/Avg | Suburban/Avg | | Suburban/Avg | | Suburban/Avg | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | Lot $1,000K | Lot $650K | +350,000 | Lot $800K | +200,000 | Lot $700K | +300,000 |
| View | Bay Front/VGood | Bay Front/VGood | | Bay Front/VGood | | Bay Front/VGood | |
| Design and Appeal | Beachhouse/Gd | Beachhouse/Gd | | Beachhouse/Gd | | Traditional/Avg | |
| Quality of Construction | Brick,Stucco/Gd | Stucco/Good | | Stucco/Good | | BrickWood/Avg | |
| Age | A3 / E3 | A8 / E6 | +60,000 | A5 / E6 | +28,500 | A14 / E12 | +89,600 |
| Condition | Good | Good | | Good | | Average | |
| Above Grade | Total :Bdrms: Baths | Total :Bdrms: Baths | | Total :Bdrms: Baths | | Total :Bdrms: Baths | |
| Room Count | 9  4  3F2H | 9 : 4 : 4 | | 7 : 3 : 2.6 | +5,000 | 6 : 3 : 2.5 | +5,000 |
| Gross Living Area | 3,655 Sq. Ft. | 3,765 Sq. Ft. | −14,400 | 3,073 Sq. Ft. | +76,200 | 1,794 Sq. Ft. | +243,700 |
| Basement & Finished | None | None | | None | | None | |
| Rooms Below Grade | None | None | | None | | None | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Cent.Elec.Ht&Air | Cent.Elec.Ht&Air | | Cent.Elec.Ht&Air | | Cent.Elec.Ht&Air | |
| Energy Efficient Items | DoublePaneWind | CFans/Stor.Win | | DoublePaneWind | | DoublePaneWind | |
| Garage/Carport | TwoCarGarage | ThreeCarGarage | −5,000 | TwoCarGarage | | TwoCarGarage | |
| Porch, Patio, Deck, | Patio,CvPrch | CvPrch,OpnPatio | 0 | CvPrch,ScrnPrch | −3,000 | Cov.Porch. | +1,000 |
| Fireplace(s), etc. | Two Fireplaces | Balcony,1Fireplac | −3,000 | One Fireplace | +2,000 | LgCvDock,1Frpla | +1,000 |
| Fence, Pool, etc. | In-Ground Pool | None | +15,000 | In-Ground Pool | | None | +15,000 |
| Dock,Boat Slip | Dock,Boat Slip | None | +10,000 | Dock,Boat Slip | | None | +10,000 |
| Net Adj. (total) | | ☒ + ☐ − $ | 412,600 | ☒ + ☐ − $ | 306,700 | ☒ + ☐ − $ | 663,300 |
| Adjusted Sales Price of Comparable | | $ | 1,612,600 | $ | 1,631,700 | $ | 1,658,300 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.):  See comments under comps 4 - 6.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source, for prior sales within year of appraisal | None found in the past 36 months | None Within 36 Months | 03/15/2002  $602,500.00  Book 2389 / Page 1642 | None Within 36 Months |

Analysis of any current agreement of sale, option, or listing of subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal:  Comparables were found in MLS. The subject is not listed in MLS and has not been listed for sale in the past 12 months. See FIRREA/USPAP Addendum for more information on the subject.

| | |
|---|---|
| INDICATED VALUE BY SALES COMPARISON APPROACH .................................................... $ | 1,887,000 |
| INDICATED VALUE BY INCOME APPROACH (if Applicable)   Estimated Market Rent  $  N/A  /Mo. x Gross Rent Multiplier  N/A  = $ | not utilized |

This appraisal is made ☒ "as is"  ☐ subject to the repairs, alterations, inspections or conditions listed below  ☐ subject to completion per plans & specifications.
Conditions of Appraisal:  See Comments on Appraisal and Report identification. All comparables used were the closest geographically, qualitatively, conditionally, age-wise, and location-wise to the subject. Very few sales located on the bay front similar to the subject.
Final Reconciliation:  The sales comparison approach to value is the primary approach to value for properties of the subject's type and class. The sales comparison approach was given the most weight in estimating the market value of the subject. Comparables 6 was given most weight due to less adjustments and due to property have been increasing and we gave the cost approach weight in the final reconciliation.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/FNMA form 1004B (Revised  06/93  ).
I(WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF  01/25/2005
(WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE  $  1,675,000

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): | |
|---|---|---|
| Signature | Signature | ☒ Did  ☐ Did Not |
| Name  William V. Shaffer | Name  Rolando E. Virgili | Inspect Property |
| Date Report Signed  January 28, 2005 | Date Report Signed  January 28, 2005 | |
| State Certification #   State  Fl | State Certification #  RZ 2495   State  Fl | |
| Or State License #  RJ 9588   State  Fl | Or State License #   State  Fl | |

Freddie Mac Form 70  6/93                          PAGE 2 OF 2                          Fannie Mae Form 1004  6-93

Form UA2 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIt

Abbott000690

02/01/2005 17:40 FAX 205 238 2039     COMPASS BANK-CLC     ☑006

File No. 4750 Page 46

## UNIFORM RESIDENTIAL APPRAISAL REPORT
## MARKET DATA ANALYSIS

These recent sales of properties are most similar and proximate to subject and have been considered in the market analysis. The description includes a dollar adjustment, reflecting market reaction to those items of significant variation between the subject and comparable properties. If a significant item in the comparable property is superior to, or more favorable than, the subject property, a minus (-) adjustment is made, thus reducing the indicated value of the subject. If a significant item in the comparable is inferior to, or less favorable than, the subject property, a plus (+) adjustment is made, thus increasing the indicated value of the subject.

| ITEM | SUBJECT | COMPARABLE NO. 4 | | COMPARABLE NO. 5 | | COMPARABLE NO. 6 | |
|---|---|---|---|---|---|---|---|
| Address | 690 Driftwood Point Road Santa Rosa Beach | 674 Woodland Bayou Drive Santa Rosa Beach | | 1301 West Hewett Road Santa Rosa Beach | | 420 Bayshore Drive Miramar Beach | |
| Proximity to Subject | | 3.92 miles | | 2.26 miles | | 3.83 miles | |
| Sales Price | $ N/A | $ 1,260,000 | | $ 1,200,000 | | $ 1,815,000 | |
| Price/Gross Living Area | $ ⌘ | $ 420.00⌘ | | $ 321.03 ⌘ | | $ 450.48 ⌘ | |
| Data and/or Verification Sources | Inspection Tax Assessor | Public Rec. Book N/A Page N/A MLS #371218 (DOM 76) | | Public Rec. Book2584 Page0140 MLS # 347466 (DOM 21) | | Public Rec. Book2606Page1603 MLS # 355795 (DOM 176) | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ Adjust. | DESCRIPTION | +(-)$ Adjust. | DESCRIPTION | +(-)$ Adjust. |
| Sales or Financing Concessions | | Conventional Amount Unknown | | Unknown Amount Unknown | | Conventional Amount Unknown | |
| Date of Sale/Time | | 01/14/2005 | | 01/22/2004 | | 09/30/2004 | |
| Location | Suburban/Avg | Suburban/Avg | | Suburban/Avg | | Suburban/Avg | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | Lot $1,000K | Lot $900K | +100,000 | Lot $600K | +400,000 | Lot $1050K | -50,000 |
| View | Bay Front/VGood | Bay Front/VGood | | Bay Front/VGood | | Bay Front/VGood | |
| Design and Appeal | Beachhouse/Gd | Beachhouse/Gd | | Beachhouse/Gd | | Beachhouse/Gd | |
| Quality of Construction | Brick,Stucco/Gd | Stucco/Good | | Stucco/Good | | Stucco/Good | |
| Age | A3 / E3 | A15 / E12 | +113,400 | A8 / E8 | +60,000 | A3 / E3 | |
| Condition | Good | Good | | Good | | Good | |
| Above Grade | Total :Bdrms: Baths | Total :Bdrms: Baths | | Total :Bdrms: Baths | | Total :Bdrms: Baths | |
| Room Count | 9 : 4 : 3F2H | 7 : 3 : 2.5 | +5,000 | 7 : 4 : 5 | -2,000 | 8 : 4 : 4 | |
| Gross Living Area | 3,655 Sq. Ft. | 3,000 Sq. Ft. | +85,800 | 3,738 Sq. Ft. | -10,900 | 4,029 Sq. Ft. | -49,000 |
| Basement & Finished | None | None | | None | | None | |
| Rooms Below Grade | None | None | | None | | None | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Cent.Elec.Ht&Air | Cent.Elec.Ht&Air | | Cent.Elec.Ht&Air | | Cent.Elec.Ht&Air | |
| Energy Efficient Items | DoublePaneWind | DoublePaneWind | | DoublePaneWind | | CFans/Stor.Win | -5,000 |
| Garage/Carport | TwoCarGarage | TwoCarGarage | | TwoCarGarage | | ThreeCarGarage | -5,000 |
| Porch, Patio, Deck | Patio,CvPrch | CvPrch,ScrnPrch | -3,000 | Bal.CvPrch,ScrnP | -5,000 | CvPrch,ScrnPrch | -3,000 |
| Fireplace(s), etc. | Two Fireplaces | One Fireplace | +2,000 | One Fireplace | +2,000 | None | +4,000 |
| Fence, Pool, etc. | In-Ground Pool | In-Ground Pool | | In-Ground Pool | | In-Ground Pool | |
| Dock, Boat Slip | Dock,Boat Slip | Dock,Boat Slip | | Dock,Boat Slip | | Dock,Boat Slip | |
| Net Adj. (total) | | ☒+ ☐- $ | 303,200 | ☒+ ☐- $ | 444,100 | ☐+ ☒- $ | 103,000 |
| Adjusted Sales Price of Comparable | | $ | 1,563,200 | $ | 1,644,100 | $ | 1,712,000 |
| Date, Price and Data Source for prior sales within year of appraisal | None found in the past 36 months. | None Within 36 Months | | None Within 36 Months | | | |

Comments: The comparable sales utilized were the most current sales with similar size, style, and features available from the public records. The sales comparison analysis had adjustments applied to the comparable sales which reflected the markets reaction to the differences in the properties, not the cost of the differences. The subject's market area has recently exploded with good quality homes similar to the subject. In search of comparable sales located on the bay that were similar to the subject was hard. In our search we found no equal sales similar to the subject, therefore, the most similar sales were found and used. Few sales similar to quality, size, age, and location to the subject, which we expanded the search for sales most similar to the subject within five miles. To find the closest sales with similar quality, there were differences in the comparable sales to the subject, and there were adjustments made. It was necessary that gross and net adjustments exceed guidelines of gross 25% and net 15% due to differences of properties for comp 1, 2, 3, 4, & 5. Property values vary due to time, size, view, location, and adjustments were made to reflect market differences. Comparable 6 was given most weight due to less adjustments were applied and due to property have been increasing at a rapid rate over the past year. Land values have tripled over the past year in the subject's market area and adjustments were made to reflect time the property sold, see state map pages...

The subject's vacant land is high in demand along with many other vacant lots, that are located near, or on the Gulf of Mexico in the subject's market area. With such high demand for vacant land, prices of vacant lots have tripled over the past year. With land values so high, it is not unusual to find land values worth 30-75% of total improved site in south Walton County. The area has a limited supply of land in the subject market area, due to it is a land locked between bay and gulf, State Parks, wet lands, and Eglin Air Force Base. With limited amount of buildable land in the area, with the same quality of homes as the subject, it was necessary to expand my search out for comparable sales more than one mile from the subject. Also, with limited amount of land and a high demand for properties, sellers are getting top dollar for homes, condo units, and vacant land, in the subject's market area. Then in some cases, buyers are bidding higher than listed price for some homes in the area.

In determining the replacement value for the subject, we used the marshall & swift valuation service and estimated the local cost to estimate reproduction cost of the subject property. The appraiser is noting that builders are charging between $90 - $250 a SF in the local area depending on what style and/or quality of home you build, therefore, $180.00 SF was used as an estimated in the cost approach from the information gathered on the proposed home. The value of land was determined be finding vacant land sales most similar to the subject in the same subdivision. It is not uncommon for the cost approach to be higher or lower than the market value.

Note: The sales utilized were the most current sales with similar size, style, location, condition, and features from the public records. Property values are increasing at a rapid rate; therefore, the most recent sales were found and used in this report. Land values have tripled, and condos are increasing from 10-40% where the homes are increasing 10 to 35% over the past year. See state map pages...

Market Data Analysis 6-89

Form UA2 (AC) — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of tAppraiseIT

Abbott000691

02/01/2005 17:41 FAX 205 238 2039          COMPASS BANK-CLC                                    ☒007

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays those costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

Appraisal House, Inc. (850) 244-0650
Form ACR DEFD — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIT

Abbott000692

File No. 4750 Page #8

**APPRAISER'S CERTIFICATION:** The appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:** 690 Driftwood Point Road, Santa Rosa Beach, Florida 32459-3020

**APPRAISER:**

Signature: _____
Name: William V. Shafer
Date Signed: January 28, 2005
State Certification #: _____
or State License #: RI 9888
State: Florida
Expiration Date of Certification or License: 11/30/2004

**SUPERVISORY APPRAISER (only if required):**

Signature: _____
Name: Ronald R. Wright
Date Signed: January 28, 2005
State Certification #: RZ 2465
or State License #: _____
State: Florida
Expiration Date of Certification or License: 11/30/2004

☒ Did     ☐ Did Not Inspect Property

Freddie Mac Form 439 6-93                          Page 2 of 2                          Fannie Mae Form 1004B 6-93

Form ACR_DEFD — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIT

Abbott000693

02/01/2005 17:42 FAX 205 238 2039          COMPASS BANK-CLC                                    ☑009

File No. 4750 Page #9

## Building Sketch (Page - 1)

| | |
|---|---|
| Borrower/Client | William & Jonlee Bell |
| Property Address | 690 Driftwood Point Road |
| City Santa Rosa Beach | County Walton | State Florida | Zip Code 32459-3020 |
| Lender Compass Bank |



| AREA CALCULATIONS SUMMARY | | |
|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA1 | First Floor | 1563.7 | 1563.7 |
| P/P | Covered Area | 236.6 | |
| | Covered Storage | 218.4 | 455.0 |
| GAR | Two Car Garage | 648.0 | 648.0 |
| | Net LIVABLE Area | (Rounded) | 1564 |

| LIVING AREA BREAKDOWN | |
|---|---|
| First Floor | |
| 18 Items | (Rounded) 1564 |

Form SKT.BldSk — "TOTAL for Windows" appraisal software by a la mode, Inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIT

Abbott000694

Case 3:16-cv-00233-RV-EMT Document 1-73 Filed 05/26/16 Page 264 of 435
Case 3:14-cv-00646-MCR-EMT Document 173-F Filed 08/19/15 Page 10 of 24

File No. 47501 Page #10

## Building Sketch (Page - 2)

| Borrower/Client | William & Jonilea Bell | | | | |
|---|---|---|---|---|---|
| Property Address | 690 Driftwood Point Road | | | | |
| City | Santa Rosa Beach | County | Walton | State | Florida | Zip Code | 32459-3020 |
| Lender | Compass Bank | | | | |



**AREA CALCULATIONS SUMMARY**

| Code | Description | Net Size | Net Totals |
|---|---|---|---|
| GLA7 | Second Floor | 2091.3 | 2091.3 |
| | Net LIVABLE Area | ( Rounded ) | 2091 |

**LIVING AREA BREAKDOWN**

| Breakdown | | Subtotals |
|---|---|---|
| Second Floor | | |
| 2.9 x 3.4 | 9.9 |
| 6.6 x 12.4 | 81.8 |
| 8.9 x 24.2 | 215.4 |
| 15.3 x 15.4 | 236.6 |
| 6.6 x 12.4 | 81.8 |
| 1.7 x 13.6 | 22.8 |
| 3.3 x 6.9 | 22.4 |
| 0.5 x 3.3 x 3.3 | 5.3 |
| 0.5 x 3.3 x 3.3 | 5.3 |
| 0.5 x 0.3 x 13.3 | 1.6 |
| 12.0 x 43.9 | 527.5 |
| 13.5 x 38.7 | 522.5 |
| 8.2 x 38.3 | 315.7 |
| 1.2 x 11.2 | 15.8 |
| 0.2 x 12.5 | 2.4 |
| 2.8 x 6.5 | 17.9 |
| 0.5 x 2.8 x 2.8 | 5.8 |
| 0.5 x 2.8 x 2.8 | 5.8 |
| 18 Items | ( Rounded ) | 2091 |

Abbott000695

02/01/2005 17:42 FAX 205 238 2039 COMPASS BANK-CLC @011

File No. 4750) Page #11

## Location Map

| Borrower/Client | William & Jonitea Bell | | | | |
|---|---|---|---|---|---|
| Property Address | 690 Driftwood Point Road | | | | |
| City | Santa Rosa Beach | County | Walton | State | Florida | Zip Code 32459-3020 |
| Lender | Compass Bank | | | | |



Form MAP.LOC — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIT

Abbott000696

Flo No. #750 Page #12

## Flood Map

| Borrower/Client | William & Jonlos Bell | | | | |
|---|---|---|---|---|---|
| Property Address | 890 Driftwood Point Road | | | | |
| City | Santa Rosa Beach | County | Walton | State | Florida | Zip Code | 32459-3020 |
| Lender | Compass Bank | | | | |



InterFlood
by a la mode
www.interflood.com • 1-800-252-6633

Prepared for:
Appraisal House, Inc.

890 Driftwood Point Road
Santa Rosa Beach, Florida 32459-5216

FLOODSCAPE

Flood Hazards Map

Map Number
12131C0537F

Effective Date
March 7, 2000

For more information about flood zones and flood insurance, contact:

Powered by FloodSource
877.77.FLOOD
www.floodsource.com

© 1999-2002 FloodSource Corp. U.S. Patents Pending. All rights reserved. For more information, please e-mail info@floodsource.com.

Form MAP.FLOOD — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIT

Abbott000697

02/01/2005 17:44 FAX 205 238 2039    COMPASS BANK-CLC    ☑013

File No. 4750 Page #13

## Plat Map

| Borrower/Client | William & Jondee Bell | | | |
|---|---|---|---|---|
| Property Address | 690 Driftwood Point Road | | | |
| City | Santa Rosa Beach | County | Walton | State Florida | Zip Code 32459-3020 |
| Lender | Compass Bank | | | |



Form MAP.PLAT — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIT

Abbott000698

Pic No. 4750 Page #14

## Subject Photos

| Borrower/Client | William & Jondea Bell | | | |
|---|---|---|---|---|
| Property Address | 690 Driftwood Point Road | | | |
| City Santa Rosa Beach | County Walton | | State Florida | Zip Code 32459-3020 |
| Lender Compass Bank | | | | |



**Subject Front**
690 Driftwood Point Road



**Subject Rear**



**Subject Street**

Form PICPIXLTR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIT

Abbott000699

File No. 4750 Page # 15

## Subject Interior Photo Page

| | | | | |
|---|---|---|---|---|
| Borrower/Client | William & Jordea Bell | | | |
| Property Address | 690 Driftwood Point Road | | | |
| City | Santa Rosa Beach | County Walton | State Florida | Zip Code 32459-9026 |
| Lender | Compass Bank | | | |



**Subject Interior**
690 Driftwood Point Road

| | |
|---|---|
| Sales Price | N/A |
| Gross Living Area | 3,855 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3F2H |
| Location | Suburban/Avg |
| View | Bay Front/VGood |
| Site | Lot $1,000K |
| Quality | Brick,Stucco/Gd |
| Age | A3 / E3 |



**Subject Interior**



**Subject Interior**

Form PICPIX.SI — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIT

Abbott000700

.02/01/2005 17:46 FAX 205 238 2039          COMPASS BANK-CLC          ☑016

File No. 4750 Page # 16

## Subject Interior Photo Page

| | | | |
|---|---|---|---|
| Borrower/Client | William & Jonise Bell | | |
| Property Address | 890 Driftwood Point Road | | |
| City Santa Rosa Beach | County Walton | State Florida | Zip Code 32459-3020 |
| Lender Compass Bank | | | |



**Subject Interior**

890 Driftwood Point Road
| | |
|---|---|
| Sales Price | N/A |
| Gross Living Area | 3,855 |
| Total Rooms | 8 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3F2H |
| Location | Suburban/Avg |
| View | Bay Front/VGood |
| Site | Lot $1,000K |
| Quality | Brick,Stucco/Gd |
| Age | A3 / E3 |



**Subject Interior**



**Subject Interior**

Form PICPIX.SI — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIT

Abbott000701

File No. 4750 Page #17

## Subject Interior Photo Page

| | | |
|---|---|---|
| Borrower/Client | William & Jonilea Bell | |
| Property Address | 690 Driftwood Point Road | |
| City | Santa Rosa Beach | County Walton | State Florida | Zip Code 32459-3020 |
| Lender | Compass Bank | |



**Subject Interior**

690 Driftwood Point Road
Sales Price        N/A
Gross Living Area  3,855
Total Rooms        9
Total Bedrooms     4
Total Bathrooms    3F2H
Location           Suburban/Avg
View               Bay Front/VGood
Site               Lot $1,000K
Quality            Brick,Stucco/Gd
Age                A3 / E3



**Subject Interior**



**Subject Interior**

Form PICPIX.SI — "TOTAL for Windows" appraisal software by a la mode, Inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIT

Abbott000702

File No. 4750 Page #18

## PHOTOGRAPH ADDENDUM

| | | | | | |
|---|---|---|---|---|---|
| Borrower/Client | William & Jonilea Bell | | | | |
| Property Address | 690 Driftwood Point Road | | | | |
| City | Santa Rose Beach | County Walton | State Florida | Zip Code | 32459-3020 |
| Lender | Compass Bank | | | | |



In-Ground Pool



Dock



Second Floor Hall

Form GPCPIX — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of cAppraiseIT

Abbott000703

File No. 4750 Page #18

## Comparable Photo Page

| Borrower/Client | William & Jorilea Bell | | | |
|---|---|---|---|---|
| Property Address | 690 Driftwood Point Road | | | |
| City | Santa Rosa Beach | County Walton | State Florida | Zip Code 32459-3020 |
| Lender | Compass Bank | | | |



**Comparable 1**
253 Driftwood Point Road



**Comparable 2**
1537 Driftwood Point Road



**Comparable 3**
194 Mitchell Avenue

Form PICPIXBR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIT

Abbott000704

02/01/2005 17:46 FAX 205 238 2039          COMPASS BANK-CLC                                      ☑020

File No. 4750I Page #20

## Comparable Photo Page

| | | | |
|---|---|---|---|
| Borrower/Client | William & Jondea Bell | | |
| Property Address | 690 Driftwood Point Road | | |
| City | Santa Rosa Beach | County | Walton | State | Florida | Zip Code | 32459-3020 |
| Lender | Compass Bank | | |



**Comparable 4**
674 Woodland Bayou Drive



**Comparable 5**
1301 West Hewett Road



**Comparable 6**
420 Bayshore Drive

Form PICPIX.BR — 'TOTAL for Windows' appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIT

Abbott000705

02/01/2005 17:48 FAX 205 238 2039          COMPASS BANK-CLC                                          ☑021

File No. 4750 | Page #21

### State Map

| Borrower/Client | William & Jonlea Bell | | | |
|---|---|---|---|---|
| Property Address | 690 Driftwood Point Road | | | |
| City | Santa Rosa Beach | County | Walton | State Florida | Zip Code 32459-3020 |
| Lender | Compass Bank | | | |

# REAL ESTATE CONTINUED

THE LOG ■ SATURDAY, MAY 29, 2004 ■ www.destin.com                    PAGE 13D

# Florida home sales soar 29 percent in April

Florida Sales Report - April 2004
Single-Family, Existing Homes

Form MAP.51ale — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIT

Abbott000706

02/01/2005 17:49 FAX 205 238 2039          COMPASS BANK-CLC                                    ☒022

File No. 4750i Page #22

## State Map

| Borrower/Client | Willam & Jonilea Bell | | | | |
|---|---|---|---|---|---|
| Property Address | 690 Driftwood Point Road | | | | |
| City | Santa Rosa Beach | County | Walton | State | Florida | Zip Code | 32459-3020 |
| Lender | Compass Bank | | | | |

Abbott000707

File No. 4750 Page 23

## State Map

| | | | |
|---|---|---|---|
| Borrower/Client | William & Jordan Bell | | |
| Property Address | 590 Driftwood Point Road | | |
| City Santa Rosa Beach | County Walton | State Florida | Zip Code 32459-3020 |
| Lender Compass Bank | | | |



form MAP.Sale — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of eAppraiseIT

Abbott000708

File No. 4750 Page #24

## Supplemental Addendum

File No.  4750

| | | | |
|---|---|---|---|
| Borrower/Client  William & Jonilea Bell | | | |
| Property Address  680 Driftwood Point Road | | | |
| City  Santa Rosa Beach | County  Walton | State  Florida | Zip Code  32459-3020 |
| Lender  Compass Bank | | | |

Due to site values increasing rapidly, the only way to justify todays market values is to adjust by site value at the time they were sold. Variations between the comparable sales and the subject property are mostly related to time sold, view, size, and location. In the subjects subdivision we found a land sale on the water:

1) Lot 4 Blk G sold for $1,300,000.00, Book 2633 / Page 0881 on 9/24/2004
2) Lot 8 Blk J sold for $850,000.00, Book 2628 / Page 275 on 9/20/2004
3) Lot 14 Blk L sold for $719,500.00, Book 2630 / Page 829 on 8/25/2004

With the three vacant land site sales we felt that the value of the subject is estimated at a value of $1,000,000.00.  We found no recent sales than the three listed above.  The appraiser does not know why land comp 1 sold so high at that time and was given little weight.  In determining value for comparable sales, the same methode was used.

Form TADD — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

This report was prepared on behalf of  eApppraiseIT

Abbott000709

Main File No. 90899 | Page #1

# INVOICE

**FROM:**

Remit Payment To:
Panhandle Appraisal Group, Inc.
PO Box 4686
Fort Walton Beach, FL 32549
Telephone Number: 850-243-2512    Fax Number: 850-226-8462

| INVOICE NUMBER |
| --- |
| 90899 |
| **DATE** |
| 9/28/2009 |

**REFERENCE**

Internal Order #:    90899
Lender Case #:
Client File #:

**TO:**

Client: William Bell

Contact - Julie

Telephone Number: 267-0900    Fax Number:
Alternate Number:    E-Mail:

Andrew Moore

2009 Appraisal

## DESCRIPTION

Lender: Client: William Bell
Purchaser/Borrower: Client: William Bell
Property Address: 690 Driftwood Point Road
City: Santa Rosa Beach
County: Walton    State: FL    Zip: 32459
Legal Description: Lot 17, Block G, Driftwood Estates

| FEES | AMOUNT |
| --- | --- |
| Base Appraisal Fee $350.00 | 350.00 |
| SUBTOTAL | 350.00 |

| PAYMENTS | AMOUNT |
| --- | --- |
| Check #:    Date:    Description: | |
| Check #:    Date:    Description: | |
| Check #:    Date:    Description: | |
| SUBTOTAL | |

| | | |
| --- | --- | --- |
| Please include invoice number on check. Thank you. | TOTAL DUE | $ 350.00 |

Steve Abbott, et al
vs
Olson and Associates, et al
Exhibit 45

Panhandle Appraisal Group
Form NIV3 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott000710

Panhandle Appraisal Group

Main File No. 90899| Page #2

## Uniform Residential Appraisal Report

90899
File # 90899

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | | | |
|---|---|---|---|
| Property Address 690 Driftwood Point Road | City Santa Rosa Beach | State FL | Zip Code 32459 |

Borrower Client: William Bell — Owner of Public Record William and Jonilea Bell — County Walton

Legal Description Lot 17, Block G, Driftwood Estates

Assessor's Parcel # 11-2S-21-42010-00G-0170 — Tax Year 2008 — R.E. Taxes $ 8,031.33

Neighborhood Name Santa Rosa Beach — Map Reference M15 S3 — Census Tract 9506.00

Occupant ☒ Owner ☐ Tenant ☐ Vacant — Special Assessments $ 0.00 — ☐ PUD HOA $ ☐ per year ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Insurance

Lender/Client Client: William Bell — Address 690 Driftwood Point Road

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☐ No

Report data source(s) used, offering price(s), and date(s). N/A

I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. N/A

Contract Price $ N/A — Date of Contract N/A — Is the property seller the owner of public record? ☐ Yes ☐ No Data Source(s) N/A

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No

If Yes, report the total dollar amount and describe the items to be paid. N/A

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | | | Property Values ☐ Increasing ☐ Stable ☒ Declining | | | PRICE $ (000) | AGE (yrs) | One-Unit | 60 % |
| Built-Up ☐ Over 75% ☒ 25-75% ☐ Under 25% | | | Demand/Supply ☐ Shortage ☐ In Balance ☒ Over Supply | | | 150 Low | New | 2-4 Unit | 5 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | | | Marketing Time ☐ Under 3 mths ☐ 3-6 mths ☒ Over 6 mths | | | 2,500 High | 40 | Multi-Family | 25 % |
| | | | | | | 350-75 Pred. | 15 | Commercial | 5 % |
| | | | | | | | | Other | 5 % |

Neighborhood Boundaries The subject is bounded on the north by Highway 98, on the west by the Destin Bridge, on the south by the Gulf of Mexico, and on the east by Gulfshore Drive.

Neighborhood Description The neighborhood is a popular vacation and retirement home area with many full time residents. Properties appeal to buyers as second homes or rentals. The subject is close to all required services, retail, and recreational facilities in Santa Rosa Beach. The main attraction is the Choctawhatchee Bay and the Gulf of Mexico.

Market Conditions (including support for the above conclusions) I have indicated the following market conditions - Declining, Over supply and Over Six months based on recent analysis.

Dimensions 100 x 268 x 100 x 273, in feet MOL — Area 27,000 +/- SF — Shape Rectangular — View Bay/VG

Specific Zoning Classification - City of Destin — Zoning Description Low Density Residential

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements - Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Asphalt | ☒ | |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley None | | |

FEMA Special Flood Hazard Area ☒ Yes ☐ No — FEMA Flood Zone AE — FEMA Map # 121310 537F — FEMA Map Date 3/7/2000

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No If Yes, describe

| General Description | | Foundation | | Exterior Description materials/condition | | Interior materials/condition | |
|---|---|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | | ☒ Concrete Slab ☐ Crawl Space | | Foundation Walls Concrete/VG | | Floors Tile/Wood/G | |
| # of Stories Two | | ☐ Full Basement ☐ Partial Basement | | Exterior Walls Brick/Stucco/VG | | Walls Wd/Paint/SR/VG | |
| Type ☒ Det ☐ Att. ☐ S-Det/End Unit | | Basement Area None sq.ft. | | Roof Surface Tile/VG | | Trim/Finish Wood/Paint/VG | |
| ☒ Existing ☐ Proposed ☐ Under Const. | | Basement Finish % | | Gutters & Downspouts None | | Bath Floor Tile/VG | |
| Design (Style) Traditional | | ☐ Outside Entry/Exit ☐ Sump Pump | | Window Type Vinyl/DP/G | | Bath Wainscot Tile/Marble/VG | |
| Year Built 2001 | | Evidence of ☐ Infestation | | Storm Sash/Insulated Yes/VG | | Car Storage ☐ None | |
| Effective Age (Yrs) 8 | | ☐ Dampness ☐ Settlement | | Screens Fib. Screens/G | | ☒ Driveway # of Cars Multiple | |
| Attic ☐ None | | Heating ☒ FWA ☐ HWBB ☐ Radiant | | Amenities | | Driveway Surface Concrete/G | |
| ☐ Drop Stair ☐ Stairs | | ☐ Other Fuel Elec. | | ☒ Fireplace(s) # 2 ☒ Fence Yes | | ☐ Garage # of Cars 2 | |
| ☒ Floor ☐ Scuttle | | Cooling ☒ Central Air Conditioning | | ☒ Patio/Deck Scrnd ☒ Porch Entry | | ☐ Carport # of Cars | |
| ☐ Finished ☐ Heated | | ☐ Individual ☐ Other | | ☒ Pool In ground ☐ Other | | ☒ Att. ☐ Det ☐ Built-in | |

Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☒ Microwave ☐ Washer/Dryer ☐ Other (describe)

Finished area above grade contains: 10 Rooms 4 Bedrooms 4 Bath(s) 3,478 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.). Ceiling fans, recessed lighting, crown molding, DP windows, tile roof, and pool.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). The subject appears to be of very good construction quality and is in good condition. The subject has a functional floor plan. There are no external factors which could have a detrimental or negative effect on the value. Therefore, neither functional nor external obsolescence will be applied. There was no curable physical depreciation.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe

Freddie Mac Form 70 March 2005 — Page 1 of 6 — Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott000711

Main File No. 90899 Page #3

# Uniform Residential Appraisal Report

90899
File # 90899

| There are | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ | | | | | to $ | | |
|---|---|---|---|---|---|---|---|---|
| There are | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ | | | | | to $ | | |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 690 Driftwood Point Road | | | | | | |
| | Santa Rosa Beach, FL 32459 | | | | | | |
| Proximity to Subject | | | | | | | |
| Sale Price | $ N/A | $ | | $ | | | $ |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ sq.ft. | | $ sq.ft. | | $ sq.ft. | |
| Data Source(s) | | | | | | | |
| Verification Source(s) | | | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | | | | | | |
| Concessions | | | | | | | |
| Date of Sale/Time | | | | | | | |
| Location | | | | | | | |
| Leasehold/Fee Simple | Fee Simple | | | | | | |
| Site | 27,000 +/- SF | | | | | | |
| View | Bay/VG | | | | | | |
| Design (Style) | Traditional | | | | | | |
| Quality of Construction | | | | | | | |
| Actual Age | | | | | | | |
| Condition | | | | | | | |
| Above Grade | Total / Bdrms. / Baths | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | |
| Room Count | 10 / 4 / 4 | | | | | | |
| Gross Living Area | 3,478 sq.ft. | sq.ft. | | sq.ft. | | sq.ft. | |
| Basement & Finished | None | | | | | | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | | | | | | | |
| Heating/Cooling | | | | | | | |
| Energy Efficient Items | | | | | | | |
| Garage/Carport | 2 | | | | | | |
| Porch/Patio/Deck | | | | | | | |
| Fireplaces | | | | | | | |
| Appliances | | | | | | | |
| Dock | | | | | | | |
| Net Adjustment (Total) | | ☐ + ☐ - | $ | ☐ + ☐ - | $ | ☐ + ☐ - | $ |
| Adjusted Sale Price | | Net Adj. % | | Net Adj. % | | Net Adj. % | |
| of Comparables | | Gross Adj. % | $ | Gross Adj. % | $ | Gross Adj. % | $ |

☐ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)
My research ☐ did ☐ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | | | | |
| Effective Date of Data Source(s) | | | | |

Analysis of prior sale or transfer history of the subject property and comparable sales

Summary of Sales Comparison Approach

Indicated Value by Sales Comparison Approach $

Indicated Value by: Sales Comparison Approach $      Cost Approach (if developed) $ 782,292      Income Approach (if developed) $

See addenda.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair.

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$ , as of 9/24/2009 , which is the date of inspection and the effective date of this appraisal.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott000712

Main File No. 90899 Page #4

# Uniform Residential Appraisal Report

90899
File # 90899

☐ **RESTRICTED-USE APPRAISAL REPORT**

This is a Restricted-Use Appraisal Report which is intended to comply with the reporting requirements in accordance with the Uniform Standards of Professional Appraisal Practice for a Restricted-Use Appraisal Report. As such, it represents discussions of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of value. All supporting documentation concerning the data, reasoning, and analyses is included in the body or the addenda to this report, or retained in the appraiser's files. The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated in the attached addenda. The appraisers are not responsible for unauthorized use of this report. See attached addenda.

**COST APPROACH TO VALUE** (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)    N/A

ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW

| | | | | | |
|---|---|---|---|---|---|
| Source of cost data   Marshall Valuation Service | OPINION OF SITE VALUE | | | =$ | |
| Quality rating from cost service  C - II      Effective date of cost data  8/2008 | DWELLING | 3,478 Sq.Ft. @ $ | 200.27 | =$ | 696,539 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | Patio/Br. Way | 555 Sq.Ft. @ $ | 50.00 | =$ | 27,750 |
| See addenda. | Appliances/Fans/FP | | | =$ | 35,000 |
| | Garage/Carport | 653 Sq.Ft. @ $ | 60.00 | =$ | 39,180 |
| | Total Estimate of Cost-New | | | =$ | 798,469 |

| | Physical | Functional | External | | |
|---|---|---|---|---|---|
| Less | | | | | |
| Depreciation | 116,177 | | | =$( | 116,177) |
| Depreciated Cost of Improvements | | | | =$ | 682,292 |
| "As-is" Value of Site Improvements | | | | =$ | 100,000 |

Estimated Remaining Economic Life (HUD and VA only)          47 Years   INDICATED VALUE BY COST APPROACH          =$   782,292

**INCOME APPROACH TO VALUE** (not required by Fannie Mae)

Estimated Monthly Market Rent $      N/A      X Gross Rent Multiplier      N/A      = $      Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM)

**PROJECT INFORMATION FOR PUDs** (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?   ☐ Yes   ☐ No    Unit type(s)   ☐ Detached   ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

Total number of phases _____     Total number of units _____     Total number of units sold _____

Total number of units rented _____     Total number of units for sale _____     Data source(s) _____

Was the project created by the conversion of existing building(s) into a PUD?   ☐ Yes   ☐ No  If Yes, date of conversion.

Does the project contain any multi-dwelling units?   ☐ Yes   ☐ No  Data Source

Are the units, common elements, and recreation facilities complete?   ☐ Yes   ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?   ☐ Yes   ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Freddie Mac Form 70 March 2005                    Page 3 of 6                    Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott000713

Main File No. 90899 | Page #5

## Uniform Residential Appraisal Report

90899
File # 90899

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

---

Abbott000714

## Uniform Residential Appraisal Report

90899
File # 90899

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Freddie Mac Form 70 March 2005                Page 5 of 6                Fannie Mae Form 1004 March 2005

Abbott000715

## Uniform Residential Appraisal Report
90899
File # 90899

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION: The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name Andrew W. Moore | Name |
| Company Name Panhandle Appraisal Group, Inc. | Company Name |
| Company Address PO Box 4686, Fort Walton Beach, FL 32548 | Company Address |
| Telephone Number (850) 243-2512 | Telephone Number |
| Email Address andrew@panappraisal.com | Email Address |
| Date of Signature and Report September 30, 2009 | Date of Signature |
| Effective Date of Appraisal 9/24/2009 | State Certification # |
| State Certification # State-Certified Residential Appraiser - RD6026 | or State License # |
| or State License # | State |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License |
| State FL | |
| Expiration Date of Certification or License 11/30/2010 | SUBJECT PROPERTY |

ADDRESS OF PROPERTY APPRAISED
690 Driftwood Point Road
Santa Rosa Beach, FL 32459
APPRAISED VALUE OF SUBJECT PROPERTY $ _____
LENDER/CLIENT
Name _____
Company Name Client: William Bell
Company Address 690 Driftwood Point Road
Email Address _____

SUBJECT PROPERTY

☐ Did not inspect subject property
☐ Did inspect exterior of subject property from street
  Date of Inspection _____
☐ Did inspect interior and exterior of subject property
  Date of Inspection _____

COMPARABLE SALES

☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
  Date of Inspection _____

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott000716

## Supplemental Addendum

File No. 90899

| | |
|---|---|
| Borrower/Client | Client: William Bell |
| Property Address | 690 Driftwood Point Road |
| City | Santa Rosa Beach | County Walton | State FL | Zip Code 32459 |
| Lender | Client: William Bell |

### • URAR : Additional Comments

In accordance with your request, an inspection has been made of the above-named property, and an appraisal for the purpose of estimating insurable value of the improvements only has been accomplished. The purpose of this appraisal is for use by the client to assist in the determination of appropriate insurance coverage for the subject property. .

I have completed the requisite inspections, research, and analyses necessary to appraise the estimated replacement cost interest in the subject improvements, 'as is' excluding land and entrepreneurial profit as of the date our last personal viewing, of September 24, 2009.

It is noted for the client that the estimated values included in this report do not include demolition costs, personal property and permitting and impact fees.

The accompanying appraisal report is a restricted-use appraisal report as contrasted with a self contained or summary appraisal report. This appraisal is intended to be used only for the purpose and client stated above. No other use of this appraisal report is authorized.

Replacement cost and other pertinent terms are defined in the following report. The opinion of highest and best use of the property is continued use as a residence.

### SCOPE OF WORK:

The purpose of this report is to determine an estimated replacement cost for the subject improvements "as is", excluding land and entrepreneurial profit. The explicit purpose of this appraisal assignment is to assist the client in determination of appropriate insurance coverage amounts only. No other use of this appraisal report is authorized. This appraisal report is considered a restricted-use appraisal report for the above-outlined purpose only, and the depth of discussion contained in this report is specific to the needs of the client.

The Cost approach was employed as the method of deriving an opinion of replacement cost for the subject property. The Sales Comparison analysis and the Income Analysis were not employed in this analysis as any sales analysis would include the value of the land and market based entrepreneurial profit and any income analysis would not be germane to a development of replacement cost.

### Replacement Cost Estimate

Replacement cost is the estimated cost to construct, at current market prices as of the effective appraisal date, a building with utility equivalent to the building being appraised, using modern materials and current standards, design and layout.

I will perform a cost estimate using Marshall Valuation Service (Marshall) to derive an opinion of the construction costs of the subject improvements adjusted for local variations. Marshall is the nationally recognized data source for construction cost.

I consider the subject improvement to contain features which could be found in High Value Residences, Marshall, Class C Type II, found at Section 12, Page 27 (August 2008). Class C Type II, High Value Residences feature a base cost of $200.27, per square foot per Marshall. I estimate that the cost to replace the subject improvements to be consistent with this figure.

Therefore, using my experience and training as an appraiser, I estimate a cost to replace most indicative of the subject improvements consistent with the figure outlined above, including the cost for interior finishes, is a figure of $200.27 per SF.

The $200.27 per square foot is my estimate of the base cost to build the subject HVAC area.

Based on data in Marshall Valuation Services, Section 12 Page 28, August 2008 the cost to construct the porches and balconies varies between 20% to 50% of the cost to construct the base HVAC area, dependent on quantity and structure of the areas. Larger proportions of balcony / porch storage areas would be closer to the low end of the range, and smaller proportions toward the higher end of the range. This is primarily a function of economy of scale in construction.

For the purposes of our estimate, we will use 25% of HVAC cost to estimate the cost to replace the patios, porches, and unconditioned storage / breeze way areas. Therefore, we will use $50.06 per SF, rounded to $50.00, as a cost estimate for the porch and patio areas of the subject improvement based on a percentage of 25% of $200.27 of base HVAC cost.

Abbott000717

Main File No. 90899  Page #9

## Supplemental Addendum

File No. 90899

| Borrower/Client | Client: William Bell | | | | |
|---|---|---|---|---|---|
| Property Address | 690 Driftwood Point Road | | | | |
| City | Santa Rosa Beach | County  Walton | | State  FL | Zip Code  32459 |
| Lender | Client: William Bell | | | | |

**COMMENTS ON RECONCILIATION OF COST NEW**
The client of this appraisal is encouraged to review the Cost Approach Section of page #3 and specifically the Total Estimate of Cost New line item.  It may be deemed beneficial by the client to insure to a lower replacement cost as identified by the Total Estimate of Cost New or a higher replacement cost as identified by the Total Estimate of Cost New, based on the client's perception of risk.

It should be understood by the client, this is a valuation of the improvements only and this derived cost figure should not be used for any type of sales consideration as it excludes the value of land, entrepuernerial incentive and demolition.

Form TADD_LT — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott000718

## Photograph Addendum

| Borrower/Client | Client: William Bell | | | |
|---|---|---|---|---|
| Property Address | 690 Driftwood Point Road | | | |
| City | Santa Rosa Beach | County Walton | State FL | Zip Code 32459 |
| Lender | Client: William Bell | | | |



**Front**



**Rear**



**Pool**



**Driveway**



**Street**

Form PICSIX2 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott000719

Main File No. 90899 Page #11

## Photograph Addendum

| Borrower/Client | Client: William Bell | | | |
|---|---|---|---|---|
| Property Address | 690 Driftwood Point Road | | | |
| City | Santa Rosa Beach | County Walton | State FL | Zip Code 32459 |
| Lender | Client: William Bell | | | |



**Kitchen**



**Living Room**



**Master Bathroom**



**Master Bedroom**



**Dining Room**



**Bonus**

Form PICS9X2 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott000720

Main File No. 90899  Page #12

## Location Map

| Borrower/Client | Client: William Bell | | | | |
|---|---|---|---|---|---|
| Property Address | 690 Driftwood Point Road | | | | |
| City | Santa Rosa Beach | County  Walton | | State  FL | Zip Code  32459 |
| Lender | Client: William Bell | | | | |



Abbott000721

Main File No. 90899| Page #13

## Plat Map

| Borrower/Client | Client: William Bell | | | | |
|---|---|---|---|---|---|
| Property Address | 690 Driftwood Point Road | | | | |
| City | Santa Rosa Beach | County Walton | | State FL | Zip Code 32459 |
| Lender | Client: William Bell | | | | |



**DRIFTWOOD ESTATES**

Form MAP.PLAT — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Abbott000722

Main File No. 90899| Page #14

## Flood Map

| Borrower/Client | Client: William Bell | | | | |
|---|---|---|---|---|---|
| Property Address | 690 Driftwood Point Road | | | | |
| City | Santa Rosa Beach | County | Walton | State FL | Zip Code 32459 |
| Lender | Client: William Bell | | | | |



**InterFlood**
www.interflood.com • 1-800-252-6633

**Prepared for:**
Panhandle Appraisal Group

690 Driftwood Point Road
Santa Rosa Beach, FL 32459

FOUR MILE POINT

**FLOODSCAPE**

Flood Hazards Map

Map Number
12131C0537F

Effective Date
March 7, 2000

© 1999-2006 SourceProse and or FloodSource Corporations. All rights reserved. Patents 6,631,326 and 6,678,615. Other patents pending. For info, info@floodsource.com

Abbott000723

Main File No. 90899I Page #15

**Building Sketch**

| Borrower/Client | Client: William Bell | | | | |
|---|---|---|---|---|---|
| Property Address | 690 Driftwood Point Road | | | | |
| City | Santa Rosa Beach | County Walton | | State FL | Zip Code 32459 |
| Lender | Client: William Bell | | | | |



Sketch by Apex Medina™

Comments:

### AREA CALCULATIONS SUMMARY

| Code | Description | Net Size | Net Totals |
|---|---|---|---|
| GLA1 | First Floor | 1570.4 | 1570.4 |
| GLA2 | Second Floor | 1908.0 | 1908.0 |
| GAR | Garage | 652.5 | 652.5 |
| P/P | Breeze Way | 238.0 | |
| | Patio | 316.5 | 554.5 |
| | Net LIVABLE Area | (rounded) | 3478 |

### LIVING AREA BREAKDOWN

| | Breakdown | | | Subtotals |
|---|---|---|---|---|
| **First Floor** | | | | |
| 0.5 x | 0.5 | x | 0.0 | 0.0 |
| | 1.0 | x | 12.2 | 12.2 |
| | 33.2 | x | 7.0 | 232.6 |
| | 2.0 | x | 26.2 | 51.2 |
| | 25.7 | x | 0.0 | 1.2 |
| 0.5 x | 2.1 | x | 2.1 | 2.2 |
| | 34.9 | x | 3.3 | 116.1 |
| | 4.0 | x | 2.1 | 8.5 |
| | 7.0 | x | 38.3 | 267.8 |
| 0.5 x | 3.3 | x | 3.3 | 5.5 |
| 0.5 x | 2.1 | x | 2.1 | 2.2 |
| 0.5 x | 3.3 | x | 3.3 | 5.5 |
| | 5.0 | x | 33.2 | 166.2 |
| | 34.9 | x | 3.3 | 116.1 |
| | 39.2 | x | 6.5 | 248.5 |
| | 6.2 | x | 33.2 | 206.0 |
| | 5.5 | x | 19.2 | 105.8 |
| 0.5 x | 2.6 | x | 2.6 | 3.4 |
| | 6.0 | x | 2.6 | 15.7 |
| 0.5 x | 2.6 | x | 2.6 | 3.4 |
| **Second Floor** | | | | |
| 0.5 x | 0.4 | x | 0.4 | 0.1 |
| | 3.3 | x | 34.9 | 116.1 |
| | 1.0 | x | 12.0 | 12.0 |
| | 34.5 | x | 2.4 | 81.2 |
| | 6.3 | x | 38.3 | 241.9 |
| 0.5 x | 3.3 | x | 3.3 | 5.5 |
| 12 Items Not Listed | | | | 1451.2 |
| 38 Items | | | (rounded) | 3478 |

Abbott000724

Main File No. 90899 Page #16

## License

| Borrower/Client | Client: William Bell | | | | |
|---|---|---|---|---|---|
| Property Address | 690 Driftwood Point Road | | | | |
| City | Santa Rosa Beach | County Walton | | State FL | Zip Code 32459 |
| Lender | Client: William Bell | | | | |

STATE OF FLORIDA

DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION
FLORIDA REAL ESTATE APPRAISAL BD

SEQ# L08101502393

| DATE | BATCH NUMBER | LICENSE NBR |
|---|---|---|
| 10/15/2008 | 088097823 | PD6025 |

The CERTIFIED RESIDENTIAL APPRAISER
Named below IS CERTIFIED
Under the provisions of Chapter 475 FS
Expiration date: NOV 30, 2010

MOORE, ANDREW WILLIAM
139 BEAL PKWY
SUITE O
FORT WALTON BEACH    FL 32548

CHARLIE CRIST
GOVERNOR

CHARLES W. DRAGO
SECRETARY

DISPLAY AS REQUIRED BY LAW

Abbott000725

Case 3:16-cv-00233-RV-EMT   Document 14-73   Filed 05/26/16   Page 295 of 435
Case 3:14-cv-00846-MCR-EMT   Document 173-9   Filed 08/19/15   Page 1 of 1
INGLE, WALTON COUNTY CLERK OF COURT DOC STMP-D   $0.70 Deputy Clerk R DAVIS

Return to
Name       Dawn E. Larsh
           Dawn E. Larsh, P.A.
Address    11714 Emerald Coast Parkway Suite 5
           Destin, Florida  32550

This Instrument Prepared

           Dawn E. Larsh
           Dawn E. Larsh, P.A.
           11714 Emerald Coast Parkway Suite 5
           Destin, Florida  32550

Property Appraisers Parcel I.D. (Folio) Numbers: 11-2S-21-42910-00J-0140

## WARRANTY DEED

This Warranty Deed is made this 28 day of September, 2004, by Stephen J. Abbott, a married man, hereinafter called the grantor, whose post office address is: 1807 Driftwood Point Road, Santa Rosa Beach, FL 32459,

To Stephen J. Abbott and Cynthia L. Abbott, husband and wife, hereinafter called the grantee, whose post office address is: 1807 Driftwood Point Road, Santa Rosa Beach, FL 32459.

WITNESSETH: That said grantor, for and in consideration of the sum of $10.00 Dollars and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys and confirms unto the grantee, all that certain land situate in Walton County, Florida, viz:

Lot 14, Block J, Driftwood Estates, according to the Plat thereof as recorded in Plat Book 5, Pages 28A, 28B and 28C, of the Public Records of Walton County, Florida.

This deed prepared without benefit of a title search

The property is not the homestead of the Grantor(s)

TOGETHER with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

To Have and to Hold, the same in fee simple forever

And the grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land; that the grantor hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances, except taxes accruing subsequent to January 1, 2004 reservations, restrictions and easements of record, if any
(The terms "grantor" and "grantee" herein shall be construed to include all genders and singular or plural as the context indicates.)

In Witness Whereof, Grantor has hereunto set grantor's hand and seal the day and year first above written.

Signed, sealed and delivered in our presence

Witness Signature: _____
Printed Name: David E Cates II                        _____
                                                      Stephen J Abbott

Witness Signature: _____
Printed Name: Jennifer Bolding

STATE OF Florida
COUNTY OF Walton

The foregoing instrument was acknowledged before me this 28 day of September, 2004 by Stephen J. Abbott, who is personally known to me or produced _____ as identification.

(seal)                                    _____
                                          Printed Name:
                                          Notary Public
                                          My Commission Expires:

Dawn E Larsh
My Commission DD118854
Expires May 19, 2006

Steve Abbott, et al
vs
Olson and Associates, et al
Exhibit 47

CFN # 1065433, OR BK 2821 Page 1886, Recorded 07/14/2009 at 09:41 AM, MARTHA INGLE, WALTON COUNTY CLERK OF COURT DOC STMP-D: $0.70 Deputy Clerk K DOUGLASS

Prepared by and return to:
J. Mark Eisner, Esq., 148 Miracle Strip Pkwy
SE, Suite 1, Ft. Walton Beach, FL 32548
(850) 244-8865 or Toll Free 1 800 977-1755

The preparer hereof has not been requested
to provide the accuracy of the legal
description and assumes no liability for the same.

Property Appraiser's Parcel
Identification No.: 11-2S-21-42310-007-0143
-H-

## WARRANTY DEED

This Warranty Deed, executed **JUL 0 8 2009**, between STEPHEN J. ABBOTT and CYNTHIA L. ABBOTT, husband and wife, of the County of Walton, State of Florida, (GRANTOR), whose post office address is 106 Harbor Blvd., Destin, Fl 32541 and CYNTHIA L. ABBOTT and STEPHEN J. ABBOTT, CO-TRUSTEES, or their successors in trust under The CYNTHIA L. ABBOTT REVOCABLE TRUST AGREEMENT DATED JUNE 9, 1999, and any amendments thereto, (GRANTEE), of the State of Florida, County of Walton, whose post office address is 106 Harbor Blvd., Destin, Fl 32541.

THE GRANTOR, in consideration of the sum of Ten Dollars ($10.00) and other good and valuable considerations, to said GRANTOR in hand paid by said GRANTEE, the receipt of which is hereby acknowledged, has granted, conveyed, bargained and sold to said GRANTEE and GRANTEE'S successors, and assigns forever the following described land situate in Walton County, Florida, to wit:

Lot 14, Block J, Driftwood Estates, according to the Plat thereof as recorded in Plat book 5, Pages 28A, 28B and 28C, of the Public Records of Walton County, Florida.

and said GRANTOR does hereby fully warrant the title to said land and will defend the same against the lawful claims of all persons whomsoever. Where used herein the terms GRANTOR, GRANTEE and TRUSTEE shall be construed as singular or plural as the context requires.

The Trust beneficiary is CYNTHIA L. ABBOTT and she retains the right to reside upon, use and possess the above identified property for the remainder of her life.

This property is being transferred without consideration as a result of GRANTOR'S estate planning decisions, into GRANTOR'S living Revocable Trust. An examination was not made of the title before transfer.

CYNTHIA L. ABBOTT and STEPHEN J. ABBOTT, as CO-TRUSTEES, shall have the independent power and authority to protect, conserve, and to sell, or to lease, or to encumber, or otherwise to manage and dispose of the real property conveyed by this deed.

CYNTHIA L. ABBOTT and STEPHEN J. ABBOTT shall act as Co-Trustees. If CYNTHIA L. ABBOTT resigns or is unable to continue to act as Trustee, STEPHEN J. ABBOTT shall continue as sole Successor Trustee. If STEPHEN J. ABBOTT resigns or is unable to continue to act as Trustee, then WILLIAM W. ABBOTT, JR., is appointed as Successor Trustee. If WILLIAM W. ABBOTT, JR., resigns or is unable to continue to act as Trustee, then NATHAN J. ABBOTT is appointed as Successor Trustee.

All Successor TRUSTEES are hereby granted the power to protect, conserve and to sell, or to lease, or to encumber, or otherwise to manage and dispose of the real property described in this deed.

Steve Abbott, et al
vs
Olson and Associates, et al
Exhibit 48

Case 3:16-cv-00233-RV-EMT Document 1-473 Filed 05/26/16 Page 297 of 435
Case 3:16-cv-00646-MCR-EMT Document 173-10 Filed 08/19/15 Page 2 of 5
CFN 1909455 OR BK 4021 PG 4081

The powers of the TRUSTEE and all Successor TRUSTEES shall extend to any and all rights which the GRANTOR possesses in the above described real property; any deed, mortgage, or other instrument executed by the TRUSTEE shall convey all rights or interests of the GRANTOR including homestead; and the TRUSTEE is appointed as the attorney-in-fact for the GRANTOR to carry out this intent, which appointment shall be durable and shall not be affected by the incapacity of the GRANTOR.

Any person dealing with the TRUSTEE shall deal with said TRUSTEE in the order as set forth above. However, no person shall deal with a Successor TRUSTEE until one or more of the following have been received by said person or placed of record in the aforementioned county:

A. The written resignation of the prior TRUSTEE sworn to and acknowledged before a notary public.

B. A certified death certificate of the prior TRUSTEE.

C. The order of a court of competent jurisdiction adjudicating the prior TRUSTEE incompetent, or removing said TRUSTEE for any reason.

D. The written certificates of two physicians currently practicing medicine that the TRUSTEE is unable to manage her own affairs or is physically or mentally incapable of discharging the duties of TRUSTEE.

E. The written removal of a successor TRUSTEE and/or the appointment of an additional Successor TRUSTEE by the GRANTOR sworn to and acknowledged before a notary public; this right being reserved to GRANTOR, **CYNTHIA L. ABBOTT**.

This conveyance is subject to restrictions, reservations, limitations, and easements of record, taxes for the current year and subsequent years, and all mortgages of record which the GRANTEE herein assumes and agree to pay.

EXECUTED ___**JUL 0 8 2009**___ .

Signed, sealed, and delivered
in the presence of:

Print Name _Tammy L. Quinlin_

_Blaire Fisher_
Print Name Blaire Fisher

_____
CYNTHIA L. ABBOTT

_____
STEPHEN J. ABBOTT

STATE OF FLORIDA
COUNTY OF OKALOOSA

The foregoing instrument was acknowledged before me this **JUL 0 8 2009** by **CYNTHIA L. ABBOTT** and **STEPHEN J. ABBOTT**, who are personally known to me or who have produced _____ as identification and who did not take an oath.

_____
J. Mark Fisher, NOTARY PUBLIC

Notary Seal and commission
expiration stamp:

INGLE, WALTON COUNTY CLERK OF COURT DOC STMP-D: $0.70 Deputy Clerk T BECK

## WARRANTY DEED TO TRUSTEE

THIS WARRANTY DEED made this 5th day of June, 2009, by ALEX KISH and wife, DIANA KISH, whose address is 1715 Driftwood Point, Santa Rosa Beach, Florida 32459, hereafter called "Grantor", to ALEX R. KISH and DIANA J. KISH, as co-trustees of the Alex R. Kish Revocable Trust Agreement dated May 15, 2009 and DIANA J. KISH and ALEX R. KISH, as co-trustees of the Diana J. Kish Revocable Trust Agreement dated May 15, 2009, hereafter called "Trustee", with full power and authority to protect, conserve and to sell, or to lease or to encumber, or to otherwise manage and dispose of the property hereafter described, and whose address is: 1715 Driftwood Point, Santa Rosa Beach, Florida 32459.

### WITNESSETH:

That the Grantor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys and confirms unto Trustee, all that certain land situated in Walton County, Florida, to-wit:

"Parcel 11-E as described in Official Records Book 892, Page 23 and being the North 133 feet of the South 366 feet of Lot 11, Block J, Driftwood Estates, according to the plat thereof as recorded in Plat Book 5, Page 28, Public Records of Walton County, Florida." See attached Exhibit "A"

Parcel Identification No. 11-2S-21-42010-00J-011E

TO HAVE AND TO HOLD the above-described real estate in fee simple with the appurtenances upon the trust and for the purposes set forth in this Deed and in the Alex R. Kish Revocable Trust Agreement dated May 15, 2009 and Diana J. Kish Revocable Trust Agreement dated May 15, 2009 (Trust Agreement).

SAID PROPERTY IS THE HOMESTEAD OF THE GRANTOR(S).

Full power and authority is hereby granted to said Trustee to improve, subdivide, protect, conserve, sell, lease, encumber and otherwise manage and dispose of said property or any part thereof, and to re-subdivide said property as often as desired, to contract to sell, to grant options to purchase, to sell on any terms, to convey either with or without consideration, to convey said property or any part thereof to a successor or successors in trust and to grant to such successor or successors in trust all of the title, estate, powers and authorities vested in said trustee, to donate, to dedicate, to mortgage, pledge or otherwise encumber said property, or any part thereof, to lease said property, to dedicate, to mortgage, pledge or otherwise encumber said property, or any part thereof, to lease said property, or any part thereof, from time to time, in possession or reversion, by leases to commence in present or future, and upon any terms and for any period or periods of time, not exceeding in the case of any single demise the term of 99 years, and to renew or extend leases upon any terms and for any period or periods of time and to amend, change or modify leases and the terms and provisions thereof at any time or times hereafter, to contract to make leases and to grant options to lease and options to renew leases and to grant options to lease and options to renew leases and options to purchase the whole or in any part of the reversion and to contract respecting the manner of fixing the amount of present or future rentals, to partition or to exchange said property, or any part thereof, for other real or personal property, to submit said easements or charges of any kind, to release, convey or assign any right, title or interest in or about or easement appurtenant to said premises or any part thereof and to deal with said property and every part thereof in all other ways, and for such other considerations as it would be lawful for any person owning the same to deal with the same, whether similar to or different from the ways above specified, at any time or times hereafter.

In no case shall any party dealing with the Trustee in relation to the real estate or to whom the real estate or any part of it shall be conveyed, contracted to be sold, leased or mortgaged by Trustee, be obliged to see to the application of any purchase money, rent or money borrowed or advanced on the premises, or be obliged to see that the terms of said Trust have been complied with, or be obliged to inquire into the necessity or expediency of any act of the Trustee, or be obliged or privileged to inquire into any of the terms of the Trust Agreement or the identification or status of any named or unnamed beneficiaries, or their heirs or assigns to whom the Trustee may be accountable; and every deed, trust deed, mortgage, lease or other instrument executed by Trustee in relation to the real estate shall be conclusive evidence in favor of every person relying upon or claiming under any such conveyance lease or other instrument (a) that at the time of its delivery the Trust created by this Deed and by the Trust Agreement was in full force and effect, (b) that the conveyance or other instrument was executed in accordance with the trusts, conditions and limitations contained in this Deed and in the Trust Agreement and is binding upon all beneficiaries under those instruments, (c) that Trustee was duly authorized and empowered to execute and deliver every such deed, trust deed, lease, mortgage or other instrument and (d) if the conveyance is made to a successor or successors in trust, that the successor or successors in trust have been appointed properly and vested fully with all the title, estate, rights, powers, duties and obligations of the predecessor in trust. If there are co-trustees, it is specifically understood that the signature of only one of the Co-Trustees shall be required to accomplish the foregoing.

Any contract, obligation or indebtedness incurred or entered into by the Trustee in connection with said property shall be as Trustee of an express trust and not individually and the Trustees shall have no obligations whatsoever with respect to any such contract, obligation or indebtedness except only so far as the trust property in

Steve Abbott, et al
vs
Olson and Associates, et al
Exhibit 51

the actual possession of the Trustee shall be applicable for the payment and discharge thereof, and it shall be expressly understood that any representations, warranties, covenants, undertakings and agreements hereinafter made on the part of the Trustee, while in form purporting to be the representation, warranties, covenants, undertakings and agreements of said Trustee, are nevertheless made and intended not as personal representations, warranties, covenants, undertakings and agreements by the Trustee or for the purpose or with the intention of binding said trustee personally, but are make and intended for the purpose of binding only the trust property specifically described herein; and that no personal liability or personal responsibility is assumed by nor shall at any time be asserted or enforceable against the trustee individually on account of any instrument executed by or on account of any representation warranty, covenant, undertaking or agreement of the said Trustee, either expresses or implied, all such personal liability, if any, being expressly waived and release and all persons and corporations whomsoever and whatsoever shall be charged with notice of this condition from the date of the filing for record of this Deed.

The interest of the beneficiary under this Deed and under the Trust Agreement referred to above of all persons claiming under them or any of them shall be only in the earnings, avails and proceeds arising from the sale or other disposition of the real estate, and that interest is declared to be personal property, and no beneficiary under this Deed shall have any title or interest, legal or equitable, in or to the real estate as such but only as interest in the earnings, avails and proceeds from that real estate as aforesaid.

In the event either of the original Co-Trustees ceases to serve, the remaining Co-Trustee shall be the sole successor trustee. If neither ALEX R. KISH nor DIANA J. KISH is able or willing to serve or to continue to serve as Trustee, then ROBERT CORNETT shall serve as the successor Trustee. If ROBERT CORNETT is unable and / or unwilling to serve or to continue to serve as Trust, then BANKTRUST shall serve as alternate successor Trustee. Upon a recording in the public records of Walton County, Florida, of a death certificate or resignation of the Trustee or of any successor trustee, title to the land described herein shall be deemed to be held by the next successor trustee and to pass to the next successor trustee without the requirement of recording any further or additional documents.

The Trustee shall have no personal liability whatsoever for action as trustee under the trust agreement referred to above or by virtue of taking title to the land described above and the sole liability of Trustee hereunder shall be limited to the property which the Trustee holds under the trust agreement referred to above.

And the Grantor by this Deed fully warrants the title to the above-described real estate and will defend the title against the lawful claims of all persons whomsoever. "Grantor", "Grantee", "Trustee" and "Beneficiary" are used for singular or plural, as context requires.

IN WITNESS WHEREOF, the Grantor aforesaid has signed and sealed these presents this 5th day of June, 2009.

Signed, sealed and witnessed
in our presence:

_____
Kevin M. Helmich
WITNESS

_____
Alex R. Kish

_____
Donna D. Householder
WITNESS

_____
Kevin M. Helmich
WITNESS

_____
Diana J. Kish

_____
Donna D. Householder
WITNESS

STATE OF FLORIDA
COUNTY OF OKALOOSA

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the county aforesaid, to take acknowledgements, personally appeared ALEX R. KISH and DIANA J. KISH who are personally known to me and who executed the foregoing instrument and acknowledged before me that they executed the same.

Witness my hand and official seal in the County and State last aforesaid this 5th day of June, 2009

(Seal)

_____
Notary Public



KEVIN M. HELMICH
Comm# DD0893278
Expires 6/17/2013
Florida Notary Assn., Inc

Case 3:14-cv-00234-RV-EMT Document 173-11 Filed 08/19/15 Page 3 of 3

Exhibit "A"

"A 133.00 foot Bayfront parcel of land, lying in and being a portion of Lot 11 Block "J" of Driftwood Estates as recorded in Plat Book 5, at Page 28-C, of the Public Records of Walton County, Florida; said parcel to be known here and hereafter, as Lot 11-E Block "J" of said Driftwood Estate: being more particularly described as follows:

Commence at the Northwest corner of Lot 12, Block "J" of "Driftwood Estates" as recorded in Plat Book 5, at Page 28-C, of the Public Records of Walton County, Florida; said point also being on the arc of the circular curved northern most right of way of Driftwood drive, (40.00 wide right of way);

THENCE along a curve to the left having a radius of 579.55 feet and an arc length of 75.86 feet, being subtended by a chord of North 43 degrees 53 minutes 34 seconds West for a distance of 75.81 feet;

THENCE North 47 degrees 38 minutes 34 seconds West for a distance of 135.00 feet to a 1/2" IRON ROD 8 CAP No. 3293;

THENCE along a curve to the right having a radius of 353.19 feet and an arc length of 65.99 feet, being subtended by a chord of North 47 degrees 38 minutes 34 seconds West for a distance of 65.89 feet to a 1/2" IRON ROD 8 Cap No. 4979, marking the point of beginning;

THENCE along a curve to the right having a radius of 353.19 feet and an arc length of 118.95 feet, being subtended by a chord of North 32 degrees 38 minutes 51 seconds West for a distance of 118.39 feet to a 1/2" IRON ROD 8 CAP No. 4979;

THENCE North 22 degrees 57 minutes 54 seconds West for a distance of 14.98 feet to a 1/2" IRON ROD 8 CAP No. 4979;

THENCE North 61 degrees 27 minutes 38 seconds East for a distance of 176.49 feet MORE OR LESS TO THE WATERS EDGE OF "CHOCTAWHATCHEE BAY"; along said waters edge;

THENCE South 31 degrees 52 minutes 32 seconds East for a distance of 133.00 feet more or less;

THENCE South 61 degrees 18 minutes 40 seconds West for a distance of 177.19 feet more or less to the point of beginning;

Together with and subject to covenants, easements, and restrictions of record.

Said property contains 0.55 acres more or less.

# SOUTHERN VALUES, INC.

## commercial & residential appraisals

725 E. 24<sup>th</sup> Plaza
Panama City, FL 32405
(850) 769-3535
fax (850) 769-3595
southernvalues@comcast.net

March 26, 2010

Alex Kish
1715 Driftwood Point Rd.
Santa Rosa Beach, FL

RE:   Appraisal
1715 Driftwood Point Rd.

Dear Mr. Kish,

Your appraisal on the above referenced property is attached.   The final value estimate is **$1,300,000**.    This value takes into account the locational characteristics of Driftwood Estates as they currently exist.   In this report, I utilized three sales (No. One, Two, and Three) that are from similar overall areas. I also used three sales (No. Four, Five, and Six) from planned developments. Sales No. Four and Five are from SanDestin. These sales show a **$1,000,000** premium paid for this superior location.   Sale No. Six is from Kelly Plantation. This sale shows a **$700,000** premium for this superior location.   The location adjustments account for the fact that Driftwood Estates does not have uniform development, does not have recreational facilities or direct access to such, does not have a guarded gate, and suffers from inferior streets and drainage.

Thank you for this opportunity.  Call with any questions.

Respectfully,

Michael L. Carroll, MAI, SRA
St. Cert. Gen. REA #0000694

Steve Abbott, et al
vs
Olson and Associates, et al
Exhibit 52

**Southern Values, Inc**

Abbott002807

File No. __2010422__

**DISCLOSURE ADDENDUM**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Intended User | Kish | | | | | | |
| Property Address | 1715 Driftwood Point Rd | | | | | | |
| City | Santa Rosa Beach | County | Walton | State | FL | Zip Code | 32459-3032 |
| Client | Kish | | | | | | |

**DEFINITION OF INSPECTION:**

The term "Inspection", as used in this report, is not the same level of inspection that is required for a "Professional Home Inspection". The appraiser does not fully inspect the electrical system, plumbing system, mechanical systems, foundation system, floor structure, or subfloor. The appraiser is not an expert in construction materials and the purpose of the appraisal is to make an economic evaluation of the subject property. If the client needs a more detailed inspection of the property, a home inspection, by a Professional Home Inspector, is suggested.

**DIGITAL SIGNATURES:**

The signature(s) affixed to this report, and certification, were applied by the original appraiser(s) or supervisory appraiser and represent their acknowledgements of the facts, opinions and conclusions found in the report. Each appraiser(s) applied his or her signature electronically using a password encrypted method. Hence these signatures have more safeguards and carry the same validity as the individual's hand applied signature. If the report has a hand-applied signature, this comment does not apply.

| APPRAISER: | | SUPERVISORY APPRAISER (ONLY IF REQUIRED): | |
|---|---|---|---|
| Signature: | | Signature: | |
| Name: | Michael L. Carroll, MAI, SRA | Name: | |
| Date Signed: | March 26, 2010 | Date Signed: | |
| State Certification #: | St.Cert.Gen.REA #0000694 | State Certification #: | |
| or State License #: | | or State License #: | |
| State: | FL | State: | |
| Expiration Date of Certification or License: | 11/30/2010 | Expiration Date of Certification or License: | |
| | | ☐ Did   ☐ Did Not Inspect Property | |

Southern Values

Abbott002808

File No. 2010422

## PHOTOGRAPH ADDENDUM

Intended User      Kish
Property Address   1715 Driftwood Point Rd
City   Santa Rosa Beach       County   Walton       State   FL       Zip Code   32459-3032
Client          Kish

### COMPARABLE #1

674 Woodland Bayou Dr
Santa Rosa Beach

| | |
|---|---|
| Price | $615,000 |
| Price/SF | 219.64 |
| Date | 11/24/2009 |
| Age | 20 years |
| Room Count | 7-3-2.5 |
| Living Area | 2,800 |
| Value Indication | $1,256,400 |

### COMPARABLE #2

4091 Indian Trail
Destin

| | |
|---|---|
| Price | $750,000 |
| Price/SF | 177.73 |
| Date | 3/4/2010 |
| Age | 15 years |
| Room Count | 7-4-3.5 |
| Living Area | 4,220 |
| Value Indication | $1,295,400 |

### COMPARABLE #3

4053 Indian Trail
Destin

| | |
|---|---|
| Price | $1,500,000 |
| Price/SF | 301.99 |
| Date | 7/13/2009 |
| Age | 22 yrs. / Renov. |
| Room Count | 7-3-3.5 |
| Living Area | 4,967 |
| Value Indication | $1,338,700 |

Southern Values

Abbott002809

File No.    2010422

## PHOTOGRAPH ADDENDUM

Intended User          Kish
Property Address       1715 Driftwood Point Rd
City    Santa Rosa Beach        County   Walton        State   FL        Zip Code   32459-3032
Client          Kish



### COMPARABLE #4

3023 Club Dr
Sandestin

| | |
|---|---|
| Price | $2,750,000 |
| Price/SF | 474.14 |
| Date | 12/4/2009 |
| Age | 12 years |
| Room Count | 8-4-6 |
| Living Area | 5,800 |
| | |
| Value Indication | $1,497,400 |



### COMPARABLE #5

3038 The Oaks
Sandestin

| | |
|---|---|
| Price | $1,812,500 |
| Price/SF | 444.68 |
| Date | 11/18/2009 |
| Age | 9 years |
| Room Count | 8-4-5.5 |
| Living Area | 4,076 |
| | |
| Value Indication | $1,279,300 |



### COMPARABLE #6

4510 Olde Plantation Pl
Destin

| | |
|---|---|
| Price | $2,150,000 |
| Price/SF | 452.06 |
| Date | 9/2/2009 |
| Age | 13 years |
| Room Count | 8-4-5/2 |
| Living Area | 4,756 |
| | |
| Value Indication | $1,256,800 |

Southern Values

Abbott002810

File No. 2010422

## LOCATION MAP

| Intended User | Kish | | | |
|---|---|---|---|---|
| Property Address | 1715 Driftwood Point Rd | | | |
| City | Santa Rosa Beach | County Walton | State FL | Zip Code 32459-3032 |
| Client | Kish | | | |



Southern Values

Abbott002811

File No. 2010422

## FLOOD MAP

| Intended User | Kish | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1715 Driftwood Point Rd | | | | | |
| City | Santo Rosa Beach | County | Walton | State | FL | Zip Code | 32459-3032 |
| Client | Kish | | | | | |



Subject
1715 DRIFTWOOD POINT RD
SANTA ROSA BEACH, FL 32459-3032

N

## Flood Zones

| | Areas inundated by 500-year flooding | | Floodway areas |
|---|---|---|---|
| | Areas outside of the 100- and 500-year flood plains | | Floodway areas with velocity hazard |
| | Areas inundated by 100-year flooding | | Areas of undetermined but possible flood hazards |
| | Areas inundated by 100-year flooding with velocity hazard | | Areas not mapped on any published FIRM |

## Flood Zone Determination

Latitude: 30.414050239743
Longitude: -86.305235621078
Community Name:
UNINCORPORATED AREA
Community: 120317
SFHA (Flood Zone): In
Within 250 ft. of multiple flood zones: No
Zone: AE
Panel: 0541F          Panel Date: 2000-03-07
FIPS Code: 12131      Census Tract: 9506

This Report is for the sole benefit of the Customer that ordered and paid for the Report and is based on the property information provided by that Customer. That Customer's use of this Report is subject to the terms agreed to by that Customer when accessing this product. No third party is authorized to use or rely on this Report for any purpose. NEITHER FIRST AMERICAN FLOOD DATA SERVICES NOR THE SELLER OF THIS REPORT MAKES ANY REPRESENTATIONS OR WARRANTIES TO ANY PARTY CONCERNING THE CONTENT, ACCURACY OR COMPLETENESS OF THIS REPORT, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Neither FARES nor the seller of this Report shall have any liability to any third party for any use or misuse of this Report.

Southern Values

Abbott002812

File No. 2010422

## SKETCH ADDENDUM

| | |
|---|---|
| Intended User | Kish |
| Property Address | 1715 Driftwood Point Rd |
| City | Santa Rosa Beach | County | Walton | State | FL | Zip Code | 32459-3032 |
| Client | Kish |



FIRST FLOOR

SECOND FLOOR

Sketch by Apex Medina™

Comments:

### AREA CALCULATIONS SUMMARY

| Code | Description | Net Size | Net Totals |
|---|---|---|---|
| GLA1 | First Floor | 2549.3 | |
| | Second Floor | 1854.4 | 4403.7 |
| GAR | Garage | 667.7 | 667.7 |
| P/P | Covered Porch | 483.0 | |
| | Screened Porch | 242.0 | 725.0 |
| OTH | Covered Area | 205.9 | 205.9 |
| | | | |
| | Net LIVABLE Area | (rounded) | 4404 |

### LIVING AREA BREAKDOWN

| Breakdown | | | Subtotals |
|---|---|---|---|
| First Floor | | | |
| 13.4 | x | 63.4 | 849.6 |
| 23.8 | x | 61.0 | 1451.8 |
| 1.3 | x | 31.0 | 40.3 |
| 0.8 | x | 46.8 | 37.4 |
| 3.7 | x | 46.0 | 170.2 |
| Second Floor | | | |
| 24.2 | x | 24.9 | 602.6 |
| 59.9 | x | 7.8 | 467.2 |
| 6.3 | x | 12.9 | 81.3 |
| 13.3 | x | 15.2 | 202.2 |
| 1.2 | x | 24.0 | 28.8 |
| 0.2 | x | 53.7 | 10.7 |
| 3.0 | x | 3.5 | 10.5 |
| 1.3 | x | 11.8 | 15.3 |
| 6.5 | x | 17.8 | 115.7 |
| 0.7 | x | 18.5 | 13.0 |
| 1.8 | x | 24.5 | 44.1 |
| 7.0 | x | 15.4 | 107.8 |
| 7.5 | x | 12.7 | 95.3 |
| 3.0 | x | 13.2 | 39.6 |
| 3.0 | x | 3.4 | 10.2 |
| 3.0 | x | 3.4 | 10.2 |
| 21 Items | | (rounded) | 4404 |

Southern Values

Abbott002813

File No. 2010422

## PHOTOGRAPH ADDENDUM

Intended User     Kish
Property Address     1715 Driftwood Point Rd
City     Santa Rosa Beach     County     Walton     State     FL     Zip Code     32459-3032
Client     Kish



1715 Driftwood Point Rd
Kitchen

1715 Driftwood Point Rd
View from Scr. Porch

1715 Driftwood Point Rd
Party Building

Southern Values

Abbott002814

File No. 2010422

## PHOTOGRAPH ADDENDUM

Intended User ___ Kish
Property Address ___ 1715 Driftwood Point Rd
City ___ Santa Rosa Beach    County ___ Walton    State ___ FL    Zip Code ___ 32459-3032
Client ___ Kish



1715 Driftwood Point Rd
Pool / Bay View



1715 Driftwood Point Rd
Shoreline / Seawall



1715 Driftwood Point Rd
Dock / Boathouse

Southern Values

Abbott002815

File No. 2010422

## PHOTOGRAPH ADDENDUM

Intended User     Kish
Property Address     1715 Driftwood Point Rd
City     Santa Rosa Beach     County     Walton     State     FL     Zip Code     32459-3032
Client     Kish



FRONT VIEW OF
SUBJECT PROPERTY

REAR VIEW OF
SUBJECT PROPERTY

STREET SCENE OF
SUBJECT PROPERTY

Southern Values

Abbott002816

File No. 2010422

## ADDITIONAL COMPARABLES

| Intended User | Kish | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1715 Driftwood Point Rd | | | | | | |
| City Santa Rosa Beach | | County Walton | | State FL | | Zip Code 32459-3032 | |
| Client | Kish | | | | | | |

| FEATURE | SUBJECT | COMPARABLE SALE NO. 4 | | COMPARABLE SALE NO. 5 | | COMPARABLE SALE NO. 6 | |
|---|---|---|---|---|---|---|---|
| Address | 1715 Driftwood Point Rd Santa Rosa Beach | 3023 Club Dr Sandestin | | 3038 The Oaks Sandestin | | 4510 Olde Plantation Pl Destin | |
| Proximity to Subject | | 1.06 miles SW | | 1.16 miles SW | | 7.79 miles W | |
| Sale Price | $ N/A | $ 2,750,000 | | $ 1,812,500 | | $ 2,150,000 | |
| Sale Price/Gross Liv. Area | $ sq. ft. | $ 474.14 sq. ft. | | $ 444.68 sq. ft. | | $ 452.06 sq. ft. | |
| Data Source(s) | | MLS #509634, inspection, | | MLS #508627, inspection, | | MLS #522465, inspection, | |
| Verification Source(s) | | Agent | | Agent | | Agent | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment |
| Sale or Financing Concessions | | Cash = | | Cash = | | Cash = | |
| Date of Sale/Time | | 12/4/2009 | | 11/18/2009 | | 9/2/2009 | |
| Location | Average | Excellent | -1,000,000 | Excellent | -1,000,000 | Very Good | -700,000 |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | .54 AC | 1.52 AC | -100,000 | .3 AC | | .91 AC | -100,000 |
| View | 125'Bay/V.Good | 112' Bay | | 86' Bay/V.Good | +100,000 | 180'Bay/V.Good | -50,000 |
| Design (Style) | Very Good | Very Good | | Average-Good | +100,000 | Very Good | |
| Quality of Construction | Very Good | Very Good | | Good | +100,000 | Very Good | |
| Actual Age | 9 years | 12 years | +6,000 | 9 years | | 13 years | +8,000 |
| Condition | Very Good | Very Good | | Good | +50,000 | Very Good | |
| Above Grade | Total / Bdrms. / Baths | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | |
| Room Count | 11 / 4 / 3.5 | 8 / 4 / 6 | -9,000 | 8 / 4 / 5.5 | -6,000 | 8 / 4 / 5/2 | -6,000 |
| Gross Living Area | 4,404 sq. ft. | 5,800 sq. ft. | -139,600 | 4,076 sq. ft. | +32,800 | 4,756 sq. ft. | -35,200 |
| Basement & Finished Rooms Below Grade | N/A | N/A | | N/A | | N/A | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Items | Typical | Typical | | Typical | | Typical | |
| Garage/Carport | 2 Car Garage | 3+ Garage | -10,000 | 2 Car Garage | | 3+ Garage | -10,000 |
| Porch/Patio/Deck | Porches, Pool w/ Spa, Boathouse Party Building. Good landsc., F/P | Pool, Scr.Pch., Summer Kitchen, Fence, Spa, V.G. Landscaping | -0- | Pool, Scr.Pch., F/P, Boathouse | +90,000 | Scr.Pool, Spa, Dock/Boat Lift, 2+FP, BBQ, V.G. Landscap. | -0- |
| Net Adjustment (Total) | | [ ] + [X] - | $ -1,252,600 | [ ] + [X] - | $ -533,200 | [ ] + [X] - | $ -893,200 |
| Adjusted Sale Price of Comparables | | Net Adj. 45.55 % Gross Adj. 45.99 % | $ 1,497,400 | Net Adj. 29.42 % Gross Adj. 81.59 % | $ 1,279,300 | Net Adj. 41.54 % Gross Adj. 42.29 % | $ 1,256,800 |

| ITEM | SUBJECT | COMPARABLE SALE #4 | COMPARABLE SALE #5 | COMPARABLE SALE #6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | N/A | N/A | N/A | N/A |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | Public Records | Public Records | Public Records | Public Records |
| Effective Date of Data Source(s) | Current | Current | Current | Current |

Comment on Sales Comparison    Sales No. Four, Five, and Six are each located in guard gated communities with uniform development, well maintained streets and common areas, and recreational facilities such as golf courses and tennis facilities.  For Sales No. Four and Five, these comparables are located in SanDestin which also includes a marina, commercial districts, and beach access.  The location adjustment accounts for the overall impact of these amenities to the properties when compared to the lack of such amenities.

Southern Values

Abbott002817

Summary Appraisal Report

## Uniform Residential Appraisal Report     File # 2010422

20. I identified the client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. I am aware that any disclosure or distribution of this appraisal report by me or the client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

22. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are denned in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

**SUPERVISORY APPRAISER'S CERTIFICATION:**   The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  Michael L. Carroll, MAI, SRA | Name |
| Company Name   Southern Values | Company Name |
| Company Address   725 E. 24th Plaza | Company Address |
| Panama City, FL 32405 | |
| Telephone Number   850-769-3535 | Telephone Number |
| Email Address | Email Address |
| Date of Signature and Report   March 26, 2010 | Date of Signature |
| Effective Date of Appraisal   3/19/2010 | State Certification # |
| State Certification #   St.Cert.Gen.REA #0000694 | or State License # |
| or State License # | State |
| or Other | Expiration Date of Certification or License |
| State   FL | |
| Expiration Date of Certification or License   11/30/2010 | SUBJECT PROPERTY |
| | ☐ Did not inspect subject property |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did inspect exterior of subject property from street |
| 1715 Driftwood Point Rd | Date of Inspection |
| Santa Rosa Beach, FL 32459-3032 | ☐ Did inspect interior and exterior of subject property |
| APPRAISED VALUE OF SUBJECT PROPERTY  $ 1,300,000 | Date of Inspection |
| CLIENT | |
| Name | COMPARABLE SALES |
| Company Name   Kish | |
| Company Address   1715 Driftwood Point Rd | ☐ Did not inspect exterior of comparable sales from street |
| Santa Rosa Beach, FL 32459 | ☐ Did inspect exterior of comparable sales from street |
| Email Address | Date of Inspection |

RMPF Form 1004 May 2007                         Page 6 of 6

Southern Values

Abbott002818

Summary Appraisal Report

## Uniform Residential Appraisal Report                    File # 2010422

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event.

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

RMPF Form 1004 May 2007                          Page 5 of 8

Southern Values

Abbott002819

Summary Appraisal Report

## Uniform Residential Appraisal Report      File #   2010422

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit, including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. The Appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

RMPF Form 1004 May 2007            Page 4 of 6

Southern Values

Abbott002820

Summary Appraisal Report

## Uniform Residential Appraisal Report

File # 2010422

EXTRA FEATURES: 1,000 s.f. synthetic dock with boat house (2 motor lift, canvas cover), 2 PWC lifts, 60 s.f. storage on dock, seawall with rip rap, sprinklers for lawn, very good landscaping, in-ground pool with hot tub / waterfall, 310 s.f. detached grill / bar party building (high quality with concrete bars, grill, sink, lighted with fans).

Driftwood Estates is located at the north end of Mack Bayou Road, in a peninsula along Choctawhatchee Bay. The Subdivision features varied property uses. The more valuable homes are located along the shores of the bay. Interior homes very widely and include newer homes on very small lots in the center of the neighborhood. Driftwood Point Road features underground utilities, no curbs or sidewalks, and open ditches. On the date of inspection, many of the ditches had standing water.

### COST APPROACH TO VALUE

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)

The Cost Approach is not applicable given the lack of recent land sales and age of the improvements.

| ESTIMATED | REPRODUCTION OR | REPLACEMENT COST NEW | OPINION OF SITE VALUE | =$ |
| --- | --- | --- | --- | --- |
| Source of cost data | | | Dwelling | Sq. Ft. @ $ | =$ |
| Quality rating from cost service | Effective date of cost data | | BSMT | Sq. Ft. @ $ | =$ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | | | |
| | | | Garage/Carport | Sq. Ft. @ $ | =$ |
| | | | Total Estimate of Cost-New | | =$ |
| | | | Less | Physical | Functional | External |
| | | | Depreciation | | | | =$ ( ) |
| | | | Depreciated Cost of Improvements | | =$ |
| | | | "As-is" Value of Site Improvements | | =$ |
| | | | | | =$ |
| Estimated Remaining Economic Life (HUD and VA only) | 60 | Years | Indicated Value By Cost Approach | =$ |

### INCOME APPROACH TO VALUE

Estimated Monthly Market Rent $ ___N/A___ X Gross Rent Multiplier ___ = $ ___ Indicated Value by Income Approach ___

Summary of Income Approach (including support for market rent and GRM)

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No   Unit type(s) ☐ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal name of project

Total number of phases ___ Total number of units ___ Total number of units sold ___

Total number of units rented ___ Total number of units for sale ___ Data Source(s) ___

Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No   If Yes, date of conversion.

Does the project contain any multi-dwelling units? ☐ Yes ☐ No   Data Source(s)

Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No   If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No   If Yes, describe the rental terms and options.

Describe common elements and recreational facilities

RMPF Form 1004 May 2007   Page 3 of 6

Southern Values

Abbott002821

Summary Appraisal Report

## Uniform Residential Appraisal Report

File # 2010422

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| There are N/A comparable properties currently offered for sale in the subject neighborhood ranging in price from $ N/A to $ N/A | | | | | | | |
| There are N/A comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ N/A to $ N/A | | | | | | | |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 1715 Driftwood Point Rd Santa Rosa Beach | 674 Woodland Bayou Dr Santa Rosa Beach | | 4091 Indian Trail Destin | | 4053 Indian Trail Destin | |
| Proximity to Subject | | 3.13 miles SE | | 10.31 miles W | | 9.66 miles W | |
| Sale Price | $ N/A | $ 615,000 | | $ 750,000 | | $ 1,500,000 | |
| Sale Price/Gross Liv. Area | $ sq. ft. | $ 219.64 sq. ft. | | $ 177.73 sq. ft. | | $ 301.99 sq. ft. | |
| Data Source(s) | | MLS #512995, inspection, | | MLS #524174, inspection, | | MLS #514950, inspection, | |
| Verification Source(s) | | Agent | | Agent | | Agent | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment |
| Sale or Financing Concessions | | Cash = | | Cash = | | Cash = | |
| Date of Sale/Time | | 11/24/2009 | | 3/4/2010 | | 7/13/2009 | -120,000 |
| Location | Average | Average | | Average | | Average | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | .54 AC | 1.73 AC | -100,000 | .91 AC | -100,000 | 1.19 AC | -100,000 |
| View | 125'Bay/V.Good | 88' Bay/V.Good | +100,000 | 100' Bay/V.Good | +100,000 | 100' Bay/V.Good | +100,000 |
| Design (Style) | Very Good | Average-Good | +100,000 | Average | +150,000 | Very Good | |
| Quality of Construction | Very Good | Average-Good | +150,000 | Average | +200,000 | Very Good | |
| Actual Age | 9 years | 20 years | +22,000 | 15 years | +12,000 | 22 yrs. / Renov. | |
| Condition | Very Good | Fair | +150,000 | Good | +50,000 | Very Good | |
| Above Grade | Total \| Bdrms. \| Baths | Total \| Bdrms. \| Baths | | Total \| Bdrms. \| Baths | | Total \| Bdrms. \| Baths | |
| Room Count | 11 \| 4 \| 3.5 | 7 \| 3 \| 2.5 | +9,000 | 7 \| 4 \| 3.5 | | 7 \| 3 \| 3.5 | |
| Gross Living Area | 4,404 sq. ft. | 2,800 sq. ft. | +160,400 | 4,220 sq. ft. | +18,400 | 4,967 sq. ft. | -56,300 |
| Basement & Finished Rooms Below Grade | N/A | N/A | | N/A | | N/A | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Items | Typical | Typical | | Typical | | Typical | |
| Garage/Carport | 2 Car Garage | 2 Car Garage | | 3 Car Garage | -10,000 | 2++ Garage | -10,000 |
| Porch/Patio/Deck | Porches, Pool w/ Spa, Boathouse, Party Building, Good landsc, F/P | Porch, Shutters, Pool, Spklr., Boat Dock/B.Hse. | +50,000 | Scr.Porch, Spklr., 2+ F/P, Storage, Dock, S.wall | +125,000 | Porches, 2+ F/P, Boathouse, Pool, Spklr., Pond, S.Wall | +25,000 |
| Net Adjustment (Total) | | [X] + [ ] - | $ 641,400 | [X] + [ ] - | $ 545,400 | [ ] + [X] - | $ -161,300 |
| Adjusted Sale Price of Comparables | | Net Adj. 104.29 % Gross Adj. 136.81 % $ 1,256,400 | | Net Adj. 72.72 % Gross Adj. 102.05 % $ 1,295,400 | | Net Adj. 10.75 % Gross Adj. 27.42 % $ 1,338,700 | |

I [X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s) Public records
My research [ ] did [X] did not reveal any prior sales or transfers of the comparable sales for the prior year to the date of sale of the comparable sale.
Data Source(s) Public records
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | N/A | 1/05 @ $1,260,000 | N/A | N/A |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | Public Records | Public Records | Public Records | Public Records |
| Effective Date of Data Source(s) | Current | Current | Current | Current |

Analysis of prior sale or transfer history of the subject property and comparable sales  Prior sales for Sale No. One illustrates recent value declines.

Summary of Sales Comparison Approach  All six sales are reasonable indicators of value for the Subject. Sales No. One, Two, and Three are in comparable locations. Sales No. Four, Five, and Six are in guard gated subdivisions with more uniform development, superior common elements, and substantial recreational amenities.

Indicated Value by Sales Comparison Approach $1,300,000
Indicated Value by: Sales Comparison Approach $1,300,000  Cost Approach (if developed) $N/A  Income Approach (if developed) $N/A

This appraisal is made [X] "as is," [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statements of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 1,300,000 , as of 3/19/2010 , which is the effective date of this appraisal.

RMPF Form 1004 May 2007                    Page 2 of 6

Southern Values

Abbott002822

Summary Appraisal Report

## Uniform Residential Appraisal Report
File # 2010422

The purpose of this summary appraisal report is to provide the client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

| | |
|---|---|
| Property Address 1715 Driftwood Point Rd | City Santa Rosa Beach | State FL | Zip Code 32459-3032 |
| Owner Kish | Intended User Kish | County Walton |
| Legal Description Lot 11-E of Lot 11 Block J. Driftwood Estates | | |
| Assessor's Parcel # 11-2S-21-42010-00J-011E | Tax Year 09 | R. E. Taxes $5,760 |
| Neighborhood Name Driftwood / N. Santa Rosa Beach | Map Reference Walton | Census Tract 9506 |
| Occupant [X] Owner [ ] Tenant [ ] Vacant | Special Assessments $ | PUD | HOA $110 [ ] per year [X] per month |
| Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe) | | |

Intended Use: Litigation

Client Kish  Address 1715 Driftwood Point Rd, Santa Rosa Beach, FL 32459

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of the appraisal? [ ] Yes [X] No

Report data source(s) used, offering price(s), and date(s). Local MLS Data

**CONTRACT**

I [ ] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. N/A

Contract Price $ N/A  Date of Contract N/A  Is the property seller the owner of public record? [ ] Yes [ ] No  Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the client? [ ] Yes [ ] No

If Yes, report the total dollar amount and describe the items to be paid: N/A

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location | Urban [ ] Suburban [X] Rural [ ] | Property Values | Increasing [ ] Stable [ ] Declining [X] | PRICE | AGE | One-Unit | 60.0 % |
| Built-Up | Over 75% [ ] 25-75% [X] Under 25% [ ] | Demand/Supply | Shortage [ ] In Balance [ ] Over Supply [X] | $(000) | (yrs) | 2-4 Unit | 5.0 % |
| Growth | Rapid [ ] Stable [ ] Slow [X] | Marketing Time | Under 3 mths [ ] 3-6 mths [ ] Over 6 mths [X] | 135 Low | New | Multi-Family | 5.0 % |

Neighborhood Boundaries N. Santa Rosa Beach - Along the southern shore of Choctawhatchee Bay
| | | | 2,000 High | 35 | Commercial | 5.0 % |
| | | | 650* Pred. | 10-20 | Other | 25.0 % |

Neighborhood Description The area includes mixed property uses. Most bay-front parcels are improved with detached homes. See Driftwood Estates comments on page 3. *Predominant value is for bay-front properties. Some bay-front homes are valued in the $1,000,000 to $2,500,000 range.

Market Conditions (including support for the above conclusions) Market conditions are fair. Values have been declining at unprecedented rates since 2006. Properties listed at or near market value tend to sell in less than 12 months. Foreclosures and short sales make up a large part of the market and are driving down values.

**SITE**

| | |
|---|---|
| Dimensions 125' x 175' (more or less) | Area .54 AC | Shape Irregular | View 125' Bay / V.Good |
| Specific Zoning Classification DRI / Mixed Use | Zoning Description Detached houses | |
| Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe) | | |
| Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No If No, describe | | |

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | X | | Water | X | | Street | Asphalt | | X |
| Gas | | | Sanitary Sewer | X | | Alley | N/A | | |

FEMA Special Flood Hazard Area [X] Yes [ ] No  FEMA Flood Zone AE  FEMA Map No. 120317 0541F  FEMA Map Date 2000-03-07

Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No If Yes, describe

A survey was not provided. The site dimensions, site area, and flood zone status should be verified with a current survey. The Subject is located along the shores of Choctawhatchee Bay. Boat access is fair due to very shallow water. The Subject is located on a short cul-de-sac with an automated gate.

**IMPROVEMENTS**

| General Description | | Foundation | | Exterior Description | materials/condition | Interior | materials/condition |
|---|---|---|---|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | [X] Concrete Slab [ ] Crawl Space | Foundation Walls | Slab / Good | Floors | Wd. Tile Cp./V.G. |
| # of Stories 1 1/2 | [ ] Full Basement [ ] Partial Basement | Exterior Walls | Stucco / Good | Walls | S.Rock / V.G. |
| Type [X] Det. [ ] Att. [ ] S-Det/End Unit | Basement Area sq. ft. | Roof Surface | Tile / Good | Trim/Finish | Good |
| [X] Existing [ ] Proposed [ ] Under Const. | Basement Finish % | Gutters & Downspouts | Metal / Good | Bath Floor | Tile/Good |
| Design (Style) Custom | [ ] Outside Entry/Exit [ ] Sump Pump | Window Type | Insulated / Good | Bath Wainscot | Tile/Good |
| Year Built 2001 | Evidence of [ ] Infestation | Storm Sash/Insulated | N/A | Car Storage | [ ] None |
| Effective Age (Yrs) 5 | [ ] Dampness [ ] Settlement | Screens | Screens / Good | [X] Driveway # of Cars |

| Attic | [ ] None | Heating [X] FWA [ ] HWBB [ ] Radiant | Amenities | | [ ] WoodStove(s) # | Driveway Surface Concrete |
|---|---|---|---|---|---|---|
| [ ] Drop Stair [ ] Stairs | [ ] Other Fuel Electric | [X] Fireplace(s) # 2 | [X] Fence V.Good | [X] Garage # of Cars 2 |
| [ ] Floor [X] Scuttle | Cooling [X] Central Air Conditioning | [X] Patio/Deck | [X] Porch Covrd. | [ ] Carport # of Cars |
| [ ] Finished [ ] Heated | [ ] Individual [ ] Other | [X] Pool W/H.T. | [X] Other Spklr. | [X] Att. [ ] Det. [ ] Built-in |

Appliances [X] Refrigerator [X] Range/Oven [X] Dishwasher [X] Disposal [X] Microwave [ ] Washer/Dryer [X] Other (describe) Wine Cooler

Finished area above grade contains: 11 Rooms  4 Bedrooms  3.5 Bath(s)  4,404 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.) 9' - 10' ceilings with crown molding, built-in cabinetry, granite kitchen counter tops, high-end appliances, d. oven, security, sound system, Rinnai hot water. See page 3.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). The Subject is of very good quality and design. The master bedroom is on the first level. The overall design and appeal is very good. Overall, the condition is very good. No repairs needed.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No If No, describe

Southern Values

Abbott002823



# SANDESTIN RESORT



STATE OF FLORIDA

# DEPARTMENT OF COMMUNITY AFFAIRS

*"Dedicated to making Florida a better place to call home"*

**CHARLIE CRIST**
Governor

**THOMAS G. PELHAM**
Secretary

May 14, 2007

Ms. Pat Blackshear
Director of Planning and Community Development
31 Coastal Center Boulevard, Suite 130
Santa Rosa Beach, Florida 32459

Dear Ms. Blackshear:

This is to inquire about the Sandestin Development of Regional Impact in regard to implementation of development order provisions pertaining to access, stormwater, and evacuation. We have received information from concerned residents from the Driftwood Estates Subdivision who have requested that the Department take appropriate enforcement action to ensure consistency with the development order. Before considering such action we would appreciate Walton County's comment.

The Sandestin DRI was originally approved on October 19, 1976, as a mixed use resort with residential, commercial and office uses. An agreement in 1984 and several amendments have been reviewed by the Department.

Information provided by residents of the Driftwood Estates indicates that development activities may have occurred that are inconsistent with development order conditions. The Department would like to receive the County's comment with regard to three issues that appear have regional significance.

First, as incorporated into the original development order and reinstated in the subsequent 1984 agreement and development order, the project is required to provide minimum stormwater standards that are outlined in 19b(2)(d) of the Application for Development Approval as incorporated. The project is required to provide stormwater treatment to retain the runoff from a three year 24 hour event (6.7 inches of rainfall), and stormwater facilities must be designed consistent with the Department of Environmental Protection rules regarding discharge to waters of the state. The Department noted in the 1984 development order that stormwater provisions would remain adequate if proper siltation methods during construction were followed and recommended the development address recommendations to include standards for a 5-year storm event. Section 19b(2) of the application indicates that no water retention areas will discharge into any of the public waters surrounding the Sandestin DRI. The project indicates that "in all cases

2555 SHUMARD OAK BOULEVARD    TALLAHASSEE, FLORIDA 32399-2100
Phone: 850.488.8466/Suncom 278.8466    FAX: 850.921.0781/Suncom 291.0781
Internet address: http://www.dca.state.fl.us

CRITICAL STATE CONCERN FIELD OFFICE
2796 Overseas Highway, Suite 212
Marathon, FL 33050-2227
(305) 289-2402

COMMUNITY PLANNING
2555 Shumard Oak Boulevard
Tallahassee, FL 32399-2100
(850) 488-2356

HOUSING & COMMUNITY
DEVELOPMENT
2555 Shumard Oak Boulevard
Tallahassee, FL 32399-2100
(850) 488-7956

EXHIBIT
**D4**



Cynthia L. Abbott, et al
vs
Olson and Associates, et al
Exhibit 80

DCA 01319



Ms. Pat Blackshear
Page 2
May 14, 2007

the handling of storm run-off, any liquid discharges…will be assimilated into the vegetation, soils and internal lake system within the Sandestin area." The application also indicates in 19b(2)(d) that all run off will be filtered and possibly re-used and in section 20b(4), the application indicates that lake canals will approach but remain approximately 150 – 200 feet from the Choctawhatchee Bay. The application also indicates that additional water quality monitoring is required should discharge to the Choctawhatchee Bay occur from the project.

During a visit to the Sandestin DRI it was brought to our attention that stormwater may be directly discharged to the Choctawhatchee Bay via pipes. It is unclear if this stormwater is being retained and is receiving preliminary treatment consistent with the development order. The Department also received a copy of a plat for the southerly portion of Parcel 561 (see attachment 1). The plat indicates the intent to develop the area as primarily residential. The current development order Master Plan Exhibit indicates the intent to develop residential but also includes substantial areas for stormwater and recreation. These areas are absent from the plat plan. The Department requests the County clarify how the project is meeting the requirements for stormwater volume control, treatment and discharge per the existing requirements in the development order.

Second, vehicular access to the project is provided at points along US 98. In reviewing the most recent master plan for the Sandestin DRI it shows that internal circulation is provided by a spine road known as Baytowne Avenue/Club Drive and another connection, Route 457, in the eastern portion of the project. The entrance points provide access to the western portion of the project and eastern portion of the project respectively. It is our understanding residents of the northern portion of the Sandestin project are directed to the most eastern access road due to the fact the spine road was changed to terminate just north of a subdivision known as Burnt Pines Estates. Based on the latest master plan on file with the Department, the current internal configuration does not terminate but continues through to Driftwood Estates and Shipwreck Roads and provides a large loop system providing access to the entirety of the project.

The Department requests the County clarify how the current internal circulation is consistent with the development order and with the master plan exhibit that identifies an internal circulation allowing movement of residents throughout the project and identifies Baytowne Avenue as a common road accessible by residents. It is not clear how termination of the internal road is consistent with the development order.

Third, it has been brought to our attention that access to Driftwood Estates may be vulnerable to flooding. The application indicates that elevations in the Four Mile Point area range from 2 feet to 14 feet above sea level. Residents in the northern portion of the project have one egress in and out of the project exiting at the most eastern north/south roadway within the project. It is also our understanding that at least one portion of the identified evacuation route for Driftwood Estates is subject to flooding during normal rain events and is listed as flood prone during natural storm events including tropical storms and hurricanes. The Department is concerned that by having an egress route located below flood elevations and the inability of residents to use the slightly higher elevated western spine road may hamper or prevent evacuation during storm events. As you know the ability to evacuate safely during a storm event is a local, regional and state issue. The Department requests the developer and County analyze evacuation implications created by the current egress option and internal circulation.

Additionally, the development order identifies the Baytown Avenue spine road as a common roadway accessible by a majority of residents. It is our understanding that a portion of the roadway has been vacated by the County and that there is current dispute regarding whether the

2

DCA 01320

Ms. Pat Blackshear
Page 3
May 14, 2007

road was properly vacated. Regardless of the dispute regarding road right-of-way, it appears that the development order has not been revised to recognize the vacation of the roadway or the revision to the internal circulation. The master plan exhibit map available to the Department continues to show the roadway as one that is common to the development and accessible by residents. It is not clear the current implementation of the project, because of the circulation and egress issues, is consistent with development order provisions shown in the master plan exhibit that work to maintain internal circulation and to provide an adequate evacuation route for residents in the northern portion of the development.

We are interested in receiving your report on these issues at your earliest opportunity. Should you have any questions please contact my staff Susan Poplin, AICP, Regional Planning Administrator at 850/922-1821.

Sincerely,

Charles Gauthier, AICP
Director, Division of Community Planning

CG/sps

cc:  Terry Joseph, Executive Director, West Florida Regional Planning Council

DCA 01321

| From: | Laurie Hobbs (SAN) |
| To: | Mike Stange (SAN); Sharon Gold (SAN) |
| Sent: | 9/25/2008 2:47:02 PM |
| Subject: | County and Driftwood Estates Issues |

I had a good conversation with County Attorney Mike Burke this morning.

Here's the bottom line:

- There was some accuracy to Nate Kelly's story. Although Sandestin is not mentioned in the County notes by name, the County is sending the legal bills (re: the "road") to the "Owners Association" c/o Rick Peterman. He made reference to an agreement in the 1980s and an indemnity agreement but he did not go into detail.

- The good news is that Mike Burke recommended to the board at the September 23 meeting this week for the county not to join the law suit against Intrawest, Olson, Adams and Campbell Engineering regarding the DRI issues.

- Mike Burke asked for Sharon/Sandestin to schedule a meeting with him and Ronnie Bell at the earliest convenience to sort through some items as they relate to "compliance". He was the County Board to report at its next commission meeting that there is a "meeting scheduled," and to help silence Allen Osborne.

I have the impression that Mike is a fan of good communication with us here at Sandestin and he'd like Mr. Osborne to not consume so much attention at the regular meetings.

Based on this information and from a PR perspective, it is not appropriate to ask the Sun to do a retraction at this time.

However, I would like the facts and the major copy points that support our position on both the road and the DRI issues if you have them Sharon. Based on the strength of that information, it could be worthwhile for me to provide Nate Kelly with advance background information so we have a better defense in the media next time a story is written.

I hope that's helpful information.

Please feel free to call if you have any questions, and I'll look forward to helping you on the management of issues like this if/when they have media implications.

With best regards, Laurie

Laurie A. Hobbs
Director, Public Relations
Sandestin Golf and Beach Resort
www.sandestin.com
9300 Emerald Coast Pkwy West
Destin FL, 32550

Office:  (850) 267-8261
Mobile:  (850) 428-3327
Fax:     (850) 267-6440

 **Sandestin**
Golf and Beach Resort


Cynthia L. Abbott, et al
vs
Olson and Associates, et al
Exhibit 121

          CONFIDENTIAL

*Find your way back to Sandel  v and*  *discover The  lage of Baytowne Wharf.*

February 6, 2003

Linda Clark, Planning Technician
Walton County Growth Management
25220 Hwy 331 South
Santa Rosa Beach, FL
(850) 267 1955 tel
(850) 267 9133 fax

Re:    Sandestin DRI – North of Highway 98 – parcel acreage reconciliation

Dear Ms. Clark,

Please find attached for your records our updated Sandestin Property map
and Master Plan Summary for the property within the Sandestin Development
of Regional Impact.   Over the past few months, we have worked with our
surveyor, Emerald Coast Association Land Surveyors, to quantify our parcel
property boundaries and actual acreages for the land within our DRI.   The
information that we are presenting are true representations of our parcels with
respect to the current approved Master Plan Summary included as Exhibit A in
the Walton County Ordinance NO. 2002-18.

The Master Plan Summary attached includes the following: the 1984
Benchmark Data, Current Approved with respect to the 2002 NOPC, and our
up to date information labeled "2003 actual." Please note that this submission
is our first installment and a work in progress, and includes North of Highway
98 only. We will continue our efforts to complete the same information for the
land included in the DRI that is South of Highway 98. We expect that we will
be able to present this information in advance of the Sandestin DRI
Development Order's November 2003 Annual Status Report.

### OVERALL ACREAGE – NORTH OF HIGHWAY 98

Our surveyors have calculated the total acreage within the DRI for this area to
be 1856.9 acres, compared to the overall acreage of 1872.3 acres that was
measured and use since 1984.



Cynthia L. Abbott, et al
vs
Olson and Associates, et al
Exhibit 136

## Sandestin™
Golf and Beach Resort

9300 Emerald Coast Parkway West ■ Sandestin, Florida 32550 ■ 850.267.8000 ■ www.sandestin.com

NGN 000917

## NORTH OF HIGHWAY 98 – NON-RESIDENTIAL – COMMERCIAL USE

There is no change in parcel numbers, Current Owner Affiliation, Commercial Land use, or Total Projected Units/sf. The acreage for each of these parcels has been updated. The net effect of this reconciliation is that our current actual/planned acreage is 13.9 acres less that in our 2002 Approved acreage (a decrease from 138.8 acres to 124.9 acres).

## NORTH OF HIGHWAY 98 – RESIDENTIAL

The actual acreage for each parcel of land has been updated in the Master Plan Summary. Each developed subdivision contains the actual acreage taken from the recorded plat. In addition, as many of these residential plats have been recorded with land that falls within the open space category of the DRI, we have tabulated the actual open space in each of these parcels to be deducted from the residential land use category. This open space acreage has then been added to the open space category in the Master Plan Summary. There has be no change to the parcel numbering, land use categories, or Total projected Units/sf, other than the Like-Kind transfers submitted to date: Parcel 231S to 340 transfer, dated January 8, 2003; Parcel 433 to 340, dated February 6, 2003; Driftwood, dated February 6, 2003. The net result of the reconciliation is a net decrease in residential acreage of 16.4 acres from our 2002 NOPC acreage. (Decrease from 755.7 acres to 739.3 acres.)

## OPEN SPACE

The Master Plan Summary includes actual acreages of all open space within the DRI, North of Highway 98. The overall acreage of open space has been calculated by subtraction of the Residential and Non-Residential acreage from the overall acreage. Sub-categories that have been quantified by our surveyors and labeled on the attached drawings are: Major ROW, Neighborhood ROW, Power Line ROW, Lakes (Sandestin), Nature Preserve, and Archeological. The Driftwood Lake and Greenbelt categories have been separated from the Lakes and Greenbelt areas within Sandestin Resort. Olson and Associates will quantify these open space acreages within the Driftwood Development Order submission. The net result of the reconciliation is a net increase in open space of 14.9 acres from our 2002 Approved acreage. (Increase from 977.8 to 992.7 acres.)

NGN 000918

## SUMMARY:

The attached Master Plan Summary and survey map is being presented in an effort to update the historical data of estimated and proposed development acreages into a true and accurate account of our development to date. We are not proposing changes to the DRI; rather, we are quantifying the actual acreage for land within the DRI, North of Highway 98. We plan to proceed with the same exercise on the property South of Highway 98. Prior to our future submission, due to the time and expense in this procedure, we would like to receive written confirmation from the county that the information and format is acceptable with respect to moving forward for all future approvals within the Sandestin DRI for submissions North of Highway 98.

Please do not hesitate to contact me directly if you have any further questions or comments. I can be reached directly at (850) 267 6242 or by cell at (850) 428 0014.

Sincerely,

Ian McCook
Director of Development – Land

cc:    Terry Joseph - NFRPC
       Connie Wynne

• Page 3

NGN 000919

MASTER PLAN SUMMARY
NORTH OF HIGHWAY 98

RESIDENTIAL LAND USE / NORTH OF HIGHWAY 98

| Benchmark | | | | Current: 2002 Approved | | | Actual 2003 | | |
|---|---|---|---|---|---|---|---|---|---|
| 1984 Land Use | Acres | Total Projected Units / Sq.Ft. | 1989 Bayou Lake Acres/Unit | 2002 Land Use | Acres | Total Projected Units / Sq.Ft. | 2003 Land Use | Acres | Total Projected Units / Sq.Ft. |
| H | 65.7 | 1,456 | | H | 34.2 | 1,179 | H | 35.8 | 1096.0 |
| M/H | 77.8 | 1,446 | | M/H | 110.7 | 1,294 | M/H | 107.3 | 1299.0 |
| M | 259.3 | 2,638 | | M | 218.90 | 1,710 | M | 316.4 | 1789.0 |
| L | 334 | 987 | 46 | 117 | L | 391.90 | 1,152 | L | 392.2 | 1151.0 |

Total Platted/undeveloped parcel acreage: 851.7

Less: Additional Greenbelt in Driftwood subdivision 38.3
Less: Open Space ROW in platted subdivisions 74.1

| 736.8 | 6,527 | 46 | 117 | | 755.7 | 5,335 | | 739.3 | 5,335 |

NON RESIDENTIAL LAND USE / NORTH OF HIGHWAY 98

| Benchmark | | | Current: 2002 Approved | | | Actual 2003 | | |
|---|---|---|---|---|---|---|---|---|
| 1984 Land Use | Acres | Total Projected Units / Sq.Ft. | 2002 Land Use | Acres | Total Projected Units / Sq.Ft. | 2003 Land Use | Acres | Total Projected Units / Sq.Ft. |
| Community Services | 62.0 | 75,500 | CS | 53.0 | 74,000 | CS | 46.4 | 74,000 |
| Commercial | 48.1 | 550,000 | C | 57.1 | 756,695 | C | 60.5 | 756,695 |
| Clubs | 14.7 | 30,000 | CL | 28.7 | 40,000 | CL | 18.0 | 40,000 |
| Hotel Units | | | | in above | 300 | | 0.0 | 300 |

| 124.8 | 655,500 | | 138.8 | 870,995 | | 124.9 | 870,995 |

LAND USE COMPARISON / NORTH OF HIGHWAY 98

| | Benchmark | Current: | Actual |
|---|---|---|---|
| | 1998 Acres | 1989 Lake Bayou | 2002 Acres | 2003 Acres |
| Residential | 736.8 | 46.2 | 755.7 | 739.3 |
| Non-Residential | 124.6 | | 138.8 | 124.9 |
| Open Space | 952.2 | 12.5 | 977.8 | 992.7 |

| 1,813.6 | 58.7 | 1,872.3 | 1,856.9 |

OPEN SPACE BREAKDOWN / NORTH OF HIGHWAY 98

| | Benchmark 1984 Acres | Current 2002 Acres | Actual 2003 Acres |
|---|---|---|---|
| Major ROW (Collection) | | 67.3 | 30.1 |
| Neighborhood ROW | 67.6 | | 37.1 |
| Power Line ROW | - | 15.6 | 15.6 |
| Lakes: Sandestin | 15.3 | 217.9 | 128.1 |
| Lakes: Driftwood | 208.4 | - | 13.0 |
| Golf/Greenbelts: Sandestin | 478.3 | 483.0 | 544.9 |
| Golf/Greenbelts: Driftwood | | - | 25.3 |
| Nature Preserve | 71.0 | 168.2 | 185.6 |
| Archaeological | 18.3 | 15.2 | 13.1 |
| Athletic/Recreation | 8.3 | 10.6 | in Golf |
| Tennis Center | 11.5 | | |
| Equestrian Center | 39.0 | | |
| Horse Trails | 34.5 | | |

*in golf club facility

| 952.2 | 977.8 | 992.7 |

NGN 000920

Master Plan                                         Exhibit A                                                     February 14, 2003

## Master Plan
### North of HWY. 98 Residential

| | 1984 - Benchmark | | | 2002 Approved | | | | 2003 Actual | | | | | | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Land Use | Acres | Total Projected Units/sf | Parcel Number | Land Use | Acres | Total Projected Units/sf | Parcel Number | Land Use | 2003 Platted Parcel Acreage | Open space in plat Included | Actual Parcel Acres | Total Projected Units/sf | |
| **NORTH OF 98 RESIDENTIAL** | | | | | | | | | | | | | | |
| Parcel No.  Current Owner/Affiliate | | | | | | | | | | | | | | |
| 024B  Subdivided | L | 7.0 | 19 | 024B | L | 7.00 | 19 | 024B | L | 7.346 | | 7.3 | 19 | COVE AT 17 |
| 024C  Subdivided | M | 5.3 | 25 | 024C | L | 5.30 | 15 | 024C | L | 2.927 | | 2.9 | 15 | COVE AT 17 |
| 220  Sandestin/subdivided | M/H | 8.6 | 150 | 220 | M/H | 7.70 | 134 | 220 | M/H | 7.092 | | 7.1 | 134 | ANCHORAGE (29), IROC phase I (59) and II (42) |
| 221A  Sandestin | M/H | 10.7 | 180 | | | | | | | | | | | |
| 221B  Sandestin | M/H | 13.8 | 15 | | | | | | | | | | | |
| 222  Sandestin | H | | 260 | | | | | | | | | | | |
| 223  Sandestin | M/H | 6.0 | 96 | | | | | | | | | | | |
| 224  Subdivided | M | 1 | 144 | 224 | | | | 224 | M/H | 2.587 | | 2.6 | 40 | HERON WALK |
| Nonaffiliated | | | | 224A | M/H | 10.80 | 164 | 224A | M/H | 7.816 | | 7.8 | 93 | OSPREY POINT |
| Subdivided | | | | 224B | | | | 224B | M/H | 6.151 | 0.9 | 7.2 | 31 | BAYPINES I & II |
| 230  Subdivided | M | 11.7 | 78 | 230 A/B | M | 12.20 | 95 | 230 A/B | M | 11.796 | 2.4 | 9.4 | 95 | ST ANDREWS DRIVE 1, 2, & 3 |
| 231N  Subdivided | M | 7.5 | 90 | 231N | M | 7.50 | 54 | 231N | M | 9.475 | | 9.5 | 54 | MAGNOLIA BAY PH 1 & 2, & TURNBERRY PH 1 & 2 |
| 231S  Subdivided | M | 7.6 | 94 | 231S | M/H | 7.50 | 106 | 231S | M/H | 5.175 | 0.8 | 4.3 | 57 | TURNBERRY VILLAS |
| 232  Subdivided | M | 3.3 | 32 | 232 | M | 3.30 | 26 | 232 | M | 4.435 | | 4.4 | 26 | THE FOUNTAINS |
| 233  Subdivided | M | 8.8 | 87 | 233 | M | 9.60 | 95 | 233 | M | 6.061 | 2.0 | 6.1 | 95 | PRESTWICK PLACE |
| 234 | M | 9.5 | 113 | | | | | | | | | | | |
| 235  Subdivided | L | 10.5 | 38 | 235 | L | 17.40 | 83 | 235 | L | 14.666 | 2.7 | 11.9 | 83 | TROON DRIVE |
| 311  Subdivided | H | 14.9 | 365 | 311 | M | 10.80 | 63 | 311 | M | 9.285 | 2.1 | 7.2 | 63 | DEERWOOD DRIVE PHASES 1-4 |
| 317  Nonaffiliated | H | 14.7 | 365 | 317 | H | 8.10 | 201 | 317 | H | 9.744 | | 9.7 | 201 | POINT OF VIEW APTS |
| 318  Subdivided | | | | 318 | L | 6.60 | 43 | 318 | L | 8.134 | 0.5 | 7.7 | 43 | DELMAR AT SANDESTIN |
| 319  Subdivided | | | | 319 | M | 4.20 | 35 | 319 | M | 3.580 | | 3.8 | 35 | PHASE 4 BAYTOWNE AVENUE EAST |
| 320  Sandestin | M/H | 22.4 | 416 | 320 | H | 20.20 | 838 | 320 | H | 18.961 | | 19.0 | 838 | GRAND SANDESTIN/GATEWAY |
| 322  Sandestin | H | 7.0 | 140 | 322 | M/H | 10.00 | 170 | 322 | M/H | 9.596 | | 9.5 | 170 | UNDEVELOPED TRACT 332 |
| 330  Subdivided | M/H | 5.5 | 56 | 330 | M | 8.50 | 64 | 330 | M | 5.533 | 1.1 | 4.4 | 64 | LEGEND CREEK |
| 331  Sandestin | M | 11.0 | 131 | 331 | M | 15.00 | 130 | 331 | M | 15.010 | | 15.0 | 130 | UNDEVELOPED TRACT 331 |
| 332  Sandestin | M | 16.5 | 197 | 332 | M | 25.20 | 146 | 332 | M | 28.290 | | 28.3 | 146 | UNDEVELOPED TRACT 332 |
| 333  Subdivided | M | 8.4 | 84 | 333 | L | 28.00 | 139 | 333 | L | 24.074 | 4.2 | 18.9 | 139 | ISLAND GREEN PHASES 1 - 3 |
| 334  Sandestin | M | 11.7 | 118 | 334 | M/H | 23.40 | 375 | 334 | M/H | 24.627 | | 24.6 | 375 | LAUREL GROVE |
| SUBTOTAL | | **218.90** | | | | **250.3** | **2,995** | | | **246.343** | **16.7** | **229.5** | **2,946** | |

NGN 000921

2/6/2003 8:16 AM
DRI - 2003 Actual Acreage Reconciliation

Master Plan  Exhibit A  February 14, 2003

| | | 1984 - Benchmark | | | 2002 Approved | | | | 2003 Actual | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| / | | Land Use | Acres | Total Projected Units/sf | Parcel Number | Land Use | Acres | Total Projected Units/sf | Parcel Number | Land Use | 2003 Actual Parcel Acreage | Open space in plat included | Actual Parcel Acres | Total Projected Units/sf | SUBDIVISION NAME |
| 335 | | L | 6.6 | 26 | | | | | | | | | | | |
| 336 | Sandestin | L | 10.8 | 43 | 336 | L | 12.1 | 38 | 336 | L | 15.281 | | 15.3 | 38 | PHASE 2 BAYTOWNE AVE EAST |
| 337 | | M | 9.9 | 100 | | | | | | | | | | | |
| 338 | | M | 12.5 | 149 | | | | | | | | | | | |
| 339 | | L | 6 | 24 | | | | | | | | | | | |
| 340 | Sandestin | L | 11.3 | 45 | 340 | M/H | 46.2 | 250 | 340 | M/H | 38.812 | 6.4 | 32.4 | 304 | PHASE I OLDETOWNE & CRYSTAL LAKE |
| 341 | Sandestin | L | 19.1 | 76 | 341 | L | 25.8 | 89 | 341 | L | 13.201 | 1.7 | 11.5 | 89 | PHASE 1 BAYTOWNE AVENUE EAST |
| 411 | Sandestin | | | | 411 | M | 5.4 | 32 | 411 | M | 5.378 | | 5.4 | 32 | PHASE IV OF CLUB DRIVE |
| 412 | Sandestin | | | | 412 | L | 14.2 | 70 | 412 | L | 13.268 | 1.0 | 12.3 | 70 | CLUB DRIVE PH II & BURNT PINE COVE |
| 413 | Sandestin | | | | 413 | L | 24.7 | 42 | 413 | L | 20.884 | 2.7 | 18.2 | 42 | SANDESTIN BAY ESTATES PH 2 & 3 |
| 414 | Sandestin | | | | 414/415 | L | 20.5 | 93 | 414/415 | L | 20.473 | 0.5 | 20.0 | 93 | BURNT PINE LANE |
| 416 | Sandestin | | | | 416 | M | 7.6 | 47 | 416 | M | 7.554 | | 7.6 | 47 | CLUB DRIVE PH III |
| 417 | Sandestin | | | | 417 | L | 17.9 | 31 | 417 | L | 20.639 | 3.0 | 17.6 | 31 | MERION AT BURNT PINT |
| 419 | Sandestin | | | | 419 | L | 5.0 | 24 | 419 | L | 4.776 | | 4.6 | 24 | PHASE 1 CLUB DRIVE |
| 420 | | H | 4.8 | 96 | | | | | | | | | | | |
| 421 | | M/H | 10.3 | 206 | | | | | | | | | | | |
| 422 | Sandestin | M/H | 19.8 | 383 | 420 | L | 35.0 | 59 | 420 | L | 26.235 | 4.8 | 21.4 | 59 | PINE VALLEY |
| 423 | Sandestin | H | 10.5 | 210 | 423 | M | 15.6 | 107 | 423 | M | 10.182 | 3.3 | 6.8 | 107 | PRESERVE AT BURNT PINE |
| 426 | Sandestin | | | | 424 | L | 7.7 | 46 | 424 | L | 8.786 | 0.4 | 8.4 | 46 | PRESERVE AT BURNT PINE PHASE II |
| 428 | Sandestin | | | | 428 | M | 11.0 | 124 | 428 | M | 8.314 | 0.7 | 7.6 | 124 | PRESERVE AT BURNT PINE |
| 430 | | M | 11.4 | 136 | | | | | | | | | | | |
| 431 | | M | 12.9 | 154 | | | | | | | | | | | |
| 432 | Sandestin | M | 10.3 | 123 | 432 | L | 6.1 | 7 | 432 | L | 5.570 | | 5.6 | 7 | PH 1 SANDESTIN BAY ESTATES |
| 433 | Sandestin | M | 6.2 | 62 | 433 | L | 12.2 | 35 | 433 | L | 12.377 | 2.6 | 9.8 | 30 | BAY VILLAS/BAY VILLA COURT |
| 434 | Sandestin | M | 11.3 | 135 | 434 | L | 17.9 | 50 | 434 | L | 15.074 | | 15.1 | 50 | ARROWHEAD AT BURNT PINE |
| SUBTOTAL | | | | | | | 284.9 | 1,144.0 | | | 246.804 | 27.0 | 219.8 | 1,193.0 | |

2/6/2003 8:16 AM
DRI - 2003 Actual Acreage Reconciliation

Sandestin DRI, WC presentation, Feb 4, 2003

Page 3

NGN 000922

|  |  | 1984 - Benchmark | | | 2002 Approved | | | | 2003 Actual | | | | | | |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | Land Use | Acres | Total Projected Units/sf | Parcel Number | Land Use | Acres | Total Projected Units/sf | Parcel Number | Land Use | 2003 Actual Parcel Acreage | Open space in plat included | Actual Parcel Acres | Total Projected Units/sf | SUBDIVISION NAME |
| 435 |  | L | 5.8 | 23 |  |  |  |  |  |  |  |  |  |  |  |
| 436 | Huff Builders | L | 12.5 | 50 | 436 | M | 12.3 | 70 | 435 | M | 8.194 | 1.6 | 6.6 | 70 | VINEYARD AT RAVEN OAKS PH I & II |
| 437 |  | L | 9.4 | 37 |  |  |  |  |  |  |  |  |  |  |  |
| 438 | Sandestin |  |  |  | 438 | M | 9.5 | 64 | 438 | M | 5.000 |  | 5.0 | 64 | BAYTOWNE NORTH |
| 439 | Sandestin |  |  |  | 439 | L | 15.0 | 22 | 439 | L | 14.854 | 3.4 | 11.5 | 22 | RAVENWOOD |
| 440 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 441 | Sandestin |  |  |  | 441 | M/H | 3.8 | 75 | 441 | M/H | 2.326 |  | 2.3 | 75 | UNDEVELOPED TRACT 441 |
| 442 | Sandestin | L | 6.5 | 22 | 442 | M | 13.5 | 96 | 442 | M | 14.371 |  | 14.4 | 96 | MACK BAYOU POINT |
| 443 | Sandestin | L | 5.8 | 23 | 443 | M | 13.0 | 70 | 443 | M | 14.801 | 0.3 | 14.6 | 70 | CLUB ESTATES/UNDEVELOPED TRACK |
| 444 |  | L | 8.4 | 33 |  |  |  |  |  |  |  |  |  |  |  |
| 445 |  | L | 8.4 | 33 |  |  |  |  |  |  |  |  |  |  |  |
| 446 | Sandestin | L | 1.3 | 5 | 446 | M/H | 1.3 | 20 | 446 | M/H | 1.102 |  | 1.1 | 20 | UNDEVELOPED TRACT 446 |
| 447 |  | M | 11.3 | 135 |  |  |  |  |  |  |  |  |  |  |  |
| 520 |  | M | 14.5 | 116 |  |  |  |  |  |  |  |  |  |  |  |
| 521 |  | M | 13.6 | 106 |  |  |  |  |  |  |  |  |  |  |  |
| 522 |  | M | 12.4 | 98 |  |  |  |  |  |  |  |  |  |  |  |
| 523 |  | M | 10.4 | 80 |  |  |  |  |  |  |  |  |  |  |  |
| 530 |  | L | 13.6 | 62 |  |  |  |  |  |  |  |  |  |  |  |
| 531 |  | L | 16.5 | 74 |  |  |  |  |  |  |  |  |  |  |  |
| 532 |  | L | 16 | 70 |  |  |  |  |  |  |  |  |  |  |  |
| 533 |  | L | 10.4 | 46 |  |  |  |  |  |  |  |  |  |  |  |
| SUBTOTAL |  |  |  |  |  |  | 68.4 | 417 |  |  | 60.658 | 5.2 | 56.5 | 417 |  |

NGN 000923

## DRIFTWOOD ESTATES AREA

| | | 1984 - Benchmark | | | 2002 Approved | | | | | 2003 Actual | | | | | | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Land Use | Acres | Total Projected Units/sf | Parcel Number | Land Use | Acres | Total Projected Units/sf | Parcel Number | Land Use | 2003 Actual Parcel Acreage | Open space in plat Included | Actual Parcel Acres | Total Projected Units/sf | |
| 540 | Subdivided | L | 3.7 | 6 | 540 | L | 9.8 | 19 | 540 | L | 9.856 | | 9.9 | 12 | – 7 |
| 541 | Subdivided | L | 15.7 | 13 | 541 | L | 22.5 | 38 | 541 | L | 22.563 | | 22.6 | 38 | |
| 542 | Sandestin | L | 53.4 | 78 | 542 | H | 3.5 | 88 | 542 | H | 3.184 | | 3.2 | 5 | – 83 |
| 543 | Subdivided | L | 11.7 | 20 | 543 | L | 15.4 | 30 | 543 | L | 15.282 | | 15.3 | 30 | |
| 544 | Subdivided | L | 6.5 | 11 | 544 | L | 2.1 | 4 | 544 | L | 9.426 | | 9.4 | 16 | + 12 ? |
| 545 | Subdivided | L | 2.1 | 3 | 545 | L | 16.7 | 26 | 545 | L | 15.392 | | 15.4 | 25 | – 1 |
| 546 | Subdivided | L | 30.0 | 47 | 546 | L | 8.1 | 22 | 546 | L | 11.358 | 1.5 | 9.8 | 22 | |
| 547 | Subdivided | L | 3.9 | 7 | | | | | | | | | | | |
| 548 | Subdivided | L | 6.0 | 19 | 548 | L | 15.2 | 36 | 548 | L | 19.462 | | 19.5 | 35 | |
| 549 | Subdivided | L | 5.4 | 9 | 549 | L | 5.4 | 13 | 549 | L | 7.745 | | 7.7 | 13 | |
| 550 | Subdivided | L | 10.7 | 19 | 550 | L | 13.3 | 29 | 550 | L | 16.587 | | 16.6 | 29 | |
| 551 | Sandestin | | | | 551 | H | 2.4 | 52 | 551 | H | 3.866 | | 3.9 | 52 | |
| 552 | | | | | | | | | | | | | | | |
| 553 | Subdivided | | | | 553 | L | 1.3 | 19 | 553 | L | 9.305 | | 9.3 | 19 | |
| 554 | Subdivided | | | | 554 | L | 1.7 | 12 | 554 | L | 6.688 | | 6.7 | 12 | |
| 555/556 | | | | | | | | | | | | | | | |
| 557 | Sandestin | | | | | | | | | | | | | | |
| 558 | Sandestin | | | | | | | | | | | | | | |
| 559 | | | | | | | | | | | | | | | |
| 560 | Sandestin | | | | | | M | | | | | | | | |
| 561 | Sandestin | | | | 561 | M | 34.7 | 392 | 561 | M | 147.197 | 23.8 | 123.6 | 471 | + 7 + 83 + |
| SUBTOTAL | | | | | | | 152.1 | 779 | | | 297.911 | 25.2 | 272.8 | 779 | |

| | Total N. of Highway 98 | | 736.8 | 6,527 | | | 755.7 | 5,335 | | | 851.716 | 74.1 | 777.6 | 5,335 | |

NGN 000924

Master Plan                                        Exhibit A                                        February 4, 2003

### NORTH OF HIGHWAY 98 / NON-RESIDENTIAL - COMMERCIAL LAND USE

| | 1984 - Benchmark | | | 2002 Approved | | | | 2003 Actual | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Parcel Number | Current Owner Affiliation | Commercial Land Use | 1984 Acres Unit/SF | Parcel Number | Commercial Land Use | Acres | Total Projected Units/sf | Parcel Number | Commercial Land Use | Acres | Total Projected Units/sf | Remarks |
| 208/308 | Howard Group | Retail/Nursing Home Mini warehouse, ofc Commercial | 48.1 550,000 In above In above | 208/308 | C - Retail C - Office C - Bank C - Commercial C - Hotel | 47.7 | 502,636 88,400 13,659 In above 300 units | 208/308 | C - Retail C - Office C - Bank C - Commercial C - Hotel | 53.8 | 502,636 88,400 13,659 In above 300 units | |
| | Nonaffiliated | | | Tract 3 | | 1.4 | | Tract 3 | | Inc. above | | |
| 210 | Sandestin | Marina | | 210 | CL - Marina | 6.8 | 98 Slips | 210 | CL - Marina | 3.3 | 98 Slips | |
| 209 | Sandestin | Club Facilities | | 209 | CL - Club | 11.2 | 17,000 | 209 | CL - Club | 3.6 | 17,000 | |
| 309 | Sandestin | | | | | | | | | | | |
| | | | | 221A | CL - Tennis | 5.9 | n/a | 221A | CL - Tennis | 6.9 | n/a | |
| | | | | 221B | CL - Retail/Spa | 4.8 | 23,000 | 221B | CL - Retail/Spa | 4.1 | 23,000 | |
| 212 | F.C.S.I. | Sewer Treatment / | | 212 | CS - Sewer | 8.7 | n/a | 212 | CS - Sewer | 8.2 | n/a | |
| 312A | | Well | | 312A | CS - Well | 27.4 | n/a | 312A | CS - Well | 24.9 | n/a | |
| 217 | Nonaffiliated | Fire Station | | 217 | CS - Fire St. | - | - | 217 | CS - Fire St. | - | - | |
| 215 | Sandestin | Resort Services | | 215 | CS - Service CS- School | 16.5 0.4 | 74,000 In above | 215 | CS - Service CS- School | 13.3 Inc. above | 74,000 in above | |
| | | | | 320 | C - Pedestrian Village - Retail | 8.0 | 152,000 | 320 | C - Pedestrian Village - Retail | 6.7 | 152,000 | |
| North of Hwy 98 / Non-Residential Land Use Total | | | | | | | 300 unit motel | | | | 300 unit motel | |
| North of Hwy 98 / Non-Residential Land Use Total | | | | | | 138.8 | 870,695 | | | 124.9 | 870,695 | |

NGN 000925

2/6/2003 8:16 AM
DRI-2003 Acreage Reconciliation

Sandestin DRI, WC presentation, Feb 4, 2003

Form #: 62-312.900(1)
Form Title: Joint Application for Works
in the Waters of Florida
Effective Date: October 30, 1991

# Joint Application
## for Works in the Waters of Florida

Department of the Army (Corps)/Florida Department of Environmental Protection (DEP)/
Water Management District (WMD)

| Corps Application Number (official use only) | DEP Application Number (official use only) |
|---|---|
| | 6l-0070104-002DF |

Type or Print Legibly

**1. Applicant's Name and Address**

Name  **Intrawest Sandestin Company, LLC**
    Last Name, First Name (if individual); Corporate Name; Name of Govt. Agency
Street  **9300 Highway 98 West**

City  **Destin**    State: **Florida**    Zip: **32550**

Telephone  **(850) 267-6244**(Day)    (Night)

**2. Name, Address, Zip Code, Telephone Number and Title of Applicant's Authorized Agent**

Name    **Wilkinson, Todd**
    Last Name, First Name
Corporate Name; Name of Govt. Agency.    **Environmental Services, Inc.**
Street **12605 Emerald Coast Parkway, Suite 3**    City    **Destin**    State **FL**  Zip **32550**
Telephone (Day)    **850-837-5377**  (Night)

**3.**    Name of Waterway at Work Site: **Unnamed Wetlands**

**4.**    Street, Road or Other Location of Work **Driftwood Drive**
    Incorporated City or Town **Sandestin Resort**
        Section **13**    Township - **2 South**  Range **21 West**
        Section **14**    Township - **2 South**  Range **21 West**
        Section    Township -    Range
        County(ies) **Walton**

Coordinates in Center of Project:        Federal Projects Only:    x    y
    Latitude  °    '    "    Longitude  °  '  "
Lot    Block    Subd.    Plat Bk    Pg

Directions to Locate Site:

**5.**    Names, Addresses, and Zip Codes of Adjacent Property Owners Whose Property Also Adjoins the Water (Excluding Applicant). Show Numbers or Names of These Owners on Plan Views. If More Than Six (6) Owners Adjoin the Project, You May Be Required to Publish a Public Notice for the DEP.
    1.        2.
    3.        4.
    5.        6.

**RECEIVED**

**JAN 27 2003**

NORTHWEST FLORIDA
DEP

Cynthia L. Abbott, et al
vs
Olson and Associates, et al
Exhibit 145

Form #62-312.900(1)
Online Document
Formatted 12/16/97 kag

WC 12336

Form #: 62-312.900(1)
Form Title: Joint Application for Works
in the Waters of Florida
Effective Date: October 30, 1991

6.    Proposed Use (Check one or more as applicable) Private: Single Family ☒    Multi-Family ☐
Public☐    Commercial☐    New Work ☒    Alteration of Existing Works☐    Maintenance☐    Other (Explain):

7.    Desired Permit Duration (see Fee Schedule): 5 Yr.☐    10 Yr.☐    Other (Specify)

8.    General Permit or Exemption Requested:

DEP General Permit FAC Rule 17-312.    DEP Exemption FAC Rule 17-312.    Section 403.    FS.

9.    Total Extent of Work in Jurisdictional Open Waters or Wetlands: (Use additional sheets and provide complete breakdown
       of each category if more space is needed.

a.    Within Corps Jurisdiction:
         Fill:                          Sq. Ft.          Acres          Cu. Yds.
         Excavation:                    Sq. Ft.          Acres          Cu. Yds.
b.    Within DEP Jurisdiction:
         Fill:                  0 Sq. Ft.    0.0 Acres    0.0 Cu. Yds.
         Excavation:            0 Sq. Ft.    0.0 Acres    0.0 Cu. Yds.
         Excavation Waterward of MHW          cu. yds. (information needed for DEP)

c.    DEP Jurisdictional Area Severed (Area Landward of Fill Structures which will be Severed):
         Sq. Ft.          Acres

d.    DEP Jurisdictional Area Created (New Excavation from Uplands, Exclusive of Mitigation):
         Sq. Ft.          Acres

e.    Docks, Piers, and Over Water Structures:
         Total Number of Slips:          Total Number of Mooring Pilings:
         Length          Width          Height above MHW
         Length          Width          Height above MHW
         Number of Finger Piers          Length          Width          Height
         Number of Finger Piers          Length          Width          Height
         Total area of structure over waters & wetlands          sq. ft.
         Use of structure

Will the docking facility provide:                    No      Yes      Number

Live-aboard Slips                                      ☐       ☐

Fueling Facilities                                     ☐       ☐

Sewage Pump-out Facilities                             ☐       ☐

Other Supplies or Services Required for Boating        ☐       ☐
(Excluding refreshments, bait and tackle)

f.    Seawall length:          ft.  Seawall material:
      Riprap revetment length:          ft.    Slope    H:        V        Toe width
      Riprap at toe of seawall length          ft. Slope    H:        V        Toe width  **RECEIVED**
      Size of riprap:
                                                                                  **JAN 27 2003**
Type of riprap or seawall material:
                                                                          **NORTHWEST FLORIDA**
g.    Other (See item 10).

Form #62-312.900(1)
Online Document
Formatted 12/16/97 kag

2

WC 12337

Form #: 62-312.900(1)
Form Title: Joint Application for Works
in the Waters of Florida
Effective Date: October 30, 1991

10. Description of Work (be specific; use additional sheets as necessary).

**See attached project description**

11. Turbidity, Erosion, and Sedimentation Controls Proposed:
Silt screens and/or hay bales will be installed at the project limits and along all wetland boundaries to minimize the potential for erosion and sedimentation into any jurisdictional areas.

12. Date Activity is Proposed to Commence Upon permit issuance    to be Completed within **2 years**
Total Time Required to Construct **2 years**

| 13. Previous Applications for this Project have been: | DEP No. | Corps no. |
|---|---|---|
| A. Denied (date) | | |
| B. issued (date) | 662644781 | 198993109 |
| C Other (please explain) | | |

Differentiate between existing work and proposed work on the drawings.

14. Certification. Application is hereby made for a permit or permits to authorize the activities described herein.

A. I Certify That: (Please check appropriate space)

1. I am the record owner ☒; lessee ☐, or the record easement holder ☐of the property on which the proposed project is to be undertaken, as described in the attached legal document.

2. I am not ☐the record owner, lessee or record easement holder of the property on which the proposed project is to be undertaken, as described in the attached legal document, but I will have, before undertaking the proposed work the requisite property interest. (Please explain what the interest will be and how it will be acquired.)

Attach legal description of property or copy of deed to the property on which project is to occur (must be provided).

B. I understand I may have to provide any additional information/data that may be necessary to provide reasonable assurance or evidence that the proposed project will comply with the applicable State Water Quality Standards or other environmental standards both before construction and after the project is completed.

C In addition, I agree to provide entry to the project site for inspectors with proper identification or documents as required by law from the environmental agencies for the purpose of inspecting the site. Further, I agree to provide entry to the project site for such inspectors to monitor permitted work, if a permit is granted.

D. This is a Joint Application and is not a Joint Permit. I hereby acknowledge the obligation and responsibility for obtaining all of the required state federal or local permits before commencement of construction. I also understand that before commencement of this proposed project, I must be granted separate permits or authorizations from the U.S. Corps of Engineers, the U.S. Coast Guard, the Department of Environmental Protection and the Delegated Water Management District (where applicable), as necessary.

JAN 2 7 2003

NORTHWEST FLORIDA
FTD

Form #62-312.900(1)
Online Document
Formatted 12/16/97 kag

3

WC 12338

Form #: 62-312.900(1)
Form Title: Joint Application for Works
in the Waters of Florida
Effective Date: October 30, 1991

E. I am familiar with the information contained in this application, and that to the best of my knowledge and belief, such information is true, complete and accurate, I further certify that I possess the authority to undertake the proposed activities or am acting as the duly authorized agent of the applicant. I understand that knowingly making any false statement or representation in this application is a violation of Section 403.161, FS. and Chapter 837, FS.

Todd S. Wilkinson
Typed/Printed Name of Applicant or Agent

Signature of Applicant or Agent

1/24/03
Date

Vice President
(Corporate Title if applicable)

AN AGENT MAY SIGN ABOVE IF APPLICANT COMPLETES THE FOLLOWING:

I hereby designate and authorize the agent listed above to act on *my* behalf as my agent in the processing of this permit application and to furnish on request, supplemental information in support of the application.

Greg Graham
Typed/Printed Name of Applicant

Signature of Applicant

1/24/03
Date

Dev. Manager
(Corporate Title if applicable)

15. For your Information: Section 370.034, Florida Statutes, requires that all dredge and fill equipment owned, used, leased, rented or operated in the state shall be registered with the Department of Natural Resources. Before selecting your contractor or equipment you may wish to determine if this requirement has been met. For further information, contact the Chief of the Bureau of Saltwater Licenses and Permits, Department of Natural Resources, 3900 Commonwealth Blvd, Tallahassee- Florida 32399. Telephone No. (904) 487-3122. This is not a requirement for a permit from the Department of Environmental Regulation.

18 U.S.C. Section 1001 provides that, Whoever, in any manner within the jurisdiction of any department or agency of The United States knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact or makes any false, fictitious or fraudulent statements or representations or makes or uses any false writing or document knowing same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

16.    Please submit this completed form, with attached drawings and the complete DEP processing fee to the appropriate DEP or Delegated WMD office with jurisdiction over the project site.

WC 12339

STORMWATER PERMIT
#
RC66-263774

ENVIRONMENTAL SERVICES, INC.

## INTRAWEST SANDESTIN COMPANY, LLC
## DRIFTWOOD ESTATES
## WALTON COUNTY, FLORIDA

### Project Description

### Introduction

The applicant, Intrawest Sandestin Company, LLC, is preparing to develop a ±200-acre parcel of land located at the northern end of their development, in Sections 13 and 14, Township 2 South, Range 21 West, Walton County, Florida (Figure 1). The parcel is known as Driftwood Estates. Sandestin previously obtained permits from the U.S. Army Corps of Engineers and the Florida Department of Environmental Protection (662644781, copy attached) for the development of this parcel. In addition, a stormwater permit was issued by DEP for the project (RC66-263774). Currently, the permit from the U.S. Army Corps of Engineers remains active and valid. The previous permits from DEP has expired at this time.

### Existing Site Conditions

The property remains undeveloped at this time. The majority of the site comprises pine flatwoods (both wetland and upland) with a central wetland system. The upland pine flatwoods have a canopy comprising slash pine (*Pinus elliottii*). Dominant understory and shrub components include saw palmetto (*Serenoa repens*), bitter gallberry (*Ilex glabra*), staggerbush (*Lyonia ferruginea*), bracken fern (*Pteridium aquilinum*), scrub mint (*Conradina canescens*), gopher apple (*Licania michauxii*) and runner oak (*Quercus pumilla*).

The wet pine flatwoods comprise a canopy of slash pine, with an understory of water oak (*Quercus nigra*), wax myrtle (*Myrica cerifera*), bitter gallberry, sweet gallberry (*Ilex coriacea*), fetterbush (*Lyonia lucida*), saw palmetto and titi (*Cyrilla racemiflora*).

The central wetland system comprises a titi/bay slough, with slash pine, sweetbay (*Magnolia virginiana*), titi, black titi (*Cliftonia monophylla*), sweet gallberry, myrtle-leaf holly (*Ilex myrtifolia*), wiregrass (*Aristida stricta*), bamboo vine (*Smilax laurifolia*),

A wild fire in 1998/1999 swept through much of this area, killing many pine trees and eliminating the canopy completely in some portions of the uplands and wetlands. This habitat is currently progressing through natural stages of regeneration and succession. Shortly after this event, Environmental Services, Inc., re-established the wetlands regulated by DEP within this central system. The central wetland has been protected by a conservation easement as required by the existing CE permit and the permit previously issued by DEP. This easement includes both wetlands regulated by CE and DEP as well as areas regulated only by CE. A wetland creation area is located at the southern end of this system. This creation area provided mitigation for other permits issued to Sandestin by CE and DEP. This area is also protected within the existing conservation easement.

WC 12340

ENVIRONMENTAL SERVICES, INC.

## Proposed Site Conditions

The applicant is proposing to develop the property as a single-family residential community as previously permitted. No impacts to wetlands regulated by DEP are proposed. Project drawings enclosed depict the site plan with the existing conservation easement shown. Wetland impacts are limited to areas authorized by the existing CE permit. All development is outside of the existing conservation easement. The applicant and project engineer will be submitting a separate request to reauthorize the stormwater permit for this development, again, as previously permitted.

No additional mitigation is proposed or necessary because no impacts are proposed to wetlands.

WC 12341



Project Location

John N. Lewis, P.E.
Florida P.E. #41080

Source: USGS Topographical Survey
Choctaw Beach, Fl, Quadrangle 1976
Sections 13, 14, Township 2 South, Range 21 West

Figure 1
Location / Topographic Map

| ENVIRONMENTAL SERVICES, INC. | Driftwood Estates | Project No. | ED99025.01 |
| --- | --- | --- | --- |
| | | Date | January 2003 |
| | Walton County, Florida | Scale | 1": 2000' |
| | | Figure 1 | |

WC 12342



Proposed Site Conditions —Detail

| | |
|---|---|
| E.O.R. John R. Lewis<br>FL P.E. #41030<br>Connelly & Wicker, Inc.<br>12305 Emerald Coast Parkway, Suite 1<br>Destin, Florida 32550<br>Engineering Business No: B130003650 | Driftwood Estates<br>Walton County, Florida |

Project No. ED99025.01
Date: January 2003
Scale: 1"=500'
Figure 3

ENVIRONMENTAL SERVICES, INC.

WC 12343



Driftwood Estates — Proposed Site Conditions

Legend:

- ▨ — Existing Conservation Easement . . ±37.82 ac.
- ▫ — DEP Wetlands. . . . . . . . . . . ±28.1 ac.

← Conservation Easement

WC 12344

Proposed Site Conditions

ENVIRONMENTAL SERVICES, INC.

E.O.R. John N. Lewis
FL P.E. #41080
Connelly & Wicker, Inc.
12605 Emerald Coast Parkway, Suite 1
Destin, Florida 32550
Engineering Business No: B130003650

Driftwood Estates
Walton County, Florida

Project No. ED99025.01
Date: January 2003
Scale: 1"=800'
Figure 2

# CLARK, PARTINGTON, HART, LARRY, BOND & STACKHOUSE
## OFFICE OF J. BRUCE BOWMAN
### BBOWMAN@CPHLAW.COM

---

### FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| **TO:** Scott Brannon | **FROM:** Teresa O'Hara (tohara@cphlaw.com) |
| **COMPANY:** Walton County Board of County Commissioners | **DATE:** 12/15/2005 |
| **FAX NUMBER:** 850-835-4836 | **TOTAL NO. OF PAGES INCLUDING COVER:** 3 |
| **PHONE NUMBER:** | **SENDER'S REFERENCE NUMBER:** 01-5498 |
| **RE:** Driftwood Estates Phase II | **CC:** Kenneth Pridgen 850-834-6385 <br> Larry Jones 850-892-8475 <br> Ro Cuchens 850-835-0295 <br> Cindy Meadows 850-622-3067 |

---

☐ URGENT   **X** FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

---

NOTES/COMMENTS:

Please see attached letter to Major Samuel A. Osborne.

If you have any questions or concerns, please feel free to contact our office.

Thank you,
Teresa
For J. Bruce Bowman

UNLESS OTHERWISE INDICATED OR OBVIOUS FROM THE NATURE OF THE TRANSMITTAL, THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS ATTORNEY PRIVILEGED AND CONFIDENTIAL INFORMATION AND INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY CALLING (850)-650-3304.

Cynthia L. Abbott, et al
vs
Olson and Associates, et al
Exhibit 167

34990 EMERALD COAST PARKWAY, SUITE 301
DESTIN, FL 32541
PHONE (850) 650-3304
FAX (850) 650-3305

WC 01395

12/15/2005 13:46   850835---   CDMM BRANNON I   PAGE   03/04

12/15/2005 12:42 FAX 850 65 305   CPH DESTIN   ☑002

# Clark, Partington, Hart, Larry, Bond & Stackhouse

### ATTORNEYS AT LAW
Suite 301
34990 Emerald Coast Parkway
. Destin, Florida 32541

Telephone (850) 650-3304
Fax (850) 650-3305
e-mail: bbowman@cphlaw.com

Offices:

Destin, Florida
Pensacola, Florida

J. Bruce Bowman
Board Certified Civil Trial Lawyer

December 14, 2005

**VIA HAND DELIVERY**

Major Samuel A. Osborne
253 Driftwood Point Road
Santa Rosa Beach, FL 32459

> Re:   Driftwood Estates Phase II ("Driftwood Phase II")
>          CPH File No.:          01-5498

Dear Major Osborne:

On April 25, 2003, Olson & Associates of NW Florida, Inc. ("Olson Associates") received approval on its Development Order for Driftwood Phase II. During the approval process, Olson Associates satisfied each and every requirement of Walton County, Florida's Land Development Code and complied with all applicable government agencies' requirements for development of Driftwood Phase II (the "Governmental Approvals"). Included in Olson Associates' submissions to obtain the Governmental Approvals were engineering plans and storm water hydraulic analysis. Having obtained the Governmental Approvals and the Development Order, Olson Associates has invested millions of dollars in Driftwood Phase II.

Your presentations before public bodies, including the Board of County Commissioners of Walton County, Florida, portray Olson Associates and Driftwood Phase II in a false light. Your assertions that Driftwood Phase II and the existing infrastructure into which Driftwood Phase II is tied were never properly permitted are patently false. It is clear that your accusations are deliberate public attempts to sabotage the continued development of Driftwood Phase II. Those accusations have caused, and will continue to cause, substantial damage to Olson Associates.

Olson Associates hereby demands that you (1) immediately cease and desist your slanderous accusations against Olson Associates and Driftwood Phase II, and (2) retract your slanderous statements against Olson Associates and Driftwood Phase II in the

WC 01396

12/15/2005 13:46 8506359656 COMM BRANNON 05/19/15 PAGE 04/04

12/15/2005 12:43 FAX 850 65  305 CPH DESTIN @003

Major Samuel A. Osborne
December 14, 2005
Page 2

same forum and manner as you made such statements. If you fail to do so before December 21, 2005, Olson Associates will seek all appropriate judicial relief, including injunctive relief, compensatory damages, and punitive damages.

Sincerely,

CLARK PARTINGTON HART

J. Bruce Bowman

JBB/tgf
cc: Lieutenant Colonel Phil Locklear, OSS Commander
Walton County Board of County Commissioners
Pat Blackshear, Growth Management Director
John Johnson, Public Works Director
David Campbell, P.E.
Dan Arner, P.E.
Richard Olson (via email)
Shannon Howell (via email)
Jason Osborn (via email)

A0106089

WC 01397

Case 3:16-cv-00334-BV-EMT Document 1-4 Filed 05/26/16 Page 344 of 435
Case 5:14-cv-00646-MCR-EMP Document 174-4 Filed 08/19/15 Page 1 of 2

Driftwood Estates Update - Yahoo! Mail                                  Page 1 of 2

# YAHOO! MAIL
Classic

**Driftwood Estates Update**                        Thursday, June 26, 2008 5:38 PM

From: olsonassociates.net>

To: ccampbell@gulfsouthprivatebank.com

Cc: "Jason Osborn" <josborn@olsonassociates.net>, tina_millerlawfirm@yahoo.com, "David Campbell" <david@bonezzidevelopment.com>, "Rick Olson" <rickolson@olsonassociates.net>, "Lucy Kisela" <lkisela@olsonassociates.net>

image001.gif (876b), PP DCR - Lovell change 071010.doc (111KB)

Cynthia L. Abbott, et al
vs
Olson and Associates, et al
Exhibit 168

Follow-up email regarding our discussions earlier this week:

Greg Graham, Bob Horner, et al. (county staff) made their drainage presentation to Commissioners Commander and Meadows on Tuesday and Wednesday. I spoke with both Greg and Bob this morning and both said the presentation was well received by both commissioners. No challenges or disputes were made by either commissioner to their analysis/findings, including the finding that at full build-out of all lots there is no contribution by interior Driftwood to the standing water problem on the perimeter road. This was of particular concern relative to Meadows, considering her past assertions that we are the problem...but so far so good. Greg said that she will likely want them to make the presentation to Allen Osborne (lead law suit plaintiff) sometime next week. I suspect it will make little difference to him, but the County Engineer 's technical analysis in support of our position should help us substantially. So far I've seen no sign of Osborne being able to refute it. Greg and Bob will also make this presentation to Commissioners Pridgen and Brannon next Tuesday, but I think they are of less concern than the 2 ladies. I'm not sure, but don't think Jones will want to see it since he has continually recused himself from this issue.

The presentation goes on to address the known construction deficiencies that may have an internal impact on Phase II. We (including David Campbell ) have agreed tentatively to several retrofit and buyer disclosure measures to mitigate these deficiencies as well as to provide some additional protective measures to further appease drainage concerns. David should have the retrofits in a plan by the first of next week that we can then discuss with Tindle. Word back from Greg/Bob is that neither commissioner so far took any issue with this as a remedy. The presentation will be made at the BCC Public Hearing at which they will vote on whether to rescind the plat. Greg recommended that we be able to provide a schedule at that hearing for completing the retrofits. I expect we will be able to do this, but will need Tindle's agreement once he has seen David's plans. Based on my understanding of the escrow agreement with him, he has obliged to do what's necessary, but there are a few things that the county (Greg) wants us to do that David and I have not discussed with Tindle. Primarily these are installation of an additional culvert under Driftwood Drive and installation of another drainage inlet (he will likely consider this add-on work). I will have to follow up with you on this once we meet with him.

I also need to have the disclosure issue resolved with Greg prior to the hearing. This is the disclosure I've mentioned several times that he wants in the form of a covenant amended to the DCR requiring all lots be developed per the approved DO plans. And also disclosure of the Army Corps wetland permit with expiration date. I would much prefer that these not be topics for discussion at the hearing – primarily the ACE permit because someone may start digging into it. I believe this can avoided if I have agreement with him on the form of disclosure beforehand. Jason indicated that he would rather not amend the DCR. If so, I need an alternate method to propose that will provide him reasonable

GRM 0300

Case 3:16-cv-00333-RV-EMT   Document 1-4   Filed 05/26/16   Page 345 of 435
Case 3:14-cv-00646-MCR-EMT   Document 174-4   Filed 08/19/15   Page 2 of 2

Driftwood Estates Update - Yahoo! Mail                                    Page 2 of 2

assurance that lot buyers will (or should) see it.  I am attaching language specifying adherence to the
approved DO Grading/Drainage plan that satisfied him previously on a project I did a couple years
ago – see grey highlighted excerpt on page 15.  As you'll see this was in the DCR.  If the language is
agreeable, I just need the form of disclosure approved (DCR amendment or otherwise).  I can come
up with language for the ACE permit also.

More to come...

**Adrian D. Lovell, Jr., P.E.**

**Director of Engineering**
**Olson & Associates of NW Florida, Inc.**
1234 Airport Rd, Suite 204
Destin, Florida   32541

(850) 699-8060 cell
(850) 650-3093 fax
adlovell@olsonassociates.net

This electronic mail transmission may constitute an attorney-client communication or other proprietary or confidential
communication that is privileged or protected at law.  This electronic mail transmission is not intended for transmission to,
or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it
from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.

GRM 0301



Driftwood Area
Contour Lines

Based on LIDAR data acquired 2006
Aerial photography from 2007

Cynthia L. Abbott, et al
vs
Olson and Associates, et al
Exhibit 200



STATE OF FLORIDA

# DEPARTMENT OF COMMUNITY AFFAIRS

*"Dedicated to making Florida a better place to call home"*

RICK SCOTT
Governor

BILLY BUZZETT
Secretary

May 17, 2011

Lynn Hoshihara, Esq.
County Attorney
161 East Sloss Avenue
Defuniak Springs, Florida 32433

   Re:  Driftwood Estates

Dear Lynn:

   We appreciate you and Gerry traveling to Tallahassee last Thursday to discuss the issues raised by the Special Magistrate Proceeding regarding Driftwood Estates. To confirm our discussion, the three main issues remaining following the Special Magistrate Proceeding are: emergency evacuation through Sandestin, reflection of the abandonment of Driftwood Drive on Map H, and Driftwood's storm water management system.

   The County's agreement with Sandestin in which the resort pledges to allow egress across its property during an evacuation event upon the request of the County satisfies the Department's concerns regarding emergency evacuation. Further, the County's assurances that it will require the next Notice of Proposed Change for the Sandestin DRI to reflect the abandonment of Driftwood Drive, and that the County will not approve any future amendment to the Sandestin DRI development order which does not contain a revised Map H reflecting the abandonment of Driftwood Drive, satisfies the Department's concerns about Map H. You also stated that the County has pledged funds for improving the exterior drainage system of Driftwood Estates, several improvements have been made, and road elevation improvements that will also alleviate flooding are in the works. We appreciate the County's commitment to monitor and maintain the Driftwood storm water management system. The Department does not believe any further action regarding Driftwood Estates or the Sandestin DRI is necessary at this time, but trust that the County will continue to keep the Department advised of its progress.

   Sincerely,

David L. Jordan
Deputy General Counsel

Cynthia L. Abbott, et al
vs
Olson and Associates, et al
Exhibit 219

2555 SHUMARD OAK BOULEVARD   □   TALLAHASSEE, FL 32399-2100
850-488-8466 (p)   □   850-921-0781 (f)   □   Website: www.dca.state.fl.us

□ COMMUNITY PLANNING 850-488-2356 (p) 850-488-3309 (f) □ FLORIDA COMMUNITIES TRUST 850-922-2207 (p) 850-921-1747 (f) □
□ HOUSING AND COMMUNITY DEVELOPMENT 850-488-7956 (p) 850-922-5623 (f) □

Letter from DCA - Driftwood Estates
Lynn Hoshihara
to:
Matthew.Davis
05/12/2011 02:13 PM
Cc:
debby.kearney, "Gerry Demers", "Crissie Singletary"
Show Details

History: This message has been replied to and forwarded.

Matt,

Thank you again for meeting with Gerry and I last week and for providing us with the attached letter so promptly. There are two changes that I would like to request:

1) The letter is dated May 9, 2010. Will you please change that to May 9, 2011?
2) The second line in the second paragraph reads "Further, the County's assurances that Map H will be changed to reflect the abandonment of Driftwood Drive prior to the County's issuance of any additional development authorization for Sandestin satisfies the Department's concerns about Map H." I think it would be more accurate to say "Further, the County's assurances that it will not approve any future NOPC's submitted by Sandestin which does not contain a revised Map H reflecting the abandonment of Driftwood Drive satisfies the Department's concerns about Map H."

As we discussed, the only way the County can withhold any additional development authorization for Sandestin is if the County finds them in violation of the ADA or subsequent NOPC, which is not the case at this time. Although the County has strongly insisted that Sandestin submit a "clean-up" NOPC, we have yet to receive anything more than a draft Annual Report. The County will, however, commit to NOT approve any future NOPC's without a revised Map H. I hope this sufficiently addresses DCA's concerns.

Should you have any questions or want to discuss this matter further, please feel free to give me a call. My cell number is 850-865-2660.

Thank you again,
Lynn

**Lynn M. Hoshihara, Esq.**
County Attorney
Office of the County Attorney
161 East Sloss Avenue
DeFuniak Springs, Florida 32433
Phone: (850) 892-8110
Fax:  (850) 892-8471

Cynthia L. Abbott, et al
vs
Olson and Associates, et al
Exhibit 221

This message is intended only for use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, please notify the sender, delete this message, and do not use, disseminate, or copy its content. Thank you.

DCA 02081

## Lynn Hoshihara

| | |
|---|---|
| **From:** | Robert Horner |
| **Sent:** | Tuesday, May 11, 2010 10:34 AM |
| **To:** | Lynn Hoshihara; Gerry Demers |
| **Cc:** | Renee Bradley |
| **Subject:** | Sandestin DRI - Stormwater Requirements by DCA |
| **Importance:** | High |

Lynn and Gerry,

This e-mail is in follow-up to our conversation today regarding the Sandestin DRI and engineering reviews for stormwater management.

As I understand Becnel's team has approached Renee Bradley about upcoming developments. DCA's interpretation and requirements of the Sandestin DRI, appear to require TOTAL RETENTION OF STORMWATER RUNOFF, until the threshold storm of 6.7 inches of rainfall in a 24-hour duration is exceeded.

Engineering department **AND APPLICANT'S ENGINEERS** require clarification from DCA as to how to apply this requirement. It is recommended by the engineering department that county staff meet with DCA staff and their engineering professionals for applications and methods to work out how to apply DCA's expectation of the DRI requirements within the confines of standard engineering principles and practices.

Until this meeting is held to resolve the questions and methods to be employed in reviewing the DRI stormwater treatment and attenuation, the engineering department and county staff are in the untenable position of reviewing project submittals for compliance with DCA's interpretation and within the confines of standard engineering principles and practices.

Several items have been on hold for months awaiting this clarification.

**Please, advise, whether all projects under the Sandestin DRI be held until clarification is determined, or under what requirement are reviews to continue?**

Thank you for your help on clarifying this important issue.
Bob Horner

Cc:      e-file

## Robert G. Horner, P.E.

Engineer
Walton County
Planning and Development Services Division
Engineering Department
Office: (850) 267-1955
Fax:  (850) 622-9133

Cynthia L. Abbott, et al
vs
Olson and Associates, et al
Exhibit 228

1

From:       Judith Williams (PLACES-SE)
To:         John Heiser (PLACES-SE)
Sent:       11/14/2006 8:37:42 PM
Subject:    RE: Driftwood

Thanks. I'll continue to keep you informed. Please let me know our progress and any way I can assist.

Judith

-----Original Message-----
From: John Heiser (PLACES-SE)
Sent: Tuesday, November 14, 2006 2:06 PM
To: Judith Williams (PLACES-SE)
Subject: Re: Driftwood

Judith,
I have been working with David Hallman, Jim Barth, Tom Pelham and Keith Arsenault on this matter for quite some time. We offered to intervene with the SOA as the lead to support the county in defending the suit. Keith was recently working to set up another mtg with all our counsels.

John
-----------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Judith Williams (PLACES-SE) <JWilliams@intrawest.com>
To: John Heiser (PLACES-SE) <JHeiser@intrawest.com>
Sent: Tue Nov 14 10:44:09 2006
Subject: FW: Driftwood

FYI -- Newspaper article on Driftwood action. Judith

-----Original Message-----
From: Phil Hummel (mailto:humbee10@hotmail.com]
Sent: Monday, November 13, 2006 9:53 AM
To: Judith Williams (PLACES-SE)
Subject: Driftwood

Hi!
This e-mail was sent to you by request from Phil Hummel
Please click on the following link to read the item:

http://www.epaperedition.com/Repository/ml.asp?Ref=V2FsdG9uU3VuLzIwMDYvMTEvMTEjQXIwMDEwMg==&
Mode=HTML&Locale=english-skin-custom
Comment: Here is a cause which will bring all of us together to fight.Should they succeed in their demands it will impact both homeowners and future development by placemaking

For AOL users: <a href="http://www.epaperedition.com/Repository
/ml.asp?Ref=V2FsdG9uU3VuLzIwMDYvMTEvMTEjQXIwMDEwMg==&Mode=HTML&Locale=english-
skin-custom">http://www.epaperedition.com/Repository
/ml.asp?Ref=V2FsdG9uU3VuLzIwMDYvMTEvMTEjQXIwMDEwMg==&Mode=HTML&Locale=english-skin-custom</a>



Cynthia L. Abbott, et al
vs
Olson and Associates, et al
Exhibit 239

INTABB007344                          CONFIDENTIAL



# Bosso, Dentzau & Imhof, Inc.

*Environmental Sciences*

December 17, 2002

Mr. Rick Olson
Olson & Associates
1234 Airport Road
Destin, Florida 32541

RE: Driftwood Estates Wetland Review



Cynthia L. Abbott, et al
vs
Olson and Associates, et al

Exhibit 276

Dear Mr. Olson:

Bosso, Dentzau, Imhof, Inc. has completed a thorough review of all the past Driftwood Estates wetland permitting documents provided by Intrawest Sandestin Company, LLC. Site inspections were also conducted to evaluate present agency wetland jurisdiction under current regulations and delineation guidelines.

The standing Army Corps of Engineers (ACOE) permit to impact 78-acres of wetland expires in August of 2008. When this permit was issued, the Florida Department of Environmental Regulation (FDER) had limited jurisdiction over wetlands in this part of the state. A survey of the FDER jurisdictional limits in the permitting documents shows the wetland limits confined to the actual hardwood swamp. Since fill activities were to be outside the FDER jurisdiction, no permits were required from the State. In July of 1994, the Florida Department of Environmental Protection (FDEP) was created from the FDER and other agencies. The FDEP developed and implemented a new wetland delineation rule that is still in effect. The FDEP "new rule" has greatly expanded the State's jurisdiction over wetlands allowing the agency to regulate into the transition zone between wetlands and uplands.

A permit issued by the FDEP in 1995 (662644781) for a boardwalk extended the "old rule" jurisdictional determination until June 1, 2000. According to the documents we have reviewed, it appears that there is no active binding jurisdictional determination for the project. Areas outside the former delineation and inside the ACOE fill impact area will most likely fall under "new rule" jurisdiction because of various hydrophytes and Rutlege soil.

An FDEP wetland delineation was completed by Environmental Services, Inc. prior to November 1999. Emerald Coast Associates, Inc. subsequently performed a survey (ECA No. 88-374) of the delineated wetland points in November 1999. Our field review of these wetland points revealed an aggressive wetland delineation that in some instances would prove extremely

difficult to defend in the presence of FDEP staff. Although the flagged line gains additional uplands, we don't feel that it is secure enough to proceed with the purchase of the property until the line is bound by the State.

Also, the newly flagged FDEP wetland boundary crosses over the conservation easement and encroaches into the permitted area as specified in the ACOE permit No. 198993109. This occurs in numerous positions landward of the conservation easement line (Sheets 2-4, ECA survey No. 88-374). If 78-acres of wetlands are filled as authorized in the ACOE permit, it appears that the project would be in violation of water quality standards with the FDEP since permits have not been procured from the State. It is essential that the new surveys and ACOE permit drawings are synchronized by scale and examined for conflicts between the agencies jurisdictions and authorizations.

Below are our recommendations based upon site visits and review of the data presented by Intrawest Sandestin Company, LLC.

- Purchase of the property should not occur until the FDEP wetland jurisdiction line is legally binding by the State.

- A binding jurisdictional determination may be achieved by submitting a joint permit application to the ACOE/FDEP for a minor project (ex: gazebo) related to the wetland boardwalk crossing. This process can take up to 120 days.

- Synchronization of the ACOE wetland fill permit drawings and current surveys.

- A thorough on site review of the mitigation areas to assure compliance with respective permit conditions. It is extremely important that the on site mitigation areas be in compliance prior to any site visits by agency personnel.

If you have questions or comments regarding our review and recommendations of the above referenced project, please contact me at the letterhead address or by cell phone at (850) 232-7385.

Sincerely,

Bosso, Dentzau & Imhof, Inc.

Patrick Imhof
Environmental Scientist

## SALE AND PURCHASE AGREEMENT

THIS SALE AND PURCHASE AGREEMENT ("Agreement") is entered into by and between OLSON & ASSOCIATES OF NW FLORIDA, INC., a Florida corporation, and/or assignees ("Buyer") and INTRAWEST SANDESTIN COMPANY, L.L.C., a Delaware limited liability company ("Seller"). Subject to all the terms and conditions stated herein, Buyer agrees to purchase from Seller and Seller agrees to sell to Buyer all of the Property further described in Paragraph 1 below.

1. PROPERTY DESCRIPTION. As used in this Agreement, (A) the term "Sandestin DRI" means and refers to the Sandestin Development of Regional Impact, issued by the Walton County, Florida Board of County Commissioners, dated October 19, 1976, including all amendments, clarifications, supplements and agreements thereafter made or entered into pertaining thereto [including without limitation Walton County Ordinance No. 2002-18, dated November 4, 2002 (herein, the "November 4, 2002 DRI Amendment")]; (B) the term "Driftwood Estates Area" means and refers to all of the property defined or referred to as the Driftwood Estates Area in the Sandestin DRI, including without limitation the property more particularly described in the plat of the Driftwood Estates subdivision recorded in Plat Book 5, pages 28 through 28C, of the public records of Walton County, Florida and/or those parcels designated in the November 2, 2002 DRI Amendment as parcel numbers 540 through 561, inclusive; (C) the term "Driftwood Declaration" means and refers to those certain Covenants and Restrictions recorded in Official Records Book 162, page 129 as amended by Amended and Restated Protective Covenants of Driftwood Estates recorded in Official Records Book 1452, page 94, as supplemented by the four Supplements thereto recorded, respectively, in Book 1452, Page 150, Book 1680, Page 396, Book 2322, Page 691 and Book 2351, Page 414, of the public records of Walton County, Florida.

The property to be conveyed by Seller to Buy pursuant to this Agreement (the "Property") comprises and includes the following:

(i) all of the platted lots ("collectively, the "Platted Lots") set forth in Schedule A of the Title Insurance Commitment dated December 4, 2002, file number 2032-126860 (the "Title Commitment") issued by First American Title Insurance Company ("Title Company"), a copy of which is attached hereto and made a part hereof as Exhibit 'A,' and in the Survey dated December 20, 2002, file no. 02-456B, prepared by Emerald Coast Associates (the "Survey"), a copy of which is attached hereto and made a part hereof as Exhibit 'B' ;

(ii) all of those certain unplatted portions of the Driftwood Estates Area described in the Title Commitment and Survey;

(iii) all Seller's right, title and interest as "Declarant" under the Driftwood Declaration (the "Driftwood Declarant Rights");

(iv) all Seller's right, title and interest in that portion of the Sandestin DRI that pertains to development or use of the portions of the Driftwood Estates Area which constitute the "Property"), including without limitation six hundred (600) density units under the Sandestin

-1-





Cynthia L. Abbott, et al
vs
Olson and Associates, et al
Exhibit 355

**Adams Resp. to Plf.'s 1st RFP
000895**

01/08/2003 19:48    858-65?-2862         OLSON & ASSOCIATES              PAGE 03

DRI, all in accordance with and subject to the terms and conditions more fully set forth in Paragraph 12 (the "Driftwood DRI Development Rights"); and

(v)    to the extent allowed by governmental law, rule or regulation, all Seller's right, title and interests in or under any other development rights, governmental approvals, governmental permits, easements, licenses or other public or private agreements pertaining to the Property more fully described on Exhibit "C" attached hereto and made apart hereof. (collectively, the "Other Development Rights"). Seller agrees that if specific development rights, governmental permits, easements, licenses or other public or private agreements other than those listed on Exhibit "C" pertaining to the Property are subsequently determined to exist, Seller will assign the development rights which are properly allocated to the Property.    The Seller represents and warrants that no water or sewer taps fees have been prepaid with respect to any portion of the Property and Buyer understands that Buyer therefore will not acquire any prepaid water or sewer tap fees in connection with its acquisition of the Property.

2.    PURCHASE PRICE. The Purchase Price to be paid by Buyer to Seller for the Property shall be ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓which Purchase Price, subject to prorations and adjustments as provided herein, shall be paid to Seller by federal bank wire transfer into a bank account designated by Seller in connection with the closing on this transaction and conveyance of title to the Property to Buyer (the "Closing").

3.    EARNEST MONEY DEPOSIT.    As a condition to the effectiveness of this Agreement, (i) on or before December 31, 2002, Buyer must deliver an initial earnest money deposit in the amount of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓(the "First Deposit"), to the law firm of Clark, Partington, Hart, et. al. ("Escrow Agent") ("Closing Agent"). located at 151 Regions Way, Suite 6-A, Destin, Florida 32541, Florida 32541; and (ii) on or before February 4, 2003, if Buyer has not terminated the Agreement as provided in paragraph 12 (i) Buyer must deliver additional earnest money in the amount of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (the "Second Deposit") to Escrow Agent; provided, Buyer may, as an alternative to delivering either or both of the First Deposit and Second Deposit to Escrow Agent, deliver instead to Seller prior to the date the applicable deposit is due a letter of credit in the amount of the said deposit (a "Letter"); provided, further, any such Letter shall be in form and substance reasonably acceptable to Seller including without limitation specifically providing that the Letter need not be personally presented to the payor but that it may be delivered to the payor by overnight courier.

Any cash deposits placed with the Escrow Agent pursuant to this Agreement shall be held in Escrow Agent's attorneys trust account (or at the request of Buyer, with Seller's approval not to be unreasonably denied, in one or more separate, federally insured interest bearing accounts at a reputable financial institution of Buyer's choice) pursuant to the provisions of Escrow Agent's customary escrow agreement and released by Escrow Agent only in accordance with the provisions of this Agreement.    In the event of a Closing hereunder, any Letter that may have been delivered to Seller in lieu of the First Deposit or the Second Deposit shall be returned to the Buyer; and in the event of Buyer's default hereunder entitling Seller to claim the Earnest Money Deposit as provided in Paragraph 14, Seller will be entitled to make demand on any such Letter. In the event of a Closing hereunder, all cash portions of the Earnest Money Deposits shall be delivered to the Closing Agent for disbursement to Seller and credited against the Purchase Price and any Letter delivered to Seller shall be returned to Buyer or the issuing payor. Once the Second Deposit (or substitute Letter is delivered), the First Deposit and Second Deposit (or substitute Letter) are non-refundable to Buyer, except in the event that Seller cannot satisfy the Wetland Delineation Condition or in the

-2-



Adams Resp. to Plf.'s 1st RFP
000896

event of Seller default. The First and Second Deposits are sometimes jointly referred to herein as "Earnest Money Deposit".

4.    CLOSING LOCATION AND DATE.  The Closing hereunder shall be held at the offices of Closing Agent within ten (10) business days following Buyer's and Seller's satisfaction of, or Buyer's written waiver of, both the Conditions to Closing set forth in Paragraph 12 hereof, but in no event sooner than January 15, 2003.

5.    CLOSING DELIVERIES.  At the Closing, Seller and Buyer shall deliver to the Closing Agent the following documents, all in form reasonably satisfactory to Buyer, Seller and Buyer's title insurance company ("Title Company") and any institutional lender providing first mortgage financing to Buyer (a "Buyer's Mortgagee") in accordance with customary title standards and conveyancing practices in Walton County, Florida:

(i)    a special warranty deed conveying to Buyer good and marketable fee simple title to the Platted Lots and the Unplatted Lands, free and clear of all liens and encumbrances except applicable governmental zoning, building and use restrictions and Permitted Exceptions (defined in Paragraph 11 hereof); provided, at Buyer's request, Seller shall, at no additional cost or expense to the Seller, deliver a separate deed to the Platted Lots to any party that Buyer may request take title to the Platted Lots (the "Platted Lots Transferee").

(ii)    a mechanic's lien and parties in possession affidavit, non foreign affidavit and such other normal and customary affidavits, resolutions, certificates and indemnities as the Title Company may reasonably require and Seller may reasonable approve, in order to issue all standard owner's and lender's title insurance policies with all standard exceptions omitted or insured over.

(iii)    an Assignment and Assumption of the Driftwood Declarant Rights.

(iv)    an Assignment and Assumption of the Driftwood DRI Development Rights.

(v)    an Assignment and Assumption of the Other Development Rights, including a covenant to pay a pro rata share of the maintenance of the wetlands on the Bruce Property, as more fully described in Paragraph 13 and accept title to the 1.4 acre mitigation site south of Harborview Road.

(vi)    such entity documents as are necessary to evidence that all documents delivered have been properly authorized and executed by the appropriate party.

(vii)    an instrument executed by Seller and Buyer, reconfirming the warranties of Seller and the Buyer set forth in Paragraph 7 hereof.

(viii)    a closing statement.

6.    CLOSING EXPENSES AND PRORATIONS.  At the Closing, Seller shall pay all state, county and municipal stamps, fees and transfer taxes required to be paid in connection with conveying the Property from Seller to Buyer (and the Platted Lots Transferee, if applicable), the costs of recording any corrective instruments and any charges imposed by the Title Company for providing any gap undertakings.  Seller shall also pay all costs associated with satisfying the Wetlands Delineation Condition and the DRI Re-Allocation Condition.  Buyer shall pay the cost of

-3-



Adams Resp. to Plf.'s 1st RFP
000897

recording the deed(s), all premiums and fees for the owner's title insurance policy, the costs of the Survey, Buyer's costs associated with Buyer's Due Diligence and any fees or costs required to be paid in connection with Buyer's preparation and processing of the Development Order Application contemplated by Paragraph 12. Each party shall pay any fees due to its own attorneys [except as set forth in Paragraph 17(h)] or other consultants. Ad-valorem real estate taxes and all assessments arising under Driftwood Estates Assessment Ordinances established under Ordinance #95-4 and Ordinance #95-26 (the "District Improvement Bonds") for the tax fiscal year during which the Closing occurs and any utility charges or similar expenses pertaining to the Property shall be apportioned between the parties as of the end of the day of Closing in accordance with customary practice. Seller shall be responsible for special assessment liens accrued as of the day of Closing (excluding, however, assessments under the District Improvement Bonds, which shall be prorated). Seller and Buyer agree that in the event any portion of the Property is currently part of a larger tax parcel that includes property not included within the Property, the tax and assessment prorations shall be based on acreage or other such other basis as will result in a fair allocation between the parties. Seller and Buyer further agree that if any supplemental information becomes available within one (1) year following the Closing that indicates any prorations made at time of Closing were incorrect, then upon written request by either party to the other, Seller or Buyer shall promptly adjust the said incorrect proration(s) by separate payment from/to Seller or Buyer as applicable (which obligation shall survive the Closing hereunder for a period of one (1) year following Closing without regard to whether any express statement to such effect appears on the Closing statement).

7.    WARRANTIES. As a material inducement to the parties entering into this Agreement and a condition to the parties' obligation to close hereunder, each party represents and warrants to the other that the following statements are true and correct and will be true and correct at time of Closing (which warranties shall survive the Closing for a period of one (1) year following the Closing):

(i)    Seller has not filed and has no present intention of filing any voluntary petition in bankruptcy or seeking any similar relief under any applicable federal or state law.

(ii)    To the Seller's knowledge, without any independent inquiry (and except as may be evidenced on any environmental audit which Buyer may elect to obtain), the Property is in compliance with all applicable federal, state or local health, safety, pollution, or similar laws, rules or regulations pertaining to the environmental condition of the Property and Seller has received no written notice of any hazardous or toxic substances or materials on or beneath the Property, or on or beneath lands located near to the Property, that would require a response or remedial action under any such environmental law.

(iii)    Seller is not aware, without any independent inquiry (and except as may be disclosed by any recorded materials or by any documents or materials expressly referenced in this Agreement) of any fact, condition, circumstance or moratorium existing which would prevent or result in the termination or impairment of any existing access to the Property.

(iv)    To Seller's knowledge, Seller has not entered into any agreements with respect to the terms and conditions of the Sandestin DRI which are not a matter of public record or otherwise referenced herein;

(v)    Except for the warranties of Seller specifically set forth herein, Buyer hereby represents and warrants to Seller that Buyer has not entered into this Agreement based upon

-4-



Adams Resp. to Plf.'s 1st RFP
000898

any representation, warranty, statement or expression of opinion by Seller or any person or entity acting or allegedly acting for or on behalf of Seller with respect to Seller, the Property or the "Condition of the Property" (as hereinafter defined). Buyer acknowledges and agrees that, except for the covenants, representations and warranties of Seller expressly contained in this Agreement, the Property shall be sold and conveyed (and accepted by Buyer at Closing) AS IS, WHERE IS, WITH ALL DEFECTS AND WITHOUT ANY WRITTEN OR ORAL REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW. Except as expressly otherwise provided in this Agreement, Seller makes no representation, warranty or covenant, express, implied or statutory, of any kind whatsoever with respect to the Property, including, without limitation, representation, warranty or covenant as to title, survey conditions, use of the Property for Buyer's intended use, the condition of the Property, past or present use, development, investment potential, tax ramifications or consequences, compliance with law, present or future zoning, the presence or absence of hazardous substances, the availability of utilities, access to public road, habitability, merchantability, fitness or suitability for any purpose, or any other matter with respect to the Property (collectively, the "Condition of the Property"), all of which are, except as otherwise expressly provided in this Agreement, hereby expressly disclaimed by Seller. Except as otherwise expressly provided in this Agreement, Buyer acknowledges that Seller has made no representation, warranty or covenant as to the Condition of the Property or compliance of the Property with any federal, state, municipal or local statutes, laws, rules, regulations or ordinances including, without limitation, those pertaining to construction, building and health codes, land use, zoning, hazardous substances or toxic wastes or substances, pollutants, contaminants, or other environmental matters.

8.    MAINTENANCE OF PROPERTY. Through the Closing or earlier termination of this Agreement Seller shall (i) maintain the Property in substantially the same condition as it exists at the time of Buyer's inspection activities, normal wear and tear excepted; (ii) comply with all applicable federal, state and local laws, ordinances, rules and regulations pertaining to the Property; and (iii) not suffer or permit any sale, transfer, lease or encumbrance of, or lien upon, the Property.

9.    INTENTIONALLY OMITTED.

10.    DUE DILIGENCE REVIEW. From the date this Agreement is executed and delivered by both Seller and Buyer until December 31, 2002 ("Due Diligence Review Period"), Buyer has the right to review, at its cost and expense, the Title Commitment and Survey of the Property, perform a Phase I environmental assessment report, conduct geological test borings, and otherwise inspect the Property and notwithstanding anything to the contrary in this Agreement, in the event any of the foregoing due diligence activities shall evidence any matters materially adverse to Buyer's development of the Property, in Buyer's reasonable discretion, then Buyer will have the right to terminate this Agreement by giving written notice to Seller (and Escrow Agent, if Buyer has placed any cash deposits with Escrow Agent), and upon such termination, the Escrow Agent shall return any cash deposit to Buyer or Seller return any Letter to Buyer, and this Agreement shall be of no further force and effect except for the indemnities set forth in this paragraph and Paragraph 15 hereof. Seller has delivered, or made available, to Buyer a copy of all existing title insurance commitments, surveys, environmental assessment reports, soil tests, wetlands delineation drawings, engineering reports, ad valorem tax bills and other reports and materials pertaining to the physical condition of the Property that presently are in Seller's possession or control. Buyer acknowledges and agrees the materials delivered pursuant to this provision are delivered as an accommodation only and Buyer makes no representations or warranties as to their accuracy and reliability and has no obligation to correct any matters set forth therein. Buyer is a sophisticated and experienced

-5-



**Adams Resp. to Plf.'s 1st RFP**
**000899**

developer of land and shall be solely responsible for satisfying itself that the Property is adequate for its intended purposes.

Seller hereby grants to Buyer, and to any surveyors, engineers, environmental testing personnel and other professionals and agents retained by Buyer, a license to reasonably enter upon the Property at any time prior to Closing for the purpose of conducting reasonable investigations and preparing Buyer's plans related to development of the Property. Buyer shall comply with all laws, rules and regulations of all governmental authorities with respect to conducting any of the aforementioned investigations; and Buyer hereby agrees to indemnify Seller and hold Seller free and harmless from any loss, damage, cost, legal fee, expense, liability or claim arising out of or in connection with Buyer's investigations (notwithstanding anything to the contrary in this Agreement, the foregoing indemnity shall survive the Closing or any termination of this Agreement).

11.    TITLE AND SURVEY. As part of Buyer's due diligence activities and prior to the expiration of the Due Diligence Review Period, Buyer has obtained, at Buyer's expense, (i) from Title Company, the Title Commitment showing marketable title in the name of the Seller and binding Title Company to deliver to Buyer upon Closing an extended coverage ALTA Form B policy of owner's title insurance in the amount of the purchase price, and (ii) Buyer has obtained from a licensed surveyor, the Survey. In the event either the Title Commitment or the Survey shall evidence any matter reasonably objectionable to Buyer, Buyer shall promptly notify Seller of same in writing (a "Title Objection") and Seller shall promptly commence reasonable diligence to cure such Title Objection prior to Closing; provided, if Seller reasonably concludes that notwithstanding its reasonable efforts, Seller will not be able to cure or remove or is not willing to cure or remove any Title Objection prior to Closing, then Seller shall promptly deliver written notice to Buyer (a "NonCure Notice") informing Buyer of Seller's inability or unwillingness to cure the Title Objection and detailing the circumstances that render Seller not able or unwilling to cure the Title Objection; further provided, in the event Seller shall delivery a NonCure Notice to Buyer, Buyer may terminate this Agreement by written notice delivered to Seller within ten (10) days following Buyer's receipt of the NonCure Notice, in which event the First and Second Deposits shall be returned to Buyer and neither Seller nor Buyer shall have any further rights or obligations under this Agreement, except the indemnities set forth in Paragraphs 10 and 15 hereof, or Buyer may elect to close notwithstanding such Title Objections, which shall then be deemed to be Permitted Exceptions to title. Any matters disclosed by the Title Commitment or the Survey and not objected to by Buyer as a Title Objection and any Title Objection which is the subject of a NonCure Notice shall be deemed "Permitted Exceptions" hereunder; provided, however, notwithstanding anything to the contrary in this Agreement, no mortgage lien, judgment lien, mechanic's lien or other lien or encumbrance upon the Property, arising from or through the Seller, which can be removed by payment of a liquidated sum of money (herein, a "Money Lien") shall qualify as a Permitted Exception. Seller shall not be required to remove any Money Lien until Closing, at which time Seller shall remove or bond off all Money Liens, using the Purchase Price proceeds as necessary, with the instrument releasing or discharging such lien or encumbrance being recorded after the Closing in accordance with customary conveyancing practices.

12.    CONDITIONS TO CLOSING.

(i)    Traffic Concurrency Condition. Seller acknowledges its understanding that Buyer desires to acquire the Property to develop same to contain six hundred (600) single-family residential lots (the "Property Plan"). Promptly following expiration of the Due Diligence Review Period, Buyer shall commence and continue with all reasonable diligence to complete its application

-6-



Adams Resp. to Plf.'s 1st RFP
000900

for a development order from Walton County that approves development of the Property in accordance with the Property Plan and, prior to filing the said application with Walton County, deliver a copy of the application to Seller for Seller's review and approval, not to be unreasonably denied or delayed (said application, as initially approved by Seller or thereafter revised with the approval of Buyer and Seller, being referenced herein as the "Development Order Application"). Buyer agrees to complete and provide Seller with a copy of its proposed Development Order Application not later than January 24, 2003, so that Buyer and Seller will have at least one week to review and revise the Development Order Application as (if) necessary to be satisfactory to both Seller and Buyer, and Buyer agrees to submit the finalized Development Order Application to Walton County at the earliest opportunity for filing such application occurring on or after February 4, 2003. Notwithstanding anything to the contrary in this Agreement, Buyer's obligation to close under this Agreement is subject to and conditioned on Seller obtaining from Walton County, Florida traffic concurrency allocations necessary and required to allow for development of the Property in accordance with the Development Order Application (the "Traffic Concurrency Condition"). Seller will exercise all reasonable diligence to satisfy the Traffic Concurrency Condition as expeditiously as possible and Buyer will cooperate with Seller to assist Seller to satisfy this Traffic Concurrency Condition. Seller shall consult with Buyer in advance and keep Buyer reasonably apprised with respect to Seller's plans, activities and communications related to satisfying the Traffic Concurrency Condition. The Traffic Concurrency Condition will be deemed satisfied if (A) Walton County shall issue a development order on the Development Order Application without conditions related to traffic concurrency, or (B) Walton County shall refuse to issue a development order on the Development Order Application for any reason other than due to traffic concurrency issues.

(ii) DRI Re-Allocation Condition. Seller is in the process of obtaining a survey of all the lands included within the Sandestin DRI, in order to determine the densities remaining under the Sandestin DRI and the compliance of the development within Sandestin with the required land uses ("DRI Land Use Survey"). Further, Buyer understands that at the time of the February 8, 2000 DRI Amendment, Seller agreed to include approximately thirteen (13) additional acres of open/green space within the Sandestin DRI. This allocation is presently located in the Driftwood Estates Area and shown as "Golf Course" on the Master Plan Map.

On or before January 24, 2003, Seller agrees to provide to Buyer a copy of the DRI Land Use Survey on which Seller has established the acreages for all uses within the Sandestin DRI and which will show to what extent all or any portion of the said 13 additional open/green space acreage requirement can be accommodated within the Sandestin DRI outside the Driftwood Estates Area and what portion, if any, of the said 13 additional open/green space acreage must be accommodated within Buyer's Property Plan (the "Revised Additional Open/Green Space Requirement"). Buyer agrees to provide for the Revised Additional Open/Green Space Requirement within its Property Plan; provided, if as a result of Buyer having to accommodate any Revised Additional Open/Green Space Requirement or accommodate any other material loss of acreage or other requirement arising from Seller's survey reconciliation of the status of all Sandestin DRI matters, Buyer is unable to plan a physically or economically feasible development of the Property to contain at least six hundred (600) single-family residential lots, then Buyer may terminate this Agreement by written notice to Seller on or before February 4, 2003.

If Buyer has agreed with the Revised Additional Open/Green Space Requirement as depicted on the DRI Land Use Survey, then Seller agrees to submit the finalized DRI Land Use Survey to Walton County at the earliest opportunity for filing such application occurring on or after February 4, 2003. Notwithstanding anything to the contrary in this Agreement, Buyer's obligation to close under this

-7-



Adams Resp. to Plf.'s 1st RFP
000901

Agreement is subject to and conditioned on Seller obtaining a final approval of the Growth Management Department of Walton County of DRI Land Use Survey ("DRI Re-Allocation Condition"). Seller will exercise all reasonable diligence to satisfy the DRI Re-Allocation Condition as expeditiously as possible and Buyer will cooperate with Seller to assist Seller to satisfy this DRI Re-Allocation Condition. Seller shall consult with Buyer in advance and keep Buyer reasonably apprised with respect to Seller's plans, activities and communications related to satisfying the DRI Re-Allocation Condition.

In connection with Seller's assignment of the Driftwood DRI Development Rights to Buyer at Closing, (i) Buyer agrees that Buyer will assume all obligations arising under the Sandestin DRI from and after Closing that pertain to the Property and to the areas within the Driftwood Estates Area designated as park lands, golf course, wetlands or other public areas; and (ii) Seller agrees that for so long as Buyer is developing the Property following Closing, Seller will cooperate with Buyer and execute such applications or approvals as are requested by Buyer to provide or allow for the development of the Property in accordance with the Property Plan, including without limitation, the right to transfer any so-called "like kind density rights" within the Property; provided, Seller shall not be required to incur any expense in connection therewith. Buyer further agrees that any such transfer shall be subject to the Seller's review and shall result in no material effect on any other part of Sandestin or the Sandestin DRI. Upon any transfer request made by Buyer pursuant to this paragraph that Seller review and execute a development related application prepared by Buyer to be submitted to appropriate Walton County officials, Seller shall, within ten (10) business days following its receipt of a written request therefor, either execute the subject application or provide Buyer with written notice of its good cause for failing or refusing to so execute the subject application as requested. Buyer further agrees that following Closing, Buyer shall at all times provide Seller with copies of any approved development orders for the Property and recorded plats in order to enable Seller to properly complete its DRI Annual Report.

(iii)  Wetlands Delineation Condition.  Seller and Buyer acknowledge their mutually understanding that, although consultants retained by Seller previously have identified the portions of the Unplatted Lands that those consultants believed would be delineated as jurisdictional wetlands by the Florida Department of Environmental Protection ("DEP"), comprising approximately twenty-seven (27) acres of wetlands within a thirty-five (35) acre Conservation Easement (the "Consultant Delineation of DEP Wetlands"), the circumstances are such that the DEP might take the position that it has not in fact issued a binding determination of the boundaries of the DEP jurisdictional wetlands located within the Unplatted Lands (a "Binding DEP Determination"). Notwithstanding anything to the contrary in this Agreement, in order to alleviate the risk that the DEP might take the position that the boundaries of the DEP jurisdictional wetlands are not established and determine that the actual DEP jurisdictional wetlands extend over a significantly larger portion of the Unplatted Lands than the lands presently encompassed by the Conversation Easement, Buyer's obligation to close under this Agreement is subject to and conditioned on Seller obtaining from appropriate DEP officials written confirmation, evidence or assurances that the DEP has issued a Binding DEP Determination that the DEP jurisdictional wetlands located within the Unplatted Lands are located within the lands which are subject to the Conservation Easement, or such that there is not material effect on the number of lots which can be developed on the Property in accordance with the Property Plan (the "Wetlands Delineation Condition"). The parties agree that the Wetlands Delineation Condition will be deemed satisfied if Seller obtains the Modified Permit as hereinafter defined, or, if Seller is not able to obtain such Modified Permit, then if Seller is able to obtain such other confirmation, evidence, or assurance as is reasonably satisfactory to Buyer. Seller agrees that following expiration of the Due Diligence Review Period, Seller shall promptly



-8-

Adams Resp. to Plf.'s 1st RFP
000902

commence and continue with diligence its efforts to satisfy the Wetlands Delineation Condition, and Seller shall consult with Buyer in advance and keep Buyer reasonably apprised with respect to Seller's plans, activities and communications related to satisfying the Wetlands Delineation Condition. Buyer shall take no independent action or contact the DEP or any of other government entity with respect to the Wetlands Delineation Condition without Seller's express consent not to be unreasonably denied.

Without limitation as to the manner in which Seller might satisfy the Wetlands Delineation Condition, Buyer agrees that Seller will be deemed to satisfy the Wetlands Delineation Condition in the event of the following: Seller applies for and obtains from the DEP a permit to modify and add a gazebo to one of the boardwalks previously constructed on the Unplatted Lands, submitting with such permit application a delineation of the DEP jurisdictional wetlands that is substantially consistent with the Consultant Delineation of DEP Wetlands, and in issuing such permit the DEP does not contest the applicant's delineation of the DEP jurisdictional wetlands, or if DEP contests the delineation and it is determined that delineation is within the Conservation Easement or otherwise has no material effect on the Buyer's development plan (such permit being referred to herein as the "Modified Permit").

Seller shall have until April 30, 2003 ("Conditions Satisfaction Period") to satisfy the Traffic Concurrency Condition, the DRI re-Allocation Condition and the Wetlands Delineation Condition, which are collectively referred to herein as "Conditions to Closing". In the event that the Conditions to Closing have not been satisfied by April 30, 2003 but it appears reasonably likely that the Conditions to Closing can be satisfied by May 31, 2003, then either Buyer or Seller may extend the Conditions Satisfaction Period to expire on May 31, 2003, by written notice delivered to the other party prior to April 30, 2003. In the event Buyer and Seller shall fail to satisfy the Conditions to Closing on or before expiration of the Conditions Satisfaction Period (extended as applicable), then, (i) Seller may at any time after the expiration of the Conditions Satisfaction Period, prior to satisfaction of the Conditions to Closing, notify Buyer in writing of Seller's desire to terminate this Agreement, and this Agreement shall terminate five (5) business days following Buyer's receipt of such written notice unless Buyer shall, within the said five (5) business day period, notify Seller in writing that Buyer waives the Conditions to Closing as a condition to Buyer's obligation to close under this Agreement; or (ii) Buyer may at any time after expiration of the Conditions Satisfaction Period, prior to satisfaction of the Conditions to Closing notify Seller in writing of Buyer's desire to terminate this Agreement, and this Agreement shall terminate ten (10) days following Seller's receipt of such written notice unless Seller shall, within the said ten (10) day period, satisfy the Conditions to Closing. In the event this Agreement is terminated by Seller or Buyer pursuant to this paragraph, all Earnest Money Deposit or Letters delivered by Buyer shall be returned to Buyer and all rights and obligations hereunder shall terminate except the indemnity provisions of Paragraphs 10 and 15 shall survive such termination.

At Closing, the applicable DEP and Army Corps of Engineer Permits will be assigned to Buyer as a part of the Other Development Rights. In connection therewith, Buyer understands and agrees that from and after the date of such assignment, Buyer will comply with all conditions of the Permits, including without limitation, the obligation to monitor all the wetlands within the Driftwood Estates Area, irrespective of whether they are located within the Property, in compliance with the recommendations in the Driftwood Estates Wetland Regulatory Permit Compliance Evaluation Report, dated December 11, 2002, prepared by Brian L. Underwood of Volkert Environmental Group Inc.

-9-



**Adams Resp. to Plf.'s 1st RFP
000903**

13.   BRUCE PROPERTY.  Seller is the owner of a parcel of land consisting of approximately 1000 acres, which is more fully described on Exhibit "D" attached hereto and made apart hereof, which is commonly referred to as the "Bruce Property". The Bruce Property is used to provide off site mitigation for lands within Sandestin, including the Driftwood Estates Area. At Closing, Buyer shall covenant to pay, or cause to be paid, a pro rata share of the cost of maintaining and monitoring the wetlands on the Bruce Property, which payment obligation shall be a covenant running with the land and binding upon all successors and assigns. Buyer's prorated share of the costs of maintaining and monitoring the wetlands of the Bruce Property shall be a fractional share determined, and subject to redetermination from time to time, as follows: (i) the numerator of said fraction shall be the number of acres of offsite mitigation required in connection with Buyer's or its assignees' initial or future development of the Property, and (ii) the denominator of said fraction shall be the total number of acres of wetlands located within the Bruce Property that are being maintained and monitored for purposes of providing off site mitigation for lands located within Sandestin.  Any change in the number of acres included within the foregoing numerator or denominator shall be applied as of the date of such change.

14.   DEFAULT.  If Buyer shall fail or refuse to perform any of Buyer's obligations under this Agreement and such failure or refusal continues for ten (10) days following written notice thereof given to Buyer by Seller, Seller may, as its sole remedy at law and in equity, terminate this Agreement by written notice to Buyer and, if such termination shall occur after expiration of the Due Diligence Review Period, Seller shall be entitled to receive all Earnest Money Deposit which has been delivered to Escrow Agent (and to make demand on any Letter that has been delivered to Seller), as agreed upon full and complete liquidated damages.  If Seller shall fail or refuse to perform any of Seller's obligations under this Agreement and such failure or refusal continues for ten (10) days following written notice thereof given to Seller by Buyer, Buyer may seek specific performance of this Agreement or may terminate this Agreement by written notice to Seller and receive a return of all Earnest Money Deposit and any Letters that may have been delivered to Seller.  In addition, upon termination by the Buyer due to Seller's default, the Seller shall reimburse Buyer for the actual costs of all third party costs and expenses incurred during the Due Diligence Period for tests, surveys, reports, etc. (collectively, "Buyer's Due Diligence Materials") and upon receipt of such reimbursement, Buyer shall assign its right, title and interest in the Buyer's Due Diligence Materials to Seller.  Upon termination, this Agreement shall be in no further force or effect, except the indemnities set forth in Paragraphs 10 and 15 hereof.

15.   BROKERS.  Seller and Buyer each represents and warrants to the other that it has not in any manner negotiated or dealt with any real estate broker, salesperson or agent in connection with the purchase or sale of the Property contemplated by this Agreement.  Seller and Buyer each hereby indemnifies the other and agrees to hold the other free and harmless from any loss, damage, cost, legal fee, expense, liability or claim which the other may suffer in connection with any real estate brokers or agents claiming by, through or under Seller or Buyer, respectively, seeking any commission, fee or payment in connection with the transaction contemplated by this Agreement.

16.   NOTICES.  All notices or communications given pursuant to this Agreement shall be in writing and shall be delivered pursuant to one of the following methods of delivery: (i) United States Post Office certified mail or registered mail, return receipt requested, (ii) a nationally recognized overnight courier service which obtains a signed receipt upon delivery (e.g., , U.S. Post Office Express Mail, Federal Express, Airborne Express, etc.), (iii) hand delivery, upon a signed receipt, or (iv) facsimile or email transmission, provided that the addressee party acknowledges in writing its receipt of the transmission (sender's email or fax confirmation message not sufficient).

-10-



Adams Resp. to Plf.'s 1st RFP
000904

Notice shall be addressed to the party or person to whom the notice is to being given, at the following addresses:

|  |  |
|---|---|
| *To Seller:* | *With a copy to:* |
| Intrawest Sandestin Company, LLC | Holland & Knight LLP |
| 9300 Highway 98 West | 50 North Laura Street, Suite 3900 |
| Destin, FL 32550 | Jacksonville, FL 32202 |
| Attn:  Jim Boivin | Attn: Linda Connor Kane, Esq. |
| Telephone:     (850) 267-6252 | Telephone:     (904) 353-2000 |
| Facsimile:     (850) 267-8245 | Facsimile:     (904) 358-1872 |
|  |  |
| *To Buyer:* | *With a copy to:* |
| Mr. Richard Olson | Kirby Williams, Esquire |
| Olson & Associates | Clark, Partington, Hart, et. al. |
| 1234 Airport Road, Suite 215 | 151 Regions Way, Suite 6-A |
| Destin, Florida  32541 | Destin, Florida 32541 |
| Telephone:     (850) 650-2858 | Telephone:     (850) 650-3304 |
| Facsimile:     (850) 650-2862 | Facsimile:     (850) 650-3305 |

17.     GENERAL PROVISIONS.

(a)     *Legal Holiday.*  If any date set forth herein for the performance of any obligation by Seller or Buyer or for the delivery of any instrument or notice should fall on a Saturday, Sunday or legal holiday, the compliance with such obligation or delivery shall be deemed acceptable on the next business day following such Saturday, Sunday or legal holiday.

(b)     *Entire Agreement.*  This Agreement represents the entire understanding between Seller and Buyer with respect to the transaction contemplated herein and supersedes, incorporates and merges all prior negotiations, representations and agreements, whether oral or written.  All understandings and agreements heretofore had between the parties hereto are merged into this Agreement, which alone fully and completely expresses their agreement.

(c)     *Amendment.*  This Agreement may not be amended, nor shall any waiver, change or modification be effected, except by an instrument in writing executed by or on behalf of the party against whom enforcement is sought.

(d)     *Successors and Assigns.*  This Agreement shall be binding upon and inure to the benefit of the heirs, successors, administrators, executors and assigns of the respective parties, and be a burden running with title to the Property.  Provided however, Buyer may assign its rights and obligations under this Agreement to an entity which is controlled by Buyer, if Buyer delivers to Seller evidence of such control, Buyer remains bound by this Agreement through Closing.

(e)     *Counterparts.*  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and in pleading or proving any provision of this Agreement it shall not

-11-



Adams Resp. to Plf.'s 1st RFP
000905

be necessary to produce more than one such counterpart.

(f) *Interpretation.* Each party hereto has been represented, or had the opportunity to be represented, by separate counsel in connection with the negotiation and drafting of this Agreement. Accordingly, this Agreement shall be interpreted without regard to any presumption or other rule requiring interpretation against the Party causing this Agreement or any part thereof to be drafted.

(g) *Severability.* Any provision of this Agreement or any paragraph, sentence, clause or wording appearing herein which shall prove to be invalid, void or illegal for any reason shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions, paragraphs, sentences, clauses or words hereof shall nevertheless remain in full force and effect.

(h) *Legal Expenses And Attorneys' Fees.* In the event a dispute arises between Seller and Buyer related to or arising out of any breach or alleged breach of this Agreement, or any representation, covenant or warranty contained in this Agreement, and such dispute gives rise to any administrative proceeding, arbitration, court action or other legal process or proceeding, then, the prevailing party in such dispute shall be entitled to reimbursement from the non-prevailing party for all losses, damages, costs, liabilities or expenses reasonably incurred by the prevailing party in furtherance of or defense of said action, process or proceeding, including, without limitation, reasonable attorneys fees whether incurred in preparation for or conduct of trial, administrative or arbitration proceedings, appellate proceedings, bankruptcy or post-judgment proceedings. The term "prevailing party" as used in reference to proceedings in the Federal Bankruptcy Court shall be deemed to mean the prevailing party in any adversary proceeding or contested matter, or any other actions taken by the non-bankruptcy party which are reasonably necessary to protect its rights in the Property and under the terms of this Agreement.

(i) *WAIVER OF JURY TRIAL.* IN THE INTEREST OF AVOIDING THE DELAYS AND EXPENSES ASSOCIATED WITH JURY TRIALS, SELLER AND BUYER MUTUALLY, EXPRESSLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY FOR ANY PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT.

18. AUTHORITY. Each individual executing this Agreement on behalf of Buyer or Seller hereby represents and warrants that (i) he or she is duly authorized to execute this Agreement on behalf of Buyer or Seller, as the case may be, and commit and bind such party to the terms hereof; (ii) all consents or other action required to be obtained from, or taken by, any partners, members, shareholders, officers, directors, boards, lenders, investors or beneficiaries of such party to execute and perform the terms of this Agreement have been duly obtained, or taken; and (iii) no other signature and/or authorization is necessary for such party to enter into, be bound by and perform the terms of this Agreement.

19. EXECUTION. No binding legal obligation shall be created hereunder until such time as both Seller and Buyer have both formally executed and delivered this Agreement and the first party to execute this Agreement shall remain free to withdraw from its offer to enter into this Agreement at any time prior to such time as it shall receive written evidence of the other party's formal execution of this Agreement (execution and delivery by facsimile transmission shall be binding, provided, any party executing and delivering this Agreement by facsimile transmission shall promptly post at least one original for delivery to the other party). In the event either Buyer or



-12-

**Adams Resp. to Plf.'s 1st RFP**
**000906**

Seller shall execute this Agreement and deliver same to the other party, the said executing party's offer to enter into this Agreement shall in any event automatically expire at 4:00 p.m. on the second (2nd) business day following the date of such delivery unless the receiving party shall deliver evidence of its full execution of this Agreement to the first executing party prior to such date and time.

IN WITNESS WHEREOF, each of Seller and Buyer has caused this Agreement to be executed in multiple copies as of the date indicated below.

Witnesses:                              SELLER:
                                        INTRAWEST SANDESTIN COMPANY, L.L.C.
                                        a Delaware limited liability company
                                        By Intrawest U. S. Holdings Inc.

                                        By: _____  12/31/02
                                        Print: _____      Date
                                        Its: Jim Boivin. VP Development


Witnesses:                              BUYER:
                                        OLSON & ASSOCIATES OF NW FLORIDA, INC.
                                        a Florida corporation

                                        _____  12/31/02
                                        Richard Olson, President     Date


-13-

Adams Resp. to Plf.'s 1st RFP
000907

01/08/2003 19:48 850-659-2862 OLSON & ASSOCIATES PAGE 15

EXHIBIT A

[Copy of the Title Commitment]



Adams Resp. to Plf.'s 1st RFP
000908

First American Title Insurance Company

FATIC-2170
ALTA COMMITMENT 1982

# TITLE INSURANCE COMMITMENT



Issued by

## *First American Title Insurance Company*

### AGREEMENT TO ISSUE POLICY

We agree to issue a policy to you according to the terms of the Commitment. When we show the policy amount and your name as the proposed insured in Schedule A, this Commitment becomes effective as of the Commitment Date shown in Schedule A.

If the Requirements shown in this Commitment have not been met within six months after the Commitment Date, our obligation under this Commitment will end. Also, our obligation under this Commitment will end when the Policy is issued and then our obligation to you will be under the Policy.

Our obligation under this Commitment is limited by the following:

> The Provisions In Schedule A.
> The Requirements In Schedule B-1.
> The Exceptions in Schedule B-2.
> The Conditions on Page 1.

This Commitment is not valid without SCHEDULE A and Sections 1 and 2 of SCHEDULE B.

*First American Title Insurance Company*

BY _____ PRESIDENT

ATTEST _____ SECRETARY

Page 1
File No.: 2032-126860

Adams Resp. to Plf.'s 1st RFP
000909

## First American Title Insurance Company

## CONDITIONS

1.  **DEFINITIONS**  (a) "Mortgage" means mortgage, deed of trust or other security instrument. (b) "Public Records" means title records that give constructive notice of matters affecting your title according to the state statutes where your land is located.

2.  **LATER DEFECTS**  The Exceptions in Schedule B - Section 2 may be amended to show any defects, liens or encumbrances that appear for the first time in the public records or are created or attach between the Commitment Date and the date on which all of the Requirements of Schedule B - Section 1 are met. We shall have no liability to you because of this amendment.

3.  **EXISTING DEFECTS**  If any defects, liens or encumbrances existing at Commitment Date are not shown in Schedule B, we may amend Schedule B to show them. If we do amend Schedule B to show these defects, liens or encumbrances, we shall be liable to you according to Paragraph 4 below unless you knew of this information and did not tell us about it in writing.

4.  **LIMITATION OF OUR LIABILITY**  Our only obligation is to issue to you the Policy referred to in this Commitment, when you have met its Requirements. If we have any liability to you for any loss you incur because of an error in this Commitment, our liability will be limited to your actual loss caused by your relying on this Commitment when you acted in good faith to:

Comply with the Requirements shown in Schedule B - Section 1

or

Eliminate, with our written consent, any Exceptions shown in Schedule B - Section 2.

We shall not be liable for more than the Policy Amount shown in Schedule A of this Commitment and our liability is subject to the terms of the Policy form to be issued to you.

5.  **CLAIMS MUST BE BASED ON THIS COMMITMENT**  Any claim, whether or not based on negligence, which you may have against us concerning the title to the land must be based on this Commitment and is subject to its terms.

FATIC 213X
ALTA Commitment (1982)

Page 2
File No.: 2032-126860



Adams Resp. to Plf.'s 1st RFP
000910

01/08/2003  19:48     850-650-2862          OLSON & ASSOCIATES                    PAGE 18

# First American Title Insurance Company

## SCHEDULE A

Issuing Office File No:  2032-126860

1.   Commitment Date:  December 04, 2002 at 8:00 a.m.

2.   Policy (or Policies) to be issued:
   (a) Owner's Policy (Identify policy type below)          Policy Amount $ 0.00
       ALTA Owners Policy (10-17-92)(with Florida Modifications)
           Proposed Insured:  Olson & Associates of N.W. Florida Inc., a Florida
                              Corporation and/or assigns

   (b) Loan Policy (Identify policy type below)             Policy Amount $ 0.00
       ALTA Loan Policy (10-17-92)(with Florida Modifications)
           Proposed Insured:  TBD, its successors and/or assigns as their respective
                              interest may appear

   (c) Other Policy (Identify policy type below)            Policy Amount $
       Proposed Insured:

3.   A Fee Simple interest in the land described in this Commitment is owned, at the Commitment Date, by :

       Intrawest Sandestin Company L.L.C., a Delaware Limited Liability Company

4.  The land referred to in this Commitment is described as follows :

      See Attached Schedule A Continued

                                               Advance Title
                                        By: _____
                                               Authorized Signatory

Issuing Office File No:  2032-126860

THIS COMMITMENT IS FURNISHED BY FIRST AMERICAN TITLE INSURANCE COMPANY OR ITS POLICY ISSUING AGENT SOLELY FOR THE
ISSUANCE OF A POLICY OR POLICIES OF TITLE INSURANCE OF FIRST AMERICAN TITLE INSURANCE COMPANY. THIS COMMITMENT IS
NOT AN ABSTRACT OR AN OPINION OF TITLE. LIABILITY UNDER THIS COMMITMENT IS DEFINED BY AND LIMITED TO THE TERMS AND
CONDITIONS OF THIS COMMITMENT AND THE TITLE INSURANCE POLICY TO BE ISSUED. PERSONS AND ENTITIES NOT LISTED ABOVE AS
PROPOSED INSUREDS ARE NOT ENTITLED TO RELY UPON THIS COMMITMENT FOR ANY PURPOSE.

Page 3
File No.: 2032-126860

Adams Resp. to Plf.'s 1st RFP
000911

02-456LD

A PARCEL OF LAND IN SECTIONS 11, 12, 13, AND 14, TOWNSHIP 2 SOUTH, RANGE 21 WEST, WALTON COUNTY, FLORIDA, BEING MORE EXPLICITLY DESCRIBED AS FOLLOWS:

ALL LANDS LYING WITHIN SAID SECTIONS NORTH OF THE NORTH BOUNDARY LINES OF BLOCKS D AND N OF DRIFTWOOD ESTATES AS RECORDED IN PLAT BOOK 5 PAGE 28, WALTON COUNTY, FLORIDA AND THE EASTERLY AND WESTERLY PROJECTIONS THEREOF.

LESS AND EXCEPT THE RECORD PLAT OF DRIFTWOOD ESTATES OF PLAT BOOK 5 PAGE 28, WALTON COUNTY, FLORIDA.

LESS AND EXCEPT THE NOT INCLUDED AREAS AS SHOWN ON SAID RECORD PLAT OF DRIFTWOOD ESTATES OF PLAT BOOK 5 PAGE 28, SAID COUNTY AND STATE; BETWEEN LOT 5 BLOCK B AND LOT 1 BLOCK C; BETWEEN LOT 5 BLOCK C AND LOT 1 BLOCK F; AND BETWEEN LOT 7 BLOCK F AND LOT 1 BLOCK G.

LESS AND EXCEPT THE 4TH ADDITION TO DRIFTWOOD ESTATES SUBDIVISION AS RECORDED IN PLAT BOOK 14 PAGES 74-74A OF WALTON COUNTY, FLORIDA;

TOGETHER WITH THE FOLLOWING LOTS AND AREAS WITHIN THE RECORD PLAT OF DRIFTWOOD ESTATES AS RECORDED IN PLAT BOOK 5 PAGE 28 OF WALTON COUNTY, FLORIDA:

LOTS 1, 6, 8, 22, 26 AND 27 BLOCK H;

LOTS 2, 3, AND 6, BLOCK I;

LOT 1, BLOCK J;

LOTS 2 AND 3 BLOCK K;

THE NOT INCLUDED PARCEL AS SHOWN ON SAID PLAT BETWEEN BLOCKS K, J AND L;

LOTS 1 THROUGH 8 INCLUSIVE, BLOCK L;

LOTS 1, 4, 5, AND 6 BLOCK M;

THE NOT INCLUDED PARCEL AS SHOWN ON SAID PLAT BETWEEN BLOCKS P AND L;

LOTS 1 THROUGH 10 INCLUSIVE, AND LOTS 12 THROUGH 22 INCLUSIVE, BLOCK P;

LOTS 1 THROUGH 12 INCLUSIVE, BLOCK N;

LOT 6, AND LOTS 8 THROUGH 29 INCLUSIVE, BLOCK D;

LOTS 4 THROUGH 11 INCLUSIVE, AND LOT 13, BLOCK E;

TOGETHER WITH THE NOT INCLUDED AREA AS SHOWN ON SAID DRIFTWOOD ESTATES RECORD PLAT BETWEEN THE 4TH ADDITION TO DRIFTWOOD ESTATES SUBDIVISION AS RECORDED IN PLAT BOOK 14 PAGES 74-74A OF WALTON COUNTY, FLORIDA AND LOT 1 BLOCK J OF SAID DRIFTWOOD ESTATES SUBDIVISION PLAT AS RECORDED IN PLAT BOOK 5 PAGE 28, WALTON COUNTY, FLORIDA;

LESS AND EXCEPT THE IIPARKD AREA AS SHOWN ON SAID RECORD PLAT OF DRIFTWOOD ESTATES.

SUBJECT TO: CONSERVATION EASEMENTS AS RECORDED IN OFFICIAL RECORDS BOOK 2219 PAGE 286; BOOK 1094 PAGE 2 AND BOOK 2252 PAGE 268; WALTON COUNTY, FLORIDA.

Page 1



Adams Resp. to Plf.'s 1st RFP
000912

01/08/2003  19:48  858-65°-2862        OLSON & ASSOCIATES           PAGE  20

## First American Title Insurance Company

FATIC 214X
ALTA Commitment (1982)

### SCHEDULE B - SECTION 1
### REQUIREMENTS

Issuing Office File No.:  2032-126860

The following requirements must be met:

1.      Pay and/or disburse the agreed amounts for the interest in the land to be insured and/or according to the mortgage to be insured.

2.      Pay us the premiums, fees and charges for the policy.

3.      Pay all taxes and/or assessments, levied and assessed against the land, which are due and payable.

4.      The following documents, satisfactory to us, creating the interest in the land and/or the mortgage to be insured, must be signed, delivered and recorded:

  a.      Special Warranty Deed conveying the land from Intrawest Sandestin Company L.L.C., a Delaware Limited Liability Company, to Olson & Associates of N.W. Florida Inc., a Florida Corporation and/or successor and assigns. In connection with said deed, we will further require:

  1) Production of a copy of the articles of organization and regulations, if adopted, with an affidavit affixed thereto that it is a true copy of the articles of organization and regulations, and all amendments thereto, and that the limited liability company has not been dissolved;

  2) That said deed shall be executed by all of the members, unless the articles of organization provides that the company shall be governed by managers, then said deed shall be executed by all of the managers, unless said articles of organization and regulations, show no limitation on the authority of one member, or one manager, if applicable, to execute a conveyance;

  3) Should any member, or manager, if applicable, be other than a natural person, we will require proof of good standing as well as documentation of authority of the person to execute documents on its behalf;

  4) Certificate of Organization from the Secretary of State, showing the limited liability company to have been formed as of date of acquisition, together with proof as to the current status of said limited liability company;

  5) Satisfactory evidence of compliance with all requirements regarding conveying company property contained in the articles of organization and regulations, if adopted; and

  6) The Company reserves the right to make such further requirements as it deems necessary after review of any of the documentation required above.

Page 5
File No.: 2032-126860

Adams Resp. to Plf.'s 1st RFP
000913

01/08/2003 19:48   858-658-2862          OLSON & ASSOCIATES              PAGE  21

## First American Title Insurance Company

b.   Mortgage encumbering the land from Olson & Associates of N.W. Florida Inc., a Florida Corporation and/or assigns , to TBD,, in the principal amount of $0.00. In connection with said mortgage, we will further require:

    1) Production of a copy of the articles of incorporation with an affidavit affixed thereto that it is a true copy of the articles of incorporation and all amendments thereto, and that the corporation has not been dissolved;

    2) Certified copy of a Board of Directors resolution setting forth the terms, conditions and consideration for which the corporation is authorized to mortgage its property. The resolution must further identify the officers authorized to execute the mortgage and other closing document on behalf of the corporation;

    3) Certified incumbency certificate showing the identity of the officers authorized to execute the mortgage on behalf of the corporation together with examples of their signatures;

    4) The corporation must have been formed as of prior to the closing of this transaction;

    5) Current Certificate from the Secretary of State of said corporation's current good standing;

    6) Satisfactory evidence of compliance with all requirements regarding encumbering corporation property contained in the articles of incorporation; and

    7) The Company reserves the right to make such further requirements as it deems necessary after reviewing any of the documentation required above.

5.   Proof of payment of any Homeowners Association liens and/or assessments.

6.   Note: Items 1, 2, 3, 4 and 5 of Schedule B, Section 2 of the Commitment, will be deleted from any policies issued pursuant thereto upon our review and acceptance of a survey acceptable to the Company, certified in accordance with Florida Statutes, or such other proof as may be acceptable to the Company, relating to any rights, interests or claims affecting the land which a correct survey would disclose, and an Affidavit of Possession and No Liens in accordance with Florida Statutes, and the Company's review of the potential exposure for construction liens. The Company reserves the right to include exceptions from coverage relating to matters disclosed by the survey or other proof, the Affidavit, or discovered in the Company's review of the potential exposure for construction liens, and to make such additional requirements as it may deem necessary.

7.   Note: 2002 ad valorem taxes show unpaid in the gross amount of $59,224.05 without homestead exemption for Tax Identification No. 11-2S-21-42000-001-0000. Assessed amount is $2,584,720.00

B.   Note: 2002 ad valorem taxes show unpaid in the gross amount of $37,387.83 without homestead exemption for Tax Identification No. 11-2S-21-42010-00D-0000. Assessed amount is $748,898.00

9.   Note: 2002 ad valorem taxes show unpaid in the gross amount of $14,306.61 without homestead exemption for Tax Identification No. 22-1S-21-42010-00E-0000. Assessed amount is $268,540.00

10.  Note: 2002 ad valorem taxes show unpaid in the gross amount of $9,452.77 whitout homestead exemption for Tax Identification No. 11-2S-21-42010-00H-0010. Assessed amount is $172,588.00

Adams Resp. to Plf.'s 1st RFP
000914

01/08/2003  19:48     850-658-2862          OLSON & ASSOCIATES                    PAGE  22

# First American Title Insurance Company

11.   Note: 2002 ad valorem taxes show unpaid in the gross amount of $4,342.70 without homestead exemption for Tax Identification No. 11-2S-21-42010-00I-0020. Assessed amount is $57,222.00

12.   Note: 2002 ad valorem taxes show unpaid in the gross amount of $1,733.89 without homestead exemption for Tax Identification No. 11-2S-21-42010-00I-0030. Assessed amount is $40,768.00

13.   Note: 2002 ad valorem taxes show unpaid in the gross amount of $7,215.31 without homestead exemption for Tax Identification No. 11-2S-21-42010-00J-0010. Assessed amount is $184,275.00

14.   Note: 2002 ad valorem taxes show unpaid in the gross amount of $3,007.73 without homestead exemption for Tax Identification No. 11-2S-21-42010-00K-0000. Assessed amount is $46,680.00

15.   Note: 2002 ad valorem taxes show unpaid in the gross amount of $15,119.05 without homestead exemption for Tax Identification No. 11-2S-21-42010-00L-0010. Assessed amount is $239,488.00

16.   Note: 2002 ad valorem taxes show unpaid in the gross amount of $18,760.69 without homestead exemption for Tax Identification No. 11-2S-21-42010-00M-0010. Assessed amount is $243,588.00

17.   Note: 2002 ad valorem taxes show unpaid in the gross amount of $3,336.94 without homestead exemption for Tax Identification No. 11-2S-21-42010-00M-0040. Assessed amount is $71,624.00

18.   Note: 2002 ad valorem taxes show unpaid in the gross amount of $18,246.31 without homestead exemption for Tax Identification No. 11-2S-21-42010-00N-0010. Assessed amount is $295,224.00

19.   Note: 2002 ad valorem taxes show unpaid in the gross amount of $30,203.36 without homestead exemption for Tax Identification No. 11-2S-21-42010-00P-0010. Assessed amount is $476,345.00

20.   Note: 2002 ad valorem taxes show unpaid in the gross amount of $1,623.46 without homestead exemption for Tax Identification No. 11-2S-21-42010-00P-0100. Assessed amount is $32,400.00

Note: Immediately prior to disbursement of the closing proceeds, the search of the public records must be continued from the effective date hereof. The Company reserves the right to raise such further exceptions and requirements as an examination of the information revealed by such search requires, provided, however, that such exceptions or requirements shall not relieve the Company from its liability under this Commitment arising from the matters which would be revealed by such search, to the extent that Company, or its Agent countersigning this Commitment, has disbursed said proceeds.

Adams Resp. to Plf.'s 1st RFP
000915

01/08/2003 19:48 850-650-2862 OLSON & ASSOCIATES PAGE 23

# First American Title Insurance Company

FATIC 216X
ALTA Commitment (1982)
(with printed mineral exception)

## SCHEDULE B - SECTION 2
### EXCEPTIONS

Issuing Office File No.: 2032-126860

Any policy we issue will have the following exceptions, unless they are taken care of to our satisfaction:

1. Any rights, interests or claims of parties in possession of the land not shown by the public records.

2. Any rights, interest or claims affecting the land which a correct survey would disclose and which are not shown by the public records.

3. Any lien for services, labor, or materials in connection with improvements, repairs or renovations provided before, on, or after Date of Policy, not shown by the public records.

4. Any dispute as to the boundaries caused by a change in the location of any water body within or adjacent to the land prior to Date of Policy, and any adverse claim to all or part of the land that is, at Date of Policy, or was previously under water.

5. Taxes or special assessments not shown as lien in the public records or in the records of the local tax collecting authority, at Date of Policy.

6. Any minerals or mineral rights lease, granted or retained by current or prior owners.

7. Taxes and assessments for the year 2003 and subsequent years, which are not yet due and payable.

8. Restrictions, dedications, conditions, reservations, easements and other matters shown on the plat of DRIFTWOOD ESTATES, as recorded in Plat Book 5, Page 28 through 28C.

9. Covenants and Restrictions recorded in Book 162, Page 129. (Applies to all "Lots" listed on Schedule A with the exception of Lots 1, 6 and 8, Block H and Lots 2, 3 and 6, Block I).

10. Amended and Restated Protective Covenants recorded in Book 162, Page 129 and Book 1452, Page 94; Supplemental recorded in Book 1452, Page 150 and Second Supplemental in Book 1680, Page 396, Supplemental in Book 2322, Page 691 and Book 2351, Page 414. (Applies to all Lots in the Insured parcel)

Page 8
File No.: 2032-126860

Adams Resp. to Plf.'s 1st RFP
000916

01/08/2003 20:08    850-6⁵⁰-2862          OLSON & ASSOCIA⁻⁻S               PAGE 82

## First American Title Insurance Company

11. Conservation Easement Deed recorded in Book 1094, Page 2, and Book 2219, Page 286 and Book 2252, Page 268 .

12. Easement granted to Gulf Power Company by instrument recorded in Book 1653, Page 260. (As to Lot 1, Block P and Lot 22, Block P only)

13. Riparian and/or littoral rights are not insured.

14. The right, title or interest, if any, of the public to use a public beach or recreation area or any part of the land described in Schedule A hereof, lying between the water abutting said land and the most inland of any of the following: (a) the natural line of vegetation; (b) the most extreme high water mark; (c) the bulkhead line; or (d) any other line which has been or which hereafter may be legally established as relating to such public use.

15. Due to all or a part of the land described herein being artificially filled in land in what was formerly navigable waters, this policy is subject to the right of the United States Government and/or the State of Florida, arising by reason of the United States Government's control over navigable waters in the interest of navigation and commerce and/or the inalienable right of the State of Florida in the lands and/or waters of such character.

16. Any loss or claims in regards to Driftwood Estates Assessment Ordinance as established under Ordinance #95-4, recorded in Book 2347, page 727.

17. Any loss and/or claims in regards to Driftwood Estates Assessment Ordinance as established under Ordinance # 95-26.

18. Quit Claim Deed and Assignment Order of Rights Order Development Rights recorded in Book 794, Page 309.

19. Easement granted to Gulf Power Company by instrument recorded in Deed Book 111, Page 460. (This is a blanket easement, will encompass the entire insured parcel)

20. Subject to any rights of use of the amenity area located adjacent to Lot 1, Block J.

Page 9
File No.: 2032-126860



Adams Resp. to Plf.'s 1st RFP
000917

01/08/2003 20:08    850-65°-2862    OLSON & ASSOCIA°°S    PAGE 03

# First American Title Insurance Company

Issuing Office File No.: 2032-126860

Note: All of the recording information contained herein refers to the Public Records of Walton County, Florida, unless otherwise indicated. Any reference herein to a Book and Page is a reference to the Official Record Books of said county, unless indicated to the contrary.

### Notices - Where Sent
All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to the Company, Attention: Claims Department, 2075 Centre Pointe Boulevard, Tallahassee, Florida 32308-3752.

### Service, Quality and Availability
First American Title Insurance Company cares about its customers and their ability to obtain information and service on a convenient, timely and accurate basis. A qualified staff of service representatives is dedicated to serving you. A toll-free number is available for your convenience in obtaining information about coverage and to provide assistance in resolving complaints at 1-800-929-7186. Office hours are from 8:30 a.m. through 5:30 p.m. Monday through Friday.

Page 10
File No.: 2032-126860



Adams Resp. to Plf.'s 1st RFP
000918

01/08/2003  20:08  850-650-2862  OLSON & ASSOCIATES  PAGE  04

# First American Title Insurance Company

TBD,

## Florida Promulgated Closing Service Letter

The operation and scope of the following closing protection letter ("Letter") is limited to the transaction which is the subject of the commitment to which this Letter is attached and is also directed to those person(s) and/or entity(ies) set forth in the Letter and identified as a proposed insured in the commitment.

Re: Issuing Agent: Agent countersigning the attached commitment.

When title insurance of *First American Title Insurance Company* is specified for your protection in connection with closings of real estate transactions in which you are to be the lessee or purchaser of an interest in land or a lender secured by a mortgage (including any other security instrument) of an interest in land, the *First American Title Insurance Company*, subject to the Conditions and Exclusions set forth below, hereby agrees to reimburse you for actual loss incurred by you in connection with such closing when conducted by said Issuing Agent when such loss arises out of:

1. Failure of said Issuing Agent to comply with your written closing instructions to the extent that they relate to (a) the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such status of title or lien, or (b) the obtaining of any other document, specifically required by you, but not to the extent that said instructions require a determination of the validity, enforceability or effectiveness of such other document, or (c) the collection and payment of funds due you, or

2. Fraud or dishonesty of said Issuing Agent in handling your funds or documents in connection with such closing.

If you are a lender protected under the foregoing paragraph, your borrower in connection with a loan secured by a mortgage on a one to four family dwelling shall be protected as if this letter were addressed to your borrower.

Conditions and Exclusions

A. The *First American Title Insurance Company* will not be liable to you for loss arising out of:

1. Failure of said Issuing Agent to comply with your closing instructions which require title insurance protection inconsistent with that set forth in the title insurance binder or commitment issued by the *First American Title Insurance Company*. Instructions which require the removal of specific exceptions to title or compliance with the requirements contained in said binder or commitment shall not be deemed to be inconsistent.

2. Loss or impairment of your funds in the course of collection or while on deposit with a bank due to bank failure, insolvency or suspension, except such as shall result from failure of said Issuing Agent to comply with your written closing instructions to deposit the funds in a bank which you designated by name.

3. Mechanics' and materialmen's liens in connection with your purchase or lease or construction loan transactions, except to the extent that protection against such liens is afforded by a title insurance binder, commitment or policy of the *First American Title Insurance Company*.

4. The periodic disbursement of construction loan proceeds or funds furnished by the owner to pay for construction costs during the construction of improvements on the land to be insured, unless an officer of the company has specifically accepted the responsibility to you for such disbursement program in writing.

B. When the *First American Title Insurance Company* shall have reimbursed you pursuant to this letter, it shall be subrogated to all rights and remedies which you would have had against any person or property had you not been so reimbursed. Liability of the *First American Title Insurance Company* for such reimbursement shall be reduced to the extent that you have knowingly and voluntarily impaired the value of such right of subrogation.

C. Any liability of the *First American Title Insurance Company* for loss incurred by you in connection with closings of real estate transactions by said Issuing Agent shall be limited to the protection provided by this letter. However, this letter shall not affect the protection afforded by a title insurance binder, commitment or policy of *First American Title Insurance Company*. The dollar amount of liability hereby incurred shall not be greater than the amount of the title insurance binder, commitment or policy of title insurance to be issued, and liability hereunder as to any particular loan transaction shall be coextensive with liability under the policy issued to you in connection with such transaction. Payment in accordance with the terms of this letter shall reduce by the same amount the liability under such policy, and payment under such policy shall reduce by the same amount the company's liability under the terms of this letter.

D. Claims of loss shall be made promptly to the *First American Title Insurance Company* at its principal office at 1 First American Way, Santa Ana, California 92707. When the failure to give prompt notice shall prejudice the First American Title Insurance Company, then liability of the *First American Title Insurance Company* hereunder shall be reduced to the extent of such prejudice. The First American Title Insurance Company shall not be liable hereunder unless notice of loss in writing is received by the First American Title Insurance Company within ninety (90) days from the date of discovery of such loss.

E. Nothing contained herein shall be construed as authorizing compliance by any issuing agent with any such closing instructions, compliance with which would constitute a violation of any applicable law, rule or regulation relating to the activity of title insurers, their issuing agents, and their failure to comply with any such closing instructions shall not create any liability under the terms of this letter.

F. The protection herein offered will be effective until cancelled by written notice from the *First American Title Insurance Company*. Any previous Insured Closing Service letter or similar agreement is hereby cancelled, except as to closings of your real estate transactions regarding which you have previously sent (or within 30 days hereafter send) written closing instructions to said Issuing Agent.

FIRST AMERICAN TITLE INSURANCE COMPANY

By: _____  Vice President

Page 11
File No.: 2032-126860

Adams Resp. to Plf.'s 1st RFP
000919

# First American Title Insurance Company

### Privacy Policy

**We Are Committed to Safeguarding Customer Information**
In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information - particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, together with our parent company, The First American Corporation, we have adopted this Privacy Policy to govern the use and handling of your personal information.

**Applicability**
This Privacy Policy governs our use of the information which you provide to us. It does not govern the manner in which we may use information we have obtained from any other source, such as information obtained from a public record or from another person or entity. First American has also adopted broader guidelines that govern our use of personal information regardless of its source. First American calls these guidelines its *Fair Information Values*, a copy of which can be found on our website at www.firstam.com.

**Types of Information**
Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:
- Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;
- Information about your transactions with us, our affiliated companies, or others; and
- Information we receive from a consumer reporting agency.

**Use of Information**
We request information from you for our own legitimate business purposes and not for the benefit of any nonaffiliated party. Therefore, we will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. We may also provide all of the types of nonpublic personal information listed above to one or more of our affiliated companies. Such affiliated companies include financial service providers, such as title insurers, property and casualty insurers, and trust and investment advisory companies, or companies involved in real estate services, such as appraisal companies, home warranty companies, and escrow companies. Furthermore, we may also provide all the information we collect, as described above, to companies that perform marketing services on our behalf, on behalf of our affiliated companies, or to other financial institutions with whom we or our affiliated companies have joint marketing agreements.

**Former Customers**
Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

**Confidentiality and Security**
We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's *Fair Information Values*. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

Page 12
File No.: 2032-126860



**Adams Resp. to Plf.'s 1st RFP**
**000920**

## EXHIBIT B

[Copy of the Survey]



Adams Resp. to Plf.'s 1st RFP
000921

01/08/2003  20:08     850-650-2862           OLSON & ASSOCIATES              PAGE 07



Adams Resp. to Plf.'s 1st RFP
000922



Adams Resp. to Plf's 1st RFP
000923

# BOUNDARY SURVEY

SHEET 3 OF 13

GRAPHIC SCALE

LOT 8
BLOCK "D"

| LOT 9 | LOT 10 | LOT 11 | LOT 12 | LOT 13 | LOT 14 | LOT 15 | LOT 16 | LOT 17 | LOT 18 | LOT 19 | LOT 20 | LOT 21 | LOT 22 | LOT |

B L O C K   "D"      B L O C K   "D"

SEE SHEET 1 OF 13 FOR CERTIFICATION, NOTES, AND LEGEND

EMERALD COAST ASSOCIATES, INC.

Adams Resp. to Plf.'s 1st RFP
000924

01/08/2003   20:08   850-650-2862   OLSON & ASSOCIATES   PAGE 89

01/08/2003 20:08    850-650-2862         OLSON & ASSOCIATES              PAGE 10



Adams Resp. to Plf.'s 1st RFP
000925

01/08/2003  20:08  850-65ª-2862          OLSON & ASSOCIATES                    PAGE  11



Adams Resp. to Plf.'s 1st RFP
000926

01/08/2003  20:08    850-650-2862              OLSON & ASSOCIATES              PAGE  12



Adams Resp. to Plf.'s 1st RFP
000927

01/08/2003  20:08    850-650-2862              OLSON & ASSOCIATES                    PAGE  13



Adams Resp. to Plf.'s 1st RFP
000928

01/08/2003  20:08    850-659-2862              OLSON & ASSOCIATES                    PAGE  14



Adams Resp. to Plf.'s 1st RFP
000929

01/08/2003 20:08    850-650-2862         OLSON & ASSOCIATES           PAGE 15



Adams Resp. to Plf.'s 1st RFP
000930

01/08/2003 20:08 850-659-2862 OLSON & ASSOCIATES PAGE 16



Adams Resp. to Plf.'s 1st RFP
000931



SEE SHEET 1 OF 13 FOR CERTIFICATION, NOTES, AND LEGEND

EMERALD COAST ASSOCIATES, INC.

Case 3:14-cv-00636-RV-EMT Document 144-1 Filed 05/29/16 Page 390 of 435

01/08/2003   20:00   850-650-2862   OLSON & ASSOCIATES   PAGE 17

Adams Resp. to Plf's 1st RFP
000932

# BOUNDARY SURVEY

SHEET 12 OF 13

GRAPHIC SCALE

PARK
PER RECORD PLAT

LOT 3

LOT 4

LOT 5

LOT 6

LOT 12

LOT 13

LOT 14

LOT 15

T 6   LOT 7   LOT 8   LOT 9   LOT 10   LOT 11   LOT 12

LOT 8   LOT 7

LOT 11

LOT 6   LOT 7   LOT 8   LOT 9   LOT 10

LOT 21

LOT 25   LOT 24   LOT 23   LOT 22

NOT
INCLUDED

LOT 17   LOT 16   LOT 15   LOT 14   LOT 13

LOT 12

CHOCTAWHATCHEE BAY

SEE SHEET 1 OF 13 FOR CERTIFICATION, NOTES, AND LEGEND

ELMERALD COAST ASSOCIATES, INC.

Adams Resp. to Plf.'s 1st RFP
000933

01/08/2003  20:08    850-659-2862           OLSON & ASSOCIATES                    PAGE 19



01/08/2003  20:08     850-659-2862          OLSON & ASSOCIATES           PAGE  20

## EXHIBIT C

### Other Development Rights

Army Corps of Engineers Permit #198993109 (IP-KE) Phase III

Nationwide Permit 13 Army Corps of Engineers

Florida Department of Environmental Protection Permit #662557831

Florida Department of Environmental Protection Permit #662644781

Development Order obtained in accordance with paragraph 12 of the Agreement.

**Adams Resp. to Plf.'s 1st RFP**
**000935**

Case 3:16-cv-00232-RV-EMT Document 174-11 Filed 05/26/16 Page 394 of 435
Case 3:14-cv-00646-MCR-EMT Document 174-11 Filed 08/19/15 Page 42 of 80

# EXHIBIT D

## Bruce Property

JAX1 #686826 v7

Adams Resp. to Plf.'s 1st RFP
000936

01/08/2003  20:08    850-659-2862         OLSON & ASSOCIATES              PAGE  22

INSURED TRACT 52:   (BRUCE TRACT)

BRUCE TRACT:

ITEM 1:        PROPERTY 2, TRACT 30

THE NORTHWEST ¼ OF SECTION 13, TOWNSHIP 1 SOUTH, RANGE 18 WEST, AND ALL OF THAT PORTION OF THE NORTHEAST ¼ OF SECTION 14, TOWNSHIP 1 SOUTH, RANGE 18 WEST, WALTON COUNTY, FLORIDA, LYING EAST OF THE CENTERLINE OF A ROAD.

SUBJECT TO A 30' RIGHT-OF-WAY EASEMENT ALONG THE WEST LINE OF THE ABOVE DESCRIBED PROPERTY FOR THE PURPOSES OF INGRESS AND EGRESS.

PROPERTY TRACT 31

ALL OF THAT PORTION OF THE NORTHEAST ¼ OF SECTION 13, TOWNSHIP 1 SOUTH, RANGE 18 WEST, WALTON COUNTY, FLORIDA, LYING WEST OF THE CENTERLINE OF A COUNTY ROAD.

PROPERTY 2, TRACT 32

ALL OF THAT PORTION OF THE NORTHEAST ¼ OF SECTION 13, TOWNSHIP 1 SOUTH, RANGE 18 WEST, WALTON COUNTY, FLORIDA, LYING EAST OF THE CENTERLINE OF A COUNTY ROAD AND THE WEST ½ OF THE NORTHWEST ¼ OF SECTION 18, TOWNSHIP 1 NORTH, RANGE 17 WEST, WALTON COUNTY, FLORIDA.

PROPERTY 2, TRACT 36

ALL OF THAT PORTION OF THE SOUTHEAST ¼ OF SECTION 14, TOWNSHIP 1 SOUTH, RANGE 18 WEST, WALTON COUNTY, FLORIDA, AND THAT PORTION OF THE SOUTHWEST ¼ OF SECTION 13, TOWNSHIP 1 SOUTH, RANGE 18 WEST, WALTON COUNTY, FLORIDA LYING EAST OF THE CENTERLINE OF A ROAD.

SUBJECT TO A 30' RIGHT-OF-WAY EASEMENT ALONG THE WEST LINE OF THE ABOVE DESCRIBED PROPERTY FOR THE PURPOSES OF INGRESS AND EGRESS.

PROPERTY 2, TRACT 37

ALL OF THAT PORTION OF THE SOUTHEAST ¼ OF SECTION 13, TOWNSHIP 1 SOUTH, RANGE 18 WEST, WALTON COUNTY, FLORIDA, LYING WEST OF THE CENTERLINE OF A COUNTY ROAD.

PROPERTY 2, TRACT 38

ALL OF THAT PORTION OF THE SOUTHEAST ¼ OF SECTION 13, TOWNSHIP 1 SOUTH, RANGE 18 WEST, LYING EAST OF THE CENTERLINE OF A COUNTY ROAD AND THE WEST ¾ OF THE NORTH ½ OF THE SOUTHWEST ¼ OF SECTION 18, TOWNSHIP 1 NORTH, RANGE 17 WEST, WALTON COUNTY, FLORIDA LYING EAST OF THE CENTERLINE OF SAID COUNTY ROAD.

                                        FL    581881 B 1854 P   285
                                        CO:WALTON          ST:FL

                            141

Adams Resp. to Plf.'s 1st RFP
000937

PROPERTY 2, TRACT 48

ALL OF THAT PORTION OF THE NORTHWEST ¼ OF SECTION 24, LYING
EAST OF THE CENTERLINE OF A COUNTY ROAD AND THE NORTH ½ OF
THE NORTHEAST ¼ OF SAID SECTION 24, TOWNSHIP 1 SOUTH, RANGE
18 WEST, WALTON COUNTY, FLORIDA.

PROPERTY 2, TRACT 33A

THE WEST ½ OF THE EAST ½ OF THE NORTHWEST ¼ OF SECTION 18,
TOWNSHIP 1 NORTH, RANGE 17 WEST, WALTON COUNTY, FLORIDA.

SUBJECT TO EASEMENTS FOR INGRESS AND EGRESS ALONG EXISTING
ROADS.

142

FL      581881 B 1854 P  286
CO:WALTON              ST:FL

Adams Resp. to Plf.'s 1st RFP
000938

3

Adams Resp. to Plf.'s 1st RFP
000939

Statement of Loan

BORROWER:   Adams Homes of Northwest Florida, Inc.

LENDER:   AmSouth Bank

DATE:   April 14, 2003

PROPERTY:   88 Lots in Driftwood

MORTGAGE LOAN AMOUNT: ▬▬▬▬

Amount Due from Seller/Purchaser Statement   ▬▬▬▬

Amount of Loan   ▬▬▬▬

Closing Cost from loan

| | | |
|---|---|---|
| Loan Origination Fee | $ | ▬▬▬ |
| Appraisal Fee | $ | 3,400.00 |
| Appraisal Review Fee | $ | 400.00 |
| Owner's Title Insurance Premium | $ | ▬▬▬ |
| Search Fee | $ | 200.00 |
| Exam Fee | $ | 55.00 |
| Closing Fee | $ | 100.00 |
| Mortgage Recording Fee | $ | ▬▬ |

Total   - $ ▬▬▬

LIP Funds   - $ ▬▬▬

Due to Close   ▬▬▬

The undersigned has read the foregoing, approves same, and authorizes Emmanuel, Sheppard & Condon to disburse as shown above.

Adams Homes of Northwest Florida, Inc.

By: _____
Wayne L. Adams, President

Adams Resp. to Plf.'s 1st RFP
000940

4

Adams Resp. to Plf.'s 1st RFP
000941

Closing Statement

| | |
|---|---|
| Seller: | North Tip Development, LLC, a Florida limited liability company |
| Purchaser: | Adams Homes of Northwest Florida, Inc., a Florida corporation |
| Purchase Price: | ████████ |
| Property: | 88 Platted Lots of Driftwood Estates, Destin, Walton County, Florida |
| Closing Date: | April __, 2003 |

## SELLER'S SETTLEMENT STATEMENT:

AGGREGATE PURCHASE PRICE: ████████

Less Credits to Buyer
      (a) Taxes for year 2003:

           104 days at $96.4218 p/d
           Platted Lots           $   10,027.87

      (b) District Improvement Bonds
           for 2003:

           104 days at $324.36 p/d
           Platted Lots           $   33,733.44    $   43,761.31

Gross Amount due Seller            ████████

Less Seller's Closing Costs
           Documentary Stamps on Deeds   $ ████████
           Recording Cost for Quit Claim Deed    18.50

           $_████████

NET AMOUNT DUE SELLER            $ ████████

## PURCHASER'S SETTLEMENT STATEMENT:

AGGREGATE PURCHASE PRICE:            ████████

Less Credits to Buyer
      (a) Taxes for year 2003:

           104 days at $96.4218 p/d
           Platted Lots           $  10,027.87

      (b) District Improvement Bonds
           for 2003:

           104 days at $324.36 p/d
           Platted Lots           $  33,733.44    $  43,761.31

Adams Resp. to Plf.'s 1st RFP
000942

Plus Buyer's Closing Costs

    (a)  Recording Fees :
        Walton County Clerk of Circuit Courts
          (i)  Special Warranty Deed .  $    28.50

Plus HOA Fees

    (a)  4-14-03 thru 6-30-03      $ 2,828.57
    (b)  Transfer Fee             100.00    $    2,928.57

Gross Amount Due from Buyer               $ ▬▬▬

NET AMOUNT DUE FROM BUYER          $ ▬▬▬

## CASH DISTRIBUTION

Amount Due from Buyer to be disbursed at Closing:    $ ▬▬▬

Disbursements

      Walton County Clerk of Circuit Court:
      Recording                     $ ▬▬
      Documentary Stamps on Deeds:
      (a) Platted Lots                  ▬▬

      Driftwood Estates Owners' Association        2,928.57

      North Tip Development, LLC
        Seller's Proceeds               ▬▬▬

Total Disbursements:                     ▬▬▬

The undersigned hereby direct Clark, Partington, Hart, et al, to disburse funds in accordance with this Closing Statement.

| SELLER(S) | BUYER(S) |
|---|---|
| NORTH TIP DEVELOPMENT, LLC, a Florida limited liability company By its Manager: Olson & Associates of NW Florida, Inc., a Florida corporation | ADAMS HOMES OF NORTHWEST FLORIDA, INC., a Florida corporation |
| By:_____ | By:_____ |
| Print Name: Rick Olson | Print Name: Wayne L. Adams |
| Title: President | Title: President |

2

Adams Resp. to Plf.'s 1st RFP
000943

Adams Resp. to Plf.'s 1st RFP
000944



Prepared by and return to:
John W. Monroe, Jr.
Emmanuel, Sheppard & Condon
30 S. Spring St.
Pensacola, FL 32501
A0458-93101 rfk

INSTR # 758020
OR BK 2490 Pages 1526 - 1532
RECORDED 04/16/03 15:02:01
MARTHA INGLE, WALTON COUNTY
CLERK OF COURT
DEPUTY CLERK K SMITH
#8

## MODIFICATION AND SPREADER AGREEMENT

STATE OF FLORIDA    )

COUNTY OF WALTON   .)

This MODIFICATION AND SPREADER AGREEMENT is made as of the 14th day of April, 2003 by and among AMSOUTH BANK (the "Mortgagee") and ADAMS HOMES OF NORTHWEST FLORIDA, INC., a Florida corporation and ADAMS HOMES, LLC, an Alabama limited liability company (collectively "Mortgagor").

### RECITALS:

Mortgagor has made and issued a Revolving Promissory Note dated the 7th day of March, 2003 (as amended, renewed and extended, the "Mortgage Note"). To secure the Mortgage Note and other obligations, Mortgagor executed and delivered a Mortgage, Assignment of Rents and Contracts, Security Agreement and Financing Statement with Cross Default and Cross Collateralization dated of even date with the Mortgage Note and recorded in official public records of the Clerk's Office of the Circuit Court for Escambia County, Florida in Official Records Book 5091, page 888, Santa Rosa County, Florida in Official Records Book 2117, page 1109, Okaloosa County, Florida in Official Records Book 2421, page 941, and Walton County, Florida in Official Records Book 2481, page 216, and the "Mortgage"). The provisions, terms, covenants, conditions, obligations and other contents of the Mortgage by this reference are incorporated in and made a part of this Agreement. The Mortgage is made and incorporated herein pursuant to Section 695.02, Florida Statutes, as amended.

Mortgagor has requested that Mortgagee consent to and make certain modifications to the Mortgage.

Mortgagor has requested an additional loan advance for the acquisition of certain additional real property, and Mortgagee has agreed to make such advance but only if such additional real property is added as additional collateral security under the Mortgage, thereby spreading the Mortgage over the additional real property, all as hereafter set forth.

NO DOCUMENTARY STAMP TAXES OR NONRECURRING INTANGIBLE TAXES ARE DUE IN THAT SAID TAXES THAT WERE DUE WERE PAID UPON FILING THE MORTGAGE RECORDED IN O.R. BOOK 5091, PAGE 888, OF THE PUBLIC RECORDS OF ESCAMBIA COUNTY, FLORIDA.

*FATCO*

*CPH: 02.5326*

Adams Resp. to Plf.'s 1st RFP
000945

Mortgagee and Mortgagor mutually desire to modify and amend the Mortgage as hereinafter set out.

NOW, THEREFORE, Mortgagee and Mortgagor, in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and the mutual covenants herein, do hereby agree that the Mortgage should be, and the same hereby is modified and amended as follows:

The Mortgage is amended to grant and convey, as additional secured collateral thereunder, the additional real property described on Exhibit A attached hereto as part hereof and recorded herewith (the "Additional Land"), by adding the Additional Land, and the legal description attached hereto as Exhibit A, to the Mortgage, as additional land conveyed under the Mortgage and Mortgagor does hereby grant, bargain, sell, alien, remise, release, convey, assign, transfer, mortgage, hypothecate, pledge, deliver, set over, warrant and confirm unto Mortgagee, its successors and assigns forever, all right, title and interest of Mortgagor in and to, and spread the Mortgage and the lien thereof over, the Additional Land.

Mortgagor covenants that Adams Homes of Northwest Florida, Inc. is seized of the Additional Land in fee and has the right to convey the same in fee simple; that the same are free and clear of all encumbrances; that Mortgagor has done no act to encumber the Additional Land; that Mortgagor will warrant and defend the title to the same against the lawful claims of all persons whomsoever; and that Mortgagor will execute such further issuances of said lands as may be required.

IT IS MUTUALLY AGREED by and between the parties hereto that this Agreement shall become a part of the Mortgage Note and the Mortgage by reference and that nothing herein contained shall impair the security now held for said indebtedness, nor shall waive, annul, vary or affect any provision, condition, covenant or agreement contained in the Mortgage except as herein amended, nor affect or impair any rights, powers or remedies under the Mortgage as hereby amended. Furthermore, Mortgagee does hereby reserve all rights and remedies it may have as against all parties who may be or may hereafter become primarily or secondarily liable for the repayment of the indebtedness evidenced by the Mortgage Note, as hereby amended.

Mortgagor promises and agrees to pay the indebtedness evidenced by the Mortgage Note, as amended, in accordance with the terms thereof and agrees to perform all of the requirements, conditions and obligations under the terms of the Mortgage Note and the Mortgage as hereby modified and amended, those documents being hereby ratified and affirmed. The execution and delivery hereof shall not constitute a novation or modification of the lien, encumbrance or security title of the Mortgage, which Mortgage shall retain its priority as originally filed for record. Mortgagor expressly agrees that the Mortgage Note is in full force and effect, and that Mortgagor has no defense, claim, counterclaim or right of setoff, legal or equitable, arising out of or in connection with the loan transaction related hereto. Mortgagor waives, releases and

2

H:\users\RJK\Construction\AmSouth Spreader.doc

Adams Resp. to Plf.'s 1st RFP
000946

discharges Mortgagee and its employees, agents and attorneys from any and all defenses, claims, counterclaims, demands, actions and causes of action whatsoever in law or at equity that Mortgagor ever had, now has or may hereafter have in connection with the loan transaction related hereto.

Mortgagor acknowledges that Mortgagee may reproduce (by electronic means or otherwise) any of the documents evidencing and/or securing the Mortgage Note and thereafter may destroy the original documents. Mortgagor does hereby agree that any document so reproduced shall be the binding obligation of Mortgagor, enforceable and admissible in evidence against it to the same extent as if the original documents had not been destroyed.

Mortgagor agrees to pay any and all documentary stamps and/or intangible taxes that may be assessed on account of the execution and/or recordation of this Agreement. Mortgagor agrees to pay such sums immediately upon receipt of notice of such amounts from Mortgagee. If Mortgagor fails to pay any such sums, Mortgagee may do so and any such payment by Mortgagee shall be added to the indebtedness secured by the Mortgage and shall bear interest from the date advanced to the date of recovery at the maximum rate of interest permitted under Florida law.

This Agreement shall be governed by and construed in accordance with the laws of the State of Florida without regard to principles of conflict of laws.

Any reference contained in the Mortgage, as amended herein, to the Mortgage shall hereinafter be deemed to be a reference to such document as amended hereby.

Nothing herein shall invalidate any security now held by Mortgagee for the payment of the indebtedness secured by the Mortgage, nor impair, nor release any covenant, condition, agreement or stipulation therein, and the same, as herein modified, shall continue in full force and effect. Any security held by Mortgagee as security for any of the indebtedness evidenced by the Mortgage Note, including without limiting the generality of the foregoing, any rights acquired by Mortgagee under any security agreement or agreements, assignments of rentals, financing statements and other instruments, shall stand as security for the repayment of the indebtedness, and Mortgagor covenants and agrees to conform, comply with and abide by each and every of the terms, covenants, conditions, agreements and stipulations of this Agreement as well as the terms, covenants, conditions, agreements and stipulations of the aforesaid Mortgage, as modified hereby, and all other security documents evidencing or securing the indebtedness.

Except as modified and amended herein, all of the terms, covenants, conditions and provisions of the Mortgage remain unchanged and in full force and effect. Nothing contained herein shall impair or affect the validity or priority of the Mortgage. The execution of this Agreement shall not constitute a novation.

3

H:\users\Rfk\Construction\AmSouth Spreader.doc

Adams Resp. to Plf.'s 1st RFP
000947

This Agreement shall be binding upon and inure to the benefit of any assignee or the respective heirs, executors, administrators, successors and assigns of the parties hereto.

This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute any of such counterparts.

IN WITNESS WHEREOF, this instrument has been executed under seal by the parties hereto and delivered on the date and year first above written.

MORTGAGEE:
AMSOUTH BANK

By: _____
Print Name: Gregory P. Brock
Its: Vice-President

MORTGAGOR:

ADAMS HOMES OF NORTHWEST FLORIDA, INC., a Florida corporation

By: _____
Wayne L. Adams
Its: President

[CORPORATE SEAL]

ADAMS HOMES, LLC, an Alabama limited liability company

By: _____
Wayne L. Adams, Member

[CORPORATE SEAL]

4

H:\users\Rfk\Construction\AmSouth Spreader.doc

Adams Resp. to Plf.'s 1st RFP
000948

STATE OF FLORIDA

COUNTY OF ESCAMBIA

The foregoing instrument was acknowledged before me this __11th__ day of April, 2003 by Gregory V. Brock _____ as __Vice-President__ _____ of AmSouth Bank, on behalf of the bank who

[   ]  Is personally known to me; or

[   ]  Produced as Identification:_____

Notary Public, State of Florida

Printed name:___REBECCA F. KATES___

[NOTARY SEAL]

OFFICIAL NOTARY SEAL
REBECCA F KATES
COMMISSION NUMBER
DD061316
MY COMMISSION EXPIRES
OCT. 20,2005

STATE OF FLORIDA

COUNTY OF ESCAMBIA

The foregoing instrument was acknowledged before me this 14th day of April, 2003 by Wayne L. Adams as President of Adams Homes of Northwest Florida, Inc., a Florida corporation, on behalf of the corporation, who

[ x ]  Is personally known to me; or

[   ]  Produced as Identification:_____

OFFICIAL NOTARY SEAL
REBECCA F KATES
COMMISSION NUMBER
DD061316
MY COMMISSION EXPIRES
OCT. 20,2005

Notary Public, State of Florida

Printed name:   REBECCA F. KATES

[NOTARY SEAL]

5

H:\users\Rfk\Construction\AmSouth Spreader.doc

Adams Resp. to Plf.'s 1st RFP
000949

STATE OF FLORIDA

COUNTY OF ESCAMBIA

The foregoing instrument was acknowledged before me this 14th day of April, 2003 by Wayne L. Adams as President of Adams Homes of Northwest Florida, Inc., a Florida corporation, on behalf of the corporation as Member of Adams Homes L.L.C., an Alabama limited liability company, on behalf of the company, and individually as Member and Manager of Adams Homes L.L.C. He:

[x  ]  Is personally known to me; or

[   ]  Produced as Identification:_____

OFFICIAL NOTARY SEAL
REBECCA F KATES
COMMISSION NUMBER
DD061316
MY COMMISSION EXPIRES
OCT. 20,2005

Notary Public, State of Florida
Printed name:  REBECCA F. KATES

[NOTARY SEAL]

6

H:\users\RfK\Construction\AmSouth Spreader.doc

Adams Resp. to Plf.'s 1st RFP
000950

EXHIBIT "A"

PARCEL 1

Lots 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, and 29, Block D, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 2

Lots 4, 5, 6, 7, 8, 9, 10, 11, and 13, Block E, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 3

Lots 1, 6, 8, 22, 26, and 27, Block H, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 4

Lots 2, 3, and 6, Block I, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 5

Lots 2 and 3, Block K, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 6

Lots 1, 2, 3, 4, 5, 6, 7 and 8 Block L DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 7

Lots 1, 4, 5, and 6, Block M, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 8

Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12, Block N, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 9

Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, and 22, Block P, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

Adams Resp. to Plf.'s 1st RFP
000951

Prepared by and return to:
John W. Monroe, Jr.
Emmanuel, Sheppard & Condon
30 S. Spring St.
Pensacola, FL 32501
A0458-93101 rfk

## MODIFICATION AND SPREADER AGREEMENT

STATE OF FLORIDA          )

COUNTY OF WALTON          )

    This MODIFICATION AND SPREADER AGREEMENT is made as of the 14th day of April, 2003 by and among AMSOUTH BANK (the "Mortgagee") and ADAMS HOMES OF NORTHWEST FLORIDA, INC., a Florida corporation and ADAMS HOMES, LLC, an Alabama limited liability company (collectively "Mortgagor"):

### RECITALS:

    Mortgagor has made and issued a Revolving Promissory Note dated the 7th day of March, 2003 (as amended, renewed and extended, the "Mortgage Note"). To secure the Mortgage Note and other obligations, Mortgagor executed and delivered a Mortgage, Assignment of Rents and Contracts, Security Agreement and Financing Statement with Cross Default and Cross Collateralization dated of even date with the Mortgage Note and recorded in official public records of the Clerk's Office of the Circuit Court for Escambia County, Florida in Official Records Book 5091, page 888, Santa Rosa County, Florida in Official Records Book 2117, page 1109, Okaloosa County, Florida in Official Records Book 2421, page 941, and Walton County, Florida in Official Records Book 2481, page 216, and the "Mortgage"). The provisions, terms, covenants, conditions, obligations and other contents of the Mortgage by this reference are incorporated in and made a part of this Agreement. The Mortgage is made and incorporated herein pursuant to Section 695.02, Florida Statutes, as amended.

    Mortgagor has requested that Mortgagee consent to and make certain modifications to the Mortgage.

    Mortgagor has requested an additional loan advance for the acquisition of certain additional real property, and Mortgagee has agreed to make such advance but only if such additional real property is added as additional collateral security under the Mortgage, thereby spreading the Mortgage over the additional real property, all as hereafter set forth.

NO DOCUMENTARY STAMP TAXES OR NONRECURRING INTANGIBLE TAXES ARE DUE IN THAT SAID TAXES THAT WERE DUE WERE PAID UPON FILING THE MORTGAGE RECORDED IN O.R. BOOK 5091, PAGE 888, OF THE PUBLIC RECORDS OF ESCAMBIA COUNTY, FLORIDA.

**Adams Resp. to Plf.'s 1st RFP**
**000952**

Mortgagee and Mortgagor mutually desire to modify and amend the Mortgage as hereinafter set out.

NOW, THEREFORE, Mortgagee and Mortgagor, in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and the mutual covenants herein, do hereby agree that the Mortgage should be, and the same hereby is modified and amended as follows:

The Mortgage is amended to grant and convey, as additional secured collateral thereunder, the additional real property described on Exhibit A attached hereto as part hereof and recorded herewith (the "Additional Land"), by adding the Additional Land, and the legal description attached hereto as Exhibit A, to the Mortgage, as additional land conveyed under the Mortgage and Mortgagor does hereby grant, bargain, sell, alien, remise, release, convey, assign, transfer, mortgage, hypothecate, pledge, deliver, set over, warrant and confirm unto Mortgagee, its successors and assigns forever, all right, title and interest of Mortgagor in and to, and spread the Mortgage and the lien thereof over, the Additional Land.

Mortgagor covenants that Adams Homes of Northwest Florida, Inc. is seized of the Additional Land in fee and has the right to convey the same in fee simple; that the same are free and clear of all encumbrances; that Mortgagor has done no act to encumber the Additional Land; that Mortgagor will warrant and defend the title to the same against the lawful claims of all persons whomsoever; and that Mortgagor will execute such further issuances of said lands as may be required.

IT IS MUTUALLY AGREED by and between the parties hereto that this Agreement shall become a part of the Mortgage Note and the Mortgage by reference and that nothing herein contained shall impair the security now held for said indebtedness, nor shall waive, annul, vary or affect any provision, condition, covenant or agreement contained in the Mortgage except as herein amended, nor affect or impair any rights, powers or remedies under the Mortgage as hereby amended. Furthermore, Mortgagee does hereby reserve all rights and remedies it may have as against all parties who may be or may hereafter become primarily or secondarily liable for the repayment of the indebtedness evidenced by the Mortgage Note, as hereby amended.

Mortgagor promises and agrees to pay the indebtedness evidenced by the Mortgage Note, as amended, in accordance with the terms thereof and agrees to perform all of the requirements, conditions and obligations under the terms of the Mortgage Note and the Mortgage as hereby modified and amended, those documents being hereby ratified and affirmed. The execution and delivery hereof shall not constitute a novation or modification of the lien, encumbrance or security title of the Mortgage, which Mortgage shall retain its priority as originally filed for record. Mortgagor expressly agrees that the Mortgage Note is in full force and effect, and that Mortgagor has no defense, claim, counterclaim or right of setoff, legal or equitable, arising out of or in connection with the loan transaction related hereto. Mortgagor waives, releases and

2

H:\users\Rfk\Construction\AmSouth Spreader.doc

discharges Mortgagee and its employees, agents and attorneys from any and all defenses, claims, counterclaims, demands, actions and causes of action whatsoever in law or at equity that Mortgagor ever had, now has or may hereafter have in connection with the loan transaction related hereto.

Mortgagor acknowledges that Mortgagee may reproduce (by electronic means or otherwise) any of the documents evidencing and/or securing the Mortgage Note and thereafter may destroy the original documents. Mortgagor does hereby agree that any document so reproduced shall be the binding obligation of Mortgagor, enforceable and admissible in evidence against it to the same extent as if the original documents had not been destroyed.

Mortgagor agrees to pay any and all documentary stamps and/or intangible taxes that may be assessed on account of the execution and/or recordation of this Agreement. Mortgagor agrees to pay such sums immediately upon receipt of notice of such amounts from Mortgagee. If Mortgagor fails to pay any such sums, Mortgagee may do so and any such payment by Mortgagee shall be added to the indebtedness secured by the Mortgage and shall bear interest from the date advanced to the date of recovery at the maximum rate of interest permitted under Florida law.

This Agreement shall be governed by and construed in accordance with the laws of the State of Florida without regard to principles of conflict of laws.

Any reference contained in the Mortgage, as amended herein, to the Mortgage shall hereinafter be deemed to be a reference to such document as amended hereby.

Nothing herein shall invalidate any security now held by Mortgagee for the payment of the indebtedness secured by the Mortgage, nor impair, nor release any covenant, condition, agreement or stipulation therein, and the same, as herein modified, shall continue in full force and effect. Any security held by Mortgagee as security for any of the indebtedness evidenced by the Mortgage Note, including without limiting the generality of the foregoing, any rights acquired by Mortgagee under any security agreement or agreements, assignments of rentals, financing statements and other instruments, shall stand as security for the repayment of the indebtedness, and Mortgagor covenants and agrees to conform, comply with and abide by each and every of the terms, covenants, conditions, agreements and stipulations of this Agreement as well as the terms, covenants, conditions, agreements and stipulations of the aforesaid Mortgage, as modified hereby, and all other security documents evidencing or securing the indebtedness.

Except as modified and amended herein, all of the terms, covenants, conditions and provisions of the Mortgage remain unchanged and in full force and effect. Nothing contained herein shall impair or affect the validity or priority of the Mortgage. The execution of this Agreement shall not constitute a novation.

3

H:\users\Rfk\Construction\AmSouth Spreader.doc

Adams Resp. to Plf.'s 1st RFP
000954

This Agreement shall be binding upon and inure to the benefit of any assignee or the respective heirs, executors, administrators, successors and assigns of the parties hereto.

This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute any of such counterparts.

IN WITNESS WHEREOF, this instrument has been executed under seal by the parties hereto and delivered on the date and year first above written.

MORTGAGEE:
AMSOUTH BANK

By:_____
    Print Name:_____
    Its:_____

MORTGAGOR:

ADAMS HOMES OF NORTHWEST FLORIDA, INC., a Florida corporation

By:_____
    Wayne L. Adams
    Its: President

[CORPORATE SEAL]

ADAMS HOMES, LLC, an Alabama limited liability company

By:_____
    Wayne L. Adams, Member

[CORPORATE SEAL]

4

H:\users\Rfk\Construction\AmSouth Spreader.doc

Adams Resp. to Plf.'s 1st RFP
000955

STATE OF FLORIDA

COUNTY OF ESCAMBIA

The foregoing instrument was acknowledged before me this _____ day of April, 2003 by
_____ as _____ of AmSouth Bank,
on behalf of the bank who

[   ]   Is personally known to me; or

[   ]   Produced as Identification:_____

Notary Public, State of Florida
Printed name:_____

[NOTARY SEAL]

STATE OF FLORIDA

COUNTY OF ESCAMBIA

The foregoing instrument was acknowledged before me this 14th day of April, 2003 by Wayne L.
Adams as President of Adams Homes of Northwest Florida, Inc., a Florida corporation, on behalf
of the corporation, who

[ x ]   Is personally known to me; or

[   ]   Produced as Identification:_____

OFFICIAL NOTARY SEAL
REBECCA F KATES
COMMISSION NUMBER
DD061315
MY COMMISSION EXPIRES
OCT. 20,2005

Notary Public, State of Florida
Printed name:   REBECCA F. KATES

[NOTARY SEAL]

5

H:\users\Rfk\Construction\AmSouth Spreader.doc

Adams Resp. to Plf.'s 1st RFP
000956

STATE OF FLORIDA

COUNTY OF ESCAMBIA

The foregoing instrument was acknowledged before me this 14th day of April, 2003 by Wayne L. Adams as President of Adams Homes of Northwest Florida, Inc., a Florida corporation, on behalf of the corporation as Member of Adams Homes L.L.C., an Alabama limited liability company; on behalf of the company, and individually as Member and Manager of Adams Homes L.L.C. He:

[x  ]  Is personally known to me; or

[   ]  Produced as Identification:_____

OFFICIAL NOTARY SEAL
REBECCA F KATES
COMMISSION NUMBER
DD051316
MY COMMISSION EXPIRES
OCT. 20,2005

Notary Public, State of Florida
Printed name:___REBECCA F. KATES___

[NOTARY SEAL]

6

H:\users\Rfk\Construction\AmSouth Spreader.doc

Adams Resp. to Plf.'s 1st RFP
000957

EXHIBIT "A"

PARCEL 1

Lots 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, and 29, Block D, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 2

Lots 4, 5, 6, 7, 8, 9, 10, 11, and 13, Block E, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 3

Lots 1, 6, 8, 22, 26, and 27, Block H, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 4

Lots 2, 3, and 6, Block I, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 5

Lots 2 and 3, Block K, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 6

Lots 1, 2, 3, 4, 5, 6, 7 and 8 Block L DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 7

Lots 1, 4, 5, and 6, Block M, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 8

Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12, Block N, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 9

Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, and 22, Block P, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

Adams Resp. to Plf.'s 1st RFP
000958

6

Adams Resp. to Plf.'s 1st RFP
000959

## BORROWER'S AFFIDAVIT

BEFORE ME, the undersigned authority, personally appeared, Wayne L. Adams, who after being duly sworn, deposes and says that:

1.  He is the President of Adams Homes of Northwest Florida, Inc., a Florida corporation, the fee simple owner ("Owner") of that certain real property located in Escambia, Santa Rosa, Okaloosa and Walton Counties, Florida, ("Property") described as follows:

See Attached Exhibit A  Annexed Hereto and Made a Part Hereof

He is also Member and Manager of Adams Homes L.L.C., an Alabama limited liability company whose other member is Owner.

2.  The Owner's title, possession and enjoyment of the Property has been open, notorious, peaceable and undisturbed. The Owner is not aware of any facts by reason of which the title to, or possession of, the Property or any part of it might be disputed or questioned by reason of which any claim to the Property or any portion of it might be adversely asserted.

3.  If the Owner is an entity other than an individual:

    A.  If it is a Florida corporation or limited liability company it is duly formed and in existence in the state of formation, and if in a state other than Florida, it is duly qualified to do business in the State of Florida;

    B.  If it is a partnership it is duly formed in the state of formation, and if in a state other than Florida, it is duly qualified to do business in the State of Florida.

    C.  It has taken all proper action so as to authorize the Owner to encumber the Property; and

    D.  The individual executing this affidavit and executing all documents in connection with this real estate transaction has full knowledge of the matters set forth herein and is duly authorized so as to fully and firmly bind the Owner to this affidavit and such documents.

4.  No "Notice of Commencement", as contemplated by Chapter 713, Florida Statutes (the "Construction Lien Law"), has been recorded or posted as to the Property, which is now in existence or which otherwise affects the Property, nor has the Affiant received a "Notice to Owner" as contemplated by the Construction Lien Law, and there are no outstanding or unpaid bills or charges for any labor, services or materials for improvements that remain unpaid to any materialman, mechanic, laborer, supplier, subcontractor, surveyor, engineer, architect or otherwise that would result in a lien against the Property, except the following:

None.

H:\users\RJX\Construction\AmSouth Borrowers Aff.doc
4/14/03 11:48 AM

Adams Resp. to Plf.'s 1st RFP
000960

5.      There has been no construction, repair or alterations or improvements on the Property within 90 days prior to the date of this affidavit and no notices or intention to claim a lien have been made and no claims of lien have been made or filed under or in connection with any construction repairs or alterations on the Property.

6.      There are no unpaid assessments made by or due to any governmental authority or other authority for improvements on the Property, including but not limited to, water charges, sanitary sewer charges, property taxes or homeowner or condominium association assessments, and no notice of any hearing regarding such assessments, or other claims against the Property, have been received by the affiant.

7.      There are:

A.      no persons or entities other than the Owner who claim or is presently entitled to the right of possession or is in possession of the Property and there are no tenancies, leases or other occupancies that affect the Property, except as may be set forth in the title commitment issued in connection with this transaction;

B.      no leases, contracts for sale or contracts for deed or other contractual rights affecting the Property;

C.      no judgments, liens, mortgages, claims or other encumbrances in the nature of a lien, recorded or unrecorded, affecting the Property;

D.      no pending actions, suits, executions or proceedings against the affiant or the Property that would result in a lien on or affect the Property;

E.      no unrecorded easements or rights-of-way for users and no adverse interest as to the Property;

F.      no other owners of the Property, and no claims or liens whatsoever of any kind or description against, the furniture, furnishings, fixtures, equipment and other personal property located on the Property;

G.      no violations of any (i) covenants or restrictions or (ii) county or municipal ordinances or regulations, zoning or otherwise, pertaining to or affecting the Property;

H.      no improvements belonging to the Property that encroach upon adjoining property nor improvements belonging to adjoining property that encroach upon the Property;

I.      none of the following on, under or affecting the Property: (i) asbestos in any form, (ii) urea formaldehyde for insulation; (iii) transformers or other equipment containing polychlorinated biphenyls (PCB's) in amounts that exceed acceptable standard levels, (iv) any other materials or substances

Adams Resp. to Plf.'s 1st RFP
000961

that are prohibited or regulated by Federal, State or local laws, or that are known to pose a hazard to the environment or human health;

J.    If a mortgage is being paid off from funds at closing, said mortgage is current and Owner has not received any notice of default nor notice or service of a foreclosure complaint;

Except the following: Any mortgage identified in the closing statement executed by Owner that is being paid from the proceeds of the sale or loan.

8.    There are no proceedings intended to liquidate or rehabilitate Owner's estate, and neither Affiant nor Owner is (i) insolvent within the meaning of the federal Bankruptcy Code, (ii) subject to any pending bankruptcy proceeding or the jurisdiction of any court in bankruptcy, or (iii) considering filing bankruptcy. Affiant is not aware of any attempts or stated intentions by any person within the past three years, written or oral, to file involuntary bankruptcy against Affiant or Owner.

9.    There are no other matters, in addition to those specified herein, that are pending against the Owner or Affiant which could result in a lien that would attach to the Property between the disbursement of funds for this transaction and the recording of the instruments creating the title or interest to be insured in this transaction by the title insurance company referenced below.

10.    Neither Affiant nor Owner have done anything nor suffered anything to be done nor will affiant do anything, including, without limitation, execute any instrument that would otherwise encumber the Property or adversely affect the title or interest to be insured in this transaction by the title insurance company referenced below, except:

None.

11.    This affidavit is made for the purpose of inducing:

A.    AmSouth Bank to extend a loan to Owner;

B.    Emmanuel, Sheppard & Condon to issue a title insurance policy to AmSouth Bank; and

C.    American Pioneer Title Insurance Company and Emmanuel Sheppard & Condon to act as closing agents and as agents for American Pioneer Title Insurance Company to issue said title insurance.

12.    The Owner hereby agrees to fully indemnify and hold those parties named in Paragraph 11 harmless from any and all loss, damage, cost and expense, including without limitation reasonable attorney's fees, which the parties named in Paragraph 11 may sustain or incur acting in reliance upon this affidavit, including but not limited to issuing a title insurance policy covering the Property, or disbursing funds for this transaction.

H:\users\R.fk\Construction\AmSouth Borrowers Aff.doc                3

Adams Resp. to Plf.'s 1st RFP
000962

13. Affiant is familiar with the nature of an oath, and with the penalties as provided by the laws of the State aforesaid for falsely swearing to statements made in an instrument of this nature. Affiant further certifies and affirms (i) that he has read or have had read to him, this affidavit, and (ii) understands its context; (iii) the statements and representations herein are given under penalty of perjury, and (iv) the statements and representations herein are true, correct and complete.

14. As used in this affidavit, the masculine, feminine, or neuter gender, and singular or plural, individual, corporation, or otherwise, shall each be deemed to include the others whenever the context so indicates. If more than one party is the affiant hereof, the obligation hereunder of each party is joint and several.

_____
Wayne L. Adams

STATE OF FLORIDA

COUNTY OF ESCAMBIA

Sworn to and subscribed before me this 14th day of April, 2003 by Wayne L. Adams who is (check one)

[xxx   ]      personally known to me; or

[     ]      produced the following identification:

_____

OFFICIAL NOTARY SEAL
REBECCA F KATES
COMMISSION NUMBER
DD061316
MY COMMISSION EXPIRES
OCT. 20,2005

_____
Notary Public, State of Florida
Print Name: REBECCA F. KATES

[NOTARY SEAL]

Adams Resp. to Plf.'s 1st RFP
000963

EXHIBIT "A"

PARCEL 1

Lots 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, and 29, Block D, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 2

Lots 4, 5, 6, 7, 8, 9, 10, 11, and 13, Block E, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 3

Lots 1, 6, 8, 22, 26, and 27, Block H, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 4

Lots 2, 3, and 6, Block I, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 5

Lots 2 and 3, Block K, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 6

Lots 1, 2, 3, 4, 5, 6, 7 and 8 Block L DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 7

Lots 1, 4, 5, and 6, Block M, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 8

Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12, Block N, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

PARCEL 9

Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, and 22, Block P, DRIFTWOOD ESTATES, according to the Plat thereof, recorded in Plat Book 5, Page 28, of the Public Records of Walton County, Florida.

Adams Resp. to Plf.'s 1st RFP
000964

7

Adams Resp. to Plf.'s 1st RFP
000965

## ACKNOWLEDGMENT OF REPRESENTATION

RE:   Adams Homes of NW Florida, Inc. Purchase From North Tip Development, LLC
      Driftwood Estates Parcels, Walton County

The undersigned acknowledges that the firm of CLARK, PARTINGTON, HART,

LARRY, BOND & STACKHOUSE is acting as closing and title agent in the above referenced

transaction and is the attorney for North Tip Development, LLC in the above-referenced

transaction and is not representing the undersigned.

The undersigned also acknowledges that they are represented by counsel of their choice

protecting their legal interests and rights in this transaction.

DATED this _14th_ day of April, 2003.

Adams Homes of NW Florida, Inc.

BY: _____

___Wayne L. Adams,_____ , Its _President_____

Adams Resp. to Plf.'s 1st RFP
000966

8

Adams Resp. to Plf.'s 1st RFP
000967

## PRORATION AGREEMENT

SELLER:        NORTH TIP DEVELOPMENT, LLC

BUYER:         ADAMS HOMES OF NORTHWEST FLORIDA, INC

PROPERTY:      REAL PROPERTY LOCATED IN WALTON
               COUNTY, FLORIDA MORE PARTICULARLY
               DESCRIBED IN EXHIBIT "A", ATTACHED

DATE:          APRIL ___, 2003

It is understood between the parties hereto that the exact amount of ad valorem real property taxes applicable to the subject property for the current year is unknown. The tax proration herein was therefore based upon estimated taxes in the amount of $35,193.57. Should actual taxes for the current year vary from estimated taxes, each party shall have the right to demand and receive from the other a re-proration of taxes and reimbursement for the prorated amount of variation thereof. Each party consents to such proration and agrees to look to the other party should a re-proration become necessary, and to save and hold harmless as to such proration the mortgagee and closing attorneys and/or title agents.

It is further understood between the parties hereto that the District Improvement Bond Assessments applicable to the subject property for the current year are prorated based upon a figure given the closing attorney by GSG Services, Inc., as the manager of the bond assessment collection, in the total amount of $▮▮▮▮▮▮▮ The parties agree that if any supplemental information becomes available within one year following the date of closing that indicates the proration was calculated incorrectly, then each party consents to correct said proration and agrees to look to the other party should a re-proration become necessary, and to save and hold harmless as to such proration the mortgagee and closing attorneys and/or title agents.

It is further understood between the parties hereto that Driftwood Estates Owner's Association Assessments have been provided to the closing agent by Emerald Coast Association Management, Inc., as manager of the homeowner's association. Intrawest Sandestin Company, Inc. is the Developer under the HOA documents and is only responsible for ½ of the quarterly assessments of $75.00 and the prorations were based upon same. In addition, there is a $100.00 transfer fee due to the purchaser of lots. The manager informed closing agent that this was a flat fee and not a "per lot" being transferred fee. In the event it is determined that this information is incorrect, the parties agree to readjust the pro-rations or pay/reimburse whatever additional fees or assessments are necessary. Each party agrees to save and hold harmless as to such payment, reimbursement or proration the mortgagee and closing attorneys and/or title agents.

SELLER:                              PURCHASER:

NORTH TIP DEVELOPMENT,               ADAMS        HOMES       OF
                                     NORTHWEST FLORIDA, INC.,
LLC, A FLORIDA LIMITED LIABILITY      A FLORIDA CORPORATION
COMPANY

By:    Olson & Associates of NW Florida, Inc.


By:    Rick Olson                    By:    Wayne L. Adams
Its:   President                     Its:   President

Adams Resp. to Plf.'s 1st RFP
000968

9

Adams Resp. to Plf.'s 1st RFP
000969

04/14/2003 12:07    850-650-2862    OLSON & ASSOCIATES    PAGE 02

## ASSIGNMENT AND ASSUMPTION OF SALE CONTRACTS

THIS ASSIGNMENT AND ASSUMPTION OF SALE CONTRACTS is made this 4th day of April, 2003, between OLSON & ASSOCIATES OF NW FLORIDA, INC., a Florida corporation, whose address is 1234 Airport Road, Suite 215, Destin, Florida 32541 ("Assignor") and NORTH TIP DEVELOPMENT, LLC, a Florida limited liability company, whose address is 1234 Airport Road, Suite 215, Destin, Florida 32541 ("Assignee").

WHEREAS, Assignor, as "Seller", and Adams Homes of Northwest Florida, Inc., a Florida corporation, as "Purchaser", have entered into (i) that certain Conditional Real Estate Purchase Agreement dated as of February 28, 2002, for the sale and purchase of 88 platted lots within the Driftwood Estates subdivision located in Walton County, Florida, and (ii) that Certain Conditional Real Estate Purchase Agreement dated March 31, 2002, for the sale and purchase of an additional 463 lots to be platted and developed by Seller in Walton County, Florida in accordance with the terms of the said contract (the two said contracts being referenced herein together as the "Sale Contracts"); and

WHEREAS, Assignor desires to assign all of its rights and obligations under the Sale Contracts to Assignee, and Assignee desires to succeed to the rights and assume the obligations of Seller under the Sale Contracts;

NOW THEREFORE, for and in consideration of Ten Dollars ($10.00) paid by Assignee to Assignor and of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    Assignor hereby assigns, grants, transfers, and conveys to Assignee all of Assignor's right, title and interest in and to the Sale Contracts, and Assignee hereby assumes all of the obligations of Assignor under the Sale Contracts.

IN WITNESS WHEREOF, the parties have caused this instrument to be executed as of the date first above written.

ASSIGNOR:                          ASSIGNEE:
OLSON & ASSOCIATES OF              NORTH TIP DEVELOPMENT, LLC
 NW FLORIDA, INC.,                 a Florida limited liability company
a Florida corporation             by:    its sole Member
                                          Olson & Associates of NW
                                          Florida, Inc., a Florida corporation

Richard Olson, President

Richard Olson, President

Adams Resp. to Plf.'s 1st RFP
000970

10

Adams Resp. to Plf.'s 1st RFP
000971

10

INSTR # 758022
OR BK 2490 Pages 1542 - 1544
RECORDED 04/16/03 15:02:01
MARTHA INGLE, WALTON COUNTY
CLERK OF COURT
DOC STMP-D: $0.70
DEPUTY CLERK K SMITH
#10

## QUIT CLAIM DEED

THIS QUIT CLAIM DEED, made this _14th_ day of April, 2003, by NORTH TIP DEVELOPMENT, LLC, a Florida limited liability company, whose address is 1234 Airport Road, Suite 215, Destin, Florida 32541, hereinafter called "Grantor", to ADAMS HOMES OF NORTHWEST FLORIDA, INC., a Florida corporation, whose address is 1101 Gulf Breeze Parkway, Suite 229, Gulf Breeze, Florida 32561, hereinafter called "Grantee":

> *(Whenever used herein, the terms "Grantor" and "Grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations and limited liability companies.)*

WITNESSETH: That Grantor, for an in consideration of the sum of $10.00 and other valuable consideration, receipt whereof is hereby acknowledged, by these presents does hereby remise, release, and quit-claim unto Grantee forever all the right, title, interest, claim, and demand which Grantor has in and to that certain lot, piece, or parcel of land situate in Walton County, Florida, and more fully described in Exhibit "A" attached hereto and made a part hereof (the "Property").

TO HAVE AND TO HOLD the same together with all and singular the appurtenance thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, lien, equity, and claim whatsoever of Grantor, either in law or in equity, to the only proper use, benefit, and behoof of Grantee forever.

IN WITNESS WHEREOF, Grantor has caused these presents to be executed in its name, the day and year first above written.

Signed, sealed and delivered
in the presence of:

NORTH TIP DEVELOPMENT, LLC
a Florida limited liability company

By and Through its sole Member,
Olson & Associates of NW Florida, Inc.
a Florida corporation

Print Name: _Kirk H. Williams_

Print Name: _TAMRA LYNN COKONOUGHER_

By: _____
Print Name: _Richard Olson_
Its _President_
(CORPORATE SEAL)

FATCO

Adams Resp. to Plf.'s 1st RFP
000972

STATE OF FLORIDA

COUNTY OF Okaloosa

The foregoing instrument was acknowledged before me this 14TH day of April, 2003, by Richard Olson, the President of OLSON & ASSOCIATES, INC., a Florida corporation, sole member of North Tip Development, LLC, a Florida limited liability company, on behalf of the limited liability company. He ☑ is personally know to me or ☐ produced _____ as identification.

> OFFICIAL NOTARY SEAL
> TAMRA LYNN
> COKONOUGHER
> COMMISSION NUMBER
> CC881292
> MY COMMISSION EXPIRES
> NOV. 12,2003

Print Name: TAMRA LYNN COKONOUGHER

Notary Public – State of Florida

My commission expires: _____

Commission number: _____

2

Adams Resp. to Plf.'s 1st RFP
000973

EXHIBIT "A"

LEGAL DESCRIPTION

The following lots within the record Plat of Driftwood Estates as recorded in Plat Book 5 page 28 of Walton County, Florida:

Lots 1, 6, 8, 22, 26 and 27 Block H;

Lots 2, 3 and 6, Block I;

Lots 2 and 3, Block K;

Lots 1 through 8 inclusive, Block L;

Lots 1, 4, 5 and 6 Block M;

Lots 1 through 10, inclusive, and Lots 12 through 22, inclusive, Block P;

Lots 1 through 12, inclusive, Block N;

Lot 6, and Lots 8 through 29, inclusive, Block D;

Lots 4 through 11 inclusive, and Lot 13, Block E.

3

Adams Resp. to Plf.'s 1st RFP
000974

*Find your way back to Sandestin and*     *discover The Village of Baytowne Wharf.*

January 24, 2003

Rick Olson
Olson and Associates
1234 Airport Road #215
Destin, Florida 32541

Re: Driftwood – DRI Reallocation

Dear Mr. Olson,

Please find attached 2 copies of our latest DRI Land Use Survey, and the summary table attached with our proposed land use totals. **PLEASE NOTE THAT THIS INFORMATION IS HIGHLY CONFIDENTIAL, AND IN DRAFT FORM, NOT TO BE DISTRIBUTED.** This is still a work in progress, and we need to review in detail prior to submitting to the County on February 4th, 2003. We are making numerous assumptions at present to try to meet, to the best of our ability, the DRI land use requirements in order to satisfy the County and all other governmental jurisdictions.

Please note that, as per the conceptual drawing provided by Robert Lee on January 24, 2003, and the subsequent conversation between yourself, David Campbell and I, we are including into our open space the acreage that you verbally committed to providing in your subdivision of Driftwood. This committed area equates to:

- 38.3 acres of open space, (calculated as follows: 23.2 acres West of the Conservation Easement, and 17.62 acres East of the Conservation easement, less the 2.52 acre amenity/waterfront parcel already included. This space will be made up of 13 acres of lakes, and the remainder in greenbelt.)
- 23.63 acres of road ROW. (13.61 West of the Conservation Easement, and 10.02 acres to the East.)

Based on our discussions, we are currently counting on this acreage in our calculations. Please realize that any change in this acreage will greatly effect our presentation to the county. We do, however, agree that this open space provided at Driftwood will make up for the 13 additional acres of open/green space referred to in section 12 (ii) of the purchase contract for the Driftwood Land.

We have found in our efforts that current calculations have a shortfall of open/green space, even with the open space provided in the Driftwood development. We intend on presenting open space within some of the already platted subdivisions and arterial road ROW as additional green space. While these assumptions are untested, we believe that we have a strong argument for this open space to be included. We continue to work toward the target submission date of February 4th, in order to present to the County in a manner intended to expedite review for the approval of a Development Order for your proposed development at Driftwood.

Cynthia L. Abbott. et al
vs
Olson and Associates, et al
Exhibit 358

## Sandestin™
### Golf and Beach Resort

9300 Emerald Coast Parkway West ■ Sandestin, Florida 32550 ■ 850.267.8000 ■ www.sandestin.com

CONFIDENTIAL

AbbottLit000017

Thank you for you assistance in this process and we look forward to working through to a success closing as per the Sale and Purchase agreement.

Sincerely,

Ian McCook
Director of Development – Land

CONFIDENTIAL

AbbottLit000018

Case 3:16-cv-00023-RV-EMT Document 1-474-15 Filed 05/26/16 08/19/15 Page 435 of 435



# BCC take stand against resident Osborne

Suzanne Preston
2009-04-30 10:32:40



The heated debate between the Walton County Board of County Commissioners and Driftwood resident Alan Osborne came to a quick end during the April 28 regular BCC meeting.

Osborne was on the agenda to address the board.

Before he could speak, Sara Comander, commission chair, said, "You came before this board with severe allegations at the last meeting and that will not happen again. You have channels to take your concerns to, the Ethics Commission."

Comander dismissed Osborne and the meeting moved forward.

At the April 14 BCC meeting Osborne accused Commissioner Scott Brannon of unethical conduct and presented documents supporting his position to the board over the protests of board members and County Attorney Mike Burke.

At this week's meeting Comander asked the board, with Osborne standing ready to speak, to vote to hire a special master (legal arbitrator) to review Osborne's concerns.

The motion was approved by all commissioners.

As Osborne attempted to speak, Comander told him "There will be no more discussion."

When told he would not be allowed to speak, Osborne spoke directly to Comander.

"You don't want to hear what I have to say?" he asked.

"No, I don't," she replied. "We are not going to discuss this any further at this time."



Cynthia L. Abbott, et al
vs
Olson and Associates, et al
Exhibit 445

When contacted later, Osborne said his right to free speech has been violated.

"I was scheduled to speak at the BCC meeting," he said. "Comander refused to allow me to speak and that is a violation of my civil rights. What happened to freedom of speech?"

According to Comader she is well within her rights as commission chair to take items off the agenda or move them around.

"I spoke with County Attorney Mike Burke prior to doing this," she said. "I feel it's time to find a solution. That is why I recommended to the board to hire a special master to review all the issues Osborne has brought before us and find a final solution."

*Attachment A part 2*